1   Jeff D. Friedman (173886)
    HAGENS BERMAN SOBOL SHAPIRO LLP
2   715 Hearst Avenue, Suite 202
    Berkeley, CA 94710
3   Telephone: (510) 725-3000
    Facsimile: (510) 725-3001
4   jefff@hbsslaw.com

    **FILED**

    **E-filing**

    JUN - 5 2009

5
    Attorneys for Plaintiffs
6

    RICHARD W. WIEKING
    CLERK, U.S. DISTRICT COURT
    NORTHERN DISTRICT OF CALIFORNIA

7

8           UNITED STATES DISTRICT COURT

9           NORTHERN DISTRICT OF CALIFORNIA

                    CV  09   2514

10  SKILSTAF, INC., on behalf of itself and all      )
    others similarly situated,                        )
11                                                    )   **CLASS ACTION COMPLAINT**
                            Plaintiff,                )
12                                                    )   JURY TRIAL DEMANDED        **SI**
                    v.                                )
13                                                    )
    CVS CAREMARK CORP.; LONGS DRUG                    )
14  STORE CORPORATION; THE KROGER CO.;                )
    NEW ALBERTSON'S, INC.; RITE AID                   )
15  CORPORATION; SAFEWAY, INC.;                       )
    SUPERVALU, INC.; WALGREEN CO.; and                )
    WAL-MART STORES, INC.,                            )
16                                                    )
17                          Defendants.               )
                                                      )

18

19

20

21

22

23

24

25

26

27

28

    CLASS ACTION COMPLAINT-

_Fax Filing_
_by_
_JWheels of Justice_

**TABLE OF CONTENTS**

**PAGE**

I.  INTRODUCTION ........................................................................................................ 1

II.  INTRADISTRICT ASSIGNMENT ........................................................................... 8

III.  JURISDICTION AND VENUE .................................................................................. 9

IV.  PARTIES ...................................................................................................................... 9

V.  STATEMENT OF FACTS ......................................................................................... 12

    A.  An Overview of the Pharmaceutical Industry and Facts Relevant to this Action ...................................................................................................... 12

       1.  Drug manufacturers and NDCs ..................................................... 13

       2.  The Wholesale Acquisition Cost .................................................... 13

       3.  The Average Wholesale Price ......................................................... 14

       4.  The WAC-to-AWP Spread ............................................................. 15

       5.  Drug Wholesalers ........................................................................... 16

       6.  Wholesaler Sales Transactions ....................................................... 17

       7.  Retail Pharmacy Channel ............................................................... 17

       8.  End Payors for Prescription Drugs ................................................. 18

       9.  End Payors' Drug Reimbursements are AWP-Based ...................... 19

       10.  PBMs .............................................................................................. 20

       11.  The Brand Drug Pharmaceutical Market Was Conducive to the Scheme ...................................................................................... 21

       12.  End Payors Rely on Published Drug Pricing Compendia ............... 22

       13.  The Emergence of First Data and Medi-Span as Electronic Data Publishers ............................................................................. 23

       14.  The Merger of First Data and Medi-Span ...................................... 25

       15.  First Data Gains the Trust of the Pharmaceutical Industry ............ 26

       16.  The Scheme Created Goodwill for McKesson with Retail Pharmacies like Defendants ........................................................... 28

       17.  By 2001, First Data WAC-to-AWP Mark-Ups Were Susceptible to Abuse ...................................................................... 29

B. McKesson Exploited First Data's Alleged Survey Process for Its Own Purposes .......................................................................................................... 30

   1. McKesson's Public Position Was That AWPs Were Determined by Manufacturers' Historic Mark-Ups and not by McKesson ........................ 30

   2. Contrary to its Official Position, McKesson Raised its Internal Mark-Ups in an Effort to Increase AWPs ......................................................... 32

   3. McKesson Colluded with First Data and the RICO Defendants to Increase Brand Drug Mark-Ups and Inflate Reimbursements by Plaintiff and the Class to Defendants ................................................................ 36

   4. McKesson Concealed its Collaboration with First Data .................................. 48

   5. McKesson, First Data and Defendants Benefited from the Scheme ............... 50

   6. McKesson's Internal Documents Admit the Long-Term Effects of the Scheme .................................................................................................... 54

   7. Evidence from Manufacturers Also Confirms the Existence of the Scheme and the Impact on Plaintiff and Members of the Class................ 57

   8. The Other Major Wholesalers – Amerisource Bergen and Cardinal – Declined to Manipulate AWP or Participate in the Scheme ............................ 59

      a. While Cardinal and ABC Faced the Same Pressures as McKesson from Defendants to Increase Profit Margins, They Did not Join the Scheme................................................................ 59

         (1) Cardinal ................................................................................... 60

            (a) Where possible, Cardinal set its "Reference Price" based on what manufacturers told Cardinal ................ 60

            (b) Cardinal ensured that its AWP Reference Price would not be confused with FDB's AWPs.................. 60

            (c) Cardinal never responded to FDB "surveys" .............. 60

            (d) Cardinal refused to respond to Defendants' pressures to raise its mark-up ...................................... 63

         (2) Amerisource Bergen .................................................................. 63

            (a) ABC based its AWPs on manufacturer information and, when that source dried up, on FDB's AWP............................................................. 63

            (b) ABC never responded to FDB "surveys".................... 64

             (c) Despite pressures from its customers to raise its mark-ups, ABC adhered to manufacturers' historic mark-ups........................................................... 64

C. Fraudulent Concealment and Continuing Violation......................................................64

VI. CLASS ACTION ALLEGATIONS..........................................................................................68

VII. CLAIMS FOR RELIEF..........................................................................................................72

COUNT I CIVIL RICO (18 U.S.C. § 1962(c)) (On Behalf of Plaintiff and the RICO
Class Against the RICO Defendants)........................................................................................72

A. McKesson, First Data, and the RICO Defendants Formed an Association-
in-Fact RICO Enterprise; in the Alternative, Plaintiff is an Enterprise Which
was the Victim of the RICO Defendants' Racketeering Activity ................................72

B. The RICO Defendants Associated with the Enterprise ................................................74

a. Albertsons / New Albertsons / SuperValu / CVS................................78

b. Rite-Aid ..............................................................................................79

c. Longs / CVS ........................................................................................80

d. Wal-Mart ............................................................................................80

e. Safeway ..............................................................................................81

C. The Enterprise Affected Interstate Commerce ............................................................82

D. The RICO Defendants Conducted and Participated in the Affairs of the
Enterprise......................................................................................................................82

E. The Enterprise Engaged in a Pattern of Racketeering Activity, Consisting
of Mail or Wire Fraud Violations................................................................................84

1. The Enterprise Engaged in a Scheme to Defraud End Payors ........................86

2. The RICO Defendants Specifically Intended to Defraud End Payors ............86

3. The Enterprise Made Use of the U.S. Mails and Interstate
Communications in Furtherance of the Scheme................................................86

F. Plaintiff and the Class Relied on the Accuracy of the Falsely Inflated AWPs
Published by First Data or Medi-Span and Knowingly Used by the RICO
Defendants to Obtain Inflated Payments......................................................................88

G. Damages Caused by the RICO Defendants' Scheme...................................................89

H. The RICO Defendants Knew of and Adopted the Illegal Purpose of
the Enterprise................................................................................................................89

I. The RICO Defendants Knowingly Joined the Conspiracy to Participate in the
Conduct of the Affairs of the Enterprise and Did in Fact Participate in the
Enterprise By Repeatedly Submitting False Claims to End Payors.............................90

J. Damages Caused by the RICO Defendants' Scheme...................................................91

K.    The RICO Defendants are Jointly and Severally Liable for the Conduct
of the Enterprise .......................................................................................................91

COUNT II RICO CONSPIRACY (18 U.S.C. § 1962(d)) (On Behalf of Plaintiff and the
RICO Class Against the RICO Defendants) ...........................................................91

COUNT III UNJUST ENRICHMENT / MONEY HAD AND RECEIVED (On Behalf
of Plaintiff and the Class Against all Defendants) .................................................92

PRAYER FOR RELIEF ..................................................................................................................93

1   Plaintiff Skilstaf, Inc. (hereinafter "Skilstaf" or "Plaintiff"), on behalf of itself and all others

2   similarly situated, for its Class Action Complaint ("Complaint") against CVS Caremark Corp.;

3   Longs Drug Store Corporation; The Kroger Co.; Rite Aid Corp.; Safeway Inc.; SuperValu Inc.;

4   Walgreen Co.; and Wal-Mart Stores, Inc. (collectively "Defendants") alleges as follows, upon

5   information and belief and the investigation of counsel:

## I.   INTRODUCTION

7   1.      This is a proposed class action brought on behalf of self-insured employers,

8   health and welfare plans, health insurers, and other private end payors of prescription drugs

9   ("End Payors") against Defendant chain pharmacies for: (1) conspiring with unnamed

10  co-conspirators McKesson Corporation and First DataBank, Inc. to fraudulently inflate the

11  so-called wholesale acquisition cost ("WAC") to average wholesale price ("AWP") mark-up

12  factor for hundreds of brand-name prescription pharmaceuticals and to cause the submission of

13  false claims for payment for these pharmaceuticals to Plaintiff and the Class; and/or

14  (2) unjustly retaining such inflated payments made by Plaintiff and the Class.

15  2.      A certified class of end payors in a case styled *New England Carpenters Health*

16  *Benefits Fund v. First DataBank Inc.*, No. 05-11148 D. Mass.), alleged the existence of this

17  scheme and named McKesson and First DataBank as defendants. A \$350 million settlement

18  with McKesson has received preliminary approved. A settlement with First DataBank

19  including a rollback of the inflated price has received final approval.

20  3.      In a March 17, 2009 Memorandum and Order in the *New England Carpenters*

21  *Health Benefits Fund* case, the District Court found that "pharmacies … reimbursed on the

22  basis of AWP, were *unjustly enriched* when drug prices were fraudulently inflated during the

23  scheme, yet they have not been asked to disgorge their profits. None of the pharmacies

24  protested the windfalls they received when prices were unilaterally inflated by five percent."

25  *Id.* at 14 (emphasis added). Some of the pharmacies Judge Saris was referring to are now

26  defendants in this action. In addition to seeking recovery for these Defendants' knowing

27

28

CLASS ACTION COMPLAINT -                              - 1 -

1     participation in the scheme, this class action seeks recovery for all Defendants' unjust

2     enrichment as recognized by the Court.

3         4.     Plaintiff and other members of the Class reimburse Defendants for brand-name

4     prescription drugs based on a formula tied to the average wholesale price ("AWP"). Although

5     Defendants get paid on the basis of AWP, they purchase drugs from wholesalers on the basis of

6     the published wholesale acquisition cost ("WAC"). WAC is a benchmark price generally set by

7     manufacturers and used by wholesalers to set prices to retail pharmacies like Defendants.

8         5.     The difference between WAC and AWP is known in the pharmaceutical industry

9     as the "spread" or "mark-up." Thus, when the spread or mark-up factor between WAC and AWP

10     increases, retail pharmacies and other industry participants like pharmaceutical benefit managers

11     ("Benefit Managers") have the opportunity to earn larger profits.

12         6.     Unnamed co-conspirator First DataBank, Inc. ("First Data") is the nation's largest

13     electronic publisher of AWPs. During the relevant period, Plaintiff and other members of the

14     Class, or their respective agents, had contracts that utilized First Data's data to determine the

15     appropriate AWP for any given drug and thereby reimburse Defendants and other providers of

16     prescription drugs according to that data.

17         7.     Unnamed co-conspirator McKesson Corporation ("McKesson") is the nation's

18     largest drug wholesaler, distributing approximately 30% of all pharmaceuticals in the United

19     States. In its 2008 fiscal year, McKesson enjoyed revenues of over $100 billion and gross profit

20     of over $5 Billion.

21         8.     Starting in late 2001, First Data, McKesson, and the "RICO Defendants" (CVS,

22     Longs, New Albertsons, Rite-Aid, Safeway, Supervalu, and Wal-Mart) engaged in a fraudulent

23     and anticompetitive scheme to inflate the AWP or mark-up for hundreds of brand-name drugs.

24     The harmful effects of this scheme continue to the present. Specifically, although First Data

25     represented to the pharmaceutical industry that its WAC and AWP data came from manufacturers

26     or from conducting surveys of wholesalers which were undertaken to confirm the prices reported

27     by manufacturers, First Data in fact agreed with McKesson to fraudulently inflate the mark-ups

28     for hundreds of brand-name drugs by five percentage points.

CLASS ACTION COMPLAINT -     - 2 -

1  9.  Thus, rather than undertaking the promised surveys or publishing the AWP prices

2  reported by the manufacturers, First Data and McKesson raised the WAC-to-AWP mark-up to

3  25% for hundreds of brand-name drugs that had previously had a 20% mark-up.

4  10.  Prior to the introduction of the scheme, the WAC-to-AWP spread for any particular

5  manufacturer had predictable patterns and tended to be either 20% or 25%. In other words,

6  manufacturers were generally known as "20%" or "25%" companies because they tended to utilize

7  one of these two mark-ups. In addition, once a particular National Drug Code ("Drug Code") came

8  to market with a mark-up, this mark-up generally stayed with the Drug Code for the life of the

9  drug. A Drug Code is a unique number assigned to each drug by the United States Food and Drug

10  Administration.

11  11.  The RICO Defendants, McKesson and its officers or employees, and First Data and

12  its officers and employees associated themselves to form a RICO association-in-fact and engage in

13  a pattern of racketeering activity including multiple episodes of mail and wire fraud, all designed to

14  increase the AWP for brand-name drugs so that Plaintiff and other members of the class overpaid

15  Defendants. The RICO Defendants and their co-conspirators engaged in numerous overt and

16  predicate fraudulent racketeering acts in furtherance of the conspiracy to violate RICO. Plaintiff

17  was injured as a result of the deceptive practices undertaken by the RICO association-in-fact and

18  seeks to obtain treble damages and other relief against the RICO Defendants for payments made

19  for prescriptions of affected brand-name drugs.

20  12.  The RICO Defendants deceptive practices and unlawful acts involved a scheme and

21  course of conduct that directly resulted in the transmission and submission of false and misleading

22  claims for payment for affected brand-name drugs to Plaintiff and other members of the Class (the

23  "Scheme"). These deceptions resulted in injuries to Plaintiff and the Class, which were and will

24  continue to be forced to bear millions of dollars of excess charges arising from the Scheme and the

25  fraudulent AWPs.

26  13.  The exact identity of the drugs covered by this lawsuit is capable of being

27  discovered from the records of First Data. Based on an investigation of publicly available

28  documents, the list of such drugs is attached as Exhibit A (the "Marked Up Drugs").

CLASS ACTION COMPLAINT -                                  - 3 -

1    14.    Each year more than three billion prescriptions are written in the United States. The

2    various actors in the marketplace must have a way of determining what the AWP is at any moment

3    in time for the approximate 65,000 drugs used in the marketplace. AWPs are, therefore, compiled

4    and published by publishing companies, including First Data and Medi-Span. Through these

5    compilations, which are available in both hard copy and electronic form, those in the distribution

6    chain can determine the AWP for any given drug and effectuate reimbursement accordingly.

7    15.    Consumers, health and welfare plans, health insurers and governmental entities,

8    including state Medicaid programs and other governmental entities ("Payors"), who pay for

9    prescription drugs use and rely on AWP in doing so. Virtually all these entities had contracts for

10    the brand-name drugs at issue that use AWP as a pricing standard.

11    16.    Defendants, First Data, McKesson, and pharmaceutical companies know that Payors

12    utilize AWP as a pricing benchmark.

13    17.    Until March 15, 2005, First Data represented to those in the pharmaceutical market

14    that it derived the WAC mark-up that establishes the AWP either from manufacturers or by

15    conducting "a survey" of wholesalers whose purpose was to verify prices reported by the

16    manufacturer. First Data further represented that AWP represents the "average of prices charged

17    by the national drug wholesalers," and that the number of surveys it was conducting to determine

18    the published AWP was "increasing." McKesson is one of the wholesalers that was purportedly

19    "surveyed" by First Data as part of this process.

20    18.    Historically, in order to arrive at the AWP for branded drugs, manufacturers applied

21    a mark-up of 20% or 25% to WAC. Whatever mark-up was given to a particular branded drug

22    "stuck" with that drug indefinitely. Until 2002, there was variation, supposedly based on

23    manufacturer direction or on First Data's wholesale surveys, in the WAC to AWP mark-up for

24    hundreds of brand-name drugs. For example, manufacturer A might have a mark-up of 20%, while

25    manufacturer B might utilize a mark-up of 25%.

26    19.    In late 2001, First Data and McKesson reached a secret agreement on how the WAC

27    to AWP mark-up would be established for hundreds of brand-name drugs. The two companies

28    agreed to artificially raise and fix the AWP on brand-name drugs and therefore artificially raise

CLASS ACTION COMPLAINT -                            - 4 -

1    prices in that market. As part of this agreement, First Data, to the extent it received information

2    from others besides McKesson, used the WAC-to-AWP mark-up provided only by McKesson as

3    the basis for its published AWP and did not "survey" any other wholesalers. To the extent FDB

4    did receive material from other wholesalers, such material was not the basis for the FDB-published

5    AWP, only McKesson's information was. McKesson knew that FDB was using its pricing as the

6    basis for setting the mark-up over WAC. Sometimes, within a day or less of requesting a price

7    change or mark-up from McKesson, FDB responded by increasing the mark-up.

8        20.    As part of their agreement and conspiracy, McKesson and First Data, without any

9    legitimate economic justification, raised the WAC-to-AWP mark-up to 25% for over four hundred

10   brand-name drugs that previously had received only the 20% mark-up amount. To conceal the

11   Scheme, McKesson and First Data agreed to typically effectuate price changes only when some

12   other WAC-based price announcement was made by a drug manufacturer. This camouflaged both

13   the associated increase in the WAC-to-AWP mark-up and WAC-to-AWP spread and McKesson as

14   the source of the increased mark-up. McKesson communicated these new WAC-to-AWP mark-

15   ups to First Data. First Data, without regard to any change in the actual average wholesale prices

16   occurring in the pharmaceutical marketplace, and without reference to the manufacturers'

17   suggested AWPs (or WACs) for these drugs, and without surveying other wholesalers, then

18   published new AWPs with the new WAC-to-AWP mark-up. First Data did so despite receipt of

19   information, in some instances, directly from manufacturers specifying or suggesting a 20% mark-

20   up as appropriate. On some occasions, some of the manufacturers discretely questioned this

21   increase, but First Data refused to change the published AWP and the manufacturers failed to take

22   any action to remedy First Data's unjustified raise in AWP.

23       21.    The dramatic nature of the Spread Scheme is illustrated by the following chart

24   depicting the hundreds of drugs whose WAC-to-AWP mark-up was raised as part of the Scheme.

25   The spike in 2002 reflects implementation of the Spread Scheme:

26

27

28

CLASS ACTION COMPLAINT -    - 5 -



**Number of NDCs with Spread Change from 20% to 25%, Jan 1999 - Oct 2004**



**Note**: "NDC" means National Drug Code and refers to a number assigned to each drug.

22.     Once McKesson and First Data raised the WAC-to-AWP mark-up to 25% on a given drug, that mark-up remained in place and still remains in place to this day, and thus continues to injure those entities that rely on AWP as a pricing standard.

23.     McKesson had an economic incentive for implementing the Scheme and the RICO Defendants had an incentive to join and further progress and effectuate the Scheme. A major part of McKesson's business comes from large pharmaceutical retail chains like Defendants and other retail pharmaceutical clients. McKesson implemented this Scheme in order to provide a benefit to those important retail pharmacy clients. Pharmacies like Defendants are reimbursed by Plaintiff and members of the Class based on AWP. Consequently, Defendants make a profit on the spread between AWP and their acquisition cost for a drug. Under this system, a higher WAC-to-AWP mark-up results in increased profits to pharmacies. Thus, an unlawful increase in the WAC-to-AWP mark-up unjustly enriches Defendants through larger profits.

CLASS ACTION COMPLAINT -                                    - 6 -

1    24.    McKesson was proud of its efforts and discretely boasted to select retail clients that

2    McKesson "had been working on AWP expansion with some success."[1] Internally McKesson

3    noted that clients were "very glad that McKesson was doing this."[2] Confirming the secrecy of the

4    Scheme, McKesson cautioned that its "AWP expansion effort" and information about McKesson's

5    role in inflating AWP is "not intended to be handed out to customers" but could be described to

6    show "McKesson is doing our part."[3] "AWP expansion" was a McKesson euphemism for the

7    WAC-to-AWP price fix.

8    25.    First Data agreed to this Scheme to ease the burden of having to establish accurate

9    spreads and to maintain the demand for its business among entities in the pharmaceutical

10   distribution chain whose reimbursement is based on AWP, even though First Data knew that it no

11   longer had the industry contacts and cooperation necessary to ensure the publication of accurate

12   pricing. Thus, First Data and McKesson shared multiple common purposes, though they may have

13   had different reasons for doing so, and each acted to achieve those purposes by implementation of

14   the 5% Scheme.

15   26.    During the Class Period, Plaintiff's payments for pharmaceuticals to Defendants

16   were tied to published AWPs by First Data.

17   27.    As a result of this artificial increase in the mark-up of the WAC from 20% to 25%,

18   Plaintiff's drug prices were increased and Defendants unjustly received these inflated payments.

19   28.    Among the drugs whose prices are artificially inflated by the Scheme are some of

20   the top brand-name drugs used by hundreds of millions of Americans, such as: Allegra (a leading

21   allergy drug), Azmacort (a leading asthma drug), Celebrex (a leading arthritis/pain medicine),

22   Coumadin (a leading anticoagulant), Flonase (a leading asthma drug), Lipitor (the world's top

23   selling drug, a statin), Neurontin (a leading pain medication), Nexium (a leading reflux drug),

24   Prevacid (a leading ulcer/reflux drug) and Valium. Given the billions of dollars spent on

25   prescription drugs annually, a 5% increase in the WAC-to-AWP mark-up results in a substantial

26   ───────────────
     [1] MCKAWP 0069726.

27   [2] MCKAWP 0069726.

28   [3] MCKAWP 0069732.

     CLASS ACTION COMPLAINT -                                -7-

increase in payments for pharmaceuticals. For example, AstraZeneca's Nexium had annual sales in 2004 of almost \$4 billion. A bump of 5% in the WAC-to-AWP mark-up results in an increase of over \$100 million per year in reimbursements for just one drug. Another such drug is Pfizer's Lipitor, whose annual sales in 2004 exceeded \$10 billion. As a result of the 5% increase imposed by First Data and McKesson, hundreds of millions per year was spent on Lipitor that would not have been absent the Scheme.

29.     As further set forth below, the RICO Defendants directly assisted in the Scheme and conspiracy by submitted fraudulently inflated prescription drug claims to Plaintiff and members of the Class (and accepting inflated payments for these drugs), despite having direct knowledge of the Scheme. But for the RICO Defendants' knowing presentation of false claims to Plaintiff and other members of the Class, the Scheme could not have been effectuated and/or continued.

30.     However, regardless of their knowledge of the scheme, all Defendants were unjustly enriched from Plaintiff and members of the Class in the form of overpayments for hundreds of brand-name prescription drugs.

31.     The fraudulent mark-ups resulting from the Rico Defendants' Scheme remain in effect and continue to injure End Payors like Plaintiff and other members of the Class that utilize AWP as a pricing standard.

32.     This action is brought to recover Plaintiff and the Class's damages against the RICO Defendants and for restitution against all Defendants. On behalf of itself and the Classes fully defined below, Plaintiff asserts claims for violations of the federal racketeering laws, 18 U.S.C. § 1962(c)-(d) and the common law of unjust enrichment against all Defendants.

## II.     INTRADISTRICT ASSIGNMENT

33.     A substantial part of the events and omissions which give rise to this claim occurred in San Francisco and Napa.

34.     Assignment to the San Francisco or Oakland division of this Court is appropriate because this action arises out of conduct occurring in the counties of San Francisco and San Bruno.

CLASS ACTION COMPLAINT -                          - 8 -

1    Pursuant to Northern District of California, Local Rule 3-2(d), assignment to either the San

2    Francisco Division or the Oakland Division is proper.

3                          **III.    JURISDICTION AND VENUE**

4          35.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal

5    question) and 18 U.S.C. § 1964 because certain claims in this action arise under the Racketeering

6    Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, *et seq*. Subject matter jurisdiction

7    over the state law claims is proper in this Court pursuant to 28 U.S.C. § 1367(a) because such

8    claims are so related to the claims in this action within the Court's original jurisdiction that they

9    form part of the same case or controversy under Article III of the United States Constitution.

10         36.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332

11    (diversity) because members of the proposed nationwide Class are citizens of states different from

12    Defendants' citizenship, and aggregate amount in controversy exceeds $5,000,000, exclusive of

13    interest and costs.

14         37.     The activities of Defendants were within the flow of, were intended to, and did have

15    a substantial effect on interstate commerce of the United States. Venue, therefore, lies within this

16    District under 28 U.S.C. § 1391.

17         38.     Venue is thus also proper under RICO's special venue provision, 18 U.S.C. § 1965,

18    as Defendants transact business in the State of California.

19         39.     This Court has personal jurisdiction over the parties because Plaintiff submits

20    to the jurisdiction of the Court, and because Defendants transact business in California and

21    systematically and continually conduct business throughout California.

22                           **IV.    PARTIES**

23         40.     Plaintiff Skilstaf, Inc. is an Alabama corporation with its principal place of

24    business in Alexander City, Alabama. Skilstaf provides prescription drug benefits through a

25    self-insured health plan for its employees and their dependents and, upon information and

26    belief, paid Defendants for Marked-Up Drugs at prices based on First Data and/or Medispan

27    AWPs during the Class Period. Accordingly, SkilStaf was injured by the RICO Defendants'

28

1    participation in the Scheme and/or all Defendants' unjust enrichment through the retention of

2    inflated payments made by Plaintiff and the Classes for Marked Up Drugs.

3         41.    Defendant CVS Caremark Corporation ("CVS") is a corporation organized and

4    existing under the laws of the State of Delaware with its principal place of business in

5    Woonsocket, Rhode Island. CVS is one of the largest pharmacy chains in the United States

6    with over 6,200 retail pharmacy stores across the country. In 2008, CVS acquired Longs Drug

7    Stores Corp. and, upon information and belief, is liable for Longs' participation as a co-

8    conspirator in the Scheme described herein. Thus, all references to Longs in this Complaint

9    also apply to CVS. CVS operates dozens of stores in the State of California. In 2008, CVS

10   acquired certain drug stores owned by Albertsons, Inc. and, upon information and belief, is

11   liable for Albertsons' participation as a co-conspirator in the Scheme described herein.

12   According to SEC filings, CVS purchased substantially all of the assets and assumed specified

13   liabilities of Albertsons' stand-alone drug store business. CVS is also liable for its own unjust

14   enrichment.

15        42.    Defendant Longs Drug Store Corporation ("Longs") is a corporation organized

16   and existing under the laws of the State of Maryland with its principal place of business in

17   Walnut Creek, California. Longs is a wholly owned d subsidiary of Defendant CVS.

18        43.    Defendant The Kroger Co. ("Kroger") is a corporation organized and existing

19   under the laws of the State of Ohio with its principal place of business in Cincinnati, Ohio.

20   Kroger is one of the nation's largest grocery and pharmaceutical retailers with over 2,400

21   stores in thirty-one States. Kroger transacts business in California, including but not limited to

22   through its divisions: Food4Less Foods Co., Fred Meyers and Ralphs.

23        44.    Defendant New Albertson's, Inc. ("New Albertsons") is a corporation organized

24   and existing under the laws of the State of Delaware, with its principal place of business at

25   Boise, Idaho. New Albertsons is a wholly owned subsidiary of Defendant SuperValu Inc.

26   According to SEC filings, New Albertsons and its other subsidiaries hold substantially all of

27   the assets and liabilities of Albertsons, Inc. for its core business, which included pharmacy

28   sales, during the time period at issue. Thus, upon information and belief, New Albertsons is

CLASS ACTION COMPLAINT -                           - 10 -

1    liable for Albertsons' participation as a co-conspirator in the Scheme described herein. Thus,

2    all references to Albertsons in this Complaint also apply to New Albertsons and Supervalu, the

3    ultimate purchaser of Albertsons' assets and liabilities. New Albertsons is also liable for its

4    own unjust enrichment.

5         45.    Defendant Rite Aid Corporation ("Rite Aid") is a corporation organized and

6    existing under the laws of the State of Delaware, with its principal place of business at 30

7    Hunter Lane, Camp Hill, Pennsylvania 17011. Rite Aid and its affiliates own and operate

8    approximately 5,000 drugstores in 31 states and the District of Columbia, including in this

9    District.

10        46.    Defendant Safeway Inc. ("Safeway") is a corporation organized and existing

11   under the laws of the State of Delaware with its principal place of business in Pleasanton,

12   California. Safeway is one of the largest grocery and pharmaceutical retailers in the United

13   States with over 1,700 stores throughout the United States, including this district.

14        47.    Defendant SuperValu Inc. ("SuperValu") is a corporation organized and existing

15   under the laws of the State of Delaware with its principal place of business in Eden Prairie,

16   Minnesota. SuperValu is one of the largest grocery and pharmaceutical retailers in the United

17   States with over 2,500 stores throughout the United States. In 2006, SuperValu acquired 1,124

18   Albertsons stores as part of its purchase of New Albertson's, Inc. and, upon information and

19   belief, is liable for Albertsons' participation as a co-conspirator in the Scheme described

20   herein. SuperValu is also liable for its own unjust enrichment.

21        48.    Defendant Walgreen Co. ("Walgreen") is a corporation organized and existing

22   under the laws of the State of Illinois with its principal place of business in Deerfield, Illinois.

23   Walgreen is one of the nation's largest pharmacy chains with over 6,400 stores in every State

24   and the District of Columbia.

25        49.    Defendant Wal-Mart Stores, Inc. ("Wal-Mart") is a corporation organized and

26   existing under the laws of the State of Delaware with its principal place of business in

27   Bentonville, Arkansas. Wal-Mart is one of the nation's largest grocery and pharmaceutical

28   retailers with over 7,000 stores throughout the United States.

CLASS ACTION COMPLAINT -                          - 11 -

1    50.    Unnamed co-conspirator McKesson is a Delaware corporation with its principal

2    place of business at McKesson Plaza, One Post Street, San Francisco, California 94101.

3    McKesson is the leading provider of supply, information and care management products and

4    services designed to reduce costs and improve quality across healthcare. Founded in 1833,

5    McKesson has annual revenues of over $100 billion and is number 18 on the 2007 Fortune 500

6    ranking of America's largest companies.

7    51.    Unnamed co-conspirator First Data is a Missouri corporation with its principal

8    place of business at 1111 Bayhill Drive, San Bruno, California 94066. First Data is a

9    subsidiary of the Hearst Corporation and is the leading provider of electronic drug

10   information to the healthcare industry. For the period of 1998 through about January 2002,

11   the Hearst Corporation owned First Data and Medi-Span, First Data's only competitor in the

12   electronic drug pricing market. As part of a divestiture agreement with the Federal Trade

13   Commission ("FTC"), First Data provided its drug price information to Medi-Span until

14   approximately October 2004.

15                                   **V.    STATEMENT OF FACTS**

16   **A.    An Overview of the Pharmaceutical Industry and Facts Relevant to this Action**

17   52.    This case involves the artificial increase in the "mark-up" factor between the

18   so-called wholesale acquisition cost (or "WAC") and the so-called average wholesale price (or

19   "AWP") of a large number of brand-name prescription drugs, a scheme first implemented in late

20   2001 by McKesson (the largest U.S. pharmaceutical wholesaler) and First Data (the nation's most

21   widely used and "trusted" electronic drug data publisher). As discussed below, the RICO

22   Defendants jointed McKesson and First Data in the Scheme and knowingly submitted false claims

23   to Plaintiff and members of the Class in order to receive inflated payments for affected drugs.

24   Moreover, regardless of their knowledge of the scheme, all Defendants unjustly received inflated

25   payments from Plaintiff and members of the Class as a result of the Scheme.

26

27

28

CLASS ACTION COMPLAINT -                        - 12 -

### 1. Drug manufacturers and NDCs

53.     Drug makers manufacture brand-name and generic drugs. Generally, a drug product that is covered by a patent and thus is manufactured and sold exclusively by one firm is a brand-name drug. After the patent expires, multiple companies can produce the same drug product in the same manner, but the name of the brand-name drug itself remains with the original manufacturer. Drug products not covered by patent protection and produced and/or distributed by many firms are referred to as generic drugs. Manufacturers tend to be either brand-name drug manufacturers or generic drug manufacturers, although some manufacture both types of drugs.

54.     There are approximately 65,000 branded and generic drug products in the United States market, including different dosages of the same drug. Prescription drugs are dispensed to patients primarily through four different drug distribution channels: (a) retail pharmacies (including national chain pharmacies, independent pharmacies, supermarket chains, and mail order pharmacies); (b) physicians who administer the drug in an office; (c) home infusion (*i.e.*, drugs administered into the patient's bloodstream); and (d) other medical providers. This lawsuit primarily involves branded drugs distributed through the first channel, the retail pharmacies.

55.     All drugs intended for retail pharmacy sale are identified by an eleven-digit National Drug Code ("NDC") that is listed with the United States Food and Drug Administration ("FDA"). The NDC is used to identify the drug delivered to the patient. The first five digits of the NDC show the identity of the company that manufactured and/or packaged the drug, the middle four digits identify the drug ingredient and dosage, and the last two digits identify the package size (*e.g.*, whether the bottle of pills contained 100 or 1,000 pills). While there are currently about 65,000 active NDCs, many more NDCs have been issued over time (over the years many drugs and associated NDCs have been phased out).

### 2. The Wholesale Acquisition Cost

56.     Branded manufacturers arrive at an original launch price by taking into account research and development costs, launch and marketing costs, competitor prices and estimates of consumer and physician demand. Generic makers, of course, generally use commodity pricing

CLASS ACTION COMPLAINT -                    - 13 -

1    approaches. Once an introductory price has been set, the branded manufacturer establishes the

2    wholesale acquisition cost, or "WAC," which is used as a baseline for sales to wholesalers (subject

3    to many adjustments, as will be seen). The WAC for branded drugs is then published by the

4    manufacturer.

5    57.    Manufacturers establish the WAC as a baseline for sales to wholesalers and others

6    in the distribution chain. Thus, while WAC may not represent *actual* acquisition cost (as

7    wholesalers may obtain discounts through volume purchases or special deals, and as wholesalers'

8    customers who also buy based on WAC may receive other price concessions charged back to the

9    manufacturers), it is the baseline for branded drug sales by manufacturers to national wholesalers.

10   In addition, WAC is a publicly available price for most branded drugs. It is the closest reported

11   price to the actual transaction price between a manufacturer and the wholesaler or other direct

12   purchaser of a drug product. Because the wholesalers' price to the retail class of trade is also

13   typically based on, or is a function of, the WAC, a change in WAC generally results in a similar

14   percent change in price to both wholesalers and to retail pharmacies.

15   58.    WACs are typically reported on invoices between the manufacturer and the drug

16   wholesaler (and between the wholesaler and the retailer, or between the manufacturer direct to the

17   retailer). Some drug manufacturers have other names for the WAC price such as manufacturer list

18   price, catalog price, direct price, wholesale net price, or book price.

19       **3.    The Average Wholesale Price**

20   59.    In addition to causing to be published a wholesale acquisition cost or WAC for

21   branded drugs, over the years branded (and generic) manufacturers have also caused to be

22   published an average wholesale price (or "AWP") for prescription pharmaceuticals. The average

23   wholesale price or AWP is a list price used for invoices between drug wholesalers and pharmacies

24   (or other appropriate drug dispensers, such as doctors for physician-administered drugs) and is

25   typically used as a benchmark for the reimbursement by end payors to dispensers (such as retail

26   pharmacies or doctors) for drugs provided to patients. Historically, the AWP is set directly or

27

28

CLASS ACTION COMPLAINT -                           - 14 -

indirectly by the drug manufacturer, with an effective date and remains in effect until a change in price is published.

60. WAC and AWP differ in that they represent list prices at different levels in the market. WAC represents a list price from manufacturer to wholesaler, while AWP represents a list price from wholesaler to dispenser (*e.g.*, pharmacy, physician, hospital, or other provider).

### 4. The WAC-to-AWP Spread

61. In the pharmaceutical industry, the percentage by which the AWP exceeds the WAC is sometimes known as the "mark-up" for a particular drug product.

62. The amount of the AWP that represents the mark-up is known as the "spread." For example, a drug with a 24% mark-up (for instance from a WAC of $100 to an AWP of $125) has a spread ($25 of the $125 AWP) of 20%.

63. For many years preceding the Scheme alleged in this Complaint, the WAC-to-AWP mark-up for branded drugs had predictably-set patterns, and the competitive pricing marketplace for pharmaceuticals had adjusted and accommodated for those patterns. For branded pharmaceuticals, the WAC/AWP mark-up tended to fall in two quantum places: 20%, and 25%. In other words, in the many years preceding the Scheme alleged in this case, a particular branded drug NDC would carry both a published WAC (*e.g.*, $100 for a 100 count bottle) and a published AWP at either 1.20 or 1.25 of the WAC (*e.g.*, $120 or $125).

64. These standard 20% and 25% WAC/AWP mark-up factors were commonly associated by McKesson, First Data, and others in the pharmaceutical industry with particular divisions of pharmaceutical companies. For example, a pharmaceutical division might be designated as a "20% mark-up" company, while another company would be designated as a "25% mark-up" company.

65. Another predictable aspect of brand drug prices over the years was the ***unchanging*** nature of the WAC/AWP mark-up for a particular NDC. In other words, if a particular NDC first launched at a 20% mark-up value, that NDC would remain as a 20% drug during the lifetime of that NDC, almost as if it were part of the genetic code for that NDC. Thus, the WAC and AWP for

CLASS ACTION COMPLAINT - -15-

that drug moved in parallel fashion (usually up), keeping the same mark-up factor associated with that NDC. *Indeed, prior to the Scheme alleged in this case, it was extraordinarily rare for the WAC/AWP mark-up to be changed for any particular NDC.*

**5. Drug Wholesalers**

66. Branded manufacturers' primary customers are wholesalers, although to a much broader extent, manufacturers also sell directly to retail pharmacy chains, mail-order pharmacies, hospital chains and some health plans. Wholesalers are manufacturers' largest group of purchasers, and wholesale prices depend partially on volume purchased.

67. Like most other types of wholesalers, pharmaceutical wholesalers purchase goods from manufacturers and then resell them to other purchasers. Wholesalers, whose main customers are retail and mail-order pharmacies, buy pharmaceuticals in large quantities, sort them by customer needs and disperse them in usable quantities.

68. The price wholesalers pay to manufacturers for any given product at any given time can fluctuate with the quantity purchased. The manufacturer may quote a wholesaler a price close to or at WAC, however, there is often a small volume discount or early cash payment discount off that price.

69. National wholesalers are the primary intermediate level in the distribution process retail channel. They account for 45.7% of prescription drugs ($98.5 billion) in 2002. Other intermediate channels of distribution include chain warehouses with 32.3% ($69.8 billion) of the market, regional and specialty wholesalers with 9.3% ($20.2 billion) of the market, and group purchasing organizations that usually contract with a wholesaler to perform the distribution function on their behalf. Only about 12% of prescription sales by drug manufacturers are made directly to providers (*e.g.*, physicians or hospitals) or pharmacies.

70. Wholesale drug distribution is heavily concentrated. The three largest wholesalers are Defendant McKesson, Cardinal Health, Inc. ("Cardinal") and AmeriSource Bergen Corporation ("ABC"). Each of these "Big Three" wholesalers has slightly less than one-third of the national

CLASS ACTION COMPLAINT - -16-

1  market of prescription drug wholesale distribution. Collectively, they account for more than 80%

2  of drug sales that flow through drug wholesalers (national, regional, and specialty).

3  **6.     Wholesaler Sales Transactions**

4  71.    National drug wholesaling is generally perceived as price competitive, with

5  McKesson, Cardinal and ABC (or their predecessors) competing for business with retailers

6  (primarily major chain drug retailers, independent pharmacies, supermarket drug retailers, and mail

7  order businesses). As a result, drug wholesaler margins to retailers tend to be thin (even at times

8  non-existent), with a significant portion of national drug wholesaler revenue instead being derived

9  from prompt pay discounts received from manufacturers and from wholesaler inventorying

10  measures that anticipate price increases.

11  72.    National drug wholesalers sell branded drugs to the retail class of trade based on

12  prices pegged to the WAC. Given the tendency for narrow margins in the national drug

13  wholesaling business, the published WAC for a manufacturer's retail-channel branded drug is not

14  only a strong market indicator for the wholesaler's buy-side cost for a branded drug, it is also

15  expected that the WAC, subject to certain adjustments, is a reasonable benchmark of the sell-side

16  costs charged by national wholesalers of branded drugs to major pharmacy retailers.

17  **7.     Retail Pharmacy Channel**

18  73.    The retail pharmacy channel (including chain drug store companies like Defendants,

19  independent pharmacies, mail orders and supermarkets), comprise roughly two-thirds of the

20  estimated market share of dollars for prescription drugs. Currently, Defendants account for most of

21  the retail pharmacy market share today, and the recent consolidation trend appears to be

22  continuing. Some large national or regional retail chains (including pharmacy, supermarket, mass-

23  merchandiser chains) purchase drugs in large enough volumes so that they can bypass the

24  wholesaler and buy directly from the manufacturer, but these direct purchases remain a small

25  portion of the overall picture.

26  74.    Regardless of whether the retail pharmacy is large or small, its purchase of

27  prescription drugs is typically based using WAC as a benchmark, although that benchmark is

28  CLASS ACTION COMPLAINT -                              - 17 -

subject to adjustments such as a variety of discounts, rebates, and direct or indirect offsets to pricing.

75. When large chain pharmacies buy directly from manufacturers, manufacturers offer these pharmacies both up-front discounts for purchasing their products and back-end discounts and formulary rebates for selling specific volumes of drugs or achieving a certain share of a specified market. When purchasing drugs directly from manufacturers, pricing uses the same WAC benchmark system, but the actual transaction cost varies considerably from the WAC given these other arrangements.

76. Smaller retail entities, such as independent retail pharmacies and regional retail chains, purchase directly from wholesalers or joint group purchasing organizations ("GPOs") in order to leverage their combined purchasing power. Some of these groups further reduce their costs through direct rebate deals offered by manufacturers. In making purchases from wholesalers, resellers and manufacturers, the starting benchmark for transactions is the WAC, but, again, the actual transaction cost is highly variable due to the additional arrangements.

77. In short, entities in the retail distribution chain (including wholesalers, resellers (retailers), retail chain pharmacies, independent pharmacies, mail order houses, and GPOs) purchase brand-name drugs based upon WAC. While the actual transaction purchase price varies from the WAC, WAC acts as the actual baseline for the many millions of transactions by which entities in the retail distribution chain acquire branded drugs.

**8. End Payors for Prescription Drugs**

78. At the most basic level, prescription drug expenditures are funded by either private or public sources. In the United States, more than $200 billion dollars is spent annually on prescription drugs. About three quarters of this amount is privately funded.

79. Private payors for prescription drugs include drug benefit plan sponsors and consumers. The drug benefit plan sponsors (who pay for part or all of the cost of prescription drugs for their covered beneficiaries) include self-insured employers, health and welfare plans, health insurers and managed care organizations ("MCOs"). Most of these plan sponsors reimburse

CLASS ACTION COMPLAINT - -18-

retailers (for retailers' drug purchase costs) through pharmacy benefit administrators (either health plans or pharmacy benefit management companies) who negotiate discounts with retail pharmacies and rebates from drug manufacturers. The vast majority of such purchases are for out-patient drugs that are self-administered, *i.e.*, drugs distributed through the retail distribution channel.

### 9. End Payors' Drug Reimbursements are AWP-Based

80. Although retail pharmacies *purchase* pharmaceutical products based upon pricing formulae that employ the WAC, retail pharmacies *get paid* (*i.e.*, receive reimbursement) from plan sponsors and consumers based upon an AWP reimbursement formula plus a dispensing fee. This is a fundamental anomaly of the retail distribution channel for drug products – that retail pharmacies' *purchases* are based on prices pegged to the published WAC, but retail pharmacies' *reimbursements* or charges are based on the published AWP.

81. Health plans typically contract with intermediaries called pharmacy benefit managers ("PBMs") to negotiate prices with manufacturers and retail pharmacies and thereafter adjudicate the numerous transactions that occur during the administration of a plan. Although the PBM negotiates prices and adjudicates claims, the plan sponsor (*i.e.*, insurer, self-insured employee, health and welfare plan) remains at risk for the charges paid to retail pharmacies and mail orders. In the contracts between PBMs and plan sponsors, the retail pharmacies' drug ingredient costs for brand-name drugs are reimbursed at the AWP less a certain percentage, or "discount."

82. Brand drug reimbursement for retail pharmacy ingredient cost contained in the contracts between PBMs and plan sponsors, and PBMs to pharmacies, use an AWP-based reimbursement structure. For example, since 2002, Express Scripts' standard form contract has expressly stated that its reimbursement formula is based on AWP from the "current information provided to ESI by drug pricing services such as First Data Bank. . . ." Similarly, Caremark's website states: "For both brand and generic drugs, the pricing formula at retail and mail is based on the discounted Average Wholesale Price (AWP) as reported by First Data. Caremark loads First

CLASS ACTION COMPLAINT -                                    -19-

1  Data's updated data into the system on a daily basis." Other PBMs expressly utilize First Data's

2  published AWPs as the source of AWP pricing to be utilized in payment.

3  83.  The AWP-based reimbursement benchmark for private payments to the retail class

4  of pharmaceutical trade has long been acknowledged. Most recently, at a hearing on December 7,

5  2004, before the United States House of Representatives Committee on Energy and Commerce, a

6  former Senior Vice President of Aventis Pharmaceuticals, testified that "AWP has been codified as

7  the benchmark price, by statute and regulations, in the public sector and by contract in the private

8  sector." Those paying for drugs, by statute or contract rely on and use the published AWP.

9  84.  Third-Party AWP-based reimbursement has also been acknowledged by McKesson.

10  For example, in September 2001, Robert James of McKesson internally noted that "I think it is

11  important to understand that the AWPs that are used for third party reimbursement are the First

12  Data Bank ("FDB") AWPs."[4]

13  85.  In summary, thousands of pharmaceutical reimbursement contracts are based on

14  AWP minus a specified discount. As a result, a leading expert on pharmaceutical pricing has

15  concluded that "AWP is the glue that binds the system of pharmaceutical reimbursement rates. All

16  or predominantly all, reimbursement rates for pharmaceuticals purchased under public sector and

17  private drug benefit insurance plans are negotiated based upon AWP and discounts from AWP."

18  Public and private payor reliance on AWP was well known to McKesson.

19  **10.  PBMs**

20  86.  Third-Party Payors ("TPPs") do not typically look at AWP-WAC but look instead to

21  overall price trends. This is because most TPPs do not negotiate directly with retail pharmacies to

22  set their rate of reimbursement, but contract with Pharmacy Benefits Managers ("PBMs"), who act

23  as the middlemen between TPPs and pharmacies. But PBMs make very little money processing

24  TPP claims and look to other sources for generating revenue. For example, in its 2005 Annual

25  Report, Express Scripts, Inc. reported that it received 35% of its revenue from mail order

28  [4] MCKAWP 0068514.

CLASS ACTION COMPLAINT -                               - 20 -

operations compared to 1% from services offered to TPPs.[5] Similarly, in its 2005 Annual Report,

Medco identified client services as less than 1% of its overall revenue, while its mail order business

accounted for 37%.

87. One observer recently explained the evolution of PBM services and competition as

follows:

> Initially, the goal of the PBM was to simplify the administration of
> benefits for health plan members and to provide some cost-
> management services. . . . In the early 1990s, as electronic point-of-
> sale (POS) claims processing became prevalent, PBMs began to shift
> their dependence on revenue from claim processing to other sources,
> including manufacturer rebates, selling data to manufacturers, and
> selling mail order and retail drugs. PBMs found that health plans and
> employers were more interested in lower administrative fees, because
> the result of pharmacy-cost reduction appeared to be too difficult to
> measure. This practice created a price war among PBMs for business
> from large health plans and resulted in a perception of POS
> pharmacy claims as a commodity. . . . *Gradually, the PBM industry*
> *shifted to aggressive strategies of seeking revenues from alternative*
> *sources to compensate for selling benefit administration services at*
> *lower costs.* PBMs that could not buy or build mail order capabilities
> quickly turned to other revenue sources. These included the sale of
> claims data to drug manufacturers and repricing of the retail network,
> known as spread pricing (fees gained through continual negotiation
> of lower rates with the pharmacy network that are not passed on to
> the health plan or employer). *Today, revenue from POS claims*
> *processing provides little to no margin for PBMs.*[6]

88. Mail order services are a particularly lucrative source of revenues for PBMs. In

their mail order capacity, PBMs stand in the same shoes as McKesson's retail pharmacy clients by

profiting from the AWP increase. Thus, PBMs had a strong incentive to remain silent about the

Scheme or risk losing additional profits stemming from new mark-ups.

**11. The Brand Drug Pharmaceutical Market Was Conducive to the Scheme**

89. The market for brand-name prescription drugs has a number of features that

facilitated the implementation of the Scheme alleged in this Complaint. The industry relies almost

exclusively on electronic publishers for the source of AWPs, especially First DataBank.

---

[5] Express Scripts 2005 Annual Report.

[6] Steve Martin, "PBM Industry Today: Who's Managing Drug Costs?", *Managed Care Magazine*, Dec.
2001, http://www.managedcaremag.com/archives/0112/0112.pbmfuture.html, accessed August 29, 2007
(emphasis added).

CLASS ACTION COMPLAINT -                                    - 21 -

Additionally, for the period of 2001 through late 2004, First DataBank and Medi-Span acted as one for the purposes of calculating and publishing AWPs: "This means that essentially the Medi-Span data is the First DataBank data."[7] First Data was therefore the industry standard bearer for both AWP, and by implication, AWP-WAC mark-up. Changes at First Data would affect prices throughout the industry.[8]

## 12. End Payors Rely on Published Drug Pricing Compendia

90. The private and public pharmaceutical reimbursement systems have at their core critical dependence and reliance upon accurate and timely publication of the current AWP for every active formulation of drugs dispensed by retail pharmacies in the country, given the breath of this dependence (private insurance systems covering more than 200 million lives as well as millions of cash payors); the healthcare system's growing reliance on pharmaceutical products as a treatment of first resort; and the scores of thousands of available drugs on the market. Private (and public) reimbursement systems, including the plan sponsors and consumers who reimburse drug dispenser costs, also rely upon pharmaceutical pricing publishers to accurately and fairly publish AWPs and WACs for NDCs. McKesson and FDB were aware of this reliance.

91. Several pharmaceutical industry compendia periodically publish the AWPs for active NDCs in the United States. Generally these publications are available in either hard copy format or in electronic media.

92. Generally speaking, the two printed compendia include Drug Topics Red Book (the "Red Book") (published by Thompson Healthcare) and American Druggist First DataBank Annual Director of Pharmaceuticals and Essential Director of Pharmaceuticals (the "Blue Book") (which for several years has been defunct). While the Red Book is used to determine published AWPs (primarily for physician-administered drugs), and while certain limited electronic information is available regarding Red Book published prices, the Red Book remains primarily an annual printed publication with periodic printed updates.

---

[7] MCKAWP 0057171; MCKAWP 0057415.

[8] MCKAWP 0057171.

CLASS ACTION COMPLAINT -                                         - 22 -

93. In periodically announcing the AWP for each drug, publishers generally report prices that are supplied to them by manufacturers for their respective drugs. For instance, the foreword to the 1999 edition of the Red Book states that "all pricing information is supplied and verified by the products' manufacturers, and it should be noted that no independent review of those prices for accuracy is conducted." In addition, a June 1996 Dow Jones news article reported that Phil Southerd, an associate product manager of the Red Book, stated that Red Book only publishes prices that are faxed directly from the manufacturer.

**13. The Emergence of First Data and Medi-Span as Electronic Data Publishers**

94. In addition to printed publications of pharmaceutical prices, the AWP for NDCs is also widely made available to manufacturers, wholesalers, retailers (including major chain pharmacies, independents, mail orders), pharmacy benefit managers and Third-Party Payors (*i.e.*, plan sponsors of drug benefit plans such as insurers, Taft-Hartley Funds and self-insured employers) through large electronic drug databases.

95. Drug databases started back in the mid-1970s with the advent of significant drug benefit programs. These programs, along with the pharmacists who are dispensing the drugs and the Third-Party Payors (primarily insurance companies) who are paying for them, needed comprehensive and accurate descriptive and pricing information to ensure the accuracy of the claims they were paying.

96. The processing of claims became a massive job as drug prescriptions increased. The need for a consistently accurate and comprehensive drug price database became a major need. As First Data documents acknowledge, the "specter of inaccurate drug prices drove the database companies to develop techniques to assure the accuracy and comprehensiveness of the data."

97. During the 1990s, there were only two major electronic drug database companies: (1) First Data, which describes itself as "started as the only purely electronic database company;" and (2) Medi-Span, which had its roots in the printed drug price catalog business.

98. The principal products sold by First Data are based upon information contained in its National Drug Database Files, or "NDDF." The NDDF is a massive electronic database dating

CLASS ACTION COMPLAINT -                                    - 23 -

back many years and containing scores of fields of information for both active and non-active NDCs. Among many other pieces of quantitative and non-quantitative information contained in the NDDF are the current and historical WAC, (known in the NDDF as the wholesale net price, or "WHN") and AWP, (set forth in various fields, including an AWP field designated by First Data as Blue Book AWP or "BBAWP") for each NDC.

99.     The principal electronic database products sold by Medi-Span are based upon its Master Drug Database Files, or "MDDF." The MDDF electronic database is smaller than the NDDF, but nevertheless contains numerous fields of data for each NDC, including current and historical WAC, and AWPs. Both the NDDF and the MDDF are comprehensive, intragratable drug information databases.

100.    Comprehensive, intragratable drug information databases ("intragratable drug data files") are electronic databases containing purportedly comprehensive clinical, pricing, and other information on prescription and non-prescription medicines. Intragratable drug data files are uniquely capable of being readily integrated with other computerized information systems to help pharmacists and Public Payors quickly obtain information important to decisions regarding the prescription, dispensing, price reimbursement and purchase of medicines, and also to automatically provide drug information that patients need for safe use of their drugs. Retail pharmacies and PBMs usually use intragratable drug data files to determine Public Payor reimbursement (when using AWP fields), as well as their own acquisition costs (when using WAC fields).

101.    Drug information in other forms is usually not an adequate substitute for the provision of much information obtainable only in intragratable drug data files. For example, a pharmacist filling a prescription can more quickly and reliably check for harmful drug interactions through an instant, automatic check of a drug data file when he or she enters the prescription into the pharmacy's computer system, than through consulting a separate, unintegrated, and less up-to-date information source such as a book or data on a compact disk. Relying on such a separate reference would be more time-consuming and would increase the risk that a harmful drug interaction would not be detected until after the patient purchased and used the drug.

CLASS ACTION COMPLAINT -                                    - 24 -

102. During the 1990's and up to 1998, First Data and Medi-Span were substantial, direct competitors within the relevant market of intragratable drug data files in the United States. They faced little or no competition from other firms. Until 1998, two electronic drug databases – First Data's NDDF and Medi-Span's MDDF – played the integral role in essentially all electronically-based drug reimbursement transactions in the United States. They accounted for billions of transactions each year and many billions of dollars of payments.

103. Of course, First Data's NDDF and Medi-Span's MDDF both contained critical price point data fields for the approximate 65,000 NDCs then active in the marketplace.[9] The retail class of trade relies on these systems and uses the AWP for the associated NDC when seeking reimbursement for drug ingredient cost.

### 14. The Merger of First Data and Medi-Span

104. In 1998, the Hearst Corporation caused First Data to be merged with the smaller Medi-Span. After the merger, First Data began the process of combining its NDDF with Medi-Span's MDDF (resulting in a product sometimes known as NDDF Plus). Through this process, the Hearst Corporation caused First Data to become the sole United States provider of intragratable drug data files, including the publication of electronic drug database pricing information such as the WAC and associated AWP for branded pharmaceutical products. Thus, beginning in or around 1998 and thereafter, virtually every participant in the pharmaceutical distribution chain who used electronic database systems in undertaking reimbursement transactions for billions of dollars of pharmaceutical products used and relied upon the accuracy of data from First Data's NDDF and MDDF, including the published WAC and AWP price fields.

105. In 2001, the Federal Trade Commission (after a lengthy investigation) brought suit against the Hearst Corporation and First Data claiming, among other things, that the First Data and Medi-Span merger had been unlawful. Shortly thereafter, the Hearst Corporation agreed to divest its Medi-Span assets, culminating in a consent decree late that year. But by this time, First Data's merger of the NDDF and MDDF, along with changes of personnel and related systems effectuated

---

[9] First Data's NDDF also contains historical information, and thus it contains data for almost 200,000 NDCs since many are no longer active in the marketplace.

1  over the prior three years, was nearly complete. As a result, as part of First Data's divestiture of

2  the Medi-Span assets, First Data was required to provide the purchaser of the Medi-Span assets

3  with transitional and editorial services for many years into the future.

4  106.  As a practical matter, pricing data contained in both the NDDF and the MDDF post-

5  divestiture remained the same. Since 1998 and despite the late 2001 divestiture, First Data has

6  functioned as the sole editor of data populating the only available comprehensive intragratable

7  electronic drug data systems (the NDDF and the MDDF) for branded drug pricing information used

8  in the United States for reimbursement transactions in the retail pharmacy channel.

9  107.  All changes in First Data's electronically published AWPs and WAC-to-AWP

10  spreads were the same. The consent decree that implemented the Medi-Span divestiture from FDB

11  required that FDB continue to provide Medi-Span with all FDB pricing information until Medi-

12  Span (now called Facts and Comparisons) could develop its own pricing production system. Thus,

13  during the time period including August 1, 2001 until sometime in 2004, when the Scheme

14  effectuated an increase in First Data's published spread, this increase also occurred in Medi-Span's

15  published prices and has remained in effect through the present. FDB and McKesson knew this

16  would be a consequence of the Scheme.

17  108.  During the 1990s and up to the end of 2001, both First Data and Medi-Span

18  maintained the historical proportion between AWP and WAC when branded price increases were

19  announced. This enabled the publishers (when receiving, for example, information only regarding

20  WAC changes to a branded drug) to automatically calculate the corresponding AWP. As a result,

21  the marketplace had predictability, and marketing pricing dynamics adjusted according to that

22  expected practice.

23  **15.  First Data Gains the Trust of the Pharmaceutical Industry**

24  109.  Before this and related litigation against McKesson began, pharmaceutical end

25  payors operated on the belief that the AWPs were the result of both honest reporting by

26  pharmaceutical companies, with respect to the publication of their WACs or submission of their

27

28

CLASS ACTION COMPLAINT -                    - 26 -

suggested AWPs to publishers, and an empirical and professional analysis undertaken by First Data or Medi-Span.

110. The reliance upon the accuracy and legitimacy of First Data's data was not only known to First Data, but was the foundation of its business model, marketing, and promotion plans. For example, First Data stated:

> For over two decades, healthcare professionals have come to depend on First DataBank's comprehensive knowledge bases to deliver the timely, accurate drug information they need to support their business and clinical decision-making.

> Thus developers can respond quickly to their customers' demands for reliable, easy-to-access drug information, available on multiple platforms.

> [First Data:] A partner you can trust.

> Trusted Drug Knowledge…Comprehensive drug knowledge bases that have been trusted for decades by healthcare professionals – in thousands of installations – to provide the timely, accurate information they need to support their clinical and business decision-making.

111. First Data promoted its pricing information as "accurate," of "high-quality," and as "set[ting] the standard in the healthcare industry for comprehensive coverage of descriptive, pricing and clinical information on drugs." It also recognizes that its pricing information is "relied upon by professionals in th[e] industry," and that, "*[t]o be useful to its audience, First Data's data must be accurate and up-to-date.*"

112. Throughout the 1990s, First Data gained the trust and reliance of participants in the pharmaceutical marketplace – most notably pharmacies and the Third-Party Payors that reimbursed them – upon First Data's electronic publication of AWP for each active NDC.

113. Throughout this time, First Data knew, of course, that the primary purpose of publication of the WAC and of the AWP, and of the associated WAC-to-AWP mark-up (embedded in the difference between the AWP and WAC data fields), was to serve as an electronic basis for the mass-reimbursement of retail pharmacies for thousands of daily transactions and billions of yearly transactions. After all, First Data acknowledged: "AWP was developed because there had to be some price which all parties could agree upon if machine processing was to be possible." As

CLASS ACTION COMPLAINT - -27-

First Data stated: "AWP represents the average wholesale price; the average price a wholesaler would charge a customer for a particular product. The operative word is *average*. AWP was developed to provide a price at which all parties could agree upon for electronic processing to be possible."

114.    First Data's representations regarding the accuracy of its electronic publication of AWP were highly successful. By 1998, after its acquisition of its only competitor, Medi-Span, First Data was the sole provider of comprehensive, intragratable electronic data files providing AWP information throughout the retail pharmacy distribution chain, including most private Third-Party Payors. Of course, First Data made this known when marketing its products, stating that it "provides you the same AWP prices used by Aetna, PAID PCS, MEDI, MET, most Blue Cross Blue Shield Plans, wholesalers and approximately 49 Medicaid programs."

### 16.    The Scheme Created Goodwill for McKesson with Retail Pharmacies like Defendants

115.    The difference between the WAC and the AWP prices "create[s] the gross margin for pharmacy retailers under third party reimbursement plans.[10] As the difference between AWP and WAC increases, the larger "spread" affords retailers and other middlemen like pharmaceutical benefit managers ("PBMs") opportunities for larger profits.[11]

116.    By engaging in the Scheme with First Data to raise AWPs by increasing the AWP-WAC mark-up on all brand-name drugs to a uniform 25%, McKesson created goodwill with its customers-retailers. By doing so, McKesson and First Data defrauded end payors like Plaintiffs, who purchased the drugs involved in this lawsuit at prices inflated by the Scheme.[12]

---

[10]  MCKAWP 0073551.

[11]  MCKAWP 0069612.

[12]  Updated Declaration of Dr. Hartman in Support of Class Certification (December 20, 2006) at 5.

**17. By 2001, First Data WAC-to-AWP Mark-Ups Were Susceptible to Abuse**

117. Traditionally, AWPs were set by manufacturers and provided to publishers.[13] Publicly, McKesson itself recognized that WAC-AWP mark-ups originated from manufacturers, not wholesalers.[14]

118. Beginning in the late 1990s, due to government scrutiny and well-publicized AWP-related litigation, many manufacturers stopped providing AWPs.[15] Some manufacturers even ceased providing First Data with any price information (AWP or WAC), making First Data increasingly dependent on wholesalers for price information.[16]

119. Wholesaler Amerisource Bergen Corporation ("ABC") recognized that First Data's AWP became a standard in the late 1990s *because* manufacturers were no longer publishing AWP.

120. First Data knew that the market widely relied upon First Data AWPs and that it played a crucial role as the most trusted supplier of such information. First Data knew that its preeminent position in the market would be at risk if First Data admitted that it did not have a reliable basis for calculating AWPs.

121. Beginning in the 1990's, First Data adopted a survey method to calculate AWPs.[17] First Data represented that its survey methodology asked *each* of the national wholesalers what mark-up they applied to a given manufacturer or product line.[18]

---

[13] MCKAWP 0084296; MCKAWP 0083898; MCKAWP 0067439; AZ0449836-449850.

[14] One McKesson employee explained to an employee of WellPoint's PBM in November 2004 that "McKesson does not maintain or alter product AWP's – we get that specific information from the manufacturer and from First DataBank. McKesson, of course, establishes that cost based upon industry practices and our cost from the manufacturer." WP-AWP009699-9703, at 9699.

[15] Morgan 2007 Dep. at 228:25-229:12; *see also* RB 00157-RB 00171, at 00158 ("[W]e were concerned when the average wholesale price (AWP) designation - one of several pieces of data that Red Book collects from manufacturers - came under fire at federal and state levels this past year. . . . We continue to regard AWP as one guideline in the Rx pricing mix and to encourage the provision and dissemination of fair, accurate prices by all suppliers.").

[16] Morgan 2007 Dep. at 179:12-22; MCKAWP 0069640 (Morgan e-mail acknowledging that FDB is missing manufacturers' WACs, noting that FDB is authorized to obtain them from wholesalers and requesting them from McKesson).

[17] *See*, *e.g.*, FDB-AWP 15104.

[18] *See*, *e.g.*, FDB-AWP 02005 (FDB website, Frequently Asked Questions, dated November 4, 2002); FDB-AWP 15104 ("Average Wholesale Price," Price Alert editorial, dated 2000).

CLASS ACTION COMPLAINT -        - 29 -

122. As detailed below, at least by August 2001, when Amerisource merged with Bergen and when McKesson and First DataBank began their collusion, First Data's representation was no longer true. If it had been conducting regular surveys of each of the major wholesalers before, it certainly was *no longer doing so* by August 2001 because two of the "big three" wholesalers, ABC and Cardinal, refused to provide mark-up information to First Data. This propelled First Data to conspire with the remaining "big three" wholesaler, McKesson, so that it could continue publishing AWPs.

**B. McKesson Exploited First Data's Alleged Survey Process for Its Own Purposes**

**1. McKesson's Public Position Was That AWPs Were Determined by Manufacturers' Historic Mark-Ups and not by McKesson**

123. In January 2002 McKesson organized an upper-management "meeting to discuss McKesson's position regarding Average Wholesale Price."[19] Greg Yonko, Senior Vice President of Purchasing and Pharma Finance, who was invited to this meeting, asked if he could "add Robert James to the invite list as he has had numerous discussions with First DataBank recently."[20] Mr. Yonko testified that he wanted Bob James, McKesson's Vice President of Brand Rx Finance Investment Purchasing, to take part in the meeting because

> Bob was managing the process that I have described many times around – with First DataBank, relative to the markups that we carry in our system, the survey process, the updates to WAC. Again, many business aspects that have to do with First DataBank, Bob would seem to be more knowledgeable about than anybody else that I knew about.[21]

124. Both Bob James and Greg Yonko attended the meeting,[22] which took place on or about January 16, 2002.[23] Among the topics discussed were "how different reimbursement models or change in reimbursement models might look,"[24] and "the legislative momentum surrounding the

---

[19] MCKAWP 0065896.
[20] MCKAWP 0065896.
[21] Yonko (5/15/07) Dep. at 85:13-20.
[22] *Id.* at 85:22-86:2; MCKAWP 0084295.
[23] Yonko (5/15/07) Dep. at 87:8-11.
[24] *Id.* at 89:10-12.

CLASS ACTION COMPLAINT -                    - 30 -

1  issue of Average Sale Price vs. Average Wholesale Price vs. Wholesale Acquisition Costs (WAC)

2  and the complexities and potential implications to our customers of any such changes and

3  eventually to our company [McKesson]."[25]

4      125.    At the meeting, it was agreed that Greg Yonko and Jeff Herzfeld, Senior Vice

5  President of Pharmaceutical Product/Pharma Finance, would "develop a position statement" that

6  could be used to "communicate throughout our management team so that we are on all on the same

7  page, so-to-speak, when discussing such issues with our customers, suppliers, and any legislative

8  types."[26]

9      126.    Yonko circulated a draft of the official McKesson position, which defined AWP as a

10  suggested retail price set by manufacturers' historic mark-ups and not established by McKesson:

11        **What is AWP?** - AWP or Average Wholesale Price represents a
   suggested retail-selling price for a branded or generic pharmaceutical

12        and has been around for many years. Its [sic] calculated as a markup
   from WAC (Wholesale Acquisition Cost). The markup typically runs

13        20 to 25 % and is for the most part determined by historical spreads
   from the manufacturer (*not by McKesson*). McKesson carries the

14        price in our system *and adjusts it if there is any pricing action*. First
   DataBank publishes this price and it is the basis for all retail

15        pharmacy dispensed prescriptions that are covered by 3rd Party
   reimbursement plans for branded products.[27] (Emphasis added.)

16

17      127.    According to this official position, McKesson did not meddle with the

   manufacturer-set AWP carried in its system and only adjusted the price if there was a pricing

18  action, that is, if the manufacturer changed its WAC.[28] And McKesson represented that it

19  understood First Data to publish the AWP consistent with the manufacturers' historic mark-up.[29]

20      128.    Notably, this policy, which was intended for public consumption, did not refer to

21  McKesson's participation in wholesaler surveys of AWP or state that AWP was in any way

22

23

24

25  [25] MCKAWP 0084295.

26  [26] MCKAWP 0084295.

   [27] MCKAWP 0084295 (emphasis added).

27  [28] *Id.*

28  [29] *Id.*

CLASS ACTION COMPLAINT -           - 31 -

1   affected by a wholesaler pricing policy.[30] To the contrary, McKesson expressly disavowed *any*

2   *involvement* in determining mark-ups.[31]

3       **2.    Contrary to its Official Position, McKesson Raised its Internal Mark-Ups in an
            Effort to Increase AWPs**

4

5       129.    Although publicly disavowing its involvement in setting AWP/WAC mark-ups,

6   McKesson had already begun as early as 2000 to manipulate AWPs by unilaterally imposing a

7   25% mark-up on its suggested sell price for all brand-name prescription drugs.[32] At his deposition,

8   Greg Yonko confirmed that in the past McKesson had used the manufacturers' historic mark-ups to

9   calculate projected retail prices, *i.e.* its suggested sell prices:

10              Q.    How did McKesson calculate its suggested sell price?

11              A.    It's not a calculation.  It was a number that we input into our
                      system, and it was again historical, provided by the
                      manufacturer, though it's currently not.[33]

12

13  He also conceded that McKesson had increased the mark-up for its suggested sell prices with the

14  intent that FDB would use the higher mark-up to set AWP:

15              We are in business to support our customers, and we have always
                supported our customers.  And I believe that is what Bob is talking
                about when he says we have attempted to raise AWP's to support our
16              customers, by changing our markup in our system, going through the
                First DataBank survey process, and hoping that, in fact, the AWP's
17              will change.[34]

18      130.    McKesson knew that First Data had a virtual lock on the determination of AWPs

19  because First Data had "a contract with the Medi-Span group [the only other electronic pricing

20

21

22

23      ───────────────
        [30] *Id.*

24      [31] "The markup . . . is for the most part determined by historical spreads from the manufacturer (not by
        McKesson). *Id.*

25      [32] MCKAWP 0057171; MCKAWP 0047807 ("Our mark up is not coming from our suppliers.
        Suppliers [have] nothing to do [with] how we mark up our items.  It is the Product Management team who
26      make[s] the decision on our mark up.")).

27      [33] Yonko FDB Dep. at 42:15-20.

28      [34] Yonko FDB Dep. at 41:8-14.

    CLASS ACTION COMPLAINT -                          - 32 -

1    source] requiring that FDB supply the data over the next 3 or 4 years [*i.e.* through 2005 or 2006].

2    This means that essentially the Medi-Span data is the First DataBank data."[35]

3       131.    McKesson knew that First Data purported to use a survey of national wholesalers to

4    calculate AWPs and that, as the largest national wholesaler, McKesson had "an opportunity to

5    'normalize' AWP spreads on brand pharmaceuticals at a 25% markup (or 20% spread)."[36] And if

6    it were to succeed, "most [of its] customers [i.e., Defendants] would love it."[37]

7       132.    Thus, it changed its mark-ups "in hopes that one of the other wholesalers happens to

8    raise their markup on an item (maybe due to pressure from retail customers), and FDB happens to

9    resurvey the items."[38] But when the competition did not respond as expected or First Data failed to

10   "survey" the change as quickly as hoped,[39] McKesson decided to work directly with First Data to

11   increase AWPs.

12      133.    In many of its internal communications McKesson candidly admitted that the

13   change was made to increase its customers' profit margins.[40] For example, McKesson's John

14   _____

15   [35] MCKAWP 0057415; *see also* MCKAWP 0057171 ("[Medi-Span gets] . . . its data from FDB.
     However, Redbook is a different deal. Redbook publishes the AWP's that the manufacturers give them
     (which is not an average, nor determined by process) or use a markup of 1.20 which provides a 16 ⅔%
16   AWP spread. If our customers are allowing language to be put into their contracts allowing Redbook
     AWP's for reimbursement, they are not being very wise.").

17      Prior to 2001 First Data and Medi-Span were jointly owned by the Hearst Corporation. Following an
     investigation and lawsuit brought by the Federal Trade Commission Hearst agreed to a divestiture of Medi-
18   Span assets. Hartman Decl. (Dec. 2006) ¶ 17. As part of the divestiture, First Data was required to continue
     to provide pricing information to Medi-Span's purchaser for several years. *Id.*, *see also* MCKAWP
19   0057415; MCKAWP 0057171.

20   [36] MCKAWP 0068514.

     [37] *Id.* (MCKAWP 0068514).
21
     [38] MCKAWP 0068514.

22   [39] *See, e.g.*, MCKAWP 0068514 ("McKesson chose to increase the markup on the Park-Davis line
     (Lipitor) [in January 2001] when Pfizer took them over. This was our [McKesson's] attempt to raise the
23   AWP's to support our customers. The other two wholesalers did not do this. (I [Bob James, Director,
     Brand Pharmaceutical Production Management, McKesson] am told by FDB that the Parke-Davis products
24   from Pfizer will most likely have the AWP's increased to 20% this January [2002] when price increases
     typically take place. . . . this will then be the same as the McK figure." (ellipsis in original)). *See also*
25   MCKAWP 0065883-84 (September 18, 2001 e-mail noting that "Amerisource has pointed out to some of
     our customers in the Michigan market that we 'manipulate' AWPs on selected items," and that McKesson's
26   internal mark-ups for Lipitor and Advair were higher than FDB's or Cardinal's).

27   [40] *See, e.g.,* MCKAWP 0042664; MCKAWP 0065592; MCKAWP 0065885; MCKAWP 0066191-92;
     MCKAWP 0066464; MCKAWP 0068131; MCKAWP 0069594; MCKAWP 0069607; MCKAWP
28   0069615; MCKAWP 0071670; MCKAWP 0084327; MCKAWP 0084485.

     CLASS ACTION COMPLAINT -                                    - 33 -

Bonner, Director of Brand Rx Product Management and Finance, observed: "There's been a great deal of activity, by McKesson, of late to increase AWPs on brand items to a uniform 25%. *That helps the pharmacy profitability greatly.*"[41] Reflecting on his achievements as of April 2003, Bob James noted:

> We played a major role (and still do) in normalizing the AWP's on Brand Pharmaceuticals from 16 ⅔% to 20% spreads [*i.e.* 20 to 25% markups]. This has had a huge impact on the profitability of our customers on their insurance based business (which is about 90% now). To summarize this impact, it's the same as lowering their cost of goods 3 ⅓% on 70% of the brand drugs. Historically, 75% to 80% of brand pharmaceuticals carried a 16 2/3% AWP spread and the remaining, a 20% spread. Today, almost 95% of brand drugs carry a 20% spread. This has provided millions of dollars in improved profits across our industry.[42]

Another McKesson employee explained:

> I received a response to an e-mail last week from John Bonner. He mentions that McK is working to increase the spread on AWP to a uniform 25% on branded Rx. One of the benefits of this will increase reimbursements to our customers from third parties.[43]

Yet another McKesson employee reported: "What Bob explained to me a few months ago is we (mckesson) [sic] are working to 'expand' the margin between AWP and cost."[44] An internal memo discussing the mark-up changes states:

> Here are a few examples of increased profits that our customers should be realizing now and into the future. The following results are based on a reimbursement formula of AWP minus 15% plus a $2.00 fee.

|  | Old 16⅔% spread | New 20% spread |
|---|---|---|
| Lipitor 20 mg 90's | $6.86 | $17.18 |
| Prilosec 20 mg 30's | $4.22 | $8.92 |
| Allegra 60 mg 100's | $3.97 | $8.16 |
| Advair Discus 500/50 |  |  |
| 60 dose | $5.11 | $11.70 |

---

[41] MCKAWP 0050602 (emphasis added).

[42] MCKAWP 0065592.

[43] MCKAWP 0066465-66.

[44] MCKAWP 0069732.

CLASS ACTION COMPLAINT -                    - 34 -

Betasteron (previously a flat $7.00 fee)

$20.00          $58.25

Most would agree that these improvements are extremely significant.[45]

134.    In other communications, McKesson represented that it increased its mark-ups for "business efficiency purposes" because McKesson's Retail List Prices and First Data's AWP often did not match:[46]

> [W]e were challenged to improve efficiencies in our systems, processes and execution of our Brand Rx Programs. One of the inefficiencies that we looked at was the number of manual overrides that were required to keep an accurate First DataBank (FDB) Average Wholesale Price (AWP) field in our system. Each time a pricing activity took place, a manual override was necessary when the Suggested Sell or Retail List Price was different from the FDB AWP. This took place several times a year and increased risk of errors.[47]

135.    McKesson estimated that at the time 80% of brand mark-ups were set at 20%.[48] Yet rather than synching its mark-ups with those actually used by FDB, McKesson reached the following decision: "A decision was made to standardize our Brand Rx markups at 25% by using a 1.25 factor times the Wholesale Acquisition Cost (WAC)."[49]

136.    Logically, the only way that raising mark-ups to 25% in an industry dominated by 20% mark-ups would eliminate McKesson's "manual overrides" arising from price discrepancies with FDB is if FDB colluded with McKesson to increase AWPs across the board. In an e-mail, dated September 18, 2001, McKesson explains:

> We are talking with First DataBank about "normalizing" the Brand AWP spreads at 20% because we believe it makes sense for our customers and also for our own efficiency in BIS. Today, when our AWP differs from First Data Bank [sic], BIS has to manually input the FDB AWP's. This translates to a great deal of extra work on every price increase where this situation exists. *If all Brand product*

---

[45] MCKAWP 0069609.

[46] *See, e.g.*, MCKAWP 0042663; MCKAWP 0065885; MCKAWP 0069608; MCKAWP 0069613.

[47] MCKAWP 0069608.

[48] MCKAWP 0069502.

[49] MCKAWP 0069608.

CLASS ACTION COMPLAINT -                                        - 35 -

was at 25% markup none of this manual input would be necessary.[50]

137. McKesson discovered that it was not difficult to impose its suggested sell prices on First Data's published AWPs. In an October 9, 2001 e-mail, while still paying lip service to an alleged survey process, McKesson marveled at "First Data Bank's willingness to work with us to normalize the brand product AWPs."[51]

### 3. McKesson Colluded with First Data and the RICO Defendants to Increase Brand Drug Mark-Ups and Inflate Reimbursements by Plaintiff and the Class to Defendants

138. As documented in an internal memo, McKesson began colluding with First Data to increase brand drug mark-ups as early as August 2001:

> After a discussion with FDB last August [2001], *we mutually agreed* to standardize Searle (16⅔% spread) product line because it had been acquired earlier by Pharmacia (20% spread). There seemed to be momentum in the industry to move to a normalized markup of 25% on brand Rx products. In December [2001], after several discussions with FDB about our business efficiency improvement strategy we began to move many of the manufacturers with mixed spreads (16⅔ and 20% products in the same line) to a consistent 25% markup. These were companies like GlaxoSmithKline, AstraZeneca, Aventis, Berlex, Bristol Myers Squibb, Merck, JOM, and 3M, Forest, Novertis, Roche, Schering and several others. These were mixed product lines and we just set their Suggested Sell Prices at a consistent 25% markup.
>
> First DataBank re-surveyed most of these companies during January and February when price increases occurred. Many of the AWP's have been increased by FDB. Because a large number of price increases occurred, some AWP's were affected twice, once when the price increase[] took effect and then a second time when FDB raised the AWP after the survey process. . . . Not all products in these companies have had AWP increases at this point in time. However, as price increases occur FDB will re-survey those products and make their determination.[52]

139. While the memo invokes the survey process, First Data's express agreement to raise the mark-up on Searle products is inconsistent with the use of a survey to ensure the appropriate

---

[50] MCKAWP 0065885 (emphasis added).

[51] MCKAWP 0068599.

[52] MCKAWP 69608-09 (emphasis added). Note that one of the named manufacturers, GlaxoSmithKline ("GSK"), wrote on March 1, 2002, to First Data asking it to explain the "unexpected change" which led First Data to list GSK products with a 25% mark-up. FDB-AWP 053695.

CLASS ACTION COMPLAINT -                                    - 36 -

1    mark-up. More fundamentally, McKesson's "business efficiency improvement strategy," *i.e.* the

2    goal of achieving harmony between its uniform 25% mark-up and FDB's data, could only be

3    achieved if FDB agreed to disregard contrary input from other industry sources and to override

4    historical mark-ups.

5         140. Indeed, it was Erlinda Thomas' understanding at the time that she wrote the

6    following March 14, 2002 e-mail that McKesson dictated the price changes to FDB:

7              Product Management is working closely with FDB to adjust their
               mark up. FDB [has] been changing their mark up to match with our
8              mark up. Eventually our list price will [be] equal to FDB's AWP.[53]

9         141. The memo's discussion of an agreement with First Data is also reflected in a

10   September 18, 2001 e-mail in which McKesson also referred to its recent "agreement with First

11   Data Bank on raising" Searle prices.[54] The e-mail further revealed: ***We are talking with First***

12   ***Data Bank about 'normalizing' the Brand AWP spreads at 20%*** [*i.e.* markups at 25%] because

13   we believe it makes sense for our customers."[55] The October 9, 2001 e-mail, applauding "First

14   Data Bank's willingness to ***work with us*** to normalize the brand product AWP's,"[56] suggests that

15   McKesson prevailed and the agreement was expanded to all brands.

16        142. Other evidence also supports this inference. Consistent with an arrangement to

17   change the mark-ups on brand drugs to a uniform 25%, FDB changed the mark-up for TAP and

18   Astra Zeneca to 25% on December 15, 2001.[57] The internal e-mail directing the change does not

19

20

21   _____
     [53] MCKAWP 0042664; Thomas Dep. at 109:6-110:7 (testifying that she believed that the statement was
     true at the time she wrote it).

22   [54] MCKAWP 0065885. Nor can there be any doubt that First Data was aware that the mark-up
     information that McKesson provided was made up from whole cloth. In addition to the preceding
23   documents referring to discussions with First Data about its normalization plan, the record also reveals that
     McKesson sent First Data a copy of its internal memo, titled "AWP Discussion," in which it stated:
24   "McKesson has chosen to 'normalize' the markups in the Brand Rx area resulting in a consistent 25%
     markup or use of a 1.25 factor. This serves to level the playing field"; "customers may potentially benefit
25   because this process provides the opportunity for increased profitability if managed care contracts remain as
     they are today." MCKAWP 0069602; MCKAWP 0069611.

26   [55] MCKAWP 0065885 (emphasis added).

27   [56] MCKAWP 0068599 (emphasis added).

28   [57] FDB-AWP 033430.

CLASS ACTION COMPLAINT -                          - 37 -

1  mention a survey and FDB did not produce any documentation tending to show that a survey was

2  conducted to warrant the changes.[58]

3      143.    On January 23, 2002, another McKesson e-mail observed: "AstraZeneca, Aventis,

4  Bristol Myers, Glaxosmithkline, Jorn etc. These vendors are <u>now</u> at a 25% mark-up instead of

5  20%. *Bob James is in contact with FDB in regards to adjustment of their AWP pricing.*"[59] The

6  McKesson e-mail does not refer to a survey process, and there are no FDB documents purporting

7  to show that the changes to these manufacturer mark-ups were made as a result of a wholesaler

8  survey.

9      144.    Later that month, McKesson's John Bonner, Director of Brand Rx Product

10  Management and Finance, noted: "There's been a great deal of activity, by McKesson, of late to

11  increase AWPs on brand items to a uniform 25%. *That helps the pharmacy profitability*

12  *greatly*."[60] He advised a sales manager to let customers "know we are fighting on their behalf to

13  normalize AWP @ 25% markup."[61] Again there is no disclaimer that the AWPs are in fact

14  determined by objective surveys as opposed to McKesson's acknowledged price manipulation.

15  The customers referred to are the RICO Defendants.

16      145.    Another internal e-mail demonstrates the same understanding:

17          Some of our friends in retail that I have spoken with are pretty
        overwhelmed *that we would be 'driving' this process on their*

18          *behalf.* Of course, we are not solely responsible for this
        'normalizing' of AWPs but we have done our part as I have

19          discussed with you previously. *I have had conversations with*
        *Albertsons and Safeway and a few others.*[62]

20      146.    The "friends" referred to are the RICO Defendants.

21      147.    McKesson documents also report that Bob James called Kay Morgan in early 2002

22  "on behalf of VitaRx on Avonex and Copaxone" and reported that the call "result[ed] in a $500K

23

24      [58] *See* Morgan (2007) at 278:16–279:9 (testifying that she could not recall any other written surveys
other than those produced by FDB and identified as exhibits at her deposition).

25

26      [59] MCKAWP 0081250 (emphasis added).

    [60] MCKAWP 0050602 (emphasis added).

27      [61] *Id.*

28      [62] MCKAWP 0065895 (emphasis added).

CLASS ACTION COMPLAINT -           - 38 -

profit improvement for VitaRx," and "FYI. Kay Morgan, FDB confirmed today that this had been done."[63] After the call, James circulated an e-mail:

> Just a note to let everyone know that "I am told" that the markup on Avonex and both the old and new sku's of Copaxone will be changed to 25% (to create a 25% spread on WAC/AWP) next week. . . . . Yes!!"

> . . . . This should have a significant contribution to your profitability as illustrated by the following example using a reimbursement of AWP – 15% plus \$2.00 fee

> Avonex at 16⅔% spread, profit would be \$18.42 . . . and now at a 25% spread, profit would be \$51.31 . . . not bad!

> This is an increase of \$32.89 per script.

> Copaxone at 16⅔% spread, profit would be \$19.72 . . . an now at 20% spread, profit would be \$57.39 . . . pretty good!

> This is an increase of \$37.67 per script.[64]

148.    Other communications do refer to a survey process, but they generally betray McKesson's expectation that the alleged survey process will merely confirm McKesson's 25% mark-up. For example, an e-mail dated February 15, 2002, from Bob James states:

> What we are seeing is a 'normalizing process for brand Rx items. As you know, suppliers do not set AWP, wholesalers do not set AWP, and neither does FDB. Wholesalers set their individual markups or Suggested Sell or List Price as in the case of McKesson. I'm not sure what the other wholesalers call their sell price. This is done independently. FDB takes a survey of at least three national wholesalers and if 2 out of 3 are at 25% markup, then that becomes the AWP . . . I think it is very positive for the industry and most people will be delighted when they understand what is going on and how the process works.[65]

149.    He then predicts: "***In a few months I would expect to see most brand products at a 25% markup.***"[66] Given that McKesson is advocating a 25% mark-up in a predominantly 20% market where such mark-ups have remained largely unchanged for years, James' expectation of

---

[63] MCKAWP 0069615; *see also* MCKAWP 0084327.

[64] MCKAWP 0084327; *see also* MCKAWP 0065592 (April 22, 2003 memo from Bob James to Greg Yonko: "Worked on behalf of Vita Rx (now MSD) in raising the AWP's of Avonex, Copaxone and Betaseron to 20% [spread]. The impact of this effort was to increase their profits \$800 k per year. . . each year, not just one time.").

[65] MCKAWP 0069590; MCKAWP 0069591.

[66] MCKAWP 0069592 (emphasis added).

CLASS ACTION COMPLAINT -                                           - 39 -

widespread change – let alone such change over a matter of months – is simply not comprehensible

unless he also believed that FDB was complicit in McKesson's Scheme.

150. This inference is further supported by the statement he makes on February 26, 2002

that he is simply waiting for FDB to "catch up" to McKesson's mark-ups and that he has been told

by FDB that these changes, and the higher AWPs they entail, are imminent:

> The McKesson Sugg. Sell or List Prices for Brand Rx will remain at the 25% markup, however. *We expect FDB AWP's to catch up over the next month or so as things normalize in the industry.* I was not aware until last week that our BIS group was changing the AWP field to match or Sugg. Sell or List Price field in the DITM before FDB actually made the changes. *We have been told by FDB that the items were going to move up but there obviously have been some timing issues.* It's my fault, I guess I did not communicate very clearly. There will be no changes by the FDB AWP field unless the information comes by electronic download from FDB.
>
> When the changes do occur, there will be a slight delay for our system to be changed. More importantly, there will most likely be a delay for the third parties to pick up and input *the new higher AWP's.*[67]

151. A month later, James' confirms his expectation that FDB has changed the mark-ups

on the majority of brand manufacturers:

> I am told by FDB that 90% of the Brand Rx companies are now listed as 1.25 factor or 25% markup companies. Not all the products in these companies have had AWP increases at this point in time. However as price increases occur FDB will resurvey those products and make their determination.[68]

In light of McKesson's confidence that FDB's AWPs will "catch up" to McKesson's Suggested

Sell or List Prices in short order, this statement leaves open the possibility that by "survey" James

does not mean an objective determination of the prevailing mark-up among the national

wholesalers, but merely the application of the agreed-upon 25% mark-up to the NDCs whose WAC

price was increased by the manufacturers.

152. Similarly, in response to Erlinda Thomas' representation that FDB adjusted its

mark-ups to match McKesson's, McKesson's field staff personnel, Joy Puccetti, responded:

---

[67] MCKAWP 0057428.

[68] MCKAWP 0069609.

CLASS ACTION COMPLAINT -                                    - 40 -

1            Erlinda: thanks for the update.  Can you or our product managers
2    give us some idea when all of our LIST prices will be adjusted to
     match FDB's AWP?

3    James interjected:

4            Joy, its really happening the other way around.  McKesson is
     normalizing our Sugg. Sell or Retail List, and AWP increases usually
5    happens when FDB re-surveys wholesalers after price increases.
     They set the AWP where 2 out of 3 national wholesalers are using
6    the same markup.  We just happen to be improving our process to
     eliminate the need to override AWPs with each pricing activity in the
7    future.  I spoke with FDB earlier this week and they stated that about
     90% of the vendors have been changed to 25% markup and use a
8    1.25 factor (times the WAC).  *Some of the detail needs to catch up*
     *with individual sku's as price increases occur.  The remaining*
9    *vendors should be done over the next quarter.  My guess is that*
     *things should look very good in the next couple of months.  I am*
10   *working with FDB to point out problem suppliers as Erlinda's*
     *group provides me weekly information comparing our List Price*
11   *with the FDB AWP.*  Sorry for the extra confusion and questions that
     have come up from our customers.  The (unintended consequences)
12   results should have a very positive impact on our customers[']
     profitability.[69]

13
     McKesson sends another such coded message in an e-mail, dated April 25, 2002 re "AWP
14
     Situation Status." James advised Greg Yonko of the progress of the Scheme:
15
             The following is a summary of activity on the subject of AWP:
16
             1.  There is a movement in the industry to normalize the brand Rx
17   markup at 25% to create a 20% AWP spread.

18           2.  90% of vendors have been moved to a 1.25 markup factor at FDB.

19           3.  Actual AWP changes have been occurring around price increases
     and FDB re-surveying the market.
20
             4.  We are working with FDB to improve "their accuracy" on WAC
21   pricing because ours is extremely accurate.

22           5.  . . . We will be sharing information with FDB on WAC price
     changes in order to make us both more accurate.
23
             6.  McKesson has had no new proactive changes since last February
24   except as noted above with Avonex and Copaxone.

25                         * * * *

26

27

[69] MCKAWP 0042663.
28

9. All new brand vendors will be set up as 1.25 markup factor
vendors, *both at McK and FDB*."[70]

While the McKesson e-mail refers to a survey process, it also refers to FDB's agreement to raise

the mark-ups for Avonex and Copaxone – without the benefit of a survey, and there is no pretense

of a survey for new manufacturers. Their mark-up is set by fiat: "All new brand vendors will be

set up as 1.25 mark-up factor vendors, both at McK and FDB."[71] Additionally, at least for "about

90% of the vendors," the alleged survey process is perceived as simply a means of applying the

pre-determined mark-up "as price increases occur."[72]

153.     John Bonner also represented that McKesson's normalization plan was the driving

force behind the changes and not a survey process:

> We are trying to Normalize brand pricing at 25%. As time goes by
> pricing services will pick up on these changes as they average in.
>
> Medi-Span is owned by First Data Bank and should see the changes
> eventually.
>
> Please don't use language that we are trying to increase AWP's with
> customers. We don't want to be viewed as increasing prices but in
> favor of normalizing branded items as a flat 25% markup that will
> level the playing field from vendor to vendor.
>
> I really don't see what problem your customer is experiencing in the
> negative. Higher AWPs should make the pharmacy more profitable.
> . . .
>
> *Bob James is working with FDB to make this happen over time* and
> I'm not sure it is something we want discussed.
>
> Please contact him before discussing outside the company.[73]
>
> We try to 'push' the AWP up to 25% above WAC rather than 20%.
> This may cause your customer some short term reimbursement pain
> with the payors, but in the long run, if AWP at First Data Bank goes
> from 20% to 25%, *your customer will benefit.*[74]

---

[70] MCKAWP 0069615 (emphasis added).

[71] *See also* FDB/NEC 040006 (e-mail from McKesson to FDB: "Any new brand pharmaceutical will be at 1.25 going forward.").

[72] MCKAWP 0042663.

[73] MCKAWP 0066464 (emphasis added).

[74] MCKAWP 0076289 (emphasis added).

154.   McKesson's monthly status reports for Rx Brand Product Management also reported its many successes raising AWPs.[75]  And McKesson's efforts to raise AWPs were prominently featured in an internal memo from Bob James identifying accomplishments and developments for 2003.[76]

155.   In addition to the foregoing examples from McKesson's internal documents supporting the existence of an agreement or concert of action, the parties' conduct also demonstrates that the AWP survey process had given way to the mark-up Scheme.

156.   Many of the communications between First Data and McKesson about manufacturer mark-ups were initiated by McKesson, not First Data, and they do not discuss a survey.  For example, on November 9, 2001, Bob James wrote to Kay Morgan:

> Hello Kay . . . . . . . . . Just went through the Merck items and updated a couple of our items to 25% markup.  However, I found some items that you might want to review.  They include Noroxin's, Prinivil and Prinzide's.  The latter two, should probably be consistent with the new AZ 1.25 markups.[77]

157.   On other occasions, Bob James also gently reminded First Data to raise AWPs on certain brands:

> Hello Kay, this note is from BMS [Bristol-Myers Squibb] and is basically saying that FDB shows BMS at a 20.5% mark up while McKesson is showing a 25% mark up.  I am assuming that they are looking at current information and I thought we took care of this several weeks ago.  Ain't it Great.[78]

> Rite Aid called this morning complaining about Diamox AWP.  Just wondered if you had a chance to get to it yet?[79]

> We're catching flack from our large retail friends about the Wyeth products that were sold to Barr . . . Of course, we raised the prices on both NDC's for consistency, . . . See if it makes sense to you that both NDC's should carry the new price.[80]

> Good morning . . . .

---

[75] MCKAWP 0066191-92 (October 2002) and MCKAWP 0071670 (December 2002).

[76] MCKAWP 0065592.

[77] MCKAWP 0068621.

[78] MCKAWP 0069586.

[79] MCK 0001168.

[80] MCKAWP 0070781.

1
2
3

> We've had a couple of inquiries from the field asking us to correct our AWP's. J&J and one of the other wholesalers are saying that the McKesson AWP's are incorrect. We have them marked up 25% like the rest of the J&J line. When you have a minute, would you verify that our file matches the FDB file.[81]

4      158.   Many of the communications from First Data are also more consistent with an

5   agreement to change AWP than an objective survey to determine what it should be. For example,

6   on April 1, 2002, Alisha Nielson, Kay Morgan's assistant at First DataBank, e-mailed Bob James

7   to "please provide me with your mark-up for Endo."[82] Bob James responded that McKesson used

8   a 25% mark-up, and moments later, without any indication that she had received (or even

9   requested) responses from other wholesalers, Alisha Nielson forwarded his response to her co-

10  worker, Inna Dimitshteyn, with the instruction: "Please change the mark-up for Endo to 1.25

11  WAC."[83]

12     159.   Similarly, the following exchange between McKesson and FDB led to increased

13  mark-ups for Lexapro and Celexa:

14
15

> [McKesson] Question: Is Forest's new Lexapro at 1.25? and we still have Celexa at 1.20. The retail customers would love to have that one changed. Please advise. Thank you.[84]

16
17

> [FDB] Lexapro and Celexa by Forest are still at the 1.20xW markup. *We will change this as directed,* unless Kay objects. I will speak with her about this. She is in a meeting right now. [85]

18     160.   The RICO Defendants knew of McKesson's role in the Scheme and occasionally

19  asked for overt assistance. For example, Seattle-based retail pharmacy, Bartell's, sent McKesson

20  an e-mail with the subject line "Low AWP companies" to complain about a low mark-up for

21  Galderma.[86] McKesson responds with the subject line, "See, we listen":

22

23  _____

[81] MCKAWP 0001188. Kay Morgan responded: "We are in sync. Janssen still suggests [sell price] on some items and perhaps this is one but as you know Manufacturer suggested is not the same as AWP. Don't know who is complaining (Janssen?) but FDB and McKesson match."

25  [82] FDB/NEC 031778.

26  [83] *Id.*

[84] FDB/NEC 040006.

27  [85] FDB/NEC 040006 (emphasis added).

28  [86] MCKAWP 0069819.

CLASS ACTION COMPLAINT -                                           - 44 -

Celexa and Lexapro will have an AWP markup of 25% or a spread of 20% as soon as FDB information is updated. Look for a change to happen next week.

Keep smiling[g] ... and who said we never listen to our customers (and old friends).[87]

161. Bartell's thanks McKesson and immediately turns its attention to Clarinex:

THANKS....I GUESS I HAVE STIRRED THINGS UP WITH THE FOREST PEOPLE...ALL YOU HAVE TO TELL THEM IS THAT WE AREN'T GOING TO STOCK LEXAPRO AND PUT IT ON SPECIAL ORDER LIKE OXYCONTIN.

SCHERING REP CALLED AND WANTED TO KNOW WHAT I WAS GOING TO DO TO MOVE THE CLARITIN BUSINESS TO CLARINEX...NOT A THING, I REPLIED...THE AWP/TO COST IS MUCH BETTER ON ZYRTEC, ALLEGRA AND CLARITIN... [ellipsis added] SHE IS GOING TO TALK TO HER BOSS ABOUT GETTING THE CLARINEX AWP CHANGED.[88]

162. McKesson responds to Bartell's that the change to Clarinex has already been arranged:

fyi.

Schering is set up at FDB as a 1.25 vendor (meaning 25% markup/20% spread). Clarinex will be moved at the next price increase when a new survey would be done.[89]

Again although McKesson mentions a "survey," the outcome of the alleged survey is a foregone conclusion.

163. Similarly, in the Monthly Status Report, Rx Brand Product Management, General Overview October 2002, McKesson reports:

We have had some recent success in getting some AWP issues resolved by requesting that new surveys be done on Celexra and Clarinex. Both items had AWP profitability for our retail customers. We are working on getting some adjustments done on Lilly and Novo Nordisk products (insulin).[90]

---

[87] MCKAWP 0069817.
[88] MCKAWP 0069818.
[89] MCKAWP 0069818.
[90] MCKAWP 0066192.

CLASS ACTION COMPLAINT -                               - 45 -

1    And indeed it happens. On December 3, 2002, Kay Morgan orders her assistant to change the

2    mark-up on E.I. Lilly to 25%. There is no mention of a survey to instigate the change.[91] FDB did

3    not produce any documents to indicate that one was ever taken.[92] The change to Novo followed

4    close behind. On December 19, 2002, Morgan e-mails James: "FYI – Novo is going to 1.25

5    today. Can't have their products at 1.2 and Lilly at 1.25."[93]

6    164.    Other exchanges also demonstrate the McKesson and FDB worked closely to

7    change the mark-ups for brand drugs industry-wide. For example, without any explanation, Kay

8    Morgan forwards to Bob James an internal First Data e-mail advising that First Data was moving

9    Reliant to a 25% mark-up.[94] Also when Alisha Nielson e-mails Bob James to request a mark-up

10    for Enzon and copies Kay Morgan, Morgan responds before James even has a chance to answer:

11            Alisha,

12            Go ahead and put them on 1.25 times WAC.

13            Thanks,

14            Kay[95]

15    165.    And in response to James' inquiry about whether First Data had a 25% mark-up on

16    some of J&J's product lines, Morgan responded: "We are in sync."[96]

17    166.    Likewise Kay Morgan responded to an e-mail from Bob James asking whether

18    Prilosec over-the-counter could be considered like the prescription product with a 25% mark-up:

19    "Thanks and we have you covered."[97]

20

21

22    [91] FDB/NEC 015451. On the contrary, earlier that year Lilly had complained to FDB's CEO and COO

23    that FDB was manipulating AWPs. MCKAWP 0068863.

   [92] *See* Morgan (2007) at 278:16–279:9 (testifying that she could not recall any other written surveys

24    other than those produced by FDB and identified as exhibits at her deposition.

25    [93] MCKAWP 0069553.

   [94] MCKAWP 0069782.

26    [95] FDB/NEC 032733.

27    [96] MCKAWP 001188.

28    [97] MCKAWP 0070967.

CLASS ACTION COMPLAINT -            - 46 -

167.    Also consistent with advancing the Scheme, McKesson conducted weekly review of

First Data's AWPs. [98] In April 2002, James forwarded one of McKesson's comparison files to Kay

Morgan, asking her to

> let me know if you think this type of information is useful and also if
> you need additional information. *We should be enthused about how
> good this is looking.* Thank you for all your cooperation. We can
> get similar information on the rest of the file that would include
> generics and OTC/Home Healthcare but for now I would like to
> focus on brand products[.][99]

Morgan replied: "It's a start. . . . I agree, brand comes first."[100]

168.    In another instance , James wrote of McKesson's weekly FDB AWP comparison

files:

> From the weekly data that I have been using, there are fewer than
> 100 brand items where we are not using the FDB AWP because its
> [sic] not correct. They have the WAC and AWP as the same or 0.00
> WAC or an old AWP that is less than our current WAC *or they use a
> different multiplier* and round down. I have asked you to find out
> from Rite Aid if they would agree to us putting in a 25% markup (or
> 20% spread) on these items *until FDB catches up.*[101]

> I need to look at all brand Rx AWP's and not just the ones that are
> problems. This will give me a chance to look at the big picture and
> *see what I have left to do.*[102]

169.    McKesson also discovered that some of First Data's AWPs were low because First

Data had no data or inaccurate WAC information or none at all. In May 2002, Bob James

observed, "Most of the problem here [*i.e.* any remaining discrepancies between McKesson's

suggested sell prices and FDB's AWPs] is that FDB does not have a WAC (just using 00.00[)].

We are providing them our figures and they will input them next week. This will get us very close

---

[98] MCKAWP 0042663.

[99] MCKAWP 0069617 (emphasis added).

[100] MCKAWP 0069640. Over the course of the Class Period, McKesson forwarded several of its AWP comparison files to FDB. *See, e.g.,* MCKAWP 0069717; MCKAWP 0070784; MCKAWP 0070826; and MCKAWP 0070928.

[101] MCKAWP 0063858 (emphasis added).

[102] MCKAWP 0069820 (emphasis added) (e-mail string between James and others at McKesson re FDB AWP comparison report).

CLASS ACTION COMPLAINT -                                        - 47 -

to being on the money."[103] The previous month Bob James noted, "We are working with FDB to improve 'their accuracy' on WAC pricing because ours seems to be extremely accurate."[104]

170.   To correct this problem and to ensure that the mark-up changes were implemented promptly when the WAC increases occurred, McKesson decided in April 2002 to

> monitor (weekly) the items where the FDB WAC and McK WAC are different and send information to FDB to discover why. These items should be corrected quickly once we discover the reason it is happening and correct the process if necessary.[105]

171.   The next month Bob Roberts reported: "Kay Morgan has agreed to use our WAC prices where they show none presently. This is positive."[106]

## 4.   McKesson Concealed its Collaboration with First Data

172.   The implication that McKesson knew that it was not simply participating in an objective survey process with First Data is further underscored by McKesson's efforts to maintain the secrecy of its normalization plan. This secrecy also made it more difficult to discover the Scheme.

173.   In a February 21, 2002 e-mail discussing McKesson's efforts to increase AWPs, McKesson's John Bonner closed with the admonition: "I'm not sure it is something we want discussed. Please contact him before discussing outside the company."[107]

174.   When Brian Ferreira of VPS Retail wrote to Bob James asking him to "[p]lease provide the list of items and/or manufacturers that were included in the AWP standardization process," he knew better than to respond to the request in writing: "Brian, this is an interesting request. . . . Please give me a call when it is convenient."[108]

175.   McKesson knew that if it did not keep its manipulations of the AWPs a secret, there would be serious repercussions:

---

[103] MCKAWP 0068889.

[104] MCKAWP 0069615.

[105] Id. (MCKAWP 0069616).

[106] MCKAWP 0069669.

[107] MCKAWP 0066464.

[108] MCKAWP 0069714.

CLASS ACTION COMPLAINT -                                                    - 48 -

1    Confidentially. Not to pass on. We have [only] about 470 brand Rx
     items where McK and FDB AWP's do not match. . . .[109]

2

3    [Bob James, discussing McKesson's efforts to raise AWPs:] For
     obvious reasons we don't want to write a memo and send it out
     because it would not be kept confidential.[110]

4

5    [James, responding to McKesson field associate's request to share
     information about McKesson's efforts with her customers:] I would
     be careful . . . . . You be the judge on how your customer will

6    interpret.[111]

7    [McKesson field associate writing to John Bonner:] My accounts are
     having issues with us 'Normalizing brand pricing at 25%' . . . . You

8    also mentioned that we should not discuss [this] outside of
     McKesson, how would you suggest we answer our customers[']

9    questions?[112]

10   [McKesson field associate, discussing McKesson's "normalization
     plan":] Obviously this is not out to the field.[113]

11

12   [James, signaling to McKesson employees that they should not state
     in writing that McKesson changed its markups to improve its
     customers' profitability:] Remember, **"McKesson is doing this to**

13   **improve our inefficiencies in our BIS group."** With mixed AWP
     spreads, our BIS group is required to make manual overrides (for our

14   pricing activity) to input the First Data Bank AWP whenever there is
     a difference from our Suggested Sell or List Price. It could be stated

15   as a benefit of the Sixth Sigma method of identifying defects. An
     "unintended consequence" is that the profitability of our customers

16   will be impacted in a positive way. They will basically get 3⅓%
     more profit on Rx's filled with this new AWP spread. (Just imagine

17   what this would mean on drugs like Lipitor or Prilosec.) [boldface in
     original][114]

18
          176.    And First Data also knew the importance of keeping the Scheme a secret. In

19
     response to an e-mail inquiry about whether electronic drug pricing publishers were increasing the

20
     WAC-AWP spread, Kay Morgan denied any involvement and brandished the false "survey"

21
     defense: "I am most curious as to the source of this rumor. First Data has always used a

22

23

24   [109] MCKAWP 0068889.

25   [110] MCKAWP 0069591.

     [111] MCKAWP 0069592.
26
     [112] MCKAWP 0066464.

27   [113] MCKAWP 0069732.

28   [114] MCKAWP 0065895 (emphasis in original).

CLASS ACTION COMPLAINT -                              - 49 -

1    wholesaler survey to determine AWP."[115] She forwarded the exchange to Bob James at

2    McKesson, stating, "I thought you might want to see my answer," to which he responds: "I love it!

3    You are the best."[116]

4        177.    Evidence also suggests that McKesson and First Data agreed, whether explicitly or

5    implicitly, to perpetuate the myth of the objective survey process as a means of covering their

6    Scheme. For example, after FDB had already agreed to raise the mark-up on Schering products,[117]

7    McKesson forwarded the e-mail from Schering asking for McKesson's help in raising FDB's

8    mark-up on Clarinex so that it could remain competitive with Claritin[118] – another of the drugs that

9    were increased as a result of the Scheme: "Even the Shering folks would like to see the AWP

10    raised on Clarinex. Last time I spoke with Chuck, *I gave him the standard response about*

11    *process.*"[119]

12        178.    And publicly, throughout the 2001-2005 period, FDB falsely represented that its

13    surveys were "performed with all national wholesalers to determine the appropriate AWP."[120]

14        **5.    McKesson, First Data and Defendants Benefited from the Scheme**

15        179.    McKesson benefited from the Scheme because it was able to demonstrate to its

16    customers its willingness to create an environment of greater pharmacy profits. McKesson

17    anticipated that the Scheme would ensure customer loyalty and possibly increase its customer base,

18    and, in fact, McKesson did maintain and increase its customer base.

19        180.    McKesson's customers included the largest retail chains in the country, many of

20    whom are Defendants: A&P, Albertsons, Brooks, Costco, Eckerd, Giant Eagle, Hy-Vee, Kinney

21    Drugs, Long's Drugs, Rite Aid, Safeway, Randall's Shopko, Snyder's, Spartan, Super D/USA

22    Drug, Target, Wal-Mart, Walgreens, and Wegmans.[121]

23

---

24    [115] MCKAWP 0069588.

    [116] *Id.*

25        [117] *See* MCKAWP 0069818.

26        [118] MCKAWP 0069857.

    [119] MCKAWP 0069857.

27        [120] *See, e.g.,* FDB-AWP 02023; FDB-AWP 02005.

28        [121] MCKAWP 0074408.

181. Like most wholesalers, McKesson sold drugs at or below its own cost, and McKesson recognized that it could distinguish itself from other wholesalers by providing an enhanced relationship with customers.[122] Although McKesson and First Data knew the importance of keeping their activities confidential, McKesson also realized that it could "'market' [its] efforts" by carefully informing its customers that it was "doing everything possible to 'raise' AWP's when appropriate."[123] McKesson also appreciated that, if it failed to inform its customers that it was behind all these changes, "it's possible that some of these accounts will believe that this stuff just happens and our efforts will go unrecognized."[124] As another McKesson executive put it: "This sounds like something we should at least [be] quietly communicating to our customers in order to get some mileage from it[.]"[125] Greg Yonko concluded: "I also think we should start communicating any AWP changes so customer[s] know what's going on, the end result should be beneficial."[126]

182. And so it began:

> [To Bartell Drugs:] Celexa and Lexapro will have an AWP markup of 25% or a spread of 20% as soon as FDB information is updated. Look for the change to happen next week. Keep smilin[g] . . . and who said we never listen to our customers (and old friends)."[127]

> [To Bartell Drugs:] Just wanted you to know that Clarinex AWP spreads went to 20% this week. A few weeks ago Celexa went to 20% as well. Fat cat status is just around the corner.")[128]

> [To Rite Aid:] P.S. latest AWP changes . . . Celexa and Clarinex, working on Lilly and Novo.[129]

> [To various individuals, not identified by pharmacy:] "I am told" that the mark up on Avonex and both the old and new sku's of Copaxone will be changed to 25% (to create a 25% spread on WAC/AWP) next week. . . . . Yes!! . . . . This should have a

---

[122] *See* John Bonner Dep. at 12:20-23 (acknowledging that wholesalers sell at or slightly below cost).

[123] MCKAWP 0065895.

[124] *Id.*

[125] MCKAWP 0069732.

[126] MCKAWP 0084300.

[127] MCKAWP 0069817.

[128] MCKAWP 0069901.

[129] MCKAWP 0069911.

CLASS ACTION COMPLAINT -                                                   - 51 -

significant contribution to your profitability as illustrated by the following example using a reimbursement of AWP – 15% plus $2.00 fee:

Avonex at 16⅔% spread, profit would be $18.42 . . . and now at a 25% spread, profit would be $51.31 . . . not bad! This is an increase of $32.89 per script.

Copaxone at 16⅔% spread, profit would be $19.72 . . . an now at 20% spread, profit would be $57.39 . . . pretty good! This is an increase of $37.67 per script.[130]

183.    A field agent reported that customers were beginning to understand McKesson's

efforts: "Some of the more sav vy [sic] stores like Med-X have taken notice."[131]

184.    Bob James realized that the goodwill McKesson established with the pharmacies as

a result of inflating AWPs would give it a substantial edge over its competition:

In my discussions [with select customers about McKesson's efforts to "normalize" the AWP markup at 25%], one of the comments that was made was "this would certainly be a good reason to renew our agreement with McKesson when its time." Talk about being good partners, wow! This is worth further discussion as we go forward. Maybe a proactive strategy like this will soften some of the activity around asking for lower costs and more benefit.[132]

185.    James proposed disclosing McKesson's efforts to customer Omnicare who

purportedly was looking for an extra-contractual year-end bonus in the neighborhood of $500,000:

Omnicare is looking for . . . . . . say $500,000 in benefit from year end deals, even though this was not part of their contract. We need to ask them to roll up or recalculate their reimbursements for last year based on the new AWP's with a 20% spread. And . . . . . . this is **not just a one time benefit.** They will receive this now and for each year going forward until they renegotiate their contracts with third parties (and hopefully do not give up this gift).[133]

186.    James also noted with pleasure that Kay Morgan spoke "with Eric Sorkin at RiteAid

to let him know how much effort we are putting into this AWP thing to get it right."[134]    Other

customers were also appreciative, for example an unnamed customer from Ohio, who called

---

[130] MCKAWP 0084327.

[131] MCKAWP 0069732.

[132] MCKAWP 006589.

[133] MCKAWP 0065895 (emphasis, ellipses in original).

[134] MCKAWP 0069669.

CLASS ACTION COMPLAINT -                                    - 52 -

McKesson "to say that he was looking at some of these items again and found that the spread appears to have increased significantly on most of these items to the area of 20-21%. He wondered if we had any part in doing this and, if so, he wanted to let us know that he really appreciated our efforts."[135] Rite Aid was McKesson's largest customer accounting for 14% of McKesson's revenues. McKesson's top ten customers accounted for 55% of its revenues and on information and belief included many of the RICO Defendants.[136]

187. Med-X Corp.'s Director of Operations, Jerry Howard, reviewed the numbers, put two and two together[137] and "was very ex[c]ited about" McKesson "working on AWP expansion."[138]

188. These internal comments are consistent with the 2007 public statements of McKesson CEO and President John Hammergren, which emphasize that, while McKesson wishes to help its retail customers, it only seeks to do so when that help is mutually beneficial:

> As to all of their [pharmacies'] pressures effect on McKesson, all of those [Medicare Part D] things are outside of our scheme. We don't use AWP or AMP or PDP negotiated prices. Our contractual relationships with our customers are independent of those mechanisms. So to the extent that they are hurt, clearly, they can come back to us and say we would like to have you help us with our margin pressure. And although we're sympathetic to those plights, they've been asking us to help them with their margin pressures for 30 or 40 years. We would have already caused to exist if we had helped them with their margin pressures over the years. So I think that's more of a market competitive issue for McKesson as to how we would respond, as opposed to whether or not they're going to ask us for a better deal. We're asked about a better deal all the time by our customers, and our sales forces and our management teams are trained to only provide better deals if it's a better deal for McKesson and there's some way to for us to get a win-win out of it, as opposed to gee, I feel your pain; why don't you take part of my margin?[139]

189. Of course, increasing AWPs in collusion with First Data was a "win-win" proposition for McKesson, because it rewarded McKesson's retail customers without costing

---

[135] MCKAWP 0069513.

[136] 2002 Form 10-K at 8.

[137] MCKAWP 0069732.

[138] MCKAWP 0069726.

[139] McKesson Corporation at the Goldman Sachs 28th Annual Global Healthcare Conference, *Fair Disclosure Wire* (June 13, 2007).

1  McKesson. Instead, End Payors and patients all around the country would pay the increased costs
2  of the Scheme.

3  190.  In an internal document dated February 3, 2004, McKesson bragged that it
4  maintained its status as the market share leader by retaining "100% of its key RNA [retail national
5  accounts] base," winning "2-3 new big customers," capturing "30% of regional chains" and
6  expanding its "#1 position" among wholesalers.[140]

7  191.  Although McKesson never mentioned the Scheme or the benefits McKesson derived
8  from it in public filings and other representations to the investing public, McKesson did
9  acknowledge that it benefited from price increases for brand drugs.

10  192.  In an earnings conference call in the first quarter of 2003, McKesson's CEO John
11  Hammergren stated that McKesson's "gross margin expansion is being driven a little bit now by
12  price increases on branded products and if those price increase trends stay the way they are, we
13  could very well see gross margin expansion, as well."[141]  Three months later, during a second
14  quarter 2003 earnings conference call, Hammergren stated:

15          You know, we continue to see a nice drug price inflation, probably in
        the 4-and-a-half to 5-and-a-half percent kind of range, and certainly
16          as strong as it was in the prior fiscal year.  We continue to find ways
        to leverage our customer base to get margin opportunities for the
17          manufacturers, and we're very positive about the way it looks for the
        balance of the year.[142]
18
McKesson continued to report the positive effect of price increases for another year.[143]
19
20  **6.  McKesson's Internal Documents Admit the Long-Term Effects of the Scheme**

21  193.  While the Scheme was still in its infancy in September 2001, McKesson realized

22  that it would have a profound effect on its customer's profitability:

23  _____
    [140] MCKAWP 0074404 at 74410.
24
    [141] *See* July 23, 2002 Fair Disclosure Wire article.
25
    [142] *See* October 21, 2002 Fair Disclosure Wire article.

26  [143] *See* January 21, 2003 Fair Disclosure Wire article, Event Brief of Q3 2003 McKesson Corporation
    Earnings Conference Call (describing "this solid pricing environment" and stating "[t]he pricing levels were
27  above 5%. We feel strongly those products are protected and have good market share and price increases.");
    July 24, 2003 Fair Disclosure Wire article, Q1 2004 McKesson Corporation Earnings Conference call
28  (stating that "drug price increases continue to be robust").

CLASS ACTION COMPLAINT -                              - 54 -

In August we were able to get the Concerta (formerly an Alza product now JOM) AWP spread raised to 20% from the previous 16 ⅔% [i.e. an increase in the markup from 20% to 25%]. Last week we got agreement with First Data Bank on raising the Searle Products, which are now part of Pharmacia, to a 20% spread as well as Genotropin which was a Pharmacia product (with a 16 ⅔% spread). This may not seem like a big deal but it has a huge positive impact on the profitability of our customers.[144]

194. Clearly, if McKesson had believed that the increases were only short-term, it would

not have bragged about a "huge positive impact on the profitability of our customers." And in the

previously cited e-mail from January 2002, Bob James confirmed this when he explained that

McKesson expected their customers to hold onto the "gift" of the increased mark-ups well into the

future:

A couple of years ago I was pulled into a conference call with Steve somebody (I think) and our McKesson MHS sales person, about how we were hurting them with our AWPs. He came on very strong and was going to call John Hammergren, etc. We calmed him down by explaining our process and tried to make him understand that we were really their advocates and were doing everything possible to "raise AWP's when appropriate. I haven't heard anything since."

Here is an idea. Two years later, and having had some recent success in raising AWP's, I think this could be presented to him positively in this way:

Omnicare is looking for . . . . say $500,000 in benefit from year end deals, even though this was not part of their contract. We need to ask them to roll up or recalculate their reimbursements for last year based on the new AWP's with a 20% spread. And this is **not just a one time benefit.** They will receive this now and each year going forward until their renegotiate contracts with third parties (and hopefully do not give up this gift).[145]

195. Similarly, James' April 2003 memo stating that "We played a major role (and still

do) in normalizing the AWP's on Brand Pharmaceuticals" also confirms the profound impact of the

Scheme:

This has had a huge impact on the profitability of our customers on their insurance based business (which is about 90% now). To summarize this impact, it's the same as lowering their cost of goods 3 ⅓% on 70% of the brand drugs. Historically, 75% to 80% of brand pharmaceuticals carried a 16 2/3% AWP spread and the remaining, a

---

[144] MCKAWP 0065885 (September 18, 2001 e-mail from Bob James to Greg Yonko).

[145] MCKAWP 0065895 (January 7, 2002 e-mail from Bob James to Greg Yonko, *et al.*) (emphasis in original).

1
2

20% spread. Today, almost 95% of brand drugs carry a 20% spread. This has provided millions of dollars in improved profits across our industry.[146]

3      196.   As many as *three years* after the Scheme was implemented, McKesson employees

4   were still internally congratulating each other about its success.

5      197.   For example, in a July 30, 2004 e-mail, McKesson's John Bonner acknowledged the

6   Scheme's impact on payors and the corresponding benefit to McKesson's clients:

7
8
9

We try to "push" the AWP up to 25% above WAC rather than 20%. This may cause your customer some short term reimbursement pain with the payors but in the long run, if AWP at First Data Bank goes from 20% to 25%, your customer will benefit.[147]

10
11

Most payors reimburse pharmacies at AWP minus 15 to 17%. *The higher AWP markup percentage, the more they are paid by the insurance company.* Pharmacies barely break even on items with 20% AWPs.[148]

12      198.   Again in July 2004, McKesson was calculating how much the price increase at

13   Johnson & Johnson had earned one of their clients: "Please see below for the work up of what the

14   impact has been for Omnicare on JOM products relative to the change in AWP spread. Three years

15   ago J & J products were all 16 ⅔% AWP spread products. Today, almost all of them are 20%

16   spread. Procrit just changed last month."[149]   McKesson concluded that, for Procrit alone, profits

17   tripled, and taking all JOM products together, the effect is "*more than 3 times the profit as*

18   *before*."

19      199.   Similarly, in April 2004, when writing to a manufacturer to decline its request to set

20   the mark-up for its products at 20%, James explained:

21
22
23

[T]hings have pretty much normalized at a 20% spread (1.25 markup) for Brand Rx, which has been extremely beneficial for our customers. . . . . Why do you want to take the profitability away from the retail pharmacies by trying to use a spread of 16 ⅔% when almost all other companies are getting a 20% spread. *If you have any doubts about what I am saying, please contact Scott Johnson at*

24

25      [146] MCKAWP 0065592.

      [147] The "customer" here is a McKesson retail client.

26      [148] MCKAWP 0076289 (e-mail string, including July 29, 2004 e-mail from John Bonner to Benjamin Coppolo).

27      [149] MCKAWP 0068131-32 (e-mail string, including July 28, 2004 e-mail from Bob James to Andrew Stubbs, *et al.*).

28

1             ***Albertsons, Dave Vucurevich or Greg Drew at Rite Aid, Frank
2             Seagraves at Wal Mart, or Frank Scorpiniti at Longs.[150]***

200.    That McKesson was touting its benefits to Albertsons, Rite Aid, Longs and

Wal-Mart in 2004 underscores the evidence that the Scheme had long term effects on End Payors

and that these RICO Defendants knowingly joined the Scheme.

### 7.    Evidence from Manufacturers Also Confirms the Existence of the Scheme and the Impact on Plaintiff and Members of the Class

201.    The Scheme is corroborated by evidence from manufacturers.  For example, an

internal memo from Johnson & Johnson ("J&J") from May 15, 2002, titled "Wholesaler

manipulation of AWP" stated:

> At a recent McKesson meeting Greg Yonko confirmed that
> McKesson was changing average selling price to reflect a higher
> spread on AWP. . . . McKesson is implementing the change after
> companies implement a price increase. . . . . Amerisource and
> Cardinal have indicated that they are NOT implementing the same
> strategy.  It is safe to assume that if McKesson is successful and the
> change in AWP is reflected in First Data Bank and Red Book, then
> ABC and Cardinal will follow.[151]

202.    Other J&J documents also recognize that the Scheme caused artificial increases for

end-payors, while increasing pharmacy profits:

> It has come to our attention that pricing services such as First
> DataBank are now adjusting our recommended AWP's based on a
> WAC + 25% formula.  The result is a win for providers (pharmacies)
> since their reimbursement from Medicaid is increased.  The state
> pays more and there is additional pressure on the industry as a whole
> because state expenditure for drugs will increase.  This is an artificial
> price increase and setting of the AWP is out of our hands.[152]

203.    J&J drafted an internal memo in which it addressed First Data's unauthorized

increase of J&J's mark-up to 25%.  It observed:

> Since AWP is the basis for reimbursements in many segments, this
> action will increase the strain on multiple payers.  The inflated AWPs
> would benefit pharmacies under Medicaid payment procedures and

---

[150] MCKAWP 0071694 (April 20, 2004 e-mail from Bob James to Chad Lucero).

[151] MDL-OBI00002828-39; *see also* MDL-OBI00040610-15 (May 13, 2002 J&J e-mail with attachments showing that ABC, Cardinal and McKesson each had 20% mark-ups for Procrit and Epogen, but noting "Bob James confirms that AWP for both PROCRIT and Epogen will be moving to cost x 1.25 in the near future.").

[152] MDL-JJ00000110.

1    since AWP is the primary basis of Medicaid reimbursement, the
     impact to states could be significant.

2

                                    * * * *

3

4    When probed by various J&J contacts, FDB provided contradictory
     responses . . . ranging from: the use of survey methods and
     techniques have not changed: the data is what it is. . . . to the other
5    end of the spectrum . . . . it was a deliberate action: "J&J will be a
     +25% company" as would other 20% companies to standardize data
6    collection and reporting requirements on FDB. There was not much
     detail provided regarding survey techniques. J&J trade relations
7    believe the major wholesalers are surveyed and two out of the three
     majors would be enough to change the price point. From a
8    wholesaler perspective the theory exists that this would be a way to
     enamor themselves with the retail pharmacies, as greater profits
9    would be realized by the pharmacists.[153]

10   204.    A Bristol Myers Squibb presentation also observed the changes, but assumed that it

11   was all First Data's doing:

12   First Data Bank has changed the way they create AWP. In the past,
     some manufacturers list prices was marked up 20.5%, others 25%
13   based on the product labeler code. Now, concurrent with price
     increases, 25% mark-up is being applied, regardless of historical
14   precedence.[154]

15   205.    The same is true about AstraZeneca, which observed:

16   Recently, FirstDataBank [sic] has independently begun to revise the
     AWP for all branded pharmaceutical products to a 25% markup. We
17   have been informed that FirstDataBank [sic] is taking this action to
     create consistency in price reporting. For AstraZeneca products with
18   a 20% spread, the spread will increase to 25% at the time of the
     WAC price change, beginning on January 1, 2002, or by the end of
19   the 1st Qtr 2002, even if the price change was not changed. We have
     seen the change to AZ and other companies' products that had price
20   changes in 2002.

21   **How the spread changes could impact the industry and**
     **healthcare system**

22

23   • Price perceptions – AWP is sometimes used to compare prices
       so a higher spread appears to inflate the prices of
24     pharmaceutical products. As an example, the new AWP price
       for Nexium 40 mg capsules is $4.32 – it would have been $4.14
25     without the spread changes.

26

27   [153] MDL-CEN00103686 (Ortiz exhibit 001). Ms. Ortiz testified that the memo represented a summary
     of her research into the question of the AWP reporting issue. Ortiz Dep. at 88:14-20.

28   [154] BMS/AWP/01109780.

CLASS ACTION COMPLAINT -                          - 58 -

- Pharmacy reimbursement – a higher spread can translate into higher reimbursement to retailers and mail order pharmacies to the extent a reimbursement formula for private third party and Medicaid RX's is anchored off of AWP.

* * * *

- Price comparisons – since AWP is sometimes used to compare the prices of competing products the change in spread will cause price differences to appear greater or lesser depending on the specific situation. . . . However, according to FirstDataBank [sic] the spread for all branded drugs will be changed to 25% by the end of the 1st Qtr 2002.[155]

206.   First Data kept the ruse alive when it told Aventis that wholesalers were driving the changes:

First DataBank has advised me that after surveying the wholesalers, they feel that there are very few manufacturers that still have a 20% AWP to AWC spread. As a result First DataBank has determined to employ a higher 25% AWP to WAC spread for all Aventis products. This will be implemented as we have price changes. Immediately the entire line of Allegra will be moved to a 25% spread from its current 20%. This will be effective immediately. The most noticeable will be that it will be more profitable for the retail pharmacist to dispense Allegra.[156]

207.   Although they ultimately did nothing about it, many of the manufacturers objected to the increases.[157]

### 8.   The Other Major Wholesalers – Amerisource Bergen and Cardinal – Declined to Manipulate AWP or Participate in the Scheme

#### a.   While Cardinal and ABC Faced the Same Pressures as McKesson from Defendants to Increase Profit Margins, They Did not Join the Scheme

208.   Although wholesaler prices are based on WAC, not AWP, wholesalers maintain AWPs for their customers' benefit to allow them to calculate their reimbursement.[158]

---

[155] AZ 00461109 (Freeberry, Exhibit Q, identified, Freeberry Dep. at 114:14-19).

[156] AV-BCA-0010336.

[157] See, e.g., MDL-OBI00002617 (J&J); Deposition of John Freeberry (May 20, 2004) at 118:11-120:18; 125: 7-15 (AstraZeneca). FDB-AWP 053695 at FDB-AWP 053697(GlaxoSmithKline); see also MCKAWP 0068863 (Morgan e-mail to James, dated April 30, 2002: "ARGHH!!!!! Lilly told our CEO and COO we were setting AWP.").

[158] See, e.g., MCKAWP 0084291 ("Regardless of where product management says the customer should get the AWP, the fact of the matter is that a lot of them I am sure use the AWP from our system for

209. But even though other wholesalers like ABC and Cardinal provided AWP information to their customers, they refrained from engaging in any scheme with First Data or otherwise manipulating pricing data.

### (1) Cardinal

#### (a) Where possible, Cardinal set its "Reference Price" based on what manufacturers told Cardinal

210. Like McKesson's Suggested Sell Price, Cardinal has a sell price in its "Master Item File" or "MIF" database called Cardinal "Reference Price."

211. Unlike McKesson, which revised its Suggested Sell Price without regard to manufacturer suggestion in order to increase First Data's published AWPs, Cardinal always relied on the manufacturer suggested price or historical mark-up and applied a default mark-up only if it had no mark-up information.

#### (b) Cardinal ensured that its AWP Reference Price would not be confused with FDB's AWPs

212. Cardinal took pains to ensure that its Reference Price was not confused with actual published AWPs. Historically, Cardinal published a "Corporate AWP" or "Cardinal AWP." In approximately 2000, Cardinal began reconsidering the label "Corporate AWP" because the field was based on vendor information, not a calculation of an average, as the name "AWP" suggested.

213. Cardinal decided to call its sell price "Reference Price" because it did not want to be presumed to be a party that sets AWPs.

#### (c) Cardinal never responded to FDB "surveys"

214. Cardinal was largely unaware of First Data's wholesaler surveys until about 2000. An internal Express Scripts document from 2002 reflects that representatives from Cardinal told employees at Express Scripts that they believed First Data surveyed three wholesalers: McKesson, AmerisourceBergen, and D&K.[159]

---

reimbursement. And yes, this [discrepancies between McKesson's list prices and what the vendors or FDB list as the AWPs] would definitely be a problem.").

[159] ESI-414-00004275.

CLASS ACTION COMPLAINT -                              - 60 -

1    215.    It has been Cardinal's policy since at least 1998 never to share its pricing

2    information with third parties, including First Data. Thus, Cardinal not only refused to participate

3    in First Data's "surveys," but, other than forwarding manufacturer price announcements, also

4    refused to provide First Data pricing information at all.

5    216.    Cardinal's policy of non-disclosure was well-enforced. Cardinal was aware of only

6    a single instance in which a Cardinal employee had provided AWP information to First Data.

7    After that incident occurred, the employee was instructed never to do so again, and Cardinal held a

8    meeting at which this message was conveyed.

9    217.    Notes from an internal First Data meeting on June 7, 2000 – over a year before the

10   Scheme began – confirm that Cardinal informed First Data that it did not want to take part in its

11   survey:

12              Steve is saying that Cardinal didn't want to participate in [FDB's]
                survey. Kay [Morgan] wants to continue to include Cardinal. . . .
13              Doesn't know if they want to be in the position of setting AWP [in
                case] Cardinal heard back from their customers that they are setting
14              the wrong AWP.[160]

15   The notes also identify as First Data's contact for Cardinal the same Cardinal employee who was

16   rebuked for violating Cardinal's policy of disclosing unpublished pricing information.[161]

17   218.    Cardinal asked her to stop calling about pricing information.[162] She further

18   conceded that the only mark-up information that she received from Cardinal after that point was

19   limited to instances in which there was a product that Cardinal wanted listed that was not carried

20   by any other wholesalers.[163]

21   219.    FDB's document production further undermines its contention that it relied on

22   Cardinal's involvement in the survey process. FDB produced three written surveys which purport

23   to show Cardinal involvement. All three pre-date the August 2001 start of the Scheme. Two are

24   dated in April 2000, within a few months of the FDB meeting in which the errant Cardinal

25   _____

26   [160] FDB-AWP 028338 at 28340.

     [161] *Id*. at 28338.

27   [162] Morgan 2007 Dep. at 49:4-6.

28   [163] *Id.* at 55:8-58:1.

CLASS ACTION COMPLAINT -                                    - 61 -

1    employee is identified as FDB's contact from Cardinal and in which it is conceded that Cardinal

2    does not want to participate in FDB's surveys.[164] A third is dated May 14, 2001, three months

3    before the Scheme began. However, in this latter document FDB's third person reference to

4    Cardinal, *i.e.* "Cardinal - uses manufacturer suggested AWP" stands out in contrast with its second

5    person references to Bergen and Amerisource, *i.e.*, "Bergen – Use AWP provided by Lilly, let us

6    know if you think we should reconsider this," and "Amerisource – Unusual. We have 1.20 for

7    00002, but the NDCs in question are 1.25."[165] FDB's use of the third-person to describe

8    Cardinal's position suggests that it is not referencing Cardinal's personal response to the May 2001

9    survey, but rather representing what it understood to be Cardinal's pricing policy.

10    220.   This attempt to include Cardinal's pricing policy as part of the AWP calculation was

11    inconsistent with Cardinals' clear intention that it did not want to take part in the survey or

12    otherwise influence AWP pricing. And even Kay Morgan conceded that she continued to try to

13    call Cardinal for mark-up information even after she had been asked not to call, which is

14    inconsistent with her professed belief that she had clear instructions from Cardinal as to how to use

15    their input in a wholesaler survey.[166]

16    221.   The testimony of Alisha Nielson, who, with Kay Morgan, was solely responsible for

17    updating First Data's mark-up database, is also consistent with Cardinal's lack of involvement.[167]

18    While she testified that First Data "looked to Bergen, Cardinal and McKesson" in the 2001-2005

19    period for mark-up information,[168] Ms. Nelson admitted that she did not know whether First Data

20    had any contacts at Cardinal for wholesaler surveys in this period.[169]

21    222.   Thus, First Data was not surveying Cardinal, one of the "Big Three" wholesalers, at

22    any time during the Scheme.

23

24    [164] FDB/NEC 018527; FDB/NEC 018521, compare FDB-AWP 028338-42 (FDB meeting notes).

     [165] FDB/NEC 015320. There is no verb and thus no reflection of person in FDB's reference to

25    McKesson, *i.e.*, "McKesson – 1.20."

     [166] Morgan Dep. 2007 at 287:7–289:2.

26    [167] Nielsen Dep. at 53:7-19; 60:5-8; 131:5-19.

27    [168] Nielsen Dep. at 70:11-17.

28    [169] Nielsen Dep. at 165:10-24.

CLASS ACTION COMPLAINT -          - 62 -

**(d) Cardinal refused to respond to Defendants' pressures to raise its mark-up**

223. Nor did Cardinal otherwise manipulate prices. In October 2002, Cardinal sales representatives were complaining that their customers were concerned because the AWPs Cardinal listed were lower than the AWPs listed by its competitors, yet Cardinal refused to become involved in any price manipulation. Similarly, documents from the PBM, Express Scripts, indicate that when Cardinal was approached by a pharmacy and asked to increase its mark-up, Cardinal refused to do so.[170]

224. Even when Cardinal received calls from customers after the Scheme had taken effect, it maintained its pricing policy.

**(2) Amerisource Bergen**

**(a) ABC based its AWPs on manufacturer information and, when that source dried up, on FDB's AWP**

225. ABC was the product of an August 2001 merger of AmeriSource and Bergen Brunswig. The AmeriSource legacy company used a formulation called "AAS AWP," which was similar to McKesson's Suggested Sell Price, and Bergen's legacy company had one called "BBCWP."

226. ABC utilized the historical mark-up because it believed AWP should be standardized throughout the industry.

227. When AmeriSource and Bergen Brunswig merged to form ABC, ABC conducted a reconciliation to ensure that all of its AWPs, and the methods by which they were calculated, were the same. Although ABC found it difficult to manually enter AWP changes, ABC never considered standardizing all of its mark-ups in order to make the process easier.

---

[170] *See* ESI-414-00004275; *see also* ESI-414-00003844.

**(b)** **ABC never responded to FDB "surveys"**

228. ABC is not aware of anyone ever being surveyed by First Data, responding to surveys, providing any type of pricing information to First Data, or providing First Data with ABC's method for calculating its proprietary AWP.[171]

229. Similarly, there are no FDB survey documents from any time during the Scheme purporting to show ABC (or its predecessors, Bergen and Amerisource) participating in the survey process. Alisha Nielson conceded that during the merger, acquisition, and subsequent layoffs of ABC employees, FDB was not getting sufficient information from ABC.[172]

230. In October 2003, First Data held a conference call with ABC, hoping to convince ABC to participate in FDB surveys, but was unsuccessful.[173]

**(c)** **Despite pressures from its customers to raise its mark-ups, ABC adhered to manufacturers' historic mark-ups**

231. Like Cardinal, ABC, too, faced pressure from its customers to raise its AWPs. Nonetheless, ABC never considered using a standardized mark-up of its own choosing.

232. Even after the Scheme took effect, ABC resisted adopting First Data AWPs for years.

**C.** **Fraudulent Concealment and Continuing Violation**

233. The RICO Defendants, McKesson and FDB cleverly hid their conduct behind FDB's confidential survey process to avoid detection and to preserve for as long as possible the benefit they had conferred to themselves and other pharmacies.

234. Additionally, McKesson and FDB made affirmative misrepresentations about their role in the Scheme, including without limitation, falsely attributing mark-up increases to the wholesaler industry as a whole, as opposed to McKesson's secret normalization agenda.[174]

---

[171] Affidavit of Denny Lindell (Mar. 1, 2006) (describing results of investigation).

[172] Nielson Dep. at 96:11–97:8.

[173] Morgan at 242:4–243:1; *see also* FDB/NEC 032851; *see also* FDB/NEC 032852-53 (internal FDB e-mail, dated September 15, 2004, discussing FDB's negotiations with ABC to provide pricing data).

[174] *See, e.g.*, AVA-BCA-0010336.

CLASS ACTION COMPLAINT -                                                    - 64 -

235. FDB continued to make false or misleading statements about the integrity of its data and the means by which it calculated its AWPs.[175] FDB also kept McKesson's participation in the process secret by refusing to disclose the alleged survey results on alleged grounds of confidentiality.[176]

236. Additionally, when asked directly whether First DataBank was in the process of normalizing mark-ups, First DataBank not only denied this and demanded to know the source of this "rumor," but forwarded its response to McKesson's Bob James, who responded: "I love it! You're the best."[177]

237. Similarly, in a conference call with Aetna, McKesson denied that it had any control over rising AWPs,[178] while at the same time it bragged to select customers that McKesson had "done [its] part" to increase AWPs through increased mark-ups. [179]

238. Nor did McKesson publicly reveal its normalization scheme, knowing that if the increases were revealed, managed care would renegotiate with retail pharmacies and McKesson's "gift" to retailers would be lost.[180]

239. The effects of the Scheme were further obscured because First Data stored its mark-up information separately from its database of published prices and generally increased the mark-up on individual drugs only when the manufacturer announced a change to the WAC.[181]

---

[175] For example, FDB-AWP 02005 (page from FDB's website, dated November 4, 2002) (stating that FDB surveys each of the national wholesalers to determine mark-up), which Kay Morgan acknowledged was never a true statement of FDB's survey practice. Patricia Kay Morgan 6.28.07 Dep. at 100:16-23.

[176] *See, e.g.*, FDB-AWP 053695 at FDB-AWP 053697 (March 1, 2002 letter from GlaxoSmithKline complaining of the mark-up increases: "First DataBank has not been willing to share any information regarding that survey or to disclose any other data that might form the basis for this change in the formula. We were informed that First DataBank considered the data to be proprietary. We were also told by certain of your personnel that, because First DataBank alone sets AWP, we had no standing to request an explanation from First DataBank for the extent of these increases in AWP."); Freeberry Dep. (May 20, 2004), at 114:18-24 (regarding AstraZeneca's efforts to address FDB's unauthorized increases of its mark-ups: "Q: Have you ever reviewed any of the wholesaler surveys that First DataBank purportedly did? A: I asked for them; they weren't provided.").

[177] MCKAWP 0069588.

[178] MCKAWP 0078652.

[179] MCKAWP 0065895.

[180] MCKAWP 0065895.

CLASS ACTION COMPLAINT - - 65 -

240.    It was McKesson and FDB's standard practice to delay the implementation of the

mark-up increase until the WAC prices were published and both changes would take place at once.

For example, when Bob James e-mailed FDB to ask Kay Morgan if she would "check the AWP for

Remicade," Alisha Nielson responded:

> Hi Bob,
>
> They (Centocor) are a 25% company. However, they have not had
> any price changes on this Remincade product since 2001 ... prior to
> the markup. I'll bring this to Kay's attention. Not sure if ... [she]
> would want to take action on it right now because it would trigger a
> lot of questions on why there was a change to the item when the
> MFG hasn't sent any price changes.
>
> Have a wonderful day!
>
> Alisha Nielson[182]

241.    Because the artificial mark-up increases were taken at the same time and

overshadowed by the manufacturers' published WAC increases, most payors were unaware of any

mark-up increases and attributed the overall increases to manufacturer price hikes.

242.    Finally, in a March 15, 2005 letter, First Data announced that its purported survey

method of determining AWPs would be discontinued, but it did not disclose the Scheme or

otherwise inform the public that its AWPs were the product of manipulation by FDB and

McKesson. On the contrary, reviewing its past practices with respect to establishing AWP, First

Data restated that it had conducted surveys to establish AWPs:

> March 15, 2005
>
> **Re: First DataBank's Blue Book AWP Data**
>
> Dear Customer:
>
> It is our pleasure to serve you as a customer of First DataBank. We
> are writing to make you aware of upcoming changes to First
> DataBank's National Drug Data File Plus™ database, or NDDF
> Plus™, that may impact your use of our products.
>
> In order to publish various drug pricing data fields available through
> its NDDF Plus database and related products, First DataBank has

---

[181] Alisha Nielsen at 84:16-85:3; 158:2-7; *see also* MCKAWP 0069609 (explaining the delay between
the change in mark-up and when it takes effect with the announcement of price changes).

[182] MCKAWP 0071440.

CLASS ACTION COMPLAINT -                               - 66 -

1
2
3
4
5
6
7

> historically relied on drug manufacturers and wholesalers to report or otherwise make available information concerning their list price for drugs. Unfortunately, First DataBank is no longer able to obtain information relating to list prices directly from wholesalers in a manner that is consistent with First DataBank's editorial standards and policies. In fact, it is our understanding that some wholesalers often do not use catalog or list prices as a basis for determining actual transaction prices. As a result, First DataBank must implement certain changes to its publication of the "Blue Book AWP" pricing data field. Effective immediately, First DataBank will no longer survey drug wholesalers for information relating to their catalog or list prices.

> First DataBank historically relied upon wholesalers to provide information relating to their catalog or list prices for purposes of publishing the Blue Book AWP data field. *First DataBank periodically surveyed full-line national wholesalers to determine the average markup applied to a manufacturer's line of products. The average markup of the wholesalers responding to the survey was applied against the Wholesale Acquisition Cost (the manufacturer's list price to wholesalers, also commonly referred to as WAC)* or, if a Wholesale Acquisition Cost was not available, the Direct Price (the manufacturer's list price to non-wholesalers), with the resulting value populating the Blue Book AWP field. In certain instances, wholesalers would accept a manufacturer's suggested wholesale price, in which case the Blue Book AWP and Suggested Wholesale Price data fields would reflect the same value.[183]

243. Plaintiff had no knowledge of the Scheme as it relates to McKesson and First Data prior to August 2008 when it received documents from a proposed settlement with First Data in the *New England Carpenters* matter pending before the Court.

244. Plaintiff had no knowledge of any facts that might have led to the discovery of the claims alleged herein until Plaintiff consulted its counsel regarding the above settlement.

245. Plaintiff could not have discovered the existence of the Scheme, claims and conspiracy alleged herein at an earlier date by the exercise of reasonable due diligence because of the deceptive practices and secrecy employed by McKesson and its co-conspirators First DataBank and the RICO Defendants to avoid detection and their affirmative concealment of such violations. Indeed, the RICO Defendants successively submitted false claims for Marked Up Drugs throughout the Class Period notwithstanding their knowledge of the falsity of these claims.

---

[183] MCKAWP 0054057.

246. As a result of the active fraudulent concealment of the conspiracy, Plaintiff asserts the tolling of the applicable statute of limitations affecting the causes of action by Plaintiff and members of the Classes. Moreover, the RICO Defendants' actions in submitting false claims constitutes a continuing violation because each and every payment of such claims and purchase of drugs at artificially inflated prices is an overt act that injured Plaintiff and members of the Classes. These artificially inflated prices continue to exist because McKesson, FDB and the RICO Defendants have failed to disclose their illegal conduct and its effect on the prices paid by Plaintiff and members of the Classes for brand-name drugs. In addition, McKesson, FDB, and the RICO Defendants committed numerous overt acts in furtherance of the Scheme and conspiracy, both within and prior to four years preceding the date of the filing of this Complaint. Such overt acts include the illegal meetings, communications, and misrepresentations regarding the fraudulent Scheme described herein, as well as the continued submission of false claims for payment to Plaintiff and members of the Classes by the RICO Defendants. Every act committed by the RICO Defendants in furtherance of the Scheme is a new and separate violation and part of a continuing course of illegal conduct that operates to toll any applicable statutes of limitation.

247. Similarly, each time a Defendant received and continues to receive an inflated payment from Plaintiff and members of the Classes, the Defendant is and was unjustly enriched. Given the ubiquitous use of AWP and FDB and/or Medispan data as benchmarks for prescription drug reimbursement, Plaintiff and members of the Classes were and are forced to use this information and data to make payments for Marked Up Drugs.

## VI. CLASS ACTION ALLEGATIONS

248. Plaintiff brings this action against each Defendant pursuant to Rule 23 on behalf of itself and as a representative of the following Class ("Unjust Enrichment Class" or "Class"):

> All persons and entities in the United States and its territories that paid Defendant for all or part of Marked Up Drugs based on AWP from August 1, 2001 to the present and that used First Data or Medi-Span data in determining the AWP of the Marked Up Drugs. The

CLASS ACTION COMPLAINT - - 68 -

Marked-Up Drugs are all drugs identified in Exhibit A and consist of brand-name drugs only.[184]

Excluded from the Unjust Enrichment Class are: (a) the respective Defendant and any entity in which any Defendant has a controlling interest, and their legal representatives, officers, directors, assignees and successors, (b) the federal government, (c) State Medicaid programs, and (d) cash payors. Also excluded from the Unjust Enrichment Class are any judicial officers to whom this action is assigned, together with any relative of such judicial officers within the third degree of relationship, and the spouse of any such person.

249. Plaintiff also brings this action pursuant to Rule 23 on behalf of itself and as a representative of the following Class ("RICO Defendant Class" or "RICO Class") pursuing RICO claims against the RICO Defendants:

All persons and entities in the United States and its territories that paid for all or part of the cost of Marked Up Drugs based on AWP from August 1, 2001 to the present and that used First Data or Medi-Span data in determining the AWP of the Marked Up Drugs. The Marked-Up Drugs are all drugs identified in Exhibit A and consist of brand-name drugs only.[185]

Excluded from the RICO Defendant Class are: (a) Defendants and any entity in which any Defendant has a controlling interest, and their legal representatives, officers, directors, assignees and successors, (b) any co-conspirators, (c) the federal government, (d) State Medicaid programs, and (e) cash payors. Also excluded from the RICO Defendant Class are any judicial officers to whom this action is assigned, together with any relative of such judicial officers within the third degree of relationship, and the spouse of any such person.

250. Each Class consists of thousands of class members geographically dispersed throughout the United States and its territories, making individual joinder impractical, as required by Rule 23(a)(1). These class members may be identified from information and records maintained by Defendants or third-parties.

---

[184] The exact identify of the drugs at issue in this lawsuit may be identified through records in the possession of Defendant. Based on information currently available, Exhibit A contains a list of such drugs.

[185] The exact identify of the drugs at issue in this lawsuit may be identified through records in the possession of Defendant. Based on information currently available, Exhibit A contains a list of such drugs.

ceph

hig

251. Plaintiff is a member of each Class[186] and Plaintiff's claims are typical of those of each Class because all members of the Classes were similarly affected by Defendants' unjust enrichment and/or wrongful conduct in violation of the federal racketeering laws. All members of the Classes were deprived of the benefits of accurate and lawful pricing for brand-name drugs as a result of Defendants' conduct.

252. Plaintiff, as a representative of all Class members, will fairly and adequately protect the interests of each Class. Plaintiff has engaged counsel who are highly experienced and competent in class action and complex litigation, including litigation involving the healthcare industry. Plaintiff's interests are consistent with, and not antagonistic to, those of the members of each Class. An effective and practicable manner of notice to such members of the Class can be fashioned by the Court.

253. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Such common questions of law and fact include:

a. Whether AWPs published by First Data are used as a contractual benchmark for payments by End Payors for drugs;

b. Whether the RICO Defendants engaged in a conspiracy to fix or raise the WAC-to-AWP markup and the AWPs used by Plaintiff and other members of the Class as the basis for reimbursement for the drugs that are the subject of this Complaint;

c. Whether the RICO Defendants assisted in a course of conduct that improperly inflated the WAC-to-AWP markup and the AWPs used by Plaintiff and other members of the Class as the basis for reimbursement for the drugs that are the subject of this Complaint;

d. Whether the RICO Defendants engaged in deceptive and/or fraudulent activity intended to defraud Plaintiff and other members of the Class;

---

[186] Plaintiff is an appropriate class representative for each Class and has purchased brand-name drugs in numerous states during the Class Period. Accordingly, Plaintiff has not specifically named class representatives for every jurisdiction in accordance with the ruling in *In re Pharm. Indus. Avg. Wholesale Price Litig.*, 252 F.R.D. 83, 2008 U.S. Dist. LEXIS 73687, *77 (D. Mass. 2008). Should the Court so require or direct, Plaintiff is prepared to name proposed class representatives for every jurisdiction or for each statewide class the Court may designate.

e. Whether the RICO Defendants engaged in conduct that violated the federal racketeering laws as alleged herein;

f. Whether Plaintiff and the other members of the Class were injured by the conduct of the RICO Defendants and, if so, the appropriate class-wide measure of damages; and

g. Whether Plaintiff and the other members of the Class are entitled to restitution for the unjust enrichment of the Unjust Enrichment Defendants.

254. Prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

255. Defendants have acted on grounds generally applicable to all Class members in that Defendants' unjust enrichment and/or participation in the RICO conspiracy described herein uniformly impacted all Class members. Accordingly, injunctive relief is necessary to protect all Class members from further injury.

256. Plaintiff knows of no difficulty that would prevent this case from being maintained as a class action. Class action treatment is a superior method for the fair and efficient adjudication of this controversy. Class action treatment will, among other things, allow a large number of similarly situated End Payors to prosecute their common claims in a single forum, thus avoiding the unnecessary duplication of resources that numerous individual actions would require. Moreover, class action treatment allows injured End Payors, such as small health plans or self-insured municipalities, the ability to seek redress on claims that might be impracticable to pursue individually.

257. This case also presents common issues of fact and law that are appropriate for issue-class certification under Rule 23(c)(4) if the Court deems such issue certification appropriate.

CLASS ACTION COMPLAINT - - 71 -

1

## VII. CLAIMS FOR RELIEF

2

3

### COUNT I
### CIVIL RICO
### (18 U.S.C. § 1962(C))

4

5

#### (On Behalf of Plaintiff and the RICO Class
#### Against the RICO Defendants)

6

258.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth

7

herein and further allege as follows.

8

259.    The RICO Defendants violated 18 U.S.C. § 1962(c) by associating with an

9

enterprise that engaged in a pattern of racketeering activity.

10

260.    Plaintiff, McKesson, First DataBank, and the RICO Defendants are each "persons,"

11

as that term is defined in 18 U.S.C. § 1961(3).

12

261.    At all relevant times, McKesson, along with its co-conspirators, First DataBank and

13

the RICO Defendants, conducted the affairs of certain association-in-fact enterprises identified

14

herein, the affairs of which affected interstate commerce through a pattern of racketeering activity.

15

In the alternative, Plaintiff, which is a legal entity, constitutes an enterprise.

16

**A.      McKesson, First Data, and the RICO Defendants Formed an Association-in-Fact
RICO Enterprise; in the Alternative, Plaintiff is an Enterprise Which was the Victim
of the RICO Defendants' Racketeering Activity**

17

18

262.    For purposes of this claim, certain RICO "enterprises" are associations-in-fact

19

within the meaning of 18 U.S.C. § 1961(4), consisting of (a) First Data and (b) McKesson, and (c)

20

the RICO Defendants, including their directors, employees and agents. These associations-in-fact,

21

are sometimes collectively referred to herein as the "Mark Up Enterprise" or "Enterprise." The

22

Enterprise is an ongoing and continuing business organization consisting of both corporations and

23

individuals that are and have been associated for the common or shared purposes of (a) publishing

24

or otherwise disseminating pharmaceutical price information, which all too often includes

25

disseminating false and misleading AWPs; (b) implementing the Scheme; (c) deriving increased

26

profits from the activities of the Enterprise; and (d) perpetuating the use of AWPs as a benchmark

27

for reimbursement in the pharmaceutical industry. First Data, McKesson and the RICO

28

Defendants each had a common purpose of perpetuating the use of AWPs as a benchmark for

CLASS ACTION COMPLAINT -                                    - 72 -

1    reimbursement in the pharmaceutical industry, inflating AWPs, and defrauding Plaintiff and
2    members of the Class for the purpose of increasing the RICO Defendant's profits through the
3    receipt of inflated payments for Marked Up Drugs.

4        263.    McKesson helped initiate the Scheme and provided FDB with the information
5    necessary to carry it out, including but not limited to its proposed mark-up, current WACs, and its
6    weekly FDB AWP comparison charts to chart the progress of the Scheme.

7        264.    FDB published the inflated AWPs and kept up the ruse that the AWPs were the
8    result of an objective survey process. It coordinated with McKesson to disguise the Scheme,
9    including but not limited to claiming that the results of its alleged surveys could not be disclosed
10   on the grounds that they contain proprietary information and by falsely representing that the
11   changes were attributable to government investigation of AWPs and generalized movements in the
12   pharmaceutical industry as opposed to McKesson and FDB's collusion.

13       265.    Each of the RICO Defendants was made aware of the Scheme by McKesson and
14   affirmatively joined and effectuated the Scheme by knowingly submitting false and inflated claims
15   for Marked-Up Drugs to Plaintiff and members of the Class and by concealing the existence of the
16   Scheme. The Scheme thus allowed the RICO Defendants to obtain payments on fraudulent
17   prescription drug claims to Plaintiff and members of the Class.

18       266.    The Enterprise functioned as a continuing unit as evidenced by the continuing
19   coordination of activities between McKesson, First Data, and the RICO Defendants. There is a
20   common communication network by which McKesson, First Data and the RICO Defendants
21   shared and continued to share information on a regular basis for all times relevant to this lawsuit,
22   including between August 1, 2001 through the present. Typically this communication occurred by
23   use of the wires and mails in which McKesson and First Data discuss and agree on the new WAC-
24   AWP mark-up for a given drug, and the RICO Defendants submit false claims to Plaintiff and the
25   members of the Class for such drugs. McKesson, First Data and the RICO Defendants functioned
26   as a continuing unit for the purposes of implementing and/or effectuating the Scheme. When
27   issues arose during the Scheme each agreed to take actions to hide the Scheme and to continue its
28   existence. Furthermore, but for the continued participation of the RICO Defendants in knowingly

CLASS ACTION COMPLAINT -                                    - 73 -

1    submitting false claims to Plaintiff and members of the Class, the Scheme could not have continued

2    to inflict billions of dollars of damages on End Payors.

3    **B.    The RICO Defendants Associated with the Enterprise**

4    267.    Along with First Data and McKesson, the RICO Defendants were willing

5    participants in the Enterprise; each had a common purpose and interest in the continued operations

6    and success of the Scheme as each knowingly submitted false insurance claims to Plaintiff and

7    members of the Class for payment. They also agreed to the manner in which the Enterprise would

8    be conducted, *i.e.*, through McKesson's transmission of increased mark-ups, First Data's

9    publication of those mark-ups, and the RICO Defendants' fraudulent use of these mark-ups to

10   obtain inflated payments from Plaintiff and members of the Class. This organizational structure

11   was the basis on which the Enterprise operated.

12   268.    At all relevant times, First Data and McKesson were generally aware of each others'

13   conduct in furtherance of the Scheme, were knowing and willing participants in that conduct; and

14   incurred benefits as a result. Similarly, the RICO Defendants were aware of their respective roles

15   in the Scheme and the roles of First Data and McKesson. McKesson and First Data initiated the

16   Scheme in 2001-2002 and, through the active participation of the RICO Defendants, the Scheme

17   continued in force in 2003-2004.

18   269.    As the creator of the Enterprise and the principal architect of the plan to defraud,

19   McKesson was keenly aware of the existence of the Enterprise, its purpose and its activities.

20   McKesson has acknowledged that it inflated its mark-ups, beginning in 2000, in order to inflate

21   AWPs. McKesson also regularly discussed the Scheme with First Data and the RICO Defendants

22   in wires, e-mails, and in telephone conversations and monitored its progress, including through

23   weekly AWP comparison reports.

24   270.    First Data was aware that McKesson's mark-ups were false and that its own

25   published AWPs were inflated by the Scheme. This awareness comes from the following sources:

26   First, McKesson informed First Data that it was artificially inflating the mark-ups to a uniform

27   25%. Second, prior to the Scheme, First Data had in some instances obtained mark-ups from

28

CLASS ACTION COMPLAINT -                              - 74 -

1    wholesalers, which made First Data aware, even in the absence of McKesson's direction

2    communication, about the artificial nature of McKesson's pricing information and the inaccuracy

3    of its reported AWPs. Third, as various governmental entities reported on AWP inflation, First

4    Data did not confirm the accuracy of the AWPs that First Data used. Fourth, First Data stopped

5    conducting even limited surveys of other wholesalers and simply accepted the Scheme, when it

6    knew there was no basis for the 5% mark-up. Fifth, First Data actually received letters from

7    certain manufacturers stating that the 5% increase in AWP was not justified.

8    271.    Each of the RICO Defendants was made aware of the Scheme by McKesson

9    and/or First Data, some at times actively solicited McKesson's assistance in raising the AWP

10   markup, and all knowingly submitted false claims for payment for Marked-Up Drugs to

11   Plaintiff and members of the Class. A vital part of Plaintiff and other Class members'

12   businesses includes paying prescription drug claims. Accordingly, the RICO Defendants

13   participated in the conduct of the Scheme and the Enterprise alleged herein by causing Plaintiff

14   and members of the Class to make payments for false and fraudulent prescription drug claims.

15   272.    This was also acknowledged in McKesson's internal mails, where McKesson's

16   executives discussed the positive impact of "normalizing" on McKesson's customers–i.e., retail

17   pharmacy chains like Defendants:

18              Here is an idea. Two years later, *and having had some recent*
                *success in raising AWP's,* I think this could be presented to him
19              positively in this way.

20              Omnicare is looking for ...... say $500,000 in benefit from year end
                deals, even though this was not part of their contract. We need to ask
21              them to roll up *or recalculate their reimbursements for last year*
                *based on the new AWP's with a 20% spread. And......this is not just*
22              *a one time benefit. They will receive this now and each year going*
                *forward until they renegotiate contracts with third parties (and*
23              *hopefully do not give up this gift).*

24              **Our successes recently and during this past year includes raising**
                **AWP spreads to 20% (markup of 25%) include Parke Davis**
25              **(division of Pfizer). Searle (division of Pharmacia).**
                **GlaxoSmithKline (Glaxo was at 16 2/3%). AstraZeneca, TAP,**
26              **Berlex,** JOM including Alza and Centocor, parts of Merck and BMS
                where things were mixed between 16 2/3% and 20%, and more to
27              come. **Some of our friends in retail that I have spoken with are**
                **pretty overwhelmed that we would be "driving" this process on**
28              **their behalf.** Of course, we are not solely responsible for this

CLASS ACTION COMPLAINT -                              - 75 -

1

2

"normalizing" of AWP's but we have done our part as I have discusses with your previously. **I have had conversations with Albertsons and Safeway and a few others.**

3

4

5

6

7

Remember, "McKesson is doing this to improve our efficiencies in our BIS group." With mixed AWP spreads, our BIS group is required to make manual overrides (for every pricing activity) to input the First Data Bank AWP whenever there is a difference from our Suggested Sell or List Price. It could be stated as a benefit of the Sixth Sigma method of identifying defects. An "unintended consequence" is that the profitability of our customers will be impacted in a appositive way. **They will basically get 3 1/3% more profit on Rx's filled with this new AWP spread. (Just imagine what this would mean on drugs like Lipitor or Prilosec....**[187]

8

9

273. McKesson also realized that it could "'market' [its] efforts" by informing customers

like the RICO Defendants that it was "doing everything possible to 'raise' AWP's when

10

appropriate."[188] McKesson appreciated that if it failed to inform its customers that it was behind

11

all these changes "it's possible that some of these accounts will believe that this stuff just happens

12

and our efforts will go unrecognized."[189] As one McKesson executive put it: "This sounds like

13

something we should at least [be] quietly communicating to our customers in order to get some

14

mileage from it[.]"[190] And so it began:

15

16

17

[To Dan Connolly of Bartell Drugs]: Celexa and Lexapro will have an AWP markup of 25% or a spread of 20% as soon as FDB information is updated. Look for the change to happen next week. Keep smilin[g] . . . and who said we never listen to our customers (and old friends).[191]

18

19

20

[To Dan Connolly]: Just wanted you to know that Clarinex AWP spreads went to 20% this week. A few weeks ago Celxa went to 20% as well. Fat cat status is just around the corner.[192]

21

[To David Vucurevich of Rite Aid]: P.S. latest AWP changes . . . Celexa and Clarinex, working on Lilly and Novo.[193]

22

23

[187] MCKAWP 0065895 (emphasis added).

24

[188] MCKAWP 0065895.

25

[189] MCKAWP 0065895.

[190] MCKAWP 0069732.

26

[191] MCKAWP 0069817.

27

[192] MCKAWP 0069901.

28

[193] MCKAWP 0069911.

CLASS ACTION COMPLAINT -                                    - 76 -

274. A field agent reports: "Some of the more savvy stores like Med-X have taken notice."[194] Bob James realized that the goodwill McKesson established with the pharmacies as a result of inflating AWPs would give it a substantial edge over its competition:

> In my discussions [with select customers like the RICO Defendants about McKesson's efforts to "normalize" the AWP markup at 25%], one of the comments that was made was "this would certainly be a good reason to renew our agreement with McKesson when its time." Talk about being good partners, wow! This is worth further discussion as we go forward. Maybe a proactive strategy like this will soften some of the activity around asking for lower costs and more benefit.[195]

275. Bob James proposed disclosing McKesson's efforts to customer Omnicare who purportedly was looking for an extra-contractual year-end bonus in the neighborhood of $500,000:

> Omnicare is looking for . . . . . . say $500,000 in benefit from year end deals, even though this was not part of their contract. We need to ask them to roll up or recalculate their reimbursements for last year based on the new AWP's with a 20% spread. And . . . . . . this is **not just a one time benefit**. They will receive this now and for each year going forward until they renegotiate their contracts with third parties (and hopefully do not give up this gift).[196]

276. Bob James also noted with pleasure that Kay Morgan spoke "with Eric Sorkin at RiteAid to let him know how much effort we are putting into this AWP thing to get it right."[197] Other customers were also appreciative. For example an unnamed customer from Ohio, called McKesson "to say that he was looking at some of these items again and found that the spread appears to have increased significantly on most of these items to the area of 20-21%. He wondered if we had any part in doing this and, if so, he wanted to let us know that he really appreciated our efforts."[198] Med-X Corp.'s Director of Operations, Jerry Howard reviewed the numbers, put two and two together,[199] and "was very ex[c]ited about" McKesson "working on AWP expansion."[200]

---

[194] MCKAWP 0069732.

[195] MCKAWP 0065895.

[196] MCKAWP 0065895 (boldface, ellipses in original).

[197] MCKAWP 0069669.

[198] MCKAWP 0069513.

[199] MCKAWP 0069732.

[200] MCKAWP 0069726.

CLASS ACTION COMPLAINT -                                    - 77 -

1

### a. Albertsons / New Albertsons / SuperValu / CVS

2       277.    A January 2002 e-mail from McKesson's Bob James discussed above at paragraph

3   270 states that: "Some of our friends in retail that I have spoken with are pretty overwhelmed that

4   we would be 'driving' this process on their behalf. Of course, we are not solely responsible for this

5   'normalizing' of AWP's but we have done our part as I have discussed with you previously. *I*

6   *have had conversations with Albertsons and Safeway and a few others.*" MCKAWP 0065895

7   (emphasis added).

8       278.    Thus, Albertsons was aware of, and joined, the Scheme as early as January 2002.

9   Upon being made aware of the Scheme, Albertsons expressed its appreciation to McKesson and

10  begin to repeatedly submit fraudulent claims for payment to Plaintiff and members of the Class

11  for Marked Up Drugs. But for Albertsons' knowing submission of these false claims, the

12  Scheme could not have continued.

13      279.    Similarly, a June 17, 2002 email from McKesson's Bob James to numerous

14  McKesson employees regarding McKesson's Albertsons contract renewal states that:

15          I know that **Albertsons both recognizes and appreciates our**
            **efforts with the AWP situation. This has most likely had a very**
16          **positive impact on their gross profits.** On their insurance based
            business this equates to lowering cost of goods about 3 1/3% on
17          those items that previously had a 16 2/3% spread......which
            previously had been about 80% of the Rx products. I am wondering
18          if this can be leveraged in any way. Worst case, it should be no less
            than a tie-breaker if the situation gets to that point. MCKAWP
19          0084485 (emphasis added)

20      280.    Thus, it is clear that McKesson and Albertsons discussed the Scheme on numerous

21  occasions through the wires and mails and that Albertsons made a conscious decision to join the

22  Scheme and continue to reap inflated and unjust profits from Plaintiff and members of the Class.

23  Albertsons also participated in numerous instances of mail and wire fraud by repeatedly sending

24  false claims for payment to Plaintiff and members of the Class.

25      281.    Albertsons was even available to lobby industry participants in furtherance of the

26  Scheme. As set forth in the email quoted at paragraph 196, McKesson wrote a manufacturer in

27

28

CLASS ACTION COMPLAINT -                           - 78 -

1  early 2004 about increasing mark ups: "if you have any doubts about what I am saying, please

2  contact Scott Johnson at Albertson's...."

3      **b.   Rite-Aid**

4      282.   Rite Aid was McKesson's largest client and James and others were anxious to

5  make sure Rite Aid understood what McKesson was doing for it.

6      283.   As noted above, Rite-Aid also knew about and knowingly joined the Scheme by

7  submitting false claims for inflated payments to Plaintiff and members of the Class. Indeed,

8  these e-mails indicate that McKesson routinely communicated with Rite-Aid about Marked Up

9  Drugs that had been affected by the Scheme and others that were targeted for inclusion in the

10  Scheme.

11      284.   Indeed, another e-mail between Bob James at McKesson and Kay Morgan at First

12  Data indicates that Rite Aid encouraged McKesson to include certain drugs in the Scheme:

13  > Rite Aid called this morning complaining about Diamox AWP. Just
14  > wondered if you had a chance to get to it yet?[201]

15      285.   Like Albertsons, Rite-Aid was available to speak on behalf of the Scheme as

16  evidenced by the same email quoted above at paragraph 196 in which McKesson wrote to a

17  manufacturer to decline its request to set a mark-up at 20%. The e-mail suggests that the

18  manufacturer also speak with either "Dave Vueurevich or Greg Drew at Rite-Aid" about the

19  benefits of the Scheme for retail pharmacies like Defendants, indicating that both Rite-Aid

20  employees were knowledgeable of the increased revenue Rite-Aid had realized from the Scheme.

21      286.   In addition, internal McKesson documents discussed above at paragraphs 154 and

22  165 provide additional evidence that Rite-Aid suggested certain drugs for the Scheme and also

23  was asked by McKesson to increase mark-ups until FDB could "catch up."

24      287.   The relationship between Rite-Aid and McKesson was so fruitful that in 2003

25  Rite-Aid accounted for 8% of McKesson's entire annual revenue and Rite-Aid named McKesson

26  its wholesaler of the year.

27

28      [201] MCKAWP 0001168.

CLASS ACTION COMPLAINT -          - 79 -

1    288.   Thus, it is clear that McKesson and Rite-Aid discussed the Scheme on numerous

2    occasions through the wires and mails and that Rite-Aid made a conscious decision to join the

3    Scheme and continue to reap inflated and unjust profits from Plaintiff and members of the Class.

4    Rite-Aid also participated in numerous instances of mail and wire fraud by targeting drugs for

5    inclusion in the Scheme and repeatedly sending false claims for payment to Plaintiff and

6    members of the Class.

7           **c.    Longs / CVS**

8    289.   Like Albertsons and Rite-Aid, Longs was knowledgeable about, and available to

9    speak on behalf of, the Scheme as evidenced by the same email quoted above at paragraph 196 in

10   which McKesson wrote to a manufacturer to decline its request to set a mark-up at 20%. The e-

11   mail suggests that the manufacturer also speak with "Frank Scorpiniti at Longs" about the

12   benefits of the Scheme for retail pharmacies like Defendants, indicating that Longs was

13   knowledgeable of the increased revenue Rite-Aid had realized from the Scheme.

14   290.   Thus, it is clear that McKesson and Longs discussed the Scheme on numerous

15   occasions through the wires and mails and that Rite-Aid made a conscious decision to join the

16   Scheme and continue to reap inflated and unjust profits from Plaintiff and members of the Class.

17   Longs also participated in numerous instances of mail and wire fraud by targeting repeatedly and

18   knowingly sending false claims for payment to Plaintiff and members of the Class.

19          **d.    Wal-Mart**

20   291.   Like Albertsons, Rite-Aid and Longs, Wal-Mart was knowledgeable about, and

21   available to speak on behalf of, the Scheme as evidenced by the same email quoted above at

22   paragraph 196 in which McKesson wrote to a manufacturer to decline its request to set a mark-up

23   at 20%. The e-mail suggests that the manufacturer also speak with "Frank Seagraves at Wal

24   Mart" about the benefits of the Scheme for retail pharmacies like Defendants, indicating that

25   Wal-Mart was knowledgeable of the increased revenue Wal-Mart had realized from the Scheme.

26   292.   Thus, it is clear that McKesson and Wal-Mart discussed the Scheme on numerous

27   occasions through the wires and mails and that Wal-Mart made a conscious decision to join the

28

CLASS ACTION COMPLAINT -                                    - 80 -

1    Scheme and continue to reap inflated and unjust profits from Plaintiff and members of the Class.

2    Wal-Mart also participated in numerous instances of mail and wire fraud by repeatedly and

3    knowingly sending false claims for payment to Plaintiff and members of the Class.

4                    **e.    Safeway**

5            293.    A January 2002 e-mail from McKesson's Bob James discussed above at paragraph

6    270 states that: "Some of our friends in retail that I have spoken with are pretty overwhelmed

7    that we would be 'driving' this process on their behalf. Of course, we are not solely responsible

8    for this 'normalizing' of AWP's but we have done our part as I have discussed with you

9    previously*. I have had conversations with Albertsons and Safeway and a few others.*"

10   MCKAWP 0065895 (emphasis added).

11           294.    Safeway was aware of, and joined, the Scheme as early as January 2002. Upon

12   being made aware of the Scheme, Safeway expressed its appreciation to McKesson and begin to

13   repeatedly submit fraudulent claims for payment to Plaintiff and members of the Class for

14   Marked Up Drugs. But for Safeway's knowing submission of these false claims, the Scheme

15   could not have continued.

16           295.    Thus, it is clear that McKesson and Safeway discussed the Scheme on numerous

17   occasions through the wires and mails and that Safeway made a conscious decision to join the

18   Scheme and continue to reap inflated and unjust profits from Plaintiff and members of the Class.

19   Safeway also participated in numerous instances of mail and wire fraud by targeting repeatedly

20   and knowingly sending false claims for payment to Plaintiff and members of the Class.

21           296.    The Scheme went to the point where FDB would query McKesson whether there

22   had been a WAC increase so that a given drug could go to a 25% mark-up. Similarly, the RICO

23   Defendants would also discuss drugs which should be "normalized" with McKesson and otherwise

24   assist in the use of fraudulent mark-ups. Thus, McKesson, FDB and the RICO Defendants

25   conspired to implement the Scheme.[202]

26

27

     _____

28   [202] MCKAWP 0069553.

1     297.    The RICO Defendants were, during the relevant time period, claimants under

2  prescription drug programs funded by Plaintiff and members of the Class. Thus, the RICO

3  Defendants were also associated with Plaintiff as the enterprise because the RICO Defendants were

4  each in a business relationship with Plaintiff and members of the Class to whom they knowingly

5  presented a false claim for Marked Up Drugs. Moreover, each RICO Defendant operates

6  pharmacies where Marked Up Drugs were sold and where fraudulent reimbursement requests for

7  Marked Up Drugs originated or were generated.

8     **C.    The Enterprise Affected Interstate Commerce**

9     298.    The Enterprise affected interstate commerce because Plaintiff is engaged in the

10  provision of services across State lines, and the Enterprise increased AWPs, a nationally

11  recognized benchmark for the purchase price of brand-name prescription drugs. Pharmacies like

12  Defendants are reimbursed by health plans and other pharmacy benefit providers based on AWP.

13  Under this system, a higher WAC-to-AWP spread results in increased profits to Defendants. Thus,

14  McKesson, First Data and the RICO Defendants helped deliver greater profits to Defendants and

15  pharmacies nationwide by conspiring to increase AWPs and assisting in the implementation of the

16  Scheme. These increased and unjust profits came directly out of the pockets of consumers and End

17  Payors like Plaintiff and members of the Class.

18     299.    In the underlying litigation on behalf of private payors, McKesson's expert, Joseph

19  Kalt, admitted that "McKesson's higher SSPs ("suggested sales prices") led to higher AWPs

20  published by FDB."[203]

21     300.    As discussed above, this was also acknowledged in McKesson's internal mails,

22  where McKesson's executives discussed the positive impact of "normalizing" on McKesson's

23  customers – the Defendants.

24  **D.    The RICO Defendants Conducted and Participated in the Affairs of the Enterprise**

25     301.    Along with McKesson and First Data, the RICO Defendants participated in the

26  affairs of Enterprise and not just their own affairs. Without their efforts in repeatedly and

27

28  [203] Report of Joseph Kalt (January 28, 2008) Report at 16.

CLASS ACTION COMPLAINT -                         - 82 -

1  knowingly submitting false claims for payment for Marked Up Drugs to Plaintiff and members of

2  the Class, the Scheme would not have continued to succeed. The RICO Defendants, with full

3  knowledge of the Scheme, conducted and participated in the affairs of the Enterprise by providing

4  End Payors with inflated invoices and utilizing First Data's fraudulent data in settling drug

5  reimbursements. The RICO Defendants also highlighted candidate suppliers/drugs to McKesson

6  for inclusion in the Scheme and/or helped conceal the Scheme. Each of these actions was

7  necessary to, or helpful in, the operation of the Enterprise to carry out its goal of disseminating

8  false price information and causing Plaintiff and members of the Class to pay inflated prices to

9  Defendants for affected drugs.

10  302.  The RICO Defendants exerted control over the Enterprise, and, in violation of

11  Section 1962(c) of RICO, the RICO Defendants have conducted or participated in the conduct of

12  the affairs of the RICO enterprises, directly or indirectly, in the following ways:

13  a.  McKesson and First Data had a degree of control concerning the WAC-to-

14  AWP mark-up and the AWPs that First Data reported;

15  b.  First Data directly controlled the creation and distribution of marketing,

16  sales, and other materials used to inform End Payors as to the value of First Data's data and/or

17  services;

18  c.  First Data allowed McKesson to exert control over its organization, knowing

19  that the AWPs were inflated as result of the Scheme and were not real numbers. McKesson

20  controlled First Data by virtue of its ability to cause an increase in the WAC-AWP mark-up. First

21  Data did so because the reporting of AWPs was, and is, a major part of its business, and McKesson

22  was integral to First Data's AWP reporting and to increasing First Data's profits for the reasons set

23  forth herein;

24  d.  The RICO Defendants likewise had a degree of control concerning the

25  WAC-to-AWP mark-up and the AWPs that First Data reported in that the RICO Defendants

26  utilized First Data's AWPs in submitting claims for reimbursement for brand-name drugs to

27  Plaintiff and members of the Class; and

28

CLASS ACTION COMPLAINT -                                                              - 83 -

1    e.    The RICO Defendants had direct knowledge of the Scheme and knowingly

2    joined and effectuated the Scheme by submitting false and inflated claims for reimbursement to

3    Plaintiff and members of the Class, thereby prolonging the Scheme and directly benefiting

4    themselves at the expense of End Payors;

5    303.    In addition, processing and paying prescription drug claims are vital parts of

6    Plaintiff's business. By acting with the purpose to cause Plaintiff to make payments on false

7    claims, the RICO Defendants participated in the operation of Plaintiff and the Enterprise.

8    304.    The RICO Defendants directed Plaintiff's and the Enterprise's affairs by causing

9    Plaintiff's employees having the authority to do so to direct that other employees make payments

10   to the RICO Defendants that otherwise would not have been made. By continually submitting false

11   claims to Plaintiff with knowledge of the Scheme, the RICO Defendants caused Plaintiff and its

12   employees to approve false claims and conduct Plaintiff's business in a manner contrary to

13   Plaintiff's business practices and caused Plaintiff to pay out large sums of money on false claims.

14   305.    The Enterprise had a hierarchical decision-making structure headed by McKesson.

15   McKesson issued instructions on how the WAC-to-AWP mark-up was to be reported and each

16   Publisher accepted those instructions despite knowing of their falsity. Similarly, each RICO

17   Defendant accepted and utilized the fraudulent mark-ups reported by the Publishers in obtaining

18   inflated payments from Plaintiff and members of the Class despite knowing of their falsity.

19   **E.    The Enterprise Engaged in a Pattern of Racketeering Activity, Consisting of Mail or Wire Fraud Violations**

20

21   306.    The Scheme consisted of a pattern of uniformly raising mark-ups on roughly 400

22   brand drugs to 25% carried out over a three-and-a-half-year period. The alteration of the mark-up

23   for these drugs was carried out through the Enterprise. McKesson used its position to provide First

24   Data with false mark-up information and to monitor First Data's progress in the dissemination of

25   false prices, as well as to capitalize on the benefits of this Scheme by boasting to the RICO

26   Defendants of its role in the AWP increases.

27   307.    The nature and pervasiveness of the Scheme, which was orchestrated out of the

28   corporate headquarters of McKesson, First Data and the RICO Defendants, necessarily required

CLASS ACTION COMPLAINT -                                    - 84 -

1  those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire

2  facilities.

3  308. McKesson, First Data and the RICO Defendants' racketeering activities amounted

4  to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiff and

5  other End Payors for the financial benefit of, among others, the RICO Defendants. Each separate

6  use of the U.S. mails and/or interstate wire facilities employed by the co-conspirators was related,

7  had similar intended purposes, involved similar participants and methods of execution, and had the

8  same results affecting the same victims, including Plaintiff. McKesson, First Data and the RICO

9  Defendants have each engaged in the pattern of racketeering activity for the purpose of conducting

10  the ongoing business affairs of the Enterprise.

11  309. McKesson, First Data, and the RICO Defendants conducted and participated in the

12  affairs of the Enterprise through a pattern of racketeering activity, including acts that are indictable

13  under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. This

14  pattern of racketeering likely involved thousands of separate instances of use of the U.S. mails or

15  interstate wire facilities in furtherance of their Scheme. Each of these fraudulent mailings and

16  interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C.

17  § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within

18  the meaning of 18 U.S.C. § 1961(5), in which McKesson, First Data and the RICO Defendants

19  intended to defraud Plaintiff and other intended victims.

20  310. Many of the precise dates of the RICO Defendants' uses of the U.S. mails and

21  interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been

22  hidden and cannot be alleged without access to their books and records. Indeed, an essential part

23  of the successful operation of the Scheme alleged herein depended upon secrecy, however, Plaintiff

24  can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud

25  occurred, and how those acts were in furtherance of the Scheme. Plaintiff describes this as follows:

26

27

28

CLASS ACTION COMPLAINT - - 85 -

**1. The Enterprise Engaged in a Scheme to Defraud End Payors**

311. The RICO Defendants' pattern of racketeering activity includes acts indictable as mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343. The RICO Defendants' fraudulent Scheme consisted of, *inter alia*: the intentional filing of false reimbursement claims in order to obtain payments from Plaintiff and members of the Class for Marked Up Drugs.

**2. The RICO Defendants Specifically Intended to Defraud End Payors**

312. McKesson's own documents, as well as the testimony of its officers, reveal that it intended to defraud End Payors by raising AWPs; that it maintained the inflated mark-ups in its system for this purpose; and that it worked closely with First Data to increase brand AWPs over time. By contrast, McKesson's competitors, ABC and Cardinal, refused to change the manufacturers' historic mark-ups even though they were pressured by retailers to do so, and even refused to take part in any First Data survey out of concern that they might be perceived as setting AWPs.

313. Similarly, documents cited herein reveal that the RICO Defendants were made aware of the Scheme and knowingly joined it by intentionally filing false and inflated claims for payment for Marked Up Drugs with Plaintiff and members of the Class.

**3. The Enterprise Made Use of the U.S. Mails and Interstate Communications in Furtherance of the Scheme**

314. McKesson, First DataBank, and the RICO Defendants' use of the U.S. mails and interstate wire facilities to perpetrate the Scheme involved thousands of communications throughout the time period including August 1, 2001 through the present, including, *inter alia*:

a. Marketing materials about First Data's services, which First Data, sent to health care providers located across the country;

b. Written representations and telephone calls between McKesson, First Data and the RICO Defendants regarding mark-ups and AWPs, which occurred on a regular basis each year;

CLASS ACTION COMPLAINT - - 86 -

1    c.    Hundreds of e-mails between McKesson and First Data agreeing to, or

2 effectuating the implementation of, the Scheme. These e-mails included, but are not limited to, the

3 e-mails identified earlier in this Complaint;

4    d.    Written and oral communications directed to U.S. Government agencies and

5 members of the Class that fraudulently misrepresented what the AWPs were, or that were intended

6 to deter investigations into the true nature of the AWPs or to forestall changes to reimbursement

7 based on something other than AWPs;

8    e.    Receipts of increased profits – the wrongful proceeds of the Scheme – sent

9 through the U.S. mails and interstate wire facilities; and

10    f.    In addition to the above-referenced RICO predicate acts, it was foreseeable

11 to McKesson and the RICO Defendants that First Data would distribute publications containing

12 false AWPs through the U.S. mails and by interstate wire facilities. Further, McKesson has, in

13 furtherance of the Scheme, communicated through use of the U.S. mails and by interstate wire

14 facilities with their various local headquarters or divisions. These uses of the U.S. mails include

15 some of the documents referenced in this Complaint

16    315.    Furthermore, it was reasonably foreseeable to each RICO Defendant that it or

17 Plaintiff and members of the Class would use the mails or wires in connection with each of the

18 fraudulent claims, or that Plaintiff would use the mails or wires to send payments to the RICO

19 Defendants. All of these uses of the mails and/or wires were in furtherance of the RICO

20 Defendants' fraudulent scheme.

21    316.    These communications by U.S. mail or wire were made for the purpose of carrying

22 out the Scheme or hiding it from Plaintiffs and other End Payors. The Enterprise exchanged scores

23 of e-mails and numerous telephone calls, in which the co-conspirators discussed their plan to

24 "normalize" AWPs at 25%, as well as communications targeting individual manufacturers, PBMs

25 and other members of the pharmaceutical industry with false information intended to hide the

26 Scheme. Additionally, McKesson communicated by e-mail and telephone many times with the

27 RICO Defendants to brag about the effects of the Scheme. McKesson also used e-mail to caution

28 its employees about discussing the Scheme. First Data made false statements in numerous

CLASS ACTION COMPLAINT -                    - 87 -

individual e-mails and telephone communications and in public statements on its website about its process of determining AWPs. First Data also used e-mail to caution McKesson against raising AWPs unless the manufacturer announced a price change.

**F. Plaintiff and the Class Relied on the Accuracy of the Falsely Inflated AWPs Published by First Data or Medi-Span and Knowingly Used by the RICO Defendants to Obtain Inflated Payments**

317. In implementing the fraudulent Scheme, McKesson was acutely aware that Plaintiffs and other End Payors relied on the AWPs published by First Data and Medi-Span as a pricing benchmark.

318. The AWP-based reimbursement benchmark for payments in the retail class of pharmaceutical trade has long been acknowledged. The two largest public purchaser programs for prescription pharmaceuticals – Medicaid and Medicare – historically relied upon published average wholesale prices as the fundamental basis upon which to reimburse for branded drug ingredient costs incurred by dispensers (retail pharmacies for Medicaid, and medical providers in the Medicare arena). Those paying for drugs, by statute or contract, rely on and use the published AWP.

319. At all times relevant to this lawsuit First Data, McKesson and the RICO Defendants knew that End Payors such as Plaintiff and members of the Class utilize AWP as a pricing benchmark. McKesson was not only aware that First Data was the premier industry source for AWP information but also that First Data supplied its pricing information to Medi-Span, thus, as McKesson acknowledged, "[t]his means that Medi-Span data is the First DataBank data." McKesson engaged in a fraudulent scheme with First Data, knowing that First Data was in the best position to cause industry-wide changes to the AWPs and that First Data's purported method of calculating AWPs would both appear to legitimize the increases and keep McKesson's pivotal role in the Scheme a secret.

320. Once McKesson and First Data raised the WAC-to-AWP mark-up to 25% on a given drug that mark-up remained in place and still remains in place to this day and thus continues to injure those entities such as Plaintiffs that rely on AWP as a pricing standard. Similarly, as a

direct result of the RICO Defendants' ongoing succession of fraudulent claims during the Class Period, Plaintiff and members of the Class suffered direct injury from the RICO Defendants' pattern of racketeering activity.

## G. Damages Caused by the RICO Defendants' Scheme

321. Plaintiff and the Class have been injured in their business and property by reason of the RICO Defendants' violations in that they have made hundreds of millions of dollars and perhaps billions in overpayments they would not have made had the RICO Defendants not engaged in its pattern of racketeering activity. The RICO Defendants' violations of federal law and their pattern of racketeering activity have directly and proximately injured Plaintiff because it has paid thousands of dollars in inflated reimbursements or other payments for drugs whose AWP was artificially raised as described herein.

322. The RICO Defendants and their co-conspirators McKesson and First Data sent false AWP information through the U.S. mails or by interstate wire facilities and reported AWPs and other information by the same methods in furtherance of their Scheme.

323. The RICO Defendants' affirmative acts of fraud through the intentional filing of false claims as part of the Scheme directly caused Plaintiff and members of the Class to make inflated payments for affected drugs.

324. Under the provisions of Section 1964(c) of RICO, the RICO Defendants are jointly and severally liable to Plaintiff for three times the damages that Plaintiff has sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## H. The RICO Defendants Knew of and Adopted the Illegal Purpose of the Enterprise

325. That the RICO Defendants knew of and adopted the illegal purpose of the Enterprise is evident from McKesson's own documents and the testimony of its officers. McKesson's internal communications speak of an express illegal agreement between McKesson and First Data to raise mark-ups on all new drugs as well as other subject drugs. These documents also reveal that McKesson frankly disclosed to First Data its plan to standardize mark-ups for brand drugs and that it worked closely together with First Data to implement this plan, supporting

CLASS ACTION COMPLAINT -                                    - 89 -

1  an inference of an implicit agreement to create a uniform mark-up for all brand drugs. McKesson's

2  officers have also testified that McKesson artificially raised the mark-ups on its suggested retail

3  prices and provided these false numbers to First DataBank.

4       326.    Similarly, McKesson's documents also reveal that McKesson frankly disclosed to

5  the RICO Defendants the Scheme and that the RICO Defendants encouraged and facilitated the

6  Scheme through the actions alleged above, including but not limited to the intentional and

7  successive submission of false claims to Plaintiff and members of the Class throughout the Class

8  Period.

9       327.    Additionally, McKesson's conduct in sending e-mails and other communications to

10  FDB to direct the normalization plan, FDB's conduct in publishing AWPs inflated by the uniform

11  25% mark-up and in sending communications acknowledging that its raised AWPs on some of the

12  NDCs and had yet to make additional changes to NDCs to be consistent with the overall Scheme,

13  as well as e-mails from McKesson to the RICO Defendants bragging about its ability to work with

14  FDB to carry out the normalization plan and is consistent with the existence of an agreement to

15  carry out the Scheme.

16  **I.    The RICO Defendants Knowingly Joined the Conspiracy to Participate in the
        Conduct of the Affairs of the Enterprise and Did in Fact Participate in the Enterprise
17        By Repeatedly Submitting False Claims to End Payors**

18       328.    As alleged above, the RICO Defendants were made aware of the Scheme by

19  McKesson and knowingly joined the conspiracy to participate in the conduct of the affairs of the

20  Enterprise, including Plaintiff's business, for the purpose of defrauding End Payors like Plaintiff

21  and members of the Class.

22       329.    The RICO Defendants, among other actions, agreed with McKesson to participate in

23  the conspiracy by submitting false claims for Marked Up Drugs to End Payors. The RICO

24  Defendants also agreed with McKesson that numerous predicate offenses be committed by

25  McKesson and First Data in furtherance of the Scheme as the RICO Defendants knew that

26  McKesson and First Data were engaged in the fraudulent inflation of AWPs as described herein

27

28

CLASS ACTION COMPLAINT -                        - 90 -

1  and continued to submit false claims based on this fraudulent data to End Payors for the RICO

2  Defendants' direct benefit.

3  **J.    Damages Caused by the RICO Defendants' Scheme**

4      330.    Plaintiff and the Class have been injured in their business and property by reason of

5  the RICO Defendants' violations in that they have made hundreds of millions of dollars in

6  overpayments they would not have made had the RICO Defendants not engaged in their pattern of

7  racketeering activity and conspiracy. The Scheme injured all end payors by virtue of raising the

8  pricing benchmark.

9  **K.    The RICO Defendants are Jointly and Severally Liable for the Conduct of the
       Enterprise**

10

11     331.    As co-conspirators, the RICO Defendants are jointly and severally liable for all

12  damage that occurred as a result of both their actions and those of McKesson and First Data in

13  furtherance of the conspiracy to raise AWPs and submit false claims to Plaintiff and members of

14  the Class.

15     332.    Under the provisions of Section 1964(c) of RICO, the RICO Defendants are jointly

16  and severally liable to Plaintiff for three times the damages that Plaintiff has sustained, plus the

17  costs of bringing this suit, including reasonable attorneys' fees.

18  **COUNT II
    RICO CONSPIRACY
    (18 U.S.C. § 1962(D))**

19

20  **(On Behalf of Plaintiff and the RICO Class
    Against the RICO Defendants)**

21     333.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth

22  herein and further alleges as follows.

23     334.    The RICO Defendants violated 18 USC § 1962(d) by conspiring to associate with a

24  racketeering enterprise, in violation of 18 U.S.C. § 1962(c). The RICO Defendants knowingly

25  joined McKesson and First Data in a conspiracy to manipulate AWPs in violation of § 1962(c).

26

27

28

CLASS ACTION COMPLAINT -                          - 91 -

## COUNT III
## UNJUST ENRICHMENT / MONEY HAD AND RECEIVED

### (On Behalf of Plaintiff and the Class Against all Defendants)

335. Plaintiff, on behalf of itself and all others similarly situated, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

336. This claim is asserted by Plaintiff on behalf of itself and all others similarly situated against all Defendants under the common law of unjust enrichment / money had and received in the fifty States and Territories.

337. As a direct result of the wrongdoing and Scheme set forth in this Complaint, Defendants have profited and benefited from overpayments Plaintiff and Class Members made at their expense for Marked Up Drugs.

338. At the time they made these overpayments, Plaintiff and the other members of the Class expected that the listed prices for branded prescription drugs were accurate and not falsely inflated.

339. Defendants have voluntarily accepted and retained these overpayments to which they were not entitled directly from Plaintiff and members of the Class with the result that Plaintiff and the other members of the Class paid more for branded prescription drugs than they would have absent the wrongful conduct. Even if a particular Defendant was not aware of the Scheme, each Defendant knowingly received, accepted, appreciated and retained a benefit directly from Plaintiff and members of the Class under circumstances where it would be inequitable for the Defendant to retain the benefit without paying the value thereof to Plaintiff and members of the Class.

340. By the improper and wrongful conduct described herein, Defendants were unjustly enriched at the expense and impoverishment of Plaintiff and the other members of the Class.

341. It would be inequitable and not in good conscience for Defendants to retain the inflated profits, benefits, and other compensation they obtained as a result of the Scheme and/or mistake and/or fraud and/or deception to the detriment of Plaintiff and members of the Class. Plaintiff and members of the Class overpaid Defendants for Marked Up Drugs under a mistake of

CLASS ACTION COMPLAINT -                                                    - 92 -

1  fact or a misreliance on a right or duty in that they properly and reasonably relied upon First Data's

2  representations regarding the accuracy of AWPs and thus the accuracy of the claims submitted by

3  Defendants. This reasonable reliance resulted in detriment to Plaintiff and members of the Class.

4      342.    Furthermore, the RICO Defendants unjustly received benefits from Plaintiff and

5  members of the Class through the fraudulent and unconscionable intentional conduct alleged

6  herein.

7      343.    There is no justification for Defendants' unjust enrichment as they have received a

8  windfall in the form of overpayments, and Plaintiff and members of the Class have no other

9  remedy at law.

10     344.    Plaintiff and members of the Class did not unjustly enrich Defendants officiously or

11  gratuitously.

12     345.    There is a direct causal relationship between Defendants' unjust enrichment and the

13  impoverishment of Plaintiff and members of the Class.

14     346.    Plaintiff and the other members of the Class are entitled in equity to seek restitution

15  of Defendants' unjust profits, revenues and benefits to the extent, and in the amount, deemed

16  appropriate by the finder of fact; and such other relief as the Court deems just and proper to remedy

17  Defendants' unjust enrichment.

18     347.    There is no equitable basis for Defendants to retain the overpayments made by

19  Plaintiff and the Class for Marked Up Drugs.

20     348.    At the appropriate time, Plaintiff will articulate the proper approach for certification

21  of the above claims. This may include the use of a common jury instruction or the grouping of

22  State laws as set forth in *In re Pharm. Ind. Avg. Wholesale Price Litig.*, 252 F.R.D. 83 (D. Mass.

23  2008) (Saris, J.)

**PRAYER FOR RELIEF**

25      WHEREFORE, Plaintiff, on behalf of itself and the other members of the Class,

26  respectfully prays:

1    A.    that the Court determine that this action may be maintained as a class action

2    pursuant to Rule 23 of the Federal Rules of Civil Procedure, and direct that reasonable notice of

3    this action be given to the Classes;

4    B.    that the acts alleged herein be adjudged and decreed to be unlawful in violation of

5    the federal racketeering laws and State common law;

6    C.    that Plaintiff and the Classes recover three-fold the damages determined to have

7    been sustained by them pursuant to 18 U.S.C. § 1964(c)-(d) and all measures of damages allowable

8    under the claims identified herein and the common law, and that judgment be entered against

9    Defendants in favor of the Classes;

10   D.    that Plaintiff and the Classes recover the costs and expenses of suit, pre- and post-

11   judgment interest, and reasonable attorney fees as provided by law;

12   E.    that the RICO Defendants be enjoined from continuing or resuming their unlawful

13   acts discussed above;

14   F.    that Defendants be ordered to pay restitution to Plaintiff and the Classes;

15   G.    that Plaintiff and the Classes be granted such other, further relief as may be

16   determined to be just, equitable and proper by this Court, including but not limited to punitive

17   damages; and that the Court order such other and further relief as the Court deems just, necessary

18   and appropriate.

19

20   Dated: June 5 2009,                              Respectfully submitted,

21

22                                                    By:

23                                                         Jeff D. Friedman (173886)
                                                         Shana E. Scarlett (217895)
                                                    HAGENS BERMAN SOBOL SHAPIRO LLP
                                                    715 Hearst Avenue, Suite 202
24                                                   Berkeley, CA 94710
                                                    Telephone: (510) 725-3000
25                                                   Facsimile: (510) 725-3001
                                                    jefff@hbsslaw.com
26                                                   shanas@hbsslaw.com

27

28

CLASS ACTION COMPLAINT -                    - 94 -

1
2
3
4
5

Steve W. Berman
Sean R. Matt
Barbara Mahoney
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
E-mail: steve@hbsslaw.com

6
7
8
9

Walker Percy Badham III
Brannon J. Buck
BADHAM & BUCK LLC
2585 Wachovia Tower,
420 20th Street North
Birmingham, AL 35203-5200
Telephone: (205) 521-0036
Facsimile: (205) 521-0037

10
11
12
13
14

James L. Ward, Jr.
RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC
P.O. Box 1007
Mt. Pleasant, SC 29465
Telephone: (843) 727-6682
Facsimile: (843) 727-6689

15
16
17

R. Bryant McCulley
MCCULLEY MCCLUER PLLC
One Independent Drive, Suite 3201
Jacksonville, FL 32202
Telephone: (904) 482-4073
Facsimile: (904) 354-4813

18
19
20
21

Stuart H. McCluer
MCCULLEY MCCLUER PLLC
1109 Van Buren Avenue
Oxford, MS 38655
Telephone: (662) 236-1401
Facsimile: (662) 234-1974

22
23
24
25

Larry W. Morris
Randall Stark Haynes
MORRIS, HAYNES & HORNSBY
131 Main Street
P.O. Box 1660
Alexander City, AL 35011
Telephone: (256) 329-2000
Facsimile: (256) 329-2015

26
27

***Attorneys for Plaintiff and the Proposed Classes***

28

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| MEDICIS DERMATOLOGICS INC | 99207001960 | A/T/S 2% TOPICAL SOLUTION |
| ASTRAZENECA LP | 00310040160 | ACCOLATE 10 MG TABLET |
| ASTRAZENECA LP | 00310040239 | ACCOLATE 20 MG TABLET |
| ASTRAZENECA LP | 00310040260 | ACCOLATE 20 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071053023 | ACCUPRIL 10 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071053040 | ACCUPRIL 10 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071053223 | ACCUPRIL 20 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071053240 | ACCUPRIL 20 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071053523 | ACCUPRIL 40 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071052723 | ACCUPRIL 5 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071052740 | ACCUPRIL 5 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071022206 | ACCURETIC 10-12.5 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071022006 | ACCURETIC 20-12.5 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071022306 | ACCURETIC 20-25 MG TABLET |
| JOHNSON & JOHNSON GROUP | 62856024330 | ACIPHEX 20 MG TABLET EC |
| JOHNSON & JOHNSON GROUP | 62856024341 | ACIPHEX 20 MG TABLET EC |
| JOHNSON & JOHNSON GROUP | 62856024390 | ACIPHEX 20 MG TABLET EC |
| WATSON LABORATORIES INC | 52544003001 | ACTIGALL 300 MG CAPSULE |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149047001 | ACTONEL 30 MG TABLET |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149047101 | ACTONEL 5 MG TABLET |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149047103 | ACTONEL 5 MG TABLET |
| TAKEDA PHARMACEUTICALS NORTH AMERICA INC | 64764015104 | ACTOS 15 MG TABLET |
| TAKEDA PHARMACEUTICALS NORTH AMERICA INC | 64764015105 | ACTOS 15 MG TABLET |
| TAKEDA PHARMACEUTICALS NORTH AMERICA INC | 64764015106 | ACTOS 15 MG TABLET |
| TAKEDA PHARMACEUTICALS NORTH AMERICA INC | 64764030114 | ACTOS 30 MG TABLET |
| TAKEDA PHARMACEUTICALS NORTH AMERICA INC | 64764030115 | ACTOS 30 MG TABLET |
| TAKEDA PHARMACEUTICALS NORTH AMERICA INC | 64764030116 | ACTOS 30 MG TABLET |
| TAKEDA PHARMACEUTICALS NORTH AMERICA INC | 64764045124 | ACTOS 45 MG TABLET |
| TAKEDA PHARMACEUTICALS NORTH AMERICA INC | 64764045125 | ACTOS 45 MG TABLET |
| TAKEDA PHARMACEUTICALS NORTH AMERICA INC | 64764045126 | ACTOS 45 MG TABLET |
| SHIRE US INC | 54092038301 | ADDERALL XR 10 MG CAPSULE SA |
| SHIRE US INC | 54092038701 | ADDERALL XR 20 MG CAPSULE SA |
| SHIRE US INC | 54092039101 | ADDERALL XR 30 MG CAPSULE SA |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173069500 | ADVAIR 100/50 DISKUS |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173069502 | ADVAIR 100/50 DISKUS |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173069600 | ADVAIR 250/50 DISKUS |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173069602 | ADVAIR 250/50 DISKUS |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173069700 | ADVAIR 500/50 DISKUS |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173069702 | ADVAIR 500/50 DISKUS |
| KOS PHARMACEUTICALS INC | 60598000890 | ADVICOR 1,000 MG/20 MG TABLET |
| KOS PHARMACEUTICALS INC | 60598000690 | ADVICOR 500 MG/20 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456067299 | AEROBID AEROSOL W/ADAPTER |
| FOREST PHARMACEUTICALS INC | 00456067099 | AEROBID-M AEROSOL W/ADAPTER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173068700 | AGENERASE 15 MG/ML ORAL SOLN |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173067200 | AGENERASE 150 MG CAPSULE |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173067900 | AGENERASE 50 MG CAPSULE |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597000160 | AGGRENOX CAPSULE SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025101131 | ALDACTAZIDE 25/25 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025101155 | ALDACTAZIDE 25/25 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025102131 | ALDACTAZIDE 50/50 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025103131 | ALDACTONE 100 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025103134 | ALDACTONE 100 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025100131 | ALDACTONE 25 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025100151 | ALDACTONE 25 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025100155 | ALDACTONE 25 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025104131 | ALDACTONE 50 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025104134 | ALDACTONE 50 MG TABLET |
| 3M PHARMACEUTICALS | 00089061012 | ALDARA 5% CREAM |
| ZYBER PHARMACEUTICAL INC | 65224065001 | ALDEX TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 59572030250 | ALKERAN 2 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00088110947 | ALLEGRA 180 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00088110647 | ALLEGRA 30 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00088110747 | ALLEGRA 60 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00088109047 | ALLEGRA-D TABLET SA |
| MERRELL PHARMACEUTICALS INC | 00088109049 | ALLEGRA-D TABLET SA |
| MERRELL PHARMACEUTICALS INC | 00088109055 | ALLEGRA-D TABLET SA |
| MCR AMERICAN PHARMACEUTICALS INC | 58605051301 | ALLFEN 1,000 MG TABLET SA |
| MCR AMERICAN PHARMACEUTICALS INC | 58605052101 | ALLFEN-DM TABLET SA |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597007017 | ALUPENT 650 MCG INHALER COMP |
| MERRELL PHARMACEUTICALS INC | 00039022110 | AMARYL 1 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039022210 | AMARYL 2 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039022211 | AMARYL 2 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039022310 | AMARYL 4 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039022311 | AMARYL 4 MG TABLET |
| SANOFI SYNTHELABO INC | 00024542131 | AMBIEN 10 MG TABLET |
| SANOFI SYNTHELABO INC | 00024542134 | AMBIEN 10 MG TABLET |
| SANOFI SYNTHELABO INC | 00024540131 | AMBIEN 5 MG TABLET |
| SANOFI SYNTHELABO INC | 00024540134 | AMBIEN 5 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173056100 | AMERGE 1 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173056200 | AMERGE 2.5 MG TABLET |
| FERNDALE LABORATORIES INC | 00496077804 | ANALPRAM-HC 1% CREAM |
| FERNDALE LABORATORIES INC | 00496080004 | ANALPRAM-HC 2.5% CREAM |
| FERNDALE LABORATORIES INC | 00496082904 | ANALPRAM-HC 2.5% LOTION |
| HOFFMANN LA ROCHE INC | 00004620201 | ANAPROX 275 MG TABLET |
| SANOFI SYNTHELABO INC | 00024008401 | ARALEN PHOSPHATE 500 MG TAB |
| MERRELL PHARMACEUTICALS INC | 00088216030 | ARAVA 10 MG TABLET |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| MERRELL PHARMACEUTICALS INC | 00088216130 | ARAVA 20 MG TABLET |
| ASTRAZENECA LP | 00310020130 | ARIMIDEX 1 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456046100 | ARMOUR THYROID 120 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456046101 | ARMOUR THYROID 120 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456046163 | ARMOUR THYROID 120 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456045701 | ARMOUR THYROID 15 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456046200 | ARMOUR THYROID 180 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456046201 | ARMOUR THYROID 180 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456046301 | ARMOUR THYROID 240 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456045800 | ARMOUR THYROID 30 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456045801 | ARMOUR THYROID 30 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456045863 | ARMOUR THYROID 30 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456046401 | ARMOUR THYROID 300 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456045900 | ARMOUR THYROID 60 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456045901 | ARMOUR THYROID 60 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456045951 | ARMOUR THYROID 60 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456045963 | ARMOUR THYROID 60 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456046001 | ARMOUR THYROID 90 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025141134 | ARTHROTEC 50 TABLET EC |
| PFIZER LABORATORIES DIV PFIZER INC | 00025141160 | ARTHROTEC 50 TABLET EC |
| PFIZER LABORATORIES DIV PFIZER INC | 00025141190 | ARTHROTEC 50 TABLET EC |
| PFIZER LABORATORIES DIV PFIZER INC | 00025142134 | ARTHROTEC 75 TABLET EC |
| PFIZER LABORATORIES DIV PFIZER INC | 00025142160 | ARTHROTEC 75 TABLET EC |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149075202 | ASACOL 400 MG TABLET EC |
| ASTRAZENECA LP | 00186001628 | ATACAND 16 MG TABLET |
| ASTRAZENECA LP | 00186001631 | ATACAND 16 MG TABLET |
| ASTRAZENECA LP | 00186001654 | ATACAND 16 MG TABLET |
| ASTRAZENECA LP | 00186003228 | ATACAND 32 MG TABLET |
| ASTRAZENECA LP | 00186003231 | ATACAND 32 MG TABLET |
| ASTRAZENECA LP | 00186003254 | ATACAND 32 MG TABLET |
| ASTRAZENECA LP | 00186000431 | ATACAND 4 MG TABLET |
| ASTRAZENECA LP | 00186000831 | ATACAND 8 MG TABLET |
| ASTRAZENECA LP | 00186016228 | ATACAND HCT 16/12.5 MG TAB |
| ASTRAZENECA LP | 00186016254 | ATACAND HCT 16/12.5 MG TAB |
| ASTRAZENECA LP | 00186032228 | ATACAND HCT 32/12.5 MG TAB |
| ASTRAZENECA LP | 00186032254 | ATACAND HCT 32/12.5 MG TAB |
| PFIZER LABORATORIES DIV PFIZER INC | 00049559093 | ATARAX 10 MG/5 ML SYRUP |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597008062 | ATROVENT 0.02% SOLUTION |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597008130 | ATROVENT 0.03% SPRAY |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597008676 | ATROVENT 0.06% SPRAY |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597008214 | ATROVENT INHALER |
| BRISTOL MYERS SQUIBB CO | 00087277531 | AVALIDE 150-12.5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277532 | AVALIDE 150-12.5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277631 | AVALIDE 300-12.5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277632 | AVALIDE 300-12.5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277215 | AVAPRO 150 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277231 | AVAPRO 150 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277232 | AVAPRO 150 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277235 | AVAPRO 150 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277315 | AVAPRO 300 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277331 | AVAPRO 300 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277332 | AVAPRO 300 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277131 | AVAPRO 75 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277132 | AVAPRO 75 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00062208506 | AXERT 12.5 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00062208006 | AXERT 6.25 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00075006037 | AZMACORT INHALER |
| WOMEN FIRST HEALTHCARE INC | 64248000410 | BACTRIM 400-80 MG TABLET |
| WOMEN FIRST HEALTHCARE INC | 64248011710 | BACTRIM DS TABLET |
| FOREST PHARMACEUTICALS INC | 00456060101 | BANCAP HC CAPSULE |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173033602 | BECONASE 42 MCG INHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173048800 | BECONASE 42 MCG INHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173038879 | BECONASE AQ 0.042% SPRAY |
| AXCAN SCANDIPHARM INC | 00068012061 | BENTYL 10 MG CAPSULE |
| AXCAN SCANDIPHARM INC | 00068012516 | BENTYL 10 MG/5 ML SYRUP |
| AXCAN SCANDIPHARM INC | 00068012361 | BENTYL 20 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00068049425 | BENZACLIN GEL |
| ABBOTT LABORATORIES | 00074335811 | BIAXIN 250 MG TABLET |
| ABBOTT LABORATORIES | 00074258611 | BIAXIN 500 MG TABLET |
| JOHNSON & JOHNSON GROUP | 17314933001 | BICITRA SOLUTION |
| AAIPHARMA LLC | 00028007201 | BRETHINE 2.5 MG TABLET |
| AAIPHARMA LLC | 00028007210 | BRETHINE 2.5 MG TABLET |
| AAIPHARMA LLC | 00028010501 | BRETHINE 5 MG TABLET |
| AAIPHARMA LLC | 00028010510 | BRETHINE 5 MG TABLET |
| SANOFI SYNTHELABO INC | 00024028016 | BRONCHOLATE SYRUP |
| HOFFMANN LA ROCHE INC | 00004012501 | BUMEX 0.5 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004012511 | BUMEX 0.5 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004012101 | BUMEX 1 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004012111 | BUMEX 1 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004012114 | BUMEX 1 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004016201 | BUMEX 2 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004016211 | BUMEX 2 MG TABLET |
| RECKITT BENCKISER HEALTHCARE UK LIMITED | 12496075701 | BUPRENEX 0.3 MG/ML AMPUL |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00087611142 | CAFCIT 20 MG/ML ORAL SOLN |
| NOVARTIS PHARMACEUTICALS CORP | 00078003302 | CAFERGOT SUPPOSITORY |
| PFIZER LABORATORIES DIV PFIZER INC | 00025186131 | CALAN 120 MG TABLET |

Page 2

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| PFIZER LABORATORIES DIV PFIZER INC | 00025186152 | CALAN 120 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025177131 | CALAN 40 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025185131 | CALAN 80 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025185151 | CALAN 80 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025185152 | CALAN 80 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025190131 | CALAN SR 120 MG CAPLET SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025190134 | CALAN SR 120 MG CAPLET SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025191131 | CALAN SR 180 MG CAPLET SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025191134 | CALAN SR 180 MG CAPLET SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025189131 | CALAN SR 240 MG CAPLET SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025189134 | CALAN SR 240 MG CAPLET SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025189151 | CALAN SR 240 MG CAPLET SA |
| MERRELL PHARMACEUTICALS INC | 00068003701 | CANTIL 25 MG TABLET |
| AXCAN SCANDIPHARM INC | 58914017110 | CARAFATE 1 GM TABLET |
| AXCAN SCANDIPHARM INC | 58914017121 | CARAFATE 1 GM TABLET |
| AXCAN SCANDIPHARM INC | 58914017130 | CARAFATE 1 GM TABLET |
| AXCAN SCANDIPHARM INC | 58914017150 | CARAFATE 1 GM TABLET |
| HOFFMANN LA ROCHE INC | 00004018301 | CARDENE 20 MG CAPSULE |
| HOFFMANN LA ROCHE INC | 00004018401 | CARDENE 30 MG CAPSULE |
| HOFFMANN LA ROCHE INC | 00004018022 | CARDENE SR 30 MG CAPSULE SA |
| HOFFMANN LA ROCHE INC | 00004018091 | CARDENE SR 30 MG CAPSULE SA |
| HOFFMANN LA ROCHE INC | 00004018122 | CARDENE SR 45 MG CAPSULE SA |
| HOFFMANN LA ROCHE INC | 00004018191 | CARDENE SR 45 MG CAPSULE SA |
| HOFFMANN LA ROCHE INC | 00004018222 | CARDENE SR 60 MG CAPSULE SA |
| BIOVAIL PHARMACEUTICALS INC | 64455079247 | CARDIZEM 120 MG TABLET |
| BIOVAIL PHARMACEUTICALS INC | 00088177147 | CARDIZEM 30 MG TABLET |
| BIOVAIL PHARMACEUTICALS INC | 00088177155 | CARDIZEM 30 MG TABLET |
| BIOVAIL PHARMACEUTICALS INC | 00088177190 | CARDIZEM 30 MG TABLET |
| BIOVAIL PHARMACEUTICALS INC | 00088177247 | CARDIZEM 60 MG TABLET |
| BIOVAIL PHARMACEUTICALS INC | 00088177255 | CARDIZEM 60 MG TABLET |
| BIOVAIL PHARMACEUTICALS INC | 00088177290 | CARDIZEM 60 MG TABLET |
| BIOVAIL PHARMACEUTICALS INC | 00088179147 | CARDIZEM 90 MG TABLET |
| BIOVAIL PHARMACEUTICALS INC | 00088179530 | CARDIZEM CD 120 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 00088179542 | CARDIZEM CD 120 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 64455079549 | CARDIZEM CD 120 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 00088179630 | CARDIZEM CD 180 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 00088179642 | CARDIZEM CD 180 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 64455079649 | CARDIZEM CD 180 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 64455079650 | CARDIZEM CD 180 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 00088179730 | CARDIZEM CD 240 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 00088179742 | CARDIZEM CD 240 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 64455079749 | CARDIZEM CD 240 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 00088179830 | CARDIZEM CD 300 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 00088179842 | CARDIZEM CD 300 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 64455079849 | CARDIZEM CD 300 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 64455079942 | CARDIZEM CD 360 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 00088177947 | CARDIZEM SR 120 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 00088177747 | CARDIZEM SR 60 MG CAPSULE SA |
| BIOVAIL PHARMACEUTICALS INC | 00088177847 | CARDIZEM SR 90 MG CAPSULE SA |
| ASTRAZENECA LP | 00310070510 | CASODEX 50 MG TABLET |
| ASTRAZENECA LP | 00310070530 | CASODEX 50 MG TABLET |
| ASTRAZENECA LP | 00310070539 | CASODEX 50 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00028015101 | CATAFLAM 50 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597000801 | CATAPRES 0.1 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597000701 | CATAPRES 0.2 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597001101 | CATAPRES 0.3 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597003112 | CATAPRES-TTS 1 PATCH |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597003212 | CATAPRES-TTS 2 PATCH |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597003334 | CATAPRES-TTS 3 PATCH |
| BRISTOL MYERS SQUIBB CO | 00015303020 | CEENU 10 MG CAPSULE |
| BRISTOL MYERS SQUIBB CO | 00015303220 | CEENU 100 MG CAPSULE |
| BRISTOL MYERS SQUIBB CO | 00015303120 | CEENU 40 MG CAPSULE |
| BRISTOL MYERS SQUIBB CO | 00015303410 | CEENU DOSE PACK |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173039501 | CEFTIN 125 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173040600 | CEFTIN 125 MG/5 ML ORAL SUSP |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173038700 | CEFTIN 250 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173038701 | CEFTIN 250 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173038742 | CEFTIN 250 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173055400 | CEFTIN 250 MG/5 ML ORAL SUSP |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173055500 | CEFTIN 250 MG/5 ML ORAL SUSP |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173039400 | CEFTIN 500 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173039401 | CEFTIN 500 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173039442 | CEFTIN 500 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087772080 | CEFZIL 250 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087772150 | CEFZIL 500 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087772160 | CEFZIL 500 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025152031 | CELEBREX 100 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025152034 | CELEBREX 100 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025152051 | CELEBREX 100 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025152531 | CELEBREX 200 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025152534 | CELEBREX 200 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025152551 | CELEBREX 200 MG CAPSULE |
| SCHERING CORP | 00085094205 | CELESTONE 0.6 MG/5 ML SYRUP |
| FOREST PHARMACEUTICALS INC | 00456401001 | CELEXA 10 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456413008 | CELEXA 10 MG/5 ML SOLUTION |
| FOREST PHARMACEUTICALS INC | 00456402001 | CELEXA 20 MG TABLET |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| FOREST PHARMACEUTICALS INC | 00456402063 | CELEXA 20 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456404001 | CELEXA 40 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456404063 | CELEXA 40 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004026129 | CELLCEPT 200 MG/ML ORAL SUSP |
| HOFFMANN LA ROCHE INC | 00004025901 | CELLCEPT 250 MG CAPSULE |
| HOFFMANN LA ROCHE INC | 00004025905 | CELLCEPT 250 MG CAPSULE |
| HOFFMANN LA ROCHE INC | 00004025943 | CELLCEPT 250 MG CAPSULE |
| HOFFMANN LA ROCHE INC | 00004026001 | CELLCEPT 500 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004028043 | CELLCEPT 500 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071052524 | CELONTIN 300 MG KAPSEAL |
| PFIZER LABORATORIES DIV PFIZER INC | 00071053724 | CELONTIN KAPSEAL 150 MG |
| US PHARMACEUTICAL CORP | 52747014060 | CENOGEN ULTRA CAPSULE |
| PURDUE PHARMACEUTICAL PRODUCTS LP | 00034549006 | CERUMENEX 10% EAR DROPS |
| PURDUE PHARMACEUTICAL PRODUCTS LP | 00034549012 | CERUMENEX 10% EAR DROPS |
| FOREST PHARMACEUTICALS INC | 00456412363 | CERVIDIL 10 MG VAGINAL INSRT |
| BAYER CORP PHARMACEUTICAL DIV | 00026855338 | CIPRO 10% SUSPENSION |
| BAYER CORP PHARMACEUTICAL DIV | 00026851106 | CIPRO 100 MG TABLET |
| BAYER CORP PHARMACEUTICAL DIV | 00026851248 | CIPRO 250 MG TABLET |
| BAYER CORP PHARMACEUTICAL DIV | 00026851251 | CIPRO 250 MG TABLET |
| BAYER CORP PHARMACEUTICAL DIV | 00026855136 | CIPRO 5% SUSPENSION |
| BAYER CORP PHARMACEUTICAL DIV | 00026851348 | CIPRO 500 MG TABLET |
| BAYER CORP PHARMACEUTICAL DIV | 00026851351 | CIPRO 500 MG TABLET |
| BAYER CORP PHARMACEUTICAL DIV | 00026851448 | CIPRO 750 MG TABLET |
| BAYER CORP PHARMACEUTICAL DIV | 00026851450 | CIPRO 750 MG TABLET |
| SCHERING CORP | 00085126401 | CLARINEX 5 MG TABLET |
| SCHERING CORP | 00085126402 | CLARINEX 5 MG TABLET |
| SCHERING CORP | 00085126403 | CLARINEX 5 MG TABLET |
| SCHERING CORP | 00085126404 | CLARINEX 5 MG TABLET |
| SCHERING CORP | 00085112802 | CLARITIN 10 MG REDITABS |
| SCHERING CORP | 00085045803 | CLARITIN 10 MG TABLET |
| SCHERING CORP | 00085045804 | CLARITIN 10 MG TABLET |
| SCHERING CORP | 00085045805 | CLARITIN 10 MG TABLET |
| SCHERING CORP | 00085045806 | CLARITIN 10 MG TABLET |
| SCHERING CORP | 00085122301 | CLARITIN 10 MG/10 ML SYRUP |
| SCHERING CORP | 00085063501 | CLARITIN-D 12 HOUR TAB SA |
| SCHERING CORP | 00085063504 | CLARITIN-D 12 HOUR TAB SA |
| SCHERING CORP | 00085063505 | CLARITIN-D 12 HOUR TAB SA |
| SCHERING CORP | 00085123301 | CLARITIN-D 24 HOUR TAB SA |
| SCHERING CORP | 00085123302 | CLARITIN-D 24 HOUR TAB SA |
| FERNDALE LABORATORIES INC | 00498085745 | CLINAC BPO 7% GEL |
| MERRELL PHARMACEUTICALS INC | 00068022630 | CLOMID 50 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078012705 | CLOZARIL 100 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078012706 | CLOZARIL 100 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078012605 | CLOZARIL 25 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078012606 | CLOZARIL 25 MG TABLET |
| FIRST HORIZON PHARMACEUTICAL CORP | 59630019012 | COGNEX 10 MG CAPSULE |
| FIRST HORIZON PHARMACEUTICAL CORP | 59630019112 | COGNEX 20 MG CAPSULE |
| FIRST HORIZON PHARMACEUTICAL CORP | 59630019212 | COGNEX 30 MG CAPSULE |
| FIRST HORIZON PHARMACEUTICAL CORP | 59630019312 | COGNEX 40 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078037745 | COMBIPATCH 0.05/0.14 MG PTCH |
| NOVARTIS PHARMACEUTICALS CORP | 00078037742 | COMBIPATCH 0.05/0.14 MG PTCH |
| NOVARTIS PHARMACEUTICALS CORP | 00078037845 | COMBIPATCH 0.05/0.25 MG PTCH |
| NOVARTIS PHARMACEUTICALS CORP | 00078037842 | COMBIPATCH 0.05/0.25 MG PTCH |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597001314 | COMBIVENT INHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173059500 | COMBIVIR TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173059502 | COMBIVIR TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078032705 | COMTAN 200 MG TABLET |
| JOHNSON & JOHNSON GROUP | 17314585002 | CONCERTA 18 MG TABLET SA |
| JOHNSON & JOHNSON GROUP | 17314585102 | CONCERTA 36 MG TABLET SA |
| JOHNSON & JOHNSON GROUP | 17314585202 | CONCERTA 54 MG TABLET SA |
| WATSON LABORATORIES INC | 55515010201 | CONDYLOX 0.5% GEL |
| WATSON LABORATORIES INC | 55515010101 | CONDYLOX 0.5% TOPICAL SOLN |
| WATSON LABORATORIES INC | 55515001424 | CORDRAN 4 MCG/SQ CM TAPE |
| WATSON LABORATORIES INC | 55515001480 | CORDRAN 4 MCG/SQ CM TAPE |
| WATSON LABORATORIES INC | 55515003515 | CORDRAN SP 0.05% CREAM |
| WATSON LABORATORIES INC | 55515003530 | CORDRAN SP 0.05% CREAM |
| WATSON LABORATORIES INC | 55515003560 | CORDRAN SP 0.05% CREAM |
| MONARCH PHARMACEUTICALS INC | 61570020301 | CORGARD 120 MG TABLET |
| MONARCH PHARMACEUTICALS INC | 61570020401 | CORGARD 160 MG TABLET |
| MONARCH PHARMACEUTICALS INC | 61570020001 | CORGARD 20 MG TABLET |
| MONARCH PHARMACEUTICALS INC | 61570020101 | CORGARD 40 MG TABLET |
| MONARCH PHARMACEUTICALS INC | 61570020110 | CORGARD 40 MG TABLET |
| MONARCH PHARMACEUTICALS INC | 61570020201 | CORGARD 80 MG TABLET |
| MONARCH PHARMACEUTICALS INC | 61570020210 | CORGARD 80 MG TABLET |
| MONARCH PHARMACEUTICALS INC | 61570017501 | CORZIDE 40/5 TABLET |
| MONARCH PHARMACEUTICALS INC | 61570017601 | CORZIDE 80/5 TABLET |
| BRISTOL MYERS SQUIBB CO | 00056016970 | COUMADIN 1 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056016975 | COUMADIN 1 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056016990 | COUMADIN 1 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017470 | COUMADIN 10 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017475 | COUMADIN 10 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017070 | COUMADIN 2 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017075 | COUMADIN 2 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017090 | COUMADIN 2 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017670 | COUMADIN 2.5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017675 | COUMADIN 2.5 MG TABLET |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| BRISTOL MYERS SQUIBB CO | 00056017690 | COUMADIN 2.5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056018870 | COUMADIN 3 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056018875 | COUMADIN 3 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056016890 | COUMADIN 3 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056016870 | COUMADIN 4 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056016875 | COUMADIN 4 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056016890 | COUMADIN 4 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017270 | COUMADIN 5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017275 | COUMADIN 5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017290 | COUMADIN 5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056018970 | COUMADIN 6 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056018975 | COUMADIN 6 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056018990 | COUMADIN 6 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017370 | COUMADIN 7.5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017375 | COUMADIN 7.5 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025201131 | COVERA-HS 180 MG TABLET SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025201134 | COVERA-HS 180 MG TABLET SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025202131 | COVERA-HS 240 MG TABLET SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025202134 | COVERA-HS 240 MG TABLET SA |
| ORGANON USA INC | 00052028306 | CYCLESSA 28 DAY TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083002430 | CYTADREN 250 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025145120 | CYTOTEC 100 MCG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025145134 | CYTOTEC 100 MCG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025145160 | CYTOTEC 100 MCG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025146131 | CYTOTEC 200 MCG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025146134 | CYTOTEC 200 MCG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025146160 | CYTOTEC 200 MCG TABLET |
| HOFFMANN LA ROCHE INC | 00004026948 | CYTOVENE 250 MG CAPSULE |
| HOFFMANN LA ROCHE INC | 00004027848 | CYTOVENE 500 MG CAPSULE |
| SANOFI SYNTHELABO INC | 00024030406 | DANOCRINE 100 MG CAPSULE |
| SANOFI SYNTHELABO INC | 00024030506 | DANOCRINE 200 MG CAPSULE |
| SANOFI SYNTHELABO INC | 00024030560 | DANOCRINE 200 MG CAPSULE |
| SANOFI SYNTHELABO INC | 00024030306 | DANOCRINE 50 MG CAPSULE |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149003305 | DANTRIUM 100 MG CAPSULE |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149003005 | DANTRIUM 25 MG CAPSULE |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149003066 | DANTRIUM 25 MG CAPSULE |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149003105 | DANTRIUM 50 MG CAPSULE |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173020155 | DARAPRIM 25 MG TABLET |
| AAIPHARMA LLC | 00002036302 | DARVOCET-N 100 TABLET |
| AAIPHARMA LLC | 00002036303 | DARVOCET-N 100 TABLET |
| AAIPHARMA LLC | 00002036333 | DARVOCET-N 100 TABLET |
| AAIPHARMA LLC | 00002035102 | DARVOCET-N 50 TABLET |
| AAIPHARMA LLC | 00002080303 | DARVON 65 MG PULVULE |
| AAIPHARMA LLC | 00002080333 | DARVON 65 MG PULVULE |
| AAIPHARMA LLC | 66591062241 | DARVON 65 MG PULVULE |
| AAIPHARMA LLC | 00002311102 | DARVON COMPOUND-65 PULVULE |
| AAIPHARMA LLC | 00002311103 | DARVON COMPOUND-65 PULVULE |
| AAIPHARMA LLC | 00002035333 | DARVON-N 100 MG TABLET |
| AAIPHARMA LLC | 66591063141 | DARVON-N 100 MG TABLET |
| AAIPHARMA LLC | 66591063151 | DARVON-N 100 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025138131 | DAYPRO 600 MG CAPLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025138134 | DAYPRO 600 MG CAPLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025138151 | DAYPRO 600 MG CAPLET |
| HOFFMANN LA ROCHE INC | 00004026301 | DEMADEX 10 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004026349 | DEMADEX 10 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004026706 | DEMADEX 10 MG/ML AMPUL |
| HOFFMANN LA ROCHE INC | 00004026806 | DEMADEX 10 MG/ML AMPUL |
| HOFFMANN LA ROCHE INC | 00004026501 | DEMADEX 100 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004026549 | DEMADEX 100 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004026401 | DEMADEX 20 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004026449 | DEMADEX 20 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004026201 | DEMADEX 5 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004026249 | DEMADEX 5 MG TABLET |
| SANOFI SYNTHELABO INC | 00024033704 | DEMEROL 100 MG TABLET |
| SANOFI SYNTHELABO INC | 00024033504 | DEMEROL 50 MG TABLET |
| SANOFI SYNTHELABO INC | 00024033506 | DEMEROL 50 MG TABLET |
| SANOFI SYNTHELABO INC | 00024033502 | DEMEROL 50 MG TABLET |
| SANOFI SYNTHELABO INC | 00024033206 | DEMEROL 50 MG/5 ML SYRUP |
| PFIZER LABORATORIES DIV PFIZER INC | 00025016109 | DEMULEN 1/35-28 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025016124 | DEMULEN 1/35-28 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025008109 | DEMULEN 1/50-28 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025008124 | DEMULEN 1/50-28 TABLET |
| ABBOTT LABORATORIES | 00074611411 | DEPAKOTE 125 MG SPRINKLE CAP |
| ABBOTT LABORATORIES | 00074621211 | DEPAKOTE 125 MG TABLET EC |
| ABBOTT LABORATORIES | 00074621411 | DEPAKOTE 250 MG TABLET EC |
| ABBOTT LABORATORIES | 00074621511 | DEPAKOTE 500 MG TABLET EC |
| ORGANON USA INC | 00052028106 | DESOGEN 28 DAY TABLET |
| MERRELL PHARMACEUTICALS INC | 00039005305 | DIABETA 1.25 MG TABLET |
| HOECHST ROUSSEL PHARMACEUTICALS DIV | 00039005005 | DIABETA 1.25MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039005110 | DIABETA 2.5 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039005111 | DIABETA 2.5 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039005150 | DIABETA 2.5 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039005210 | DIABETA 5 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039005211 | DIABETA 5 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039005260 | DIABETA 5 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039005270 | DIABETA 5 MG TABLET |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149040560 | DIDRONEL 200 MG TABLET |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149040660 | DIDRONEL 400 MG TABLET |
| WATSON LABORATORIES INC | 52544048201 | DILACOR XR 120 MG CAPSULE SA |
| WATSON LABORATORIES INC | 00075025000 | DILACOR XR 120MG CAPSULE SA |
| WATSON LABORATORIES INC | 52544073201 | DILACOR XR 120MG CAPSULE SA |
| WATSON LABORATORIES INC | 52544048301 | DILACOR XR 180 MG CAPSULE SA |
| WATSON LABORATORIES INC | 52544048305 | DILACOR XR 180 MG CAPSULE SA |
| WATSON LABORATORIES INC | 00075025100 | DILACOR XR 180MG CAPSULE SA |
| WATSON LABORATORIES INC | 52544073301 | DILACOR XR 180MG CAPSULE SA |
| WATSON LABORATORIES INC | 52544048401 | DILACOR XR 240 MG CAPSULE SA |
| WATSON LABORATORIES INC | 52544048405 | DILACOR XR 240 MG CAPSULE SA |
| WATSON LABORATORIES INC | 00075025200 | DILACOR XR 240MG CAPSULE SA |
| WATSON LABORATORIES INC | 52544073401 | DILACOR XR 240MG CAPSULE SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00071036224 | DILANTIN 100 MG KAPSEAL |
| PFIZER LABORATORIES DIV PFIZER INC | 00071036232 | DILANTIN 100 MG KAPSEAL |
| PFIZER LABORATORIES DIV PFIZER INC | 00071036240 | DILANTIN 100 MG KAPSEAL |
| PFIZER LABORATORIES DIV PFIZER INC | 00071221420 | DILANTIN 125 MG/5 ML SUSP |
| PFIZER LABORATORIES DIV PFIZER INC | 00071036524 | DILANTIN 30 MG KAPSEAL |
| PFIZER LABORATORIES DIV PFIZER INC | 00071000724 | DILANTIN 50 MG INFATAB |
| PFIZER LABORATORIES DIV PFIZER INC | 00071000740 | DILANTIN 50 MG INFATAB |
| SCHERING CORP | 00085063401 | DIPROLENE 0.05% GEL |
| SCHERING CORP | 00085063403 | DIPROLENE 0.05% GEL |
| SCHERING CORP | 00085096201 | DIPROLENE 0.05% LOTION |
| SCHERING CORP | 00085096202 | DIPROLENE 0.05% LOTION |
| SCHERING CORP | 00085057502 | DIPROLENE 0.05% OINTMENT |
| SCHERING CORP | 00085057505 | DIPROLENE 0.05% OINTMENT |
| SCHERING CORP | 00085051701 | DIPROLENE AF 0.05% CREAM |
| SCHERING CORP | 00085051704 | DIPROLENE AF 0.05% CREAM |
| JOHNSON & JOHNSON GROUP | 17314920001 | DITROPAN 5 MG TABLET |
| JOHNSON & JOHNSON GROUP | 17314920002 | DITROPAN 5 MG TABLET |
| JOHNSON & JOHNSON GROUP | 17314920003 | DITROPAN 5 MG TABLET |
| JOHNSON & JOHNSON GROUP | 17314920104 | DITROPAN 5 MG/5 ML SYRUP |
| WARNER CHILCOTT INC | 00430083819 | DORYX 100 MG CAPSULE EC |
| WARNER CHILCOTT INC | 00430083620 | DORYX 75 MG CAPSULE EC |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072026006 | DOVONEX 0.005% CREAM |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072026012 | DOVONEX 0.005% CREAM |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072254006 | DOVONEX 0.005% OINTMENT |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072254012 | DOVONEX 0.005% OINTMENT |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072118006 | DOVONEX 0.005% SOLUTION |
| SANOFI SYNTHELABO INC | 00024039202 | DRISDOL 50,000 UNITS CAPSULE |
| JOHNSON & JOHNSON GROUP | 50458003605 | DURAGESIC 100 MCG/HR PATCH |
| JOHNSON & JOHNSON GROUP | 50458003305 | DURAGESIC 25 MCG/HR PATCH |
| JOHNSON & JOHNSON GROUP | 50458003405 | DURAGESIC 50 MCG/HR PATCH |
| JOHNSON & JOHNSON GROUP | 50458003505 | DURAGESIC 75 MCG/HR PATCH |
| WARNER CHILCOTT INC | 00430278217 | DURICEF 250 MG/5 ML ORAL SUSP |
| WARNER CHILCOTT INC | 00087078446 | DURICEF 500 MG CAPSULE |
| WARNER CHILCOTT INC | 00430278317 | DURICEF 500 MG/5 ML ORAL SUSP |
| RELIANT PHARMACEUTICALS INC | 65726022615 | DYNACIRC 2.5 MG CAPSULE |
| RELIANT PHARMACEUTICALS INC | 65726022625 | DYNACIRC 2.5 MG CAPSULE |
| RELIANT PHARMACEUTICALS INC | 65726022715 | DYNACIRC 5 MG CAPSULE |
| RELIANT PHARMACEUTICALS INC | 65726022725 | DYNACIRC 5 MG CAPSULE |
| RELIANT PHARMACEUTICALS INC | 65726023810 | DYNACIRC CR 10 MG TABLET SA |
| RELIANT PHARMACEUTICALS INC | 65726023625 | DYNACIRC CR 10 MG TABLET SA |
| RELIANT PHARMACEUTICALS INC | 65726023510 | DYNACIRC CR 5 MG TABLET SA |
| RELIANT PHARMACEUTICALS INC | 65726023525 | DYNACIRC CR 5 MG TABLET SA |
| HOFFMANN LA ROCHE INC | 00004641501 | EC-NAPROSYN 375 MG TABLET EC |
| HOFFMANN LA ROCHE INC | 00004641601 | EC-NAPROSYN 500 MG TABLET EC |
| ASTRAZENECA LP | 00310004010 | ELAVIL 10 MG TABLET |
| ASTRAZENECA LP | 00310004310 | ELAVIL 100 MG TABLET |
| ASTRAZENECA LP | 00310004710 | ELAVIL 150 MG TABLET |
| ASTRAZENECA LP | 00310004730 | ELAVIL 150 MG TABLET |
| ASTRAZENECA LP | 00310004510 | ELAVIL 25 MG TABLET |
| ASTRAZENECA LP | 00310004550 | ELAVIL 25 MG TABLET |
| ASTRAZENECA LP | 00310004110 | ELAVIL 50 MG TABLET |
| ASTRAZENECA LP | 00310004210 | ELAVIL 75 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078037540 | ELIDEL 1% CREAM |
| NOVARTIS PHARMACEUTICALS CORP | 00078037546 | ELIDEL 1% CREAM |
| NOVARTIS PHARMACEUTICALS CORP | 00078037563 | ELIDEL 1% CREAM |
| SANOFI SYNTHELABO INC | 00024079375 | ELIGARD 7.5 MG SYRINGE |
| FOREST PHARMACEUTICALS INC | 00456064808 | ELIXOPHYLLIN GG 100/100 LIQ |
| FOREST PHARMACEUTICALS INC | 00456064818 | ELIXOPHYLLIN GG 100/100 LIQ |
| FOREST PHARMACEUTICALS INC | 00456064508 | ELIXOPHYLLIN-KI ELIXIR |
| JOHNSON & JOHNSON GROUP | 17314930001 | ELMIRON 100 MG CAPSULE |
| SCHERING CORP | 00085056701 | ELOCON 0.1% CREAM |
| SCHERING CORP | 00085056702 | ELOCON 0.1% CREAM |
| SCHERING CORP | 00085085401 | ELOCON 0.1% LOTION |
| SCHERING CORP | 00085085402 | ELOCON 0.1% LOTION |
| SCHERING CORP | 00085037001 | ELOCON 0.1% OINTMENT |
| SCHERING CORP | 00085037002 | ELOCON 0.1% OINTMENT |
| ASTRAZENECA LP | 00186151601 | EMLA CREAM |
| ASTRAZENECA LP | 00186151501 | EMLA CREAM W/TEGADERM |
| ASTRAZENECA LP | 00186151503 | EMLA CREAM W/TEGADERM |
| IMMUNEX CORP | 58406042534 | ENBREL 25 MG KIT |
| IMMUNEX CORP | 58406042541 | ENBREL 25 MG KIT |
| ASTRAZENECA LP | 00186070210 | ENTOCORT EC 3 MG CAPSULE |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173047100 | EPIVIR 10 MG/ML ORAL SOLN |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173047001 | EPIVIR 150 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173066200 | EPIVIR HBV 100 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173066300 | EPIVIR HBV 25 MG/5 ML SOLN |
| JOHNSON & JOHNSON GROUP | 50458027036 | ERGAMISOL 50MG TABLET |
| WARNER CHILCOTT INC | 00430069624 | ERYC 250 MG CAPSULE EC |
| JOHNSON & JOHNSON GROUP | 00062118501 | ERYCETTE 2% PLEDGETS |
| FOREST PHARMACEUTICALS INC | 00456063001 | ESGIC TABLET |
| FOREST PHARMACEUTICALS INC | 00535001101 | ESGIC TABLET |
| FOREST PHARMACEUTICALS INC | 00456067801 | ESGIC-PLUS TABLET |
| WARNER CHILCOTT INC | 00430375411 | ESTRACE 0.01% CREAM |
| WARNER CHILCOTT INC | 00430375414 | ESTRACE 0.01% CREAM |
| WARNER CHILCOTT INC | 00430002324 | ESTRACE 1 MG TABLET |
| WARNER CHILCOTT INC | 00430002330 | ESTRACE 1 MG TABLET |
| WARNER CHILCOTT INC | 00430002424 | ESTRACE 2 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083231008 | ESTRADERM 0.05 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00083231062 | ESTRADERM 0.05 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00083232008 | ESTRADERM 0.1 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00083232062 | ESTRADERM 0.1 MG PATCH |
| PFIZER LABORATORIES DIV PFIZER INC | 00071092815 | ESTROSTEP FE-28 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071092847 | ESTROSTEP FE-28 TABLET |
| BAXTER HEALTHCARE CORP | 10019035060 | ETHRANE INHALATION |
| SCHERING CORP | 00085052503 | EULEXIN 125 MG CAPSULE |
| SCHERING CORP | 00085052505 | EULEXIN 125 MG CAPSULE |
| SCHERING CORP | 00085052506 | EULEXIN 125 MG CAPSULE |
| ELI LILLY AND CO | 00002418502 | EVISTA 60 MG TABLET |
| ELI LILLY AND CO | 00002416507 | EVISTA 60 MG TABLET |
| ELI LILLY AND CO | 00002416530 | EVISTA 60 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078032306 | EXELON 1.5 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078032344 | EXELON 1.5 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078033931 | EXELON 2 MG/ML ORAL SOLUTION |
| NOVARTIS PHARMACEUTICALS CORP | 00078032406 | EXELON 3 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078032444 | EXELON 3 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078032506 | EXELON 4.5 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078032544 | EXELON 4.5 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078032606 | EXELON 6 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078032644 | EXELON 6 MG CAPSULE |
| HOFFMANN LA ROCHE INC | 00004016103 | FANSIDAR 500/25 TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078024915 | FEMARA 2.5 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00430054414 | FEMHRT 1/5 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00430054423 | FEMHRT 1/5 TABLET |
| WARNER CHILCOTT INC | 00430620140 | FEMRING 0.05 MG VAGINAL RING |
| WARNER CHILCOTT INC | 00430620240 | FEMRING 0.10 MG VAGINAL RING |
| ABBOTT LABORATORIES | 00074707930 | FERO-FOLIC-500 FILMTAB |
| NOVARTIS PHARMACEUTICALS CORP | 00078010305 | FIORINAL CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078010308 | FIORINAL CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078010705 | FIORINAL/CODEINE #3 CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025183131 | FLAGYL 250 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025183150 | FLAGYL 250 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025183155 | FLAGYL 250 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025194234 | FLAGYL 375 CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025194250 | FLAGYL 375 CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025182131 | FLAGYL 500 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025182150 | FLAGYL 500 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025182151 | FLAGYL 500 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025196130 | FLAGYL ER 750 MG TABLET SA |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173045301 | FLONASE 0.05% NASAL SPRAY |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173050900 | FLOVENT 100 MCG ROTADISK |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173049400 | FLOVENT 110 MCG INHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173049800 | FLOVENT 110 MCG INHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173049500 | FLOVENT 220 MCG INHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173049900 | FLOVENT 220 MCG INHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173050400 | FLOVENT 250 MCG ROTADISK |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173049100 | FLOVENT 44 MCG INHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173049700 | FLOVENT 44 MCG INHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173051100 | FLOVENT 50 MCG ROTADISK |
| JOHNSON & JOHNSON GROUP | 00062154002 | FLOXIN 200 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00062154102 | FLOXIN 300 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00062154201 | FLOXIN 400 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456052101 | FLUMADINE 100 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456052708 | FLUMADINE 50 MG/5 ML SYRUP |
| NOVARTIS PHARMACEUTICALS CORP | 00078038205 | FOCALIN 10 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078038605 | FOCALIN 2.5 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078038105 | FOCALIN 5 MG TABLET |
| SCHERING CORP | 00085140101 | FORADIL AEROLIZER 12 MCG CAP |
| SCHERING CORP | 00085140201 | FORADIL AEROLIZER 12 MCG CAP |
| HOFFMANN LA ROCHE INC | 00004024648 | FORTOVASE 200 MG SOFTGEL CAP |
| NOVARTIS PHARMACEUTICALS CORP | 00078037366 | GLEEVEC 100 MG CAPSULE |
| BRISTOL MYERS SQUIBB CO | 00087607111 | GLUCOPHAGE 1,000 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087606005 | GLUCOPHAGE 500 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087606010 | GLUCOPHAGE 500 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087607005 | GLUCOPHAGE 850 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087607211 | GLUCOVANCE 1.25/250 MG TAB |
| BRISTOL MYERS SQUIBB CO | 00087607311 | GLUCOVANCE 2.5/500 MG TAB |
| BRISTOL MYERS SQUIBB CO | 00087607411 | GLUCOVANCE 5/500 MG TAB |
| JOHNSON & JOHNSON GROUP | 00062020604 | GRIFULVIN V 125 MG/5 ML SUSP |
| PROMETHEUS LABORATORIES INC | 65483049514 | HELIDAC THERAPY |

Page 7

No

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| US PHARMACEUTICAL CORP | 52747080060 | HEMOCYTE PLUS CAPSULE |
| US PHARMACEUTICAL CORP | 52747030830 | HEMOCYTE PLUS TABULE |
| US PHARMACEUTICAL CORP | 52747030870 | HEMOCYTE PLUS TABULE |
| US PHARMACEUTICAL CORP | 52747030630 | HEMOCYTE-F TABLET |
| US PHARMACEUTICAL CORP | 52747030670 | HEMOCYTE-F TABLET |
| GILEAD SCIENCES INC | 61958050101 | HEPSERA 10 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00068027761 | HIPREX 1 GM TABLET |
| HOFFMANN LA ROCHE INC | 00004022001 | HIVID 0.375 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004022101 | HIVID 0.750 MG TABLET |
| SANOFI SYNTHELABO INC | 00024079202 | HYTAKEROL 0.125 MG CAPSULE |
| ABBOTT LABORATORIES | 00074712530 | IBERET-FOLIC 500 FILMTAB |
| HAWTHORN PHARMACEUTICALS | 63717015003 | ICAR PRENATAL COMBO PACK |
| HAWTHORN PHARMACEUTICALS | 63717011201 | ICAR-C PLUS SR CAPSULE |
| SCHERING CORP | 00085115303 | IMDUR 120 MG TABLET SA |
| SCHERING CORP | 00085115304 | IMDUR 120 MG TABLET SA |
| SCHERING CORP | 00085330601 | IMDUR 30 MG TABLET SA |
| SCHERING CORP | 00085330603 | IMDUR 30 MG TABLET SA |
| SCHERING CORP | 00085411001 | IMDUR 60 MG TABLET SA |
| SCHERING CORP | 00085411003 | IMDUR 60 MG TABLET SA |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173045003 | IMITREX 100 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173052300 | IMITREX 20 MG NASAL SPRAY |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173046002 | IMITREX 25 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173052400 | IMITREX 5 MG NASAL SPRAY |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173045900 | IMITREX 50 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483059010 | IMURAN 50 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 60793001114 | INTAL INHALER |
| MERRELL PHARMACEUTICALS INC | 00585067302 | INTAL NEBULIZER SOLUTION |
| MERRELL PHARMACEUTICALS INC | 00585067303 | INTAL NEBULIZER SOLUTION |
| HOFFMANN LA ROCHE INC | 00004024515 | INVIRASE 200 MG CAPSULE |
| SCHERING CORP | 00085026301 | K-DUR 10 MEQ TABLET SA |
| SCHERING CORP | 00085026381 | K-DUR 10 MEQ TABLET SA |
| SCHERING CORP | 00085078701 | K-DUR 20 MEQ TABLET SA |
| SCHERING CORP | 00085078706 | K-DUR 20 MEQ TABLET SA |
| SCHERING CORP | 00085078710 | K-DUR 20 MEQ TABLET SA |
| SCHERING CORP | 00085076781 | K-DUR 20 MEQ TABLET SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00024230110 | KERLONE 10 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00024230020 | KERLONE 20 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004006801 | KLONOPIN 0.5 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004005801 | KLONOPIN 1 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004009801 | KLONOPIN 2 MG TABLET |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072573028 | LAC-HYDRIN 12% CREAM |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072573038 | LAC-HYDRIN 12% CREAM |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072570801 | LAC-HYDRIN 12% LOTION |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072571208 | LAC-HYDRIN 12% LOTION |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072571214 | LAC-HYDRIN 12% LOTION |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072571401 | LAC-HYDRIN 12% LOTION |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173064255 | LAMICTAL 100 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173064360 | LAMICTAL 150 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173064460 | LAMICTAL 200 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173052700 | LAMICTAL 25 MG DISPER TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173063302 | LAMICTAL 25 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173052600 | LAMICTAL 5 MG DISPER TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078032882 | LAMISIL 1% SOLUTION |
| NOVARTIS PHARMACEUTICALS CORP | 00078017905 | LAMISIL 250 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078017915 | LAMISIL 250 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00028010801 | LAMPRENE 50 MG CAPSULE |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173024255 | LANOXIN 125 MCG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173024256 | LANOXIN 125 MCG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173024275 | LANOXIN 125 MCG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173024955 | LANOXIN 250 MCG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173024956 | LANOXIN 250 MCG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173024975 | LANOXIN 250 MCG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173024980 | LANOXIN 250 MCG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173026427 | LANOXIN 50 MCG/ML ELIXIR |
| HOFFMANN LA ROCHE INC | 00004017202 | LARIAM 250 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039006710 | LASIX 20 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039006750 | LASIX 20 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039006770 | LASIX 20 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039006011 | LASIX 40 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039006013 | LASIX 40 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039006050 | LASIX 40 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039006070 | LASIX 40 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039006605 | LASIX 80 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039006650 | LASIX 80 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078017605 | LESCOL 20 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078017615 | LESCOL 20 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078023405 | LESCOL 40 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078023415 | LESCOL 40 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078035405 | LESCOL XL 80 MG TABLET SA |
| NOVARTIS PHARMACEUTICALS CORP | 00078035415 | LESCOL XL 80 MG TABLET SA |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173063535 | LEUKERAN 2 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045152010 | LEVAQUIN 250 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045152050 | LEVAQUIN 250 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045152510 | LEVAQUIN 500 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045152550 | LEVAQUIN 500 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045153010 | LEVAQUIN 750 MG TABLET |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| JOHNSON & JOHNSON GROUP | 00045153050 | LEVAQUIN 750 MG TABLET |
| ASTRAZENECA LP | 00186000231 | LEXXEL 5-2.5 MG TABLET SA |
| ASTRAZENECA LP | 00186000131 | LEXXEL 5-5 MG TABLET SA |
| ASTRAZENECA LP | 00186000186 | LEXXEL 5-5 MG TABLET SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00071015523 | LIPITOR 10 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071015534 | LIPITOR 10 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071015540 | LIPITOR 10 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071015623 | LIPITOR 20 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071015640 | LIPITOR 20 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071015723 | LIPITOR 40 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071015823 | LIPITOR 80 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071091648 | LOESTRIN 21 1.5/30 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071091548 | LOESTRIN 21 1/20 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071091745 | LOESTRIN FE 1.5/30 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071091748 | LOESTRIN FE 1.5/30 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071091345 | LOESTRIN FE 1/20 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071091348 | LOESTRIN FE 1/20 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025006602 | LOMOTIL LIQUID |
| PFIZER LABORATORIES DIV PFIZER INC | 00025006131 | LOMOTIL TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025006134 | LOMOTIL TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025006151 | LOMOTIL TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025006152 | LOMOTIL TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025006155 | LOMOTIL TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071073720 | LOPID 600 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071073730 | LOPID 600 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00028420133 | LOPRESSOR 1 MGML AMPUL |
| NOVARTIS PHARMACEUTICALS CORP | 00028007101 | LOPRESSOR 100 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00028007110 | LOPRESSOR 100 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00028007161 | LOPRESSOR 100 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00028005101 | LOPRESSOR 50 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00028005110 | LOPRESSOR 50 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00028005301 | LOPRESSOR HCT 100/25 TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00028007301 | LOPRESSOR HCT 100/50 TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00028003501 | LOPRESSOR HCT 50/25 TABLET |
| FOREST PHARMACEUTICALS INC | 00785835001 | LORCET 10/650 TABLET |
| FOREST PHARMACEUTICALS INC | 00785835050 | LORCET 10/650 TABLET |
| FOREST PHARMACEUTICALS INC | 00785835063 | LORCET 10/650 TABLET |
| FOREST PHARMACEUTICALS INC | 00785112201 | LORCET PLUS TABLET |
| FOREST PHARMACEUTICALS INC | 00785112250 | LORCET PLUS TABLET |
| FOREST PHARMACEUTICALS INC | 00785112263 | LORCET PLUS TABLET |
| FOREST PHARMACEUTICALS INC | 00785112001 | LORCET-HD CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00083006330 | LOTENSIN 10 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083006332 | LOTENSIN 10 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083006390 | LOTENSIN 10 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083007930 | LOTENSIN 20 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083007932 | LOTENSIN 20 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083007990 | LOTENSIN 20 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083009430 | LOTENSIN 40 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083009432 | LOTENSIN 40 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083009490 | LOTENSIN 40 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083005930 | LOTENSIN 5 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083005932 | LOTENSIN 5 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083005990 | LOTENSIN 5 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083007230 | LOTENSIN HCT 10/12.5 TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083007430 | LOTENSIN HCT 20/12.5 TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083007530 | LOTENSIN HCT 20/25 TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083007730 | LOTENSIN HCT 5/6.25 TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083225530 | LOTREL 2.5/10 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00083226530 | LOTREL 5/10 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00083226530 | LOTREL 5/20 MG CAPSULE |
| SCHERING CORP | 00085092401 | LOTRISONE CREAM |
| SCHERING CORP | 00085092402 | LOTRISONE CREAM |
| SCHERING CORP | 00085080901 | LOTRISONE LOTION |
| BRISTOL MYERS SQUIBB CO | 00015308060 | LYSODREN 500 MG TABLET |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149071001 | MACROBID 100 MG CAPSULE |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149000605 | MACRODANTIN 100 MG CAPSULE |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149000687 | MACRODANTIN 100 MG CAPSULE |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149000705 | MACRODANTIN 25 MG CAPSULE |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149000805 | MACRODANTIN 50 MG CAPSULE |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149000886 | MACRODANTIN 50 MG CAPSULE |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149000887 | MACRODANTIN 50 MG CAPSULE |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173067501 | MALARONE 250-100 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173067601 | MALARONE 62.5-25 MG PED TAB |
| WARNER CHILCOTT INC | 00430016624 | MANDELAMINE 500 MG TABLET |
| 3M PHARMACEUTICALS | 00089081521 | MAXAIR AUTOHALER 0.2 MG AERO |
| MCR AMERICAN PHARMACEUTICALS INC | 58605052001 | MAXIFED 700/80 TABLET SA |
| MCR AMERICAN PHARMACEUTICALS INC | 58605052601 | MAXIFED DM TABLET SA |
| MCR AMERICAN PHARMACEUTICALS INC | 58605051401 | MAXIFED-G TABLET SA |
| OVATION PHARMACEUTICALS INC | 67386080302 | MEBARAL 100 MG TABLET |
| OVATION PHARMACEUTICALS INC | 67386080102 | MEBARAL 32 MG TABLET |
| OVATION PHARMACEUTICALS INC | 67386080202 | MEBARAL 50 MG TABLET |
| BERTEK PHARMACEUTICALS INC | 62794015102 | MENTAX 1% CREAM |
| BERTEK PHARMACEUTICALS INC | 62794015103 | MENTAX 1% CREAM |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173066518 | MEPRON 750 MG/5 ML SUSPENSION |
| NOVARTIS PHARMACEUTICALS CORP | 00078005405 | METHERGINE 0.2 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078005303 | METHERGINE 0.2 MG/ML AMPUL |

## Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| 3M PHARMACEUTICALS | 00089020025 | METROGEL-VAGINAL 0.75% GEL |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597006601 | MEXITIL 150 MG CAPSULE |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597006701 | MEXITIL 200 MG CAPSULE |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597006801 | MEXITIL 250 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078031190 | MIACALCIN 200 UNITS NASAL SPRA |
| ABBOTT LABORATORIES | 00597003928 | MICARDIS 20 MG TABLET |
| ABBOTT LABORATORIES | 00597004028 | MICARDIS 40 MG TABLET |
| ABBOTT LABORATORIES | 00597004128 | MICARDIS 80 MG TABLET |
| ABBOTT LABORATORIES | 00597004328 | MICARDIS HCT 40/12.5 MG TAB |
| ABBOTT LABORATORIES | 00597004428 | MICARDIS HCT 80/12.5 MG TAB |
| WATSON LABORATORIES INC | 52544062201 | MICROZIDE 12.5 MG CAPSULE |
| XCEL PHARMACEUTICALS | 66490024568 | MIGRANAL 4 MG/ML NASAL SPRAY |
| ORGANON USA INC | 00052028106 | MIRCETTE 28 DAY TABLET |
| ABBOTT LABORATORIES | 00597003001 | MOBIC 15 MG TABLET |
| ABBOTT LABORATORIES | 00597002901 | MOBIC 7.5 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00062171415 | MODICON 28 TABLET |
| JOHNSON & JOHNSON GROUP | 00107171427 | MODICON 28 TABLET |
| JOHNSON & JOHNSON GROUP | 00062543701 | MONISTAT 3 200 MG VAG SUPP |
| JOHNSON & JOHNSON GROUP | 00062543401 | MONISTAT-DERM 2% CREAM |
| JOHNSON & JOHNSON GROUP | 00062543402 | MONISTAT-DERM 2% CREAM |
| JOHNSON & JOHNSON GROUP | 00062543403 | MONISTAT-DERM 2% CREAM |
| WATSON LABORATORIES INC | 55515025904 | MONODOX 100 MG CAPSULE |
| WATSON LABORATORIES INC | 55515026006 | MONODOX 50 MG CAPSULE |
| BRISTOL MYERS SQUIBB CO | 00087015846 | MONOPRIL 10 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087015885 | MONOPRIL 10 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087060942 | MONOPRIL 20 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087060945 | MONOPRIL 20 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087060985 | MONOPRIL 20 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087120213 | MONOPRIL 40 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087149201 | MONOPRIL HCT 10/12.5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087149301 | MONOPRIL HCT 20/12.5 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456430008 | MONUROL 3 GM SACHET |
| JOHNSON & JOHNSON GROUP | 17314940001 | MYCELEX 10 MG TROCHE |
| JOHNSON & JOHNSON GROUP | 17314940002 | MYCELEX 10 MG TROCHE |
| JOHNSON & JOHNSON GROUP | 17314940003 | MYCELEX 10 MG TROCHE |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173071325 | MYLERAN 2 MG TABLET |
| SANOFI SYNTHELABO INC | 00024128704 | MYTELASE 10 MG CAPLET |
| HOFFMANN LA ROCHE INC | 00004631301 | NAPROSYN 250 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004631114 | NAPROSYN 375 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004631014 | NAPROSYN 500 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071027024 | NARDIL 15 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00075150616 | NASACORT AQ NASAL SPRAY |
| MERRELL PHARMACEUTICALS INC | 00075150543 | NASACORT NASAL INHALER |
| SCHERING CORP | 00085119701 | NASONEX 50 MCG NASAL SPRAY |
| WARNER CHILCOTT INC | 00430022723 | NATACHEW TABLET CHEW |
| WARNER CHILCOTT INC | 00430022640 | NATAFORT TABLET |
| SANOFI SYNTHELABO INC | 00024132203 | NEGGRAM 500 MG CAPLET |
| SANOFI SYNTHELABO INC | 00024135901 | NEO-SYNEPHRINE 10% EYE DROP |
| SANOFI SYNTHELABO INC | 00024136201 | NEO-SYNEPHRINE 10% EYE DROP |
| SANOFI SYNTHELABO INC | 00024135801 | NEO-SYNEPHRINE 2.5% EYE DRP |
| PFIZER LABORATORIES DIV PFIZER INC | 00071080324 | NEURONTIN 100 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00071080340 | NEURONTIN 100 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00071080524 | NEURONTIN 300 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00071080540 | NEURONTIN 300 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00071080624 | NEURONTIN 400 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00071080640 | NEURONTIN 400 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00071041624 | NEURONTIN 600 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071042624 | NEURONTIN 800 MG TABLET |
| ASTRAZENECA LP | 00186502031 | NEXIUM 20 MG CAPSULE |
| ASTRAZENECA LP | 00186502054 | NEXIUM 20 MG CAPSULE |
| ASTRAZENECA LP | 00186502082 | NEXIUM 20 MG CAPSULE |
| ASTRAZENECA LP | 00186502228 | NEXIUM 20 MG CAPSULE |
| ASTRAZENECA LP | 00186504031 | NEXIUM 40 MG CAPSULE |
| ASTRAZENECA LP | 00186504054 | NEXIUM 40 MG CAPSULE |
| ASTRAZENECA LP | 00186504082 | NEXIUM 40 MG CAPSULE |
| ASTRAZENECA LP | 00186504228 | NEXIUM 40 MG CAPSULE |
| KOS PHARMACEUTICALS INC | 60598000301 | NIASPAN 1,000 MG TABLET SA |
| KOS PHARMACEUTICALS INC | 60598000101 | NIASPAN 500 MG TABLET SA |
| KOS PHARMACEUTICALS INC | 60598000201 | NIASPAN 750 MG TABLET SA |
| MERRELL PHARMACEUTICALS INC | 00088111114 | NILANDRON 150 MG TABLET |
| SCHERING CORP | 00085331530 | NITRO-DUR 0.3 MG/HR PATCH |
| SCHERING CORP | 00085331535 | NITRO-DUR 0.3 MG/HR PATCH |
| SCHERING CORP | 00085081930 | NITRO-DUR 0.8 MG/HR PATCH |
| SCHERING CORP | 00085081935 | NITRO-DUR 0.8 MG/HR PATCH |
| JOHNSON & JOHNSON GROUP | 50458022115 | NIZORAL 2% CREAM |
| JOHNSON & JOHNSON GROUP | 50458022130 | NIZORAL 2% CREAM |
| JOHNSON & JOHNSON GROUP | 50458022160 | NIZORAL 2% CREAM |
| JOHNSON & JOHNSON GROUP | 50458022304 | NIZORAL 2% SHAMPOO |
| JOHNSON & JOHNSON GROUP | 50458022010 | NIZORAL 200 MG TABLET |
| ASTRAZENECA LP | 00310060018 | NOLVADEX 10 MG TABLET |
| ASTRAZENECA LP | 00310060060 | NOLVADEX 10 MG TABLET |
| ASTRAZENECA LP | 00310060075 | NOLVADEX 10 MG TABLET |
| ASTRAZENECA LP | 00310060412 | NOLVADEX 20 MG TABLET |
| ASTRAZENECA LP | 00310060430 | NOLVADEX 20 MG TABLET |
| ASTRAZENECA LP | 00310060490 | NOLVADEX 20 MG TABLET |
| WATSON LABORATORIES INC | 52544053901 | NORCO 10/325 TABLET |

Page 10

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| WATSON LABORATORIES INC | 52544053905 | NORCO 10/325 TABLET |
| WATSON LABORATORIES INC | 52544026528 | NORINYL 1+50-28 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025275231 | NORPACE 100 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025275252 | NORPACE 100 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025276231 | NORPACE 150 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025273231 | NORPACE CR 100 MG CAPSULE SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025273234 | NORPACE CR 100 MG CAPSULE SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025273251 | NORPACE CR 100 MG CAPSULE SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025274231 | NORPACE CR 150 MG CAPSULE SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025274234 | NORPACE CR 150 MG CAPSULE SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025274251 | NORPACE CR 150 MG CAPSULE SA |
| MERRELL PHARMACEUTICALS INC | 00068000701 | NORPRAMIN 10 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00068002001 | NORPRAMIN 100 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00068002150 | NORPRAMIN 150 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00068001101 | NORPRAMIN 25 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00068001501 | NORPRAMIN 50 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00068001901 | NORPRAMIN 75 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00062190315 | ORTHO TRI-CYCLEN 28 TABLET |
| JOHNSON & JOHNSON GROUP | 00062179615 | ORTHO-CEPT 28 DAY TABLET |
| JOHNSON & JOHNSON GROUP | 00062190115 | ORTHO-CYCLEN 28 TABLET |
| JOHNSON & JOHNSON GROUP | 00062176115 | ORTHO-NOVUM 1/35-28 TABLET |
| JOHNSON & JOHNSON GROUP | 00107176104 | ORTHO-NOVUM 1/35-28 TABLET |
| JOHNSON & JOHNSON GROUP | 00107176107 | ORTHO-NOVUM 1/35-28 TABLET |
| JOHNSON & JOHNSON GROUP | 00107176127 | ORTHO-NOVUM 1/35-28 TABLET |
| JOHNSON & JOHNSON GROUP | 00062133215 | ORTHO-NOVUM 1/50-28 TABLET |
| JOHNSON & JOHNSON GROUP | 00062133220 | ORTHO-NOVUM 1/50-28 TABLET |
| JOHNSON & JOHNSON GROUP | 00107133207 | ORTHO-NOVUM 1/50-28 TABLET |
| JOHNSON & JOHNSON GROUP | 00107133227 | ORTHO-NOVUM 1/50-28 TABLET |
| JOHNSON & JOHNSON GROUP | 00062177115 | ORTHO-NOVUM 10/11-28 TABLET |
| JOHNSON & JOHNSON GROUP | 00062178115 | ORTHO-NOVUM 7/7/7-28 TABLET |
| JOHNSON & JOHNSON GROUP | 00062178120 | ORTHO-NOVUM 7/7/7-28 TABLET |
| JOHNSON & JOHNSON GROUP | 00062178122 | ORTHO-NOVUM 7/7/7-28 TABLET |
| WARNER CHILCOTT INC | 00430058214 | OVCON-35 28 TABLET |
| WARNER CHILCOTT INC | 00430058514 | OVCON-50 28 TABLET |
| PAN AMERICAN LABORATORIES INC | 00525942216 | PANCOF HC LIQUID |
| PAN AMERICAN LABORATORIES INC | 00525975816 | PANCOF XP LIQUID |
| JOHNSON & JOHNSON GROUP | 00045034260 | PANCREASE MT 10 CAPSULE EC |
| JOHNSON & JOHNSON GROUP | 00045034360 | PANCREASE MT 16 CAPSULE EC |
| JOHNSON & JOHNSON GROUP | 00045034660 | PANCREASE MT 20 CAPSULE EC |
| JOHNSON & JOHNSON GROUP | 00045034160 | PANCREASE MT 4 CAPSULE EC |
| PAN AMERICAN LABORATORIES INC | 00525079516 | PANMIST DM SYRUP |
| PAN AMERICAN LABORATORIES INC | 00525076801 | PANMIST JR 595/48 TABLET |
| PAN AMERICAN LABORATORIES INC | 00525079201 | PANMIST LA 795/85 TABLET |
| JOHNSON & JOHNSON GROUP | 00045032560 | PARAFON FORTE DSC 500 MG CPT |
| NOVARTIS PHARMACEUTICALS CORP | 00078001705 | PARLODEL 2.5 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078001715 | PARLODEL 2.5 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078010205 | PARLODEL 5 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078010215 | PARLODEL 5 MG CAPSULE |
| SANOFI SYNTHELABO INC | 00024150906 | PEDIACOF LIQUID |
| ZYBER PHARMACEUTICAL INC | 65224017516 | PEDIATEX LIQUID |
| ZYBER PHARMACEUTICAL INC | 65224045716 | PEDIATEX-D LIQUID |
| ATLEY PHARMACEUTICALS INC | 59702015201 | PEDIOX CHEWABLE TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597001701 | PERSANTINE 25 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597001801 | PERSANTINE 50 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597001901 | PERSANTINE 75 MG TABLET |
| SANOFI SYNTHELABO INC | 00024153502 | PHISOHEX 3% CLEANSER |
| SANOFI SYNTHELABO INC | 00024153506 | PHISOHEX 3% CLEANSER |
| SANOFI SYNTHELABO INC | 00024153508 | PHISOHEX 3% CLEANSER |
| SANOFI SYNTHELABO INC | 00024153524 | PHISOHEX 3% CLEANSER |
| SANOFI SYNTHELABO INC | 00024153648 | PHISOHEX 3% CLEANSER |
| SANOFI SYNTHELABO INC | 00024156210 | PLAQUENIL 200 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 63653117101 | PLAVIX 75 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 63653117103 | PLAVIX 75 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 63653117105 | PLAVIX 75 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 63653117106 | PLAVIX 75 MG TABLET |
| ASTRAZENECA LP | 00186045228 | PLENDIL 10 MG TABLET SA |
| ASTRAZENECA LP | 00186045231 | PLENDIL 10 MG TABLET SA |
| ASTRAZENECA LP | 00186045258 | PLENDIL 10 MG TABLET SA |
| ASTRAZENECA LP | 00186045028 | PLENDIL 2.5 MG TABLET SA |
| ASTRAZENECA LP | 00186045031 | PLENDIL 2.5 MG TABLET SA |
| ASTRAZENECA LP | 00186045058 | PLENDIL 2.5 MG TABLET SA |
| ASTRAZENECA LP | 00186045128 | PLENDIL 5 MG TABLET SA |
| ASTRAZENECA LP | 00186045131 | PLENDIL 5 MG TABLET SA |
| ASTRAZENECA LP | 00186045158 | PLENDIL 5 MG TABLET SA |
| JOHNSON & JOHNSON GROUP | 17314932201 | POLYCITRA SYRUP |
| JOHNSON & JOHNSON GROUP | 17314932001 | POLYCITRA-K CRYSTALS PACKET |
| JOHNSON & JOHNSON GROUP | 17314932101 | POLYCITRA-K SOLUTION |
| JOHNSON & JOHNSON GROUP | 17314932301 | POLYCITRA-LC SOLUTION S/F |
| BRISTOL MYERS SQUIBB CO | 00087048741 | POLY-VI-FLOR 0.25 MG TAB CHW |
| BRISTOL MYERS SQUIBB CO | 00087046841 | POLY-VI-FLOR 0.5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087047402 | POLY-VI-FLOR 1 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087048841 | POLY-VI-FLOR/IRON 0.25 MG TB |
| FERNDALE LABORATORIES INC | 00496071603 | PRAMOSONE 1% CREAM |
| FERNDALE LABORATORIES INC | 00496071604 | PRAMOSONE 1% CREAM |
| FERNDALE LABORATORIES INC | 00496072903 | PRAMOSONE 1% LOTION |
| FERNDALE LABORATORIES INC | 00496072904 | PRAMOSONE 1% LOTION |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| FERNDALE LABORATORIES INC | 00496072906 | PRAMOSONE 1% LOTION |
| FERNDALE LABORATORIES INC | 00496078304 | PRAMOSONE 1% OINTMENT |
| FERNDALE LABORATORIES INC | 00496071703 | PRAMOSONE 2.5% CREAM |
| FERNDALE LABORATORIES INC | 00496071704 | PRAMOSONE 2.5% CREAM |
| FERNDALE LABORATORIES INC | 00496072604 | PRAMOSONE 2.5% LOTION |
| FERNDALE LABORATORIES INC | 00496072806 | PRAMOSONE 2.5% LOTION |
| FERNDALE LABORATORIES INC | 00496077704 | PRAMOSONE 2.5% OINTMENT |
| NOVO NORDISK PHARMACEUTICAL INDUSTRIES INC | 00169008181 | PRANDIN 0.5 MG TABLET |
| NOVO NORDISK PHARMACEUTICAL INDUSTRIES INC | 00169008281 | PRANDIN 1 MG TABLET |
| NOVO NORDISK PHARMACEUTICAL INDUSTRIES INC | 00169008481 | PRANDIN 2 MG TABLET |
| BAYER CORP PHARMACEUTICAL DIV | 00026288251 | PRECOSE 100 MG TABLET |
| BAYER CORP PHARMACEUTICAL DIV | 00026288148 | PRECOSE 50 MG TABLET |
| MONARCH PHARMACEUTICALS INC | 61570012563 | PREFEST TABLET |
| FIRST HORIZON PHARMACEUTICAL CORP | 59630042090 | PRENATE ADVANCE TABLET |
| TAP PHARMACEUTICALS INC | 00300154111 | PREVACID 15 MG CAPSULE DR |
| TAP PHARMACEUTICALS INC | 00300154119 | PREVACID 15 MG CAPSULE DR |
| TAP PHARMACEUTICALS INC | 00300154130 | PREVACID 15 MG CAPSULE DR |
| TAP PHARMACEUTICALS INC | 00300730930 | PREVACID 15 MG SUSPENSION DR |
| TAP PHARMACEUTICALS INC | 00300304611 | PREVACID 30 MG CAPSULE DR |
| TAP PHARMACEUTICALS INC | 00300304613 | PREVACID 30 MG CAPSULE DR |
| TAP PHARMACEUTICALS INC | 00300304619 | PREVACID 30 MG CAPSULE OR |
| TAP PHARMACEUTICALS INC | 00300731130 | PREVACID 30 MG SUSPENSION DR |
| MERRELL PHARMACEUTICALS INC | 00088210003 | PRIFTIN 150 MG TABLET |
| ASTRAZENECA LP | 00186060628 | PRILOSEC 10 MG CAPSULE DR |
| ASTRAZENECA LP | 00186060631 | PRILOSEC 10 MG CAPSULE DR |
| ASTRAZENECA LP | 00186060668 | PRILOSEC 10 MG CAPSULE DR |
| ASTRAZENECA LP | 00186060682 | PRILOSEC 10 MG CAPSULE DR |
| ASTRAZENECA LP | 00186074228 | PRILOSEC 20 MG CAPSULE DR |
| ASTRAZENECA LP | 00186074231 | PRILOSEC 20 MG CAPSULE DR |
| ASTRAZENECA LP | 00186074282 | PRILOSEC 20 MG CAPSULE DR |
| ASTRAZENECA LP | 00186074328 | PRILOSEC 40 MG CAPSULE DR |
| ASTRAZENECA LP | 00186074331 | PRILOSEC 40 MG CAPSULE DR |
| ASTRAZENECA LP | 00186074368 | PRILOSEC 40 MG CAPSULE DR |
| ASTRAZENECA LP | 00186074382 | PRILOSEC 40 MG CAPSULE DR |
| SANOFI SYNTHELABO INC | 00024159601 | PRIMAQUINE 26.3 MG TABLET |
| MERCK AND CO INC | 00006010628 | PRINIVIL 10 MG TABLET |
| MERCK AND CO INC | 00006010631 | PRINIVIL 10 MG TABLET |
| MERCK AND CO INC | 00006010658 | PRINIVIL 10 MG TABLET |
| MERCK AND CO INC | 00006010672 | PRINIVIL 10 MG TABLET |
| MERCK AND CO INC | 00006010682 | PRINIVIL 10 MG TABLET |
| MERCK AND CO INC | 00006010687 | PRINIVIL 10 MG TABLET |
| MERCK AND CO INC | 00006010694 | PRINIVIL 10 MG TABLET |
| MERCK AND CO INC | 00006001528 | PRINIVIL 2.5 MG TABLET |
| MERCK AND CO INC | 00006001531 | PRINIVIL 2.5 MG TABLET |
| MERCK AND CO INC | 00006001558 | PRINIVIL 2.5 MG TABLET |
| MERCK AND CO INC | 00006020728 | PRINIVIL 20 MG TABLET |
| MERCK AND CO INC | 00006020731 | PRINIVIL 20 MG TABLET |
| MERCK AND CO INC | 00006020758 | PRINIVIL 20 MG TABLET |
| MERCK AND CO INC | 00006020772 | PRINIVIL 20 MG TABLET |
| MERCK AND CO INC | 00006020782 | PRINIVIL 20 MG TABLET |
| MERCK AND CO INC | 00006020787 | PRINIVIL 20 MG TABLET |
| MERCK AND CO INC | 00006020794 | PRINIVIL 20 MG TABLET |
| MERCK AND CO INC | 00006023758 | PRINIVIL 40 MG TABLET |
| MERCK AND CO INC | 00006001928 | PRINIVIL 5 MG TABLET |
| MERCK AND CO INC | 00006001958 | PRINIVIL 5 MG TABLET |
| MERCK AND CO INC | 00006001982 | PRINIVIL 5 MG TABLET |
| MERCK AND CO INC | 00006001986 | PRINIVIL 5 MG TABLET |
| MERCK AND CO INC | 00006001987 | PRINIVIL 5 MG TABLET |
| MERCK AND CO INC | 00006001994 | PRINIVIL 5 MG TABLET |
| MERCK AND CO INC | 00006001972 | PRINIVIL 5 MG TABLET |
| MERCK AND CO INC | 00006014531 | PRINZIDE 10/12.5 TABLET |
| MERCK AND CO INC | 00006014558 | PRINZIDE 10/12.5 TABLET |
| MERCK AND CO INC | 00006014031 | PRINZIDE 20/12.5 TABLET |
| MERCK AND CO INC | 00006014058 | PRINZIDE 20/12.5 TABLET |
| MERCK AND CO INC | 00006014231 | PRINZIDE 20/25 TABLET |
| MERCK AND CO INC | 00006014258 | PRINZIDE 20/25 TABLET |
| WYETH DIV WYETH PHARMACEUTICALS INC | 00008084191 | PROTONIX 40 MG TABLET EC |
| WYETH DIV WYETH PHARMACEUTICALS INC | 00008084199 | PROTONIX 40 MG TABLET EC |
| SCHERING CORP | 00085061402 | PROVENTIL 90 MCG INHALER |
| SCHERING CORP | 00085113201 | PROVENTIL HFA 90 MCG INHALER |
| DISTA PRODUCTS CO DIV ELI LILLY AND CO | 00777310402 | PROZAC 10 MG PULVULE |
| ELI LILLY AND CO | 00002400602 | PROZAC 10 MG TABLET |
| ELI LILLY AND CO | 00002400630 | PROZAC 10 MG TABLET |
| DISTA PRODUCTS CO DIV ELI LILLY AND CO | 00777310501 | PROZAC 20 MG PULVULE |
| DISTA PRODUCTS CO DIV ELI LILLY AND CO | 00777310502 | PROZAC 20 MG PULVULE |
| DISTA PRODUCTS CO DIV ELI LILLY AND CO | 00777310507 | PROZAC 20 MG PULVULE |
| DISTA PRODUCTS CO DIV ELI LILLY AND CO | 00777310530 | PROZAC 20 MG PULVULE |
| DISTA PRODUCTS CO DIV ELI LILLY AND CO | 00777310533 | PROZAC 20 MG PULVULE |
| DISTA PRODUCTS CO DIV ELI LILLY AND CO | 00777310581 | PROZAC 20 MG PULVULE |
| DISTA PRODUCTS CO DIV ELI LILLY AND CO | 00777310582 | PROZAC 20 MG PULVULE |
| DISTA PRODUCTS CO DIV ELI LILLY AND CO | 00777512056 | PROZAC 20 MG/5 ML SOLUTION |
| DISTA PRODUCTS CO DIV ELI LILLY AND CO | 00777310730 | PROZAC 40 MG PULVULE |
| ELI LILLY AND CO | 00002300475 | PROZAC WEEKLY 90 MG CAPSULE |
| ASTRAZENECA LP | 00186091542 | PULMICORT 200 MCG TURBUHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 57844052207 | PURINETHOL 50 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 57844052252 | PURINETHOL 50 MG TABLET |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| WARNER CHILCOTT INC | 00430018124 | PYRIDIUM 200 MG TABLET |
| WARNER CHILCOTT INC | 00430018215 | PYRIDIUM PLUS TABLET |
| BERLEX INC | 50419010110 | QUINAGLUTE DURA-TABS 324 MG |
| BERLEX INC | 50419010111 | QUINAGLUTE DURA-TABS 324 MG |
| BERLEX INC | 50419010125 | QUINAGLUTE DURA-TABS 324 MG |
| BERLEX INC | 50419010150 | QUINAGLUTE DURA-TABS 324 MG |
| SCHERING CORP | 00085119403 | REBETOL 200 MG CAPSULE |
| SCHERING CORP | 00085132704 | REBETOL 200 MG CAPSULE |
| SCHERING CORP | 00085135105 | REBETOL 200 MG CAPSULE |
| SCHERING CORP | 00085138507 | REBETOL 200 MG CAPSULE |
| JOHNSON & JOHNSON GROUP | 00045061015 | REGRANEX 0.01% GEL |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173068101 | RELENZA 5 MG DISKHALER |
| ORGANON USA INC | 00052010530 | REMERON 15 MG TABLET |
| ORGANON USA INC | 00052010590 | REMERON 15 MG TABLET |
| ORGANON USA INC | 00052010730 | REMERON 30 MG TABLET |
| ORGANON USA INC | 00052010790 | REMERON 30 MG TABLET |
| ORGANON USA INC | 00052010930 | REMERON 45 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458039260 | REMINYL 12 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458039060 | REMINYL 4 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458039910 | REMINYL 4 MG/ML ORAL SOL |
| JOHNSON & JOHNSON GROUP | 50458039160 | REMINYL 8 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00062018702 | RENOVA 0.02% CREAM |
| JOHNSON & JOHNSON GROUP | 00062018503 | RENOVA 0.05% CREAM |
| JOHNSON & JOHNSON GROUP | 00062018505 | RENOVA 0.05% CREAM |
| JOHNSON & JOHNSON GROUP | 00062057544 | RETIN-A 0.01% GEL |
| JOHNSON & JOHNSON GROUP | 00062057546 | RETIN-A 0.01% GEL |
| JOHNSON & JOHNSON GROUP | 00062016501 | RETIN-A 0.025% CREAM |
| JOHNSON & JOHNSON GROUP | 00062018502 | RETIN-A 0.025% CREAM |
| JOHNSON & JOHNSON GROUP | 00062047542 | RETIN-A 0.025% GEL |
| JOHNSON & JOHNSON GROUP | 00062047545 | RETIN-A 0.025% GEL |
| JOHNSON & JOHNSON GROUP | 00062017512 | RETIN-A 0.05% CREAM |
| JOHNSON & JOHNSON GROUP | 00062017513 | RETIN-A 0.05% CREAM |
| JOHNSON & JOHNSON GROUP | 00062007507 | RETIN-A 0.05% LIQUID |
| JOHNSON & JOHNSON GROUP | 00062027501 | RETIN-A 0.1% CREAM |
| JOHNSON & JOHNSON GROUP | 00062027523 | RETIN-A 0.1% CREAM |
| JOHNSON & JOHNSON GROUP | 00062019002 | RETIN-A MICRO 0.1% GEL |
| JOHNSON & JOHNSON GROUP | 00062019003 | RETIN-A MICRO 0.1% GEL |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173011318 | RETROVIR 10 MG/ML SYRUP |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173010855 | RETROVIR 100 MG CAPSULE |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173010856 | RETROVIR 100 MG CAPSULE |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173050100 | RETROVIR 300 MG TABLET |
| ASTRAZENECA LP | 00186107509 | RHINOCORT NASAL INHALER |
| PROMETHEUS LABORATORIES INC | 65483009306 | RIDAURA 3 MG CAPSULE |
| MERRELL PHARMACEUTICALS INC | 00068051030 | RIFADIN 150 MG CAPSULE |
| MERRELL PHARMACEUTICALS INC | 00068050830 | RIFADIN 300 MG CAPSULE |
| MERRELL PHARMACEUTICALS INC | 00068050860 | RIFADIN 300 MG CAPSULE |
| MERRELL PHARMACEUTICALS INC | 00068050861 | RIFADIN 300 MG CAPSULE |
| MERRELL PHARMACEUTICALS INC | 00068050960 | RIFAMATE CAPSULE |
| MERRELL PHARMACEUTICALS INC | 00068057641 | RIFATER TABLET |
| JOHNSON & JOHNSON GROUP | 50458030104 | RISPERDAL 0.25 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458030150 | RISPERDAL 0.25 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458030206 | RISPERDAL 0.5 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458030250 | RISPERDAL 0.5 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458030001 | RISPERDAL 1 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458030006 | RISPERDAL 1 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458030050 | RISPERDAL 1 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458030503 | RISPERDAL 1 MG/ML SOLUTION |
| JOHNSON & JOHNSON GROUP | 50458032001 | RISPERDAL 2 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458032006 | RISPERDAL 2 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458032050 | RISPERDAL 2 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458033001 | RISPERDAL 3 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458033006 | RISPERDAL 3 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458033050 | RISPERDAL 3 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458035001 | RISPERDAL 4 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458035006 | RISPERDAL 4 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083000330 | RITALIN 10 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083003430 | RITALIN 20 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083000730 | RITALIN 5 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083001630 | RITALIN-SR 20 MG TABLET SA |
| HOFFMANN LA ROCHE INC | 00004014301 | ROCALTROL 0.25 MCG CAPSULE |
| HOFFMANN LA ROCHE INC | 00004014323 | ROCALTROL 0.25 MCG CAPSULE |
| HOFFMANN LA ROCHE INC | 00004014401 | ROCALTROL 0.5 MCG CAPSULE |
| HOFFMANN LA ROCHE INC | 00004911500 | ROCALTROL 1 MCG/ML ORAL SOLN |
| NOVARTIS PHARMACEUTICALS CORP | 00078005805 | SANSERT 2 MG TABLET |
| ELI LILLY AND CO | 00430043514 | SARAFEM 10 MG PULVULE |
| ELI LILLY AND CO | 00430043614 | SARAFEM 20 MG PULVULE |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597002001 | SERENTIL 10 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597002301 | SERENTIL 100 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597002101 | SERENTIL 25 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597002504 | SERENTIL 25 MG/ML ORAL CONC |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173046400 | SEREVENT 21 MCG INHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173046700 | SEREVENT 21 MCG INHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173046500 | SEREVENT 21 MCG INHLR REFILL |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173052000 | SEREVENT DISKUS 50 MCG |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173052100 | SEREVENT DISKUS 50 MCG |
| ASTRAZENECA LP | 00310027110 | SEROQUEL 100 MG TABLET |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| ASTRAZENECA LP | 00310027139 | SEROQUEL 100 MG TABLET |
| ASTRAZENECA LP | 00310027210 | SEROQUEL 200 MG TABLET |
| ASTRAZENECA LP | 00310027239 | SEROQUEL 200 MG TABLET |
| ASTRAZENECA LP | 00310027510 | SEROQUEL 25 MG TABLET |
| ASTRAZENECA LP | 00310027539 | SEROQUEL 25 MG TABLET |
| ASTRAZENECA LP | 00310027439 | SEROQUEL 300 MG TABLET |
| ASTRAZENECA LP | 00310027460 | SEROQUEL 300 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087003231 | SERZONE 100 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087003931 | SERZONE 150 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087003331 | SERZONE 200 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087004131 | SERZONE 250 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087003147 | SERZONE 50 MG TABLET |
| SANOFI SYNTHELABO INC | 00024180018 | SKELID 200 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004028857 | SORIATANE 10 MG CAPSULE |
| HOFFMANN LA ROCHE INC | 63032009125 | SORIATANE 25 MG CAPSULE |
| JOHNSON & JOHNSON GROUP | 00062546001 | SPECTAZOLE 1% CREAM |
| JOHNSON & JOHNSON GROUP | 00062546002 | SPECTAZOLE 1% CREAM |
| JOHNSON & JOHNSON GROUP | 00062546003 | SPECTAZOLE 1% CREAM |
| JOHNSON & JOHNSON GROUP | 50458029515 | SPORANOX 10 MG/ML SOLUTION |
| JOHNSON & JOHNSON GROUP | 50458029001 | SPORANOX 100 MG CAPSULE |
| JOHNSON & JOHNSON GROUP | 50458029004 | SPORANOX 100 MG CAPSULE |
| JOHNSON & JOHNSON GROUP | 50458029028 | SPORANOX 100 MG CAPSULE |
| SCOT TUSSIN PHARMACAL CO INC | 00372004816 | S-T FORTE 2 LIQUID SrF |
| BRISTOL MYERS SQUIBB CO | 00087565041 | STADOL NS 10 MG/ML SPRAY |
| NOVARTIS PHARMACEUTICALS CORP | 00078035205 | STARLIX 120 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078035105 | STARLIX 60 MG TABLET |
| FIRST HORIZON PHARMACEUTICAL CORP | 59630044010 | SULAR 10 MG TABLET |
| FIRST HORIZON PHARMACEUTICAL CORP | 00310089139 | SULAR 10 MG TABLET SA |
| FIRST HORIZON PHARMACEUTICAL CORP | 59630044110 | SULAR 20 MG TABLET |
| FIRST HORIZON PHARMACEUTICAL CORP | 00310089239 | SULAR 20 MG TABLET SA |
| FIRST HORIZON PHARMACEUTICAL CORP | 59630044210 | SULAR 30 MG TABLET |
| FIRST HORIZON PHARMACEUTICAL CORP | 00310089339 | SULAR 30 MG TABLET SA |
| FIRST HORIZON PHARMACEUTICAL CORP | 59630044310 | SULAR 40 MG TABLET |
| BAXTER HEALTHCARE CORP | 10019064124 | SUPRANE INHALATION LIQUID |
| ODYSSEY PHARMACEUTICALS INC | 65473072001 | SURMONTIL 100 MG CAPSULE |
| ODYSSEY PHARMACEUTICALS INC | 65473071801 | SURMONTIL 25 MG CAPSULE |
| ODYSSEY PHARMACEUTICALS INC | 65473071901 | SURMONTIL 50 MG CAPSULE |
| BRISTOL MYERS SQUIBB CO | 00056047330 | SUSTIVA 100 MG CAPSULE |
| BRISTOL MYERS SQUIBB CO | 00058047492 | SUSTIVA 200 MG CAPSULE |
| BRISTOL MYERS SQUIBB CO | 00056047030 | SUSTIVA 50 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025018608 | SYNAREL 2 MG/ML NASAL SPRAY |
| SANOFI SYNTHELABO INC | 00024193704 | TALACEN CAPLET |
| SANOFI SYNTHELABO INC | 00024195104 | TALWIN NX TABLET |
| 3M PHARMACEUTICALS | 00089030710 | TAMBOCOR 100 MG TABLET |
| 3M PHARMACEUTICALS | 00089031410 | TAMBOCOR 150 MG TABLET |
| 3M PHARMACEUTICALS | 00089030510 | TAMBOCOR 50 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004080085 | TAMIFLU 75 MG GELCAP |
| HOFFMANN LA ROCHE INC | 00004081095 | TAMIFLU ORAL SUSPENSION |
| HOFFMANN LA ROCHE INC | 00004592001 | TASMAR 100 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004592101 | TASMAR 200 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083005230 | TEGRETOL 100 MG TABLET CHEW |
| NOVARTIS PHARMACEUTICALS CORP | 00083005232 | TEGRETOL 100 MG TABLET CHEW |
| NOVARTIS PHARMACEUTICALS CORP | 00083001976 | TEGRETOL 100 MG/5 ML SUSP |
| NOVARTIS PHARMACEUTICALS CORP | 00083002730 | TEGRETOL 200 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083002732 | TEGRETOL 200 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083002740 | TEGRETOL 200 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083006130 | TEGRETOL XR 100 MG TABLET SA |
| NOVARTIS PHARMACEUTICALS CORP | 00083006230 | TEGRETOL XR 200 MG TABLET SA |
| NOVARTIS PHARMACEUTICALS CORP | 00083006030 | TEGRETOL XR 400 MG TABLET SA |
| SCHERING CORP | 00085125901 | TEMODAR 100 MG CAPSULE |
| SCHERING CORP | 00085125902 | TEMODAR 100 MG CAPSULE |
| SCHERING CORP | 00085124401 | TEMODAR 20 MG CAPSULE |
| SCHERING CORP | 00085124402 | TEMODAR 20 MG CAPSULE |
| SCHERING CORP | 00085125201 | TEMODAR 250 MG CAPSULE |
| SCHERING CORP | 00085125202 | TEMODAR 250 MG CAPSULE |
| SCHERING CORP | 00085124801 | TEMODAR 5 MG CAPSULE |
| SCHERING CORP | 00085124602 | TEMODAR 5 MG CAPSULE |
| ELAN PHARMACEUTICALS INC | 00173043201 | TEMOVATE 0.05% SOLUTION |
| ASTRAZENECA LP | 00310011710 | TENORETIC 100 TABLET |
| ASTRAZENECA LP | 00310011510 | TENORETIC 50 TABLET |
| ASTRAZENECA LP | 00310010110 | TENORMIN 100 MG TABLET |
| ASTRAZENECA LP | 00310010710 | TENORMIN 25 MG TABLET |
| ASTRAZENECA LP | 00310010510 | TENORMIN 50 MG TABLET |
| ASTRAZENECA LP | 00310010534 | TENORMIN 50 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00068069761 | TENUATE 25 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00068069861 | TENUATE DOSPAN 75 MG TAB SA |
| MERRELL PHARMACEUTICALS INC | 00068069862 | TENUATE DOSPAN 75 MG TAB SA |
| BRISTOL MYERS SQUIBB CO | 00015117750 | TEQUIN 200 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00015117780 | TEQUIN 200 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00015117760 | TEQUIN 400 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00015117780 | TEQUIN 400 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00062535101 | TERAZOL 3 80 MG SUPPOSITORY |
| JOHNSON & JOHNSON GROUP | 00062535601 | TERAZOL 3 CREAM |
| JOHNSON & JOHNSON GROUP | 00062535001 | TERAZOL 7 CREAM |
| FOREST PHARMACEUTICALS INC | 00456069801 | TESSALON 200 MG CAPSULE |
| FOREST PHARMACEUTICALS INC | 00456068801 | TESSALON PERLE 100 MG CAP |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| FOREST PHARMACEUTICALS INC | 00456068802 | TESSALON PERLE 100 MG CAP |
| JOHNSON & JOHNSON GROUP | 17314460803 | TESTODERM 4 MG/24HR PATCH |
| JOHNSON & JOHNSON GROUP | 17314283603 | TESTODERM 6 MG/24HR PATCH |
| JOHNSON & JOHNSON GROUP | 17314460903 | TESTODERM 6 MG/24HR PATCH |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173088025 | THIOGUANINE TABLOID 40 MG TB |
| FOREST PHARMACEUTICALS INC | 00456005001 | THYROLAR-1 STRENGTH TABLET |
| FOREST PHARMACEUTICALS INC | 00456004501 | THYROLAR-1/2 STRENGTH TAB |
| FOREST PHARMACEUTICALS INC | 00456004001 | THYROLAR-1/4 STRENGTH TAB |
| FOREST PHARMACEUTICALS INC | 00456005501 | THYROLAR-2 STRENGTH TABLET |
| FOREST PHARMACEUTICALS INC | 00456006001 | THYROLAR-3 STRENGTH TABLET |
| JOHNSON & JOHNSON GROUP | 00045041660 | TOLECTIN 600 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045041460 | TOLECTIN DS 400 MG CAPSULE |
| ASTRAZENECA LP | 00186070768 | TONOCARD 400 MG TABLET |
| ASTRAZENECA LP | 00186070968 | TONOCARD 600 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045064165 | TOPAMAX 100 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045064765 | TOPAMAX 15 MG SPRINKLE CAP |
| JOHNSON & JOHNSON GROUP | 00045064265 | TOPAMAX 200 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045064565 | TOPAMAX 25 MG SPRINKLE CAP |
| JOHNSON & JOHNSON GROUP | 00045063965 | TOPAMAX 25 MG TABLET |
| ASTRAZENECA LP | 00186109205 | TOPROL XL 100 MG TABLET SA |
| ASTRAZENECA LP | 00186108805 | TOPROL XL 25 MG TABLET SA |
| ASTRAZENECA LP | 00186109005 | TOPROL XL 50 MG TABLET SA |
| HOFFMANN LA ROCHE INC | 00004027301 | TORADOL 10 MG TABLET |
| ROXANE LABORATORIES INC | 00054474825 | TORECAN 10 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483039110 | TRANDATE 100 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483039111 | TRANDATE 100 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483039150 | TRANDATE 100 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483039210 | TRANDATE 200 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483039222 | TRANDATE 200 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483039250 | TRANDATE 200 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483039310 | TRANDATE 300 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483039333 | TRANDATE 300 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483039350 | TRANDATE 300 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039007810 | TRENTAL 400 MG TABLET SA |
| MERRELL PHARMACEUTICALS INC | 00039007811 | TRENTAL 400 MG TABLET SA |
| NOVARTIS PHARMACEUTICALS CORP | 00078033605 | TRILEPTAL 150 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078033606 | TRILEPTAL 150 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078033705 | TRILEPTAL 300 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078033706 | TRILEPTAL 300 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078035752 | TRILEPTAL 300 MG/5 ML SUSP |
| NOVARTIS PHARMACEUTICALS CORP | 00078033805 | TRILEPTAL 600 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078033806 | TRILEPTAL 600 MG TABLET |
| PURDUE PHARMACEUTICAL PRODUCTS LP | 00034051080 | TRILISATE 1,000 MG TABLET |
| PURDUE PHARMACEUTICAL PRODUCTS LP | 00034050050 | TRILISATE 500 MG TABLET |
| PURDUE PHARMACEUTICAL PRODUCTS LP | 00034050080 | TRILISATE 500 MG TABLET |
| PURDUE PHARMACEUTICAL PRODUCTS LP | 00034050550 | TRILISATE 750 MG TABLET |
| PURDUE PHARMACEUTICAL PRODUCTS LP | 00034050580 | TRILISATE 750 MG TABLET |
| SCHERING CORP | 00085070304 | TRINALIN REPETABS |
| WATSON LABORATORIES INC | 52544027428 | TRI-NORINYL 28 TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173069100 | TRIZIVIR TABLET |
| SCOT TUSSIN PHARMACAL CO INC | 00372001616 | TUSSIREX S/F LIQUID |
| SCOT TUSSIN PHARMACAL CO INC | 00372001716 | TUSSIREX SYRUP |
| JOHNSON & JOHNSON GROUP | 00045051380 | TYLENOL W/CODEINE #3 TABLET |
| JOHNSON & JOHNSON GROUP | 00045051370 | TYLENOL W/CODEINE #3 TABLET |
| JOHNSON & JOHNSON GROUP | 00045051372 | TYLENOL W/CODEINE #3 TABLET |
| JOHNSON & JOHNSON GROUP | 00045051373 | TYLENOL W/CODEINE #3 TABLET |
| JOHNSON & JOHNSON GROUP | 00045051380 | TYLENOL W/CODEINE #3 TABLET |
| JOHNSON & JOHNSON GROUP | 00045051560 | TYLENOL W/CODEINE #4 TABLET |
| JOHNSON & JOHNSON GROUP | 00045051570 | TYLENOL W/CODEINE #4 TABLET |
| JOHNSON & JOHNSON GROUP | 00045050816 | TYLENOL W/CODEINE ELIXIR |
| JOHNSON & JOHNSON GROUP | 00045052680 | TYLOX 5/500 CAPSULE |
| JOHNSON & JOHNSON GROUP | 00045052679 | TYLOX 5/500 CAPSULE |
| JOHNSON & JOHNSON GROUP | 00045065010 | ULTRACET TABLET |
| JOHNSON & JOHNSON GROUP | 00045065060 | ULTRACET TABLET |
| JOHNSON & JOHNSON GROUP | 00045065910 | ULTRAM 50 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045065960 | ULTRAM 50 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045065970 | ULTRAM 50 MG TABLET |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072140015 | ULTRAVATE 0.05% CREAM |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072140050 | ULTRAVATE 0.05% CREAM |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072145015 | ULTRAVATE 0.05% OINTMENT |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072145050 | ULTRAVATE 0.05% OINTMENT |
| ODYSSEY PHARMACEUTICALS INC | 65473070301 | URECHOLINE 10 MG TABLET |
| ODYSSEY PHARMACEUTICALS INC | 65473070401 | URECHOLINE 25 MG TABLET |
| ODYSSEY PHARMACEUTICALS INC | 65473069701 | URECHOLINE 5 MG TABLET |
| ODYSSEY PHARMACEUTICALS INC | 65473070001 | URECHOLINE 50 MG TABLET |
| JOHNSON & JOHNSON GROUP | 17314922001 | URISPAS 100 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004003822 | VALCYTE 450 MG TABLET |
| HOFFMANN LA ROCHE INC | 00140000601 | VALIUM 10 MG TABLET |
| HOFFMANN LA ROCHE INC | 00140000614 | VALIUM 10 MG TABLET |
| HOFFMANN LA ROCHE INC | 00140000401 | VALIUM 2 MG TABLET |
| HOFFMANN LA ROCHE INC | 00140000501 | VALIUM 5 MG TABLET |
| HOFFMANN LA ROCHE INC | 00140000514 | VALIUM 5 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173056502 | VALTREX 1 GM CAPLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173093303 | VALTREX 500 MG CAPLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173093356 | VALTREX 500 MG CAPLET |
| SCHERING CORP | 00085073804 | VANCERIL INHALER |

Page 15

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| ELI LILLY AND CO | 00002312542 | VANCOCIN HCL 125 MG PULVULE |
| ELI LILLY AND CO | 00002312642 | VANCOCIN HCL 250 MG PULVULE |
| WOMEN FIRST HEALTHCARE INC | 64248015030 | VANIQA 13.9% CREAM |
| JOHNSON & JOHNSON GROUP | 00045088233 | VASCOR 200 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045088333 | VASCOR 300 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173032198 | VENTOLIN 90 MCG INH REFILL |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173032188 | VENTOLIN 90 MCG INHALER |
| BRISTOL MYERS SQUIBB CO | 00015309145 | VEPESID 50 MG CAPSULE |
| HOFFMANN LA ROCHE INC | 00004018851 | VERSED 10 MG/5 ML SYRUP |
| HOFFMANN LA ROCHE INC | 00004025001 | VESANOID 10 MG CAPSULE |
| BRISTOL MYERS SQUIBB CO | 00087661443 | VIDEX 100 MG PACKET |
| BRISTOL MYERS SQUIBB CO | 00087665201 | VIDEX 100 MG TABLET CHEWABLE |
| BRISTOL MYERS SQUIBB CO | 00087665301 | VIDEX 150 MG TABLET CHEWABLE |
| BRISTOL MYERS SQUIBB CO | 00087661543 | VIDEX 167 MG PACKET |
| BRISTOL MYERS SQUIBB CO | 00087663241 | VIDEX 2 GM PEDIATRIC SOLN |
| BRISTOL MYERS SQUIBB CO | 00087666515 | VIDEX 200 MG TABLET CHEWABLE |
| BRISTOL MYERS SQUIBB CO | 00087665001 | VIDEX 25 MG TABLET CHEWABLE |
| BRISTOL MYERS SQUIBB CO | 00087661643 | VIDEX 250 MG PACKET |
| BRISTOL MYERS SQUIBB CO | 00087663341 | VIDEX 4 GM PEDIATRIC SOLN |
| BRISTOL MYERS SQUIBB CO | 00087665101 | VIDEX 50 MG TABLET CHEWABLE |
| BRISTOL MYERS SQUIBB CO | 00087667117 | VIDEX EC 125 MG CAP SA |
| BRISTOL MYERS SQUIBB CO | 00087667217 | VIDEX EC 200 MG CAP SA |
| BRISTOL MYERS SQUIBB CO | 00087667317 | VIDEX EC 250 MG CAP SA |
| BRISTOL MYERS SQUIBB CO | 00087667417 | VIDEX EC 400 MG CAP SA |
| AGOURON PHARMACEUTICALS INC | 63010001030 | VIRACEPT 250 MG TABLET |
| AGOURON PHARMACEUTICALS INC | 63010001190 | VIRACEPT POWDER |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597004601 | VIRAMUNE 200 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597004680 | VIRAMUNE 200 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597004661 | VIRAMUNE 200 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597004724 | VIRAMUNE 50 MG/5 ML SUSP |
| PEDIAMED TM PHARMACEUTICALS INC | 66346003158 | VIRAVAN-S SUSPENSION |
| PEDIAMED TM PHARMACEUTICALS INC | 66346003165 | VIRAVAN-S SUSPENSION |
| PEDIAMED TM PHARMACEUTICALS INC | 66346003223 | VIRAVAN-T TABLET CHEWABLE |
| GILEAD SCIENCES INC | 61958040101 | VIREAD 300 MG TABLET |
| ODYSSEY PHARMACEUTICALS INC | 65473070201 | VIVACTIL 10 MG TABLET |
| ODYSSEY PHARMACEUTICALS INC | 65473070101 | VIVACTIL 5 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083232508 | VIVELLE 0.0375 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00083232562 | VIVELLE 0.0375 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00083232706 | VIVELLE 0.075 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00083232762 | VIVELLE 0.075 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00078034342 | VIVELLE-DOT 0.0375 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00076034345 | VIVELLE-DOT 0.0375 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00076034442 | VIVELLE-DOT 0.05 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00078034445 | VIVELLE-DOT 0.05 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00078034542 | VIVELLE-DOT 0.075 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00078034545 | VIVELLE-DOT 0.075 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00078034642 | VIVELLE-DOT 0.1 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00078034645 | VIVELLE-DOT 0.1 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00028025801 | VOLTAREN 25 MG TABLET EC |
| NOVARTIS PHARMACEUTICALS CORP | 00028005801 | VOLTAREN 25MG TABLET EC |
| NOVARTIS PHARMACEUTICALS CORP | 00028026201 | VOLTAREN 50 MG TABLET EC |
| NOVARTIS PHARMACEUTICALS CORP | 00028016201 | VOLTAREN 50MG TABLET EC |
| NOVARTIS PHARMACEUTICALS CORP | 00028026401 | VOLTAREN 75 MG TABLET EC |
| NOVARTIS PHARMACEUTICALS CORP | 00028016401 | VOLTAREN 75MG TABLET EC |
| NOVARTIS PHARMACEUTICALS CORP | 00028020501 | VOLTAREN-XR 100 MG TABLET SA |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173017855 | WELLBUTRIN 100 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173017755 | WELLBUTRIN 75 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173094755 | WELLBUTRIN SR 100 MG TAB SA |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173013555 | WELLBUTRIN SR 150 MG TAB SA |
| OVATION PHARMACEUTICALS INC | 00024225304 | WINSTROL 2 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004110051 | XELODA 150 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004110116 | XELODA 500 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004025652 | XENICAL 120 MG CAPSULE |
| ASTRAZENECA LP | 00186033001 | XYLOCAINE 2% JELLY |
| ASTRAZENECA LP | 00186033036 | XYLOCAINE 2% JELLY |
| ASTRAZENECA LP | 00186036001 | XYLOCAINE 2% VISCOUS SOLN |
| ASTRAZENECA LP | 00186036011 | XYLOCAINE 2% VISCOUS SOLN |
| ASTRAZENECA LP | 00186032001 | XYLOCAINE 4% SOLUTION |
| ASTRAZENECA LP | 00186031521 | XYLOCAINE 5% OINTMENT |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173036354 | ZANTAC 15 MG/ML SYRUP |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173042702 | ZANTAC 150 MG EFFERDOSE TAB |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173034412 | ZANTAC 150 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173034414 | ZANTAC 150 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173034417 | ZANTAC 150 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173034442 | ZANTAC 150 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173034447 | ZANTAC 150 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173039306 | ZANTAC 300 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173039340 | ZANTAC 300 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173039347 | ZANTAC 300 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071023724 | ZARONTIN 250 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00071241823 | ZARONTIN 250 MG/5 ML SYRUP |
| ASTRAZENECA LP | 00310014110 | ZESTORETIC 10/12.5 TABLET |
| ASTRAZENECA LP | 00310014210 | ZESTORETIC 20/12.5 TABLET |
| ASTRAZENECA LP | 00310014510 | ZESTORETIC 20/25 TABLET |
| ASTRAZENECA LP | 00310013110 | ZESTRIL 10 MG TABLET |
| ASTRAZENECA LP | 00310013134 | ZESTRIL 10 MG TABLET |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| ASTRAZENECA LP | 00310013139 | ZESTRIL 10 MG TABLET |
| ASTRAZENECA LP | 00310013173 | ZESTRIL 10 MG TABLET |
| ASTRAZENECA LP | 00310013510 | ZESTRIL 2.5 MG TABLET |
| ASTRAZENECA LP | 00310013210 | ZESTRIL 20 MG TABLET |
| ASTRAZENECA LP | 00310013234 | ZESTRIL 20 MG TABLET |
| ASTRAZENECA LP | 00310013239 | ZESTRIL 20 MG TABLET |
| ASTRAZENECA LP | 00310013273 | ZESTRIL 20 MG TABLET |
| ASTRAZENECA LP | 00310013310 | ZESTRIL 30 MG TABLET |
| ASTRAZENECA LP | 00310013410 | ZESTRIL 40 MG TABLET |
| ASTRAZENECA LP | 00310013010 | ZESTRIL 5 MG TABLET |
| ASTRAZENECA LP | 00310013034 | ZESTRIL 5 MG TABLET |
| ASTRAZENECA LP | 00310013039 | ZESTRIL 5 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173066400 | ZIAGEN 20 MG/ML SOLUTION |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173066100 | ZIAGEN 300 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173066101 | ZIAGEN 300 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173068000 | ZOFRAN 24 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173044600 | ZOFRAN 4 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173044602 | ZOFRAN 4 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173044604 | ZOFRAN 4 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173048900 | ZOFRAN 4 MG/5 ML ORAL SOLN |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173044700 | ZOFRAN 8 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173044702 | ZOFRAN 8 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173044704 | ZOFRAN 8 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173058900 | ZOFRAN ODT 4 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173057000 | ZOFRAN ODT 8 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173057004 | ZOFRAN ODT 8 MG TABLET |
| ASTRAZENECA LP | 00037721020 | ZOMIG 2.5 MG TABLET |
| ASTRAZENECA LP | 00037721125 | ZOMIG 5 MG TABLET |
| ASTRAZENECA LP | 00310020920 | ZOMIG ZMT 2.5 MG TABLET |
| ASTRAZENECA LP | 00310021321 | ZOMIG ZMT 5 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173099155 | ZOVIRAX 200 MG CAPSULE |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173099156 | ZOVIRAX 200 MG CAPSULE |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173095396 | ZOVIRAX 200 MG/5 ML SUSP |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173094955 | ZOVIRAX 400 MG TABLET |
| BIOVAIL PHARMACEUTICALS INC | 00173099341 | ZOVIRAX 5% OINTMENT |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173094555 | ZOVIRAX 800 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173055601 | ZYBAN 150 MG TABLET SA |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173055602 | ZYBAN 150 MG TABLET SA |
| PROMETHEUS LABORATORIES INC | 65483099110 | ZYLOPRIM 100 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483099310 | ZYLOPRIM 300 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483099350 | ZYLOPRIM 300 MG TABLET |
| ELI LILLY AND CO | 00002411704 | ZYPREXA 10 MG TABLET |
| ELI LILLY AND CO | 00002411733 | ZYPREXA 10 MG TABLET |
| ELI LILLY AND CO | 00002411760 | ZYPREXA 10 MG TABLET |
| ELI LILLY AND CO | 00002441504 | ZYPREXA 15 MG TABLET |
| ELI LILLY AND CO | 00002441533 | ZYPREXA 15 MG TABLET |
| ELI LILLY AND CO | 00002441560 | ZYPREXA 15 MG TABLET |
| ELI LILLY AND CO | 00002411204 | ZYPREXA 2.5 MG TABLET |
| ELI LILLY AND CO | 00002411233 | ZYPREXA 2.5 MG TABLET |
| ELI LILLY AND CO | 00002411260 | ZYPREXA 2.5 MG TABLET |
| ELI LILLY AND CO | 00002442004 | ZYPREXA 20 MG TABLET |
| ELI LILLY AND CO | 00002442033 | ZYPREXA 20 MG TABLET |
| ELI LILLY AND CO | 00002442060 | ZYPREXA 20 MG TABLET |
| ELI LILLY AND CO | 00002411504 | ZYPREXA 5 MG TABLET |
| ELI LILLY AND CO | 00002411533 | ZYPREXA 5 MG TABLET |
| ELI LILLY AND CO | 00002411560 | ZYPREXA 5 MG TABLET |
| ELI LILLY AND CO | 00002411633 | ZYPREXA 7.5 MG TABLET |
| ELI LILLY AND CO | 00002411660 | ZYPREXA 7.5 MG TABLET |
| ELI LILLY AND CO | 00002445401 | ZYPREXA ZYDIS 10 MG TABLET |
| ELI LILLY AND CO | 00002445485 | ZYPREXA ZYDIS 10 MG TABLET |
| ELI LILLY AND CO | 00002445501 | ZYPREXA ZYDIS 15 MG TAB |
| ELI LILLY AND CO | 00002445585 | ZYPREXA ZYDIS 15 MG TAB |
| ELI LILLY AND CO | 00002445685 | ZYPREXA ZYDIS 20 MG TAB |
| ELI LILLY AND CO | 00002445601 | ZYPREXA ZYDIS 20 MG TABLET |
| ELI LILLY AND CO | 00002445301 | ZYPREXA ZYDIS 5 MG TABLET |
| ELI LILLY AND CO | 00002445385 | ZYPREXA ZYDIS 5 MG TABLET |