1  PETER BUSCEMI, State Bar No. 255213
   MORGAN, LEWIS & BOCKIUS LLP
2  One Market, Spear Street Tower
   San Francisco, CA 94105
3  Tel: 415.442.1000
   Fax: 415.442.1001
4  E-mail:  pbuscemi@morganlewis.com

5  THOMAS A. SCHMUTZ (*pro hac* pending)
   MORGAN, LEWIS & BOCKIUS LLP
6  1111 Pennsylvania Avenue, N.W.
   Washington, D.C. 20004
7  Tel: 202.739.3000
   Fax: 202.739.3001
8  E-mail:  tschmutz@morganlewis.com

9  SUSANNAH R. HENDERSON (*pro hac* pending)
   MORGAN, LEWIS & BOCKIUS LLP
10 1701 Market Street
   Philadelphia, PA 19103
11 Tel: 215.963.5000
   Fax: 215.963.5001
12 E-mail: shenderson@morganlewis.com

13 Attorneys for Defendant Rite Aid  Corporation

14                    UNITED STATES DISTRICT COURT

15                    NORTHERN DISTRICT OF CALIFORNIA

16                    SAN FRANCISCO DIVISION

17

18
   SKILSTAF, INC., on behalf of itself and      Case No. CV 09 2514
19 all others similarly situated,

20                       Plaintiff,

21              vs.                               **EXHIBIT A TO DEFENDANT RITE AID
                                                  CORPORATION'S MOTION TO DISMISS**
22 CVS CAREMARK CORP.; LONGS
   DRUG STORE CORPORATION; THE          Date: October 16, 2009
23 KROGER CO.; NEW ALBERTSON'S,         Time: 9:00 A.M.
   INC.; RITE AID CORPORATION;          Courtroom: 10
24 SAFEWAY, INC.; SUPERVALU, INC.;      Judge:  Hon. Susan Illston
   WALGREEN CO.; and WAL-MART
25 STORES, INC.,                         Complaint Filed June 5, 2009

26                       Defendant.

27

28

MORGAN, LEWIS &
  BOCKIUS LLP       DB1/63445189.1                                    EXHIBIT A
 ATTORNEYS AT LAW   DRAFT 7/28/09                                     CV-09-2514

# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**0 5 - 1 1 1 4 8 DPW**

|  |  |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; and PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, | ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| FIRST DATABANK, INC., a Missouri Corporation; and McKESSON CORPORATION, a Delaware Corporation, | ) ) ) ) ) |
| Defendants | ) ) |

Civil Action No.

RECEIPT #
AMOUNT $ 250
SUMMONS ISSUED 465
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY CLK
DATE 6/2/05

CLASS ACTION COMPLAINT

This writing/publication is a creative work fully protected by all applicable copyright laws, as well as by misappropriation, trade secret, unfair competition and other applicable laws. The authors of this work have added value to the underlying factual materials herein through one or more of the following:  unique and original selection, coordination, expression, arrangement, and classification of the information.

No copyright is claimed in the text of statutes, regulations, and any excerpts from analysts' reports quoted within this work.

Copyright © 2005 by Steve W. Berman and Hagens Berman Sobol Shapiro LLP. Steve W. Berman and Hagens Berman Sobol Shapiro LLP will vigorously defend all of their rights to this writing/publication.

All rights reserved – including the right to reproduce in whole or in part in any form. Any reproduction in any form by anyone of the material contained herein without the permission of Steve W. Berman and Hagens Berman Sobol Shapiro LLP is prohibited.

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION.......................................................................................................... 1

II.     JURISDICTION AND VENUE ................................................................................... 6

III.    PARTIES ..................................................................................................................... 7

        A.      Plaintiffs...........................................................................................................7

        B.      Defendants .......................................................................................................9

IV.     STATEMENT OF FACTS ........................................................................................... 9

        A.      Drug Manufacturers and NDCs ......................................................................10

        B.      The Wholesale Acquisition Cost ....................................................................11

        C.      The Average Sale Price....................................................................................12

        D.      The Average Wholesale Price..........................................................................12

        E.      The AWP/WAC Spread...................................................................................13

        F.      Drug Wholesalers............................................................................................14

        G.      Wholesaler Sales Transactions .......................................................................16

        H.      Retail Pharmacy Channel................................................................................16

        I.      The Private End-Payors for Prescription Drugs...............................................18

        J.      End Payors Drug Reimbursements Are AWP-Based .........................................18

        K.      Medicaid Drug Reimbursements Are AWP-Based ...........................................21

        L.      Medicare Drug Reimbursements Were AWP-Based..........................................21

        M.      Private and Public End Payors Rely on Published Drug
                Pricing Compendia..........................................................................................23

        N.      The Emergence of First Data and MediSpan as Electronic
                Data Publishers ...............................................................................................24

        O.      The Merger of First Data and MediSpan Systems............................................27

        P.      First Data Gains the Trust of the Pharmaceutical Industry................................29

1821.10 0006 BSC.DOC

|  | Q. | First Data's Representation to Gain Pharmaceutical Reliance | 30 |
|--|----|-----|-----|
|  | R. | In the Late 1990's, Retailers and McKesson Looked to the AWP/WAC Spread to Increase Margin | 34 |
|  | S. | By 2001, First Data AWP/WAC Markups Were Susceptible to Abuse | 35 |
|  | T. | Implementation of the Five Percent Spread Scheme | 38 |
|  | U. | Branded Manufacturers' in Action in Response to the McKesson/First Data Scheme | 51 |
|  | V. | First Data's 2005 Capitulation | 53 |
| V. |  | CLASS ACTION ALLEGATIONS FOR THE AWP PAYOR SCHEME | 54 |

COUNT I .......................................................................................................................... 57
Violations of 18 U.S.C. § 1962(C)
(Against Defendant Drug Manufacturers Identified Herein
For Unlawful Conduct Associated With AWP Drug)

COUNT II ......................................................................................................................... 64
Untrue And Misleading Advertising
(Business and Professions Code §§ 17500, *et seq.*)

COUNT III ........................................................................................................................ 65
Violations of Unfair Competition Law
(Business and Professions Code §§ 17200, *et seq.*)

COUNT IV.......................................................................................................................... 66
Violations of the Consumers Legal Remedies Act
(Cal. Civ. Code §§ 1750, *et seq.*)

COUNT V ........................................................................................................................... 67
Negligent Misrepresentation

COUNT VI.......................................................................................................................... 68
Civil Conspiracy

| VI. | DEMAND FOR JUDGMENT | 69 |
|--|-----|-----|

Plaintiffs, by and through their counsel, upon personal knowledge as to their own acts and beliefs, and upon information and belief as to all matters based upon the investigation of counsel, allege as follows:

## I.   INTRODUCTION

1.     This is a proposed national class action brought on behalf of consumers, self-insured employers, health and welfare plans, health insurers and other end payors of prescription drugs ("End Payors") against First DataBank ("First Data") and McKesson Corporation ("McKesson") for wrongfully increasing the so-called WAC to AWP markup factor for numerous prescription pharmaceuticals through a scheme begun in late 2001 and 2002, thereby causing members of the proposed Class, whose payments for pharmaceuticals are tied to AWP, to make billions of dollars of excess payments for those pharmaceuticals.

2.     In the pharmaceutical marketplace, those in the retail distribution chain – national chain drug pharmacies, independent pharmacies, mail order houses and other retailers – purchase drugs on the basis of the published wholesale acquisition cost or "WAC," a benchmark price established by manufacturers and used by them and wholesalers to establish prices to retailers. Although retailers *buy* pharmaceuticals on the basis of WAC, they *get paid* (*i.e.*, get reimbursed) for branded drugs based on a different benchmark, the average wholesale price or "AWP." As the difference between AWP and WAC increases, the larger "spread" affords retailers and other middlemen like pharmaceutical benefit managers ("PBMs") opportunities for larger profits.

3.     Each year more than three billion prescriptions are written in the United States. Because the majority of pharmaceutical reimbursements are tied to the AWP, end payors must have a way of determining what the AWP is at any moment in time for the approximate 65,000 drugs used in the marketplace. AWPs are therefore compiled and published by several

- 1 -

publishing companies, including First Data. Through these compilations, which are available in both hard copy or electronic form, those in the distribution chain can determine the AWP for any given drug and effectuate reimbursement to retailers accordingly.

4. Health and welfare plans, health insurers and other end payors for prescription drugs use and rely on AWP as a reasonable and accurate indicator of the underlying transaction prices for almost all drugs. Virtually all these entities' contracts governing pharmaceutical reimbursement use AWP as a pricing standard.

5. First Data, McKesson and pharmaceutical companies know that end payors utilize AWP as a pricing benchmark and view AWP as a reasonably accurate measurement of list and transaction prices in order to negotiate payment terms for drugs used by their constituents.

6. Until March 15, 2005, First Data represented that it derived the WAC/AWP markup either from manufacturers or by conducting "a survey" of wholesalers. First Data further represented throughout the Class Period that AWP represents the "average of prices charged by the national drug wholesalers," and that the number of surveys it was conducting to determine the published AWP was "increasing." McKesson is one of the wholesalers who was "surveyed" by First Data.

7. Historically, in order to arrive at the AWP for branded drugs, manufacturers and wholesalers applied a markup of 20% or 25% to WAC. Whatever markup was given to a particular branded drug "stuck" with that drug indefinitely. Until 2002, there was variation, supposedly based on manufacturer direction or on First Data's surveys, in the difference between the WAC to AWP spread for hundreds of brand-name drugs. For example, manufacturer A might have a markup of 20%, while manufacturer B might utilize a markup of 25%.

- 2 -

8.    In approximately late 2001 or early 2002, unknown to payors in the
pharmaceutical marketplace, First Data and McKesson reached agreement on how the WAC to
AWP markup would be established for hundreds of brand-name drugs. As part of this
agreement, First Data, to the extent it relied upon information other than that provided directly
from various drug manufacturers for certain drugs, used the WAC-to-AWP markup provided
only by McKesson as the basis for its published AWP and did not "survey" any other
wholesalers.

9.    And at the same time, McKesson, without any economic justification, raised the
WAC-to-AWP spread to 25% for over four hundred brand-name drugs that previously had
received only the 20% markup amount. To conceal the scheme, McKesson typically effectuated
this change only when some other WAC-based price announcement was made by a drug maker.
This camouflaged both the associated increase in the markup and WAC-to-AWP spread
McKesson as the source of the increased markup. McKesson then communicated these new
WAC-to-AWP spreads to First Data. First Data, without regard to any change in the actual
average wholesale prices occurring in the pharmaceutical marketplace, and without reference to
the manufacturers' suggested AWPs (or WACs) for these drugs, then published new AWPs with
the new WAC-to-AWP markup. First Data's action had the effect of raising the WAC-to-AWP
spread by additional percentage points so as to have a 25% difference between pharmaceutical
companies' reported WAC and the First Data published AWP. First Data did so despite receipt
of information, in some instances, directly from manufacturers specifying or suggesting a 20%
markup as appropriate. On some occasions, some of the manufacturers secretly questioned this
increase, but First Data refused to change the published AWP and the manufacturers failed to
take any action to remedy defendants' unjustified raise in AWP.

- 3 -

10.     This collaboration between First Data and McKesson to raise the WAC-to-AWP

spreads is referred to as the "Five Percent Spread Scheme" or "Scheme." The dramatic nature of

the Scheme is illustrated by the following chart depicting the hundreds of drugs whose WAC-to-

AWP spread was raised as part of the conspiracy in 2002 and 2003:

**Number of NDCs with Spread Change from 20% to 25%, Jan 1999 - Oct 2004**



**Note**: "NDC" means National Drug Code and refers to a number assigned to each drug.

11.     Once First Data and McKesson raised the WAC-to-AWP spread to 25% on a

given drug, that spread remained in place and still remains in place to this day.

12.     Both McKesson and First Data had economic and business reasons for reaching

an understanding that McKesson would artificially raise the WAC-to-AWP spread and that First

Data would publish the increased AWPs. A major part of McKesson's business comes from

large pharmaceutical retail chains and other retail pharmaceutical clients. McKesson

- 4 -

implemented this Scheme in order to provide a benefit to those important retail pharmacy clients as well as its own pharmacy related business. For sales to non-cash paying customers, pharmacies are reimbursed by health plans and other pharmacy benefit providers based on AWP. Consequently, pharmacies make a profit on the spread between AWP and their acquisition cost for a drug. Under this system, a higher WAC-to-AWP spread results in increased profits to pharmacies. Thus, an increase in the WAC-to-AWP markup results in larger profits for retailers and McKesson's pharmacy-related businesses. First Data agreed to this Scheme in order to ease the burden of having to actually establish accurate spreads and to curry favor with McKesson so that McKesson would utilize First Data as the pricing source in has in some of its contracts with pharmaceutical companies and others in the distribution chain, as well as in the pricing database that it provides to its customers, thereby increasing First Data's business. First Data also agreed to the Scheme as part of an effort to increase the demand for its business among entities in the pharmaceutical distribution chain whose reimbursement is based on AWP. McKesson in turn where it could do so, specified in its dealings with pharmaceutical companies, that First Data's AWP would be the AWP used for contract pricing purposes as opposed to the other published AWPs. Thus, each defendant shared multiple common purposes and each acted to achieve those purposes by implementation of the 5% Scheme.

13.     Health and welfare funds, insurance companies and thousands of third-party payors have contracts that expressly tie their payment for pharmaceuticals to First Data's published AWPs.

14.     As a result of this artificial increase in the markup of the WAC-to-AWP spread from 20% to 25%, thousands of third-party payors and consumers have had their drug prices

- 5 -

increased by a Scheme that directly contravenes market expectations concerning the establishment, meaning and publication of AWPs.

15. Among the drugs whose prices are artificially inflated by the Scheme are some of the top brand-name drugs used by hundreds of millions of Americans, such as: Allegra (a leading allergy drug), Azmacort (a leading asthma drug), Celebrex (a leading arthritis/pain medicine), Coumadin (a leading anticoagulant), Flonase (a leading asthma drug), Lipitor (the world's top selling drug, a statin neurontin (a leading pain medication), Nexium (a leading reflux drug), Prevacid (a leading ulcer/reflux drug) and Valium. Given the billions of dollars spent on prescription drugs, a 5% increase in the WAC-to-AWP spread results in a substantial increase in payments for pharmaceuticals. For example, AstraZeneca's Nexium had annual sales in 2004 of almost $4 billion. A bump of 5% in the WAC-to-AWP spread results in an increase of over $100 million per year in reimbursements for just one drug. Another such drug is Pfizer's Lipitor, whose annual sales in 2004 exceeded $10 billion. As a result of the 5% increase imposed by First Data and McKesson, hundreds of millions per year was spent on Lipitor that would not have been absent the Scheme.

16. In this action, plaintiffs and the Class seek to recover damages incurred from defendants' unlawful acts and practices.

## II.    JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, which, *inter alia*, amends 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class of plaintiffs is a citizen of a State different from any Defendants" and the aggregated amount in controversy exceeds five million dollars ($5,000,000). *See* 28 U.S.C. §§ 1332(d)(2)

- 6 -

and (6). This Court has personal jurisdiction over the parties because plaintiffs submit to the jurisdiction of the Court and defendants systematically and continually conduct business throughout the Commonwealth of Massachusetts, including marketing, advertising, and sales directed to Massachusetts residents.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a) and (c) because defendants as corporations are "deemed to reside in any judicial district in which [they are] subject to personal jurisdiction" and because the misrepresentation and material omissions "giving rise to claim[s] occurred" in this District as well as throughout the State of Massachusetts.

## III.    PARTIES

### A.    Plaintiffs

19.     Plaintiff New England Carpenters Health Benefits Fund ("Carpenters") is an employee welfare benefit plan established and maintained pursuant to §§ 1002(1) and (3) of ERISA, for the purpose of providing health benefits to eligible participants and beneficiaries. As such, Carpenters is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d). Carpenters maintains its principal place of business in Wilmington, Massachusetts. It provides comprehensive health coverage for over 22,000 participants and beneficiaries in the states of Main, New Hampshire, Vermont, and Massachusetts. During the Class Period, Carpenters has been billed for and paid charges for drugs. It reimburses retail pharmacies for pharmaceuticals on the basis of the published AWPs (minus a fixed percentages) and those AWPs are published by First Data.

20.     Plaintiff Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust ("PMBT") is a voluntary employee benefits association maintained pursuant to the federal

- 7 -

Employee Retirement Security Act, 29 U.S.C. § 1132, *et seq.* and to the settlement of a federal court action (Case No. 3:94-0573) brought in the United States District Court for the Middle District of Tennessee against Pirelli Armstrong Tire Corp. ("Pirelli") in the early 1990s by many Pirelli retirees for the purpose of providing health and medical benefits to eligible participants and beneficiaries. PBMT maintains its principal place of business in Goodlettsville, Sumner County, Tennessee. During the Class Period, PMBT has been billed for and has paid charges for drugs based on AWP. Since May 1, 2001, PMBT has contracted with ACS/Caremark, a PBM, to administer its drug program for its members. PMBT's contract with its PBM provides that reimbursement is to be based on First Data's published AWP.

21.     Plaintiff Teamsters Health & Welfare Fund of Philadelphia and Vicinity ("THWF") is an employee welfare benefit plan and employee benefit plan established and maintained pursuant to Section 302(c)(5) of the LMRA, and is an employee welfare benefit plan established and maintained pursuant to §§ 1002(1) and (3) of ERISA, for the purpose of providing health benefits to eligible participants and beneficiaries. As such, THWF is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d). THWF maintains its principal place of business at Fourth & Cherry Streets, Philadelphia, Pennsylvania 19106. It provides comprehensive health coverage for over 28,000 participants and beneficiaries in parts of Pennsylvania, New Jersey and Delaware. During the Class Period, THWF has been billed for and paid charges for drugs. It reimburses retail pharmacies for pharmaceuticals on the basis of the published AWPs (minus a fixed percentage) and those AWPs are published by First Data.

22.     Plaintiff Philadelphia Federation of Teachers Health and Welfare Fund ("PFTHW") is a voluntary employee benefits plan organized pursuant to § 501(c) of the Internal Revenue Code for the purpose of providing health benefits to eligible participants and

- 8 -

beneficiaries. PFTHW maintains its principal place of business in Philadelphia, Pennsylvania. PFTHW provides health benefits, including prescription drug benefits, to approximately 20,000 active participants, and their spouses and dependents. During the Class Period, PFTHW has been billed for and paid charges for drugs. It reimburses retail pharmacies for pharmaceuticals on the basis of the published AWPs (minus a fixed percentage) and those AWPs are published by First Data.

**B.      Defendants**

23.      Defendant First Data ("First Data") is a Missouri corporation with its principal place of business at 1111 Bayhill Drive, San Bruno, California 94066. First Data is a subsidiary of the Hearst Corporation and is the leading provider of electronic drug information to the healthcare industry.

24.      Defendant McKesson Corporation is a Delaware corporation with its principal place of business at McKesson Plaza, One Post Street, San Francisco, California 94101. McKesson Corporation is the leading provider of supply, information and care management products and services designed to reduce costs and improve quality across healthcare. Founded in 1833, with annual revenues of more than $50 billion, McKesson ranks as the 16th largest industrial company in the United States.

## IV.    STATEMENT OF FACTS

25.      This case involves the unlawful inflation of the "markup" factor between the so-called wholesale acquisition cost (or "WAC") and the so-called average wholesale price (or "AWP") of a large number of prescription pharmaceutical products, a scheme implemented in late 2001 and 2002 by McKesson (the largest U.S. pharmaceutical wholesaler) and First Data (the nation's most widely used and "trusted" electronic drug data publisher).

- 9 -

## A. Drug Manufacturers and NDCs

26.     Drug makers manufacture brand name and generic drugs. Generally, a drug product that is covered by a patent and thus is manufactured and sold exclusively by one firm is a brand-name drug. After the patent expires, multiple companies can produce the same drug product in the same manner, but the name of the brand name itself remains with the original manufacturer. Drug products not covered by patent protection and produced and/or distributed by many firms are generic drugs. Manufacturers tend to be either brand name manufacturers or generic drug manufacturers, although some manufacture both types of drugs.

27.     There are approximately 65,000 branded and generic drug products in the United States market, including different dosages of the same drug. Prescription drugs are dispensed to patients primarily through four different drug distribution channels: (a) retail pharmacies (including national chain pharmacies, independent pharmacies, supermarket chains, and mail order pharmacies); (b) physicians who administer the drug in an office; (c) home infusion; and (d) other medical providers. This lawsuit primarily involves branded drugs distributed through the first channel, the retail pharmacies.

28.     All drugs intended for retail pharmacy sale are identified by a National Drug Code ("NDC") that is listed with the United States Food and Drug Administration ("FDA") and contains eleven digits. The NDC is used to identify the drug delivered to the patient. The first five digits of the NDC show the identity of the company that manufactured and/or packaged the drug, the middle four digits identify the drug ingredient and dosage, and the last two digits identify the package size (*e.g.*, whether the bottle of pills contained 100 or 1,000 pills). While there are currently about 65,000 active NDCs, many more NDCs have been issued over time (in large part because over the years many drugs and associated NDCs have been phased out).

- 10 -

**B.     The Wholesale Acquisition Cost**

29.     Branded manufacturers arrive at an original launch price by taking into account research and development costs, launch and marketing costs, competitor prices and estimates of consumer and physician demand. (Generic makers, of course, use more commodity pricing approaches). Once an introductory price has been set, the branded manufacturer establishes the wholesale acquisition cost, or "WAC," which is used as a baseline for sales to wholesalers (subject to many adjustments, as will be seen). The WAC for branded drugs is then published by the manufacturer.

30.     Manufacturers establish the WAC as a baseline for sales to wholesalers and others in the distribution chain. Thus, while WAC may not represent *actual* acquisition cost (as wholesalers may obtain discounts through volume purchases or special deals, and as wholesalers' customers who also buy based on WAC may receive other price concessions charged back to the manufacturers), it is the baseline for most branded drug sales by manufacturers to national wholesalers. In addition, WAC is a publicly available price for most branded drugs and is the closest reported price to the actual transaction price between a manufacturer and the wholesaler or other direct purchaser of a drug product. And because the wholesalers' price to the retail class of trade is also typically based on, or is a function of, the WAC, a change in WAC generally results in a similar percent change in price to both wholesalers and to retail pharmacies.

31.     WACs are typically reported on invoices between the manufacturer and the drug wholesaler (and as between the wholesaler and the retailer, or between the manufacturer direct to the retailer). Some drug manufacturers have other names for the WAC price such as list price, catalog price, direct price, wholesale net price, or book price.

- 11 -

## C. The Average Sale Price

32. After all price concessions are considered, a manufacturer achieves a net sales price, *i.e.*, a transaction price paid by a pharmacy or provider when purchasing a drug product from either a drug manufacturer or wholesaler. The net sales price takes into account the invoice price and all on-invoice, as well as off-invoice adjustments for discounts, rebates, purchasing allowances, or other forms of economic consideration.

33. Of course, manufacturers can (and do) calculate for internal purposes the net sales price at which they are able to sell their products, and the average of those net sales prices is usually called the average sales price (or "ASP"). While net acquisition prices and associated ASPs are known to each drug manufacturer, they are not typically published or made public.[1] Some drug manufacturers may have a variety of terms for specific discounts that are based on class of trade, volume of purchase, market share movement, preferred formulary status, terms of payment, and other criteria. Because ASP is meant to be the net price after all forms of discounts, rebates, purchasing allowances or any other forms of economic consideration have been taken into account, discounts that contribute to ASP are considered proprietary and confidential by drug manufacturers. As a result, for retail pharmaceutical products the exact relationship of ASP to WAC (or to the average wholesale price or AWP, discussed below) for a particular drug at a particular point in time is not publicly known.

## D. The Average Wholesale Price

34. In addition to causing to be published a wholesale acquisition cost or WAC for branded drugs, over the years branded (and generic) manufacturers have also caused to be

---

[1] The important exception to this is Congress' recent enactment of the Medicare Modernization Act of 2003, in which Congress changed the Medicare reimbursement system for drugs and biologicals from an AWP-based system to an ASP-based system physician-administered. This exception is not relevant here.

- 12 -

published an average wholesale price (or "AWP") for prescription pharmaceuticals. The average wholesale price or AWP is a list price used for invoices between drug wholesalers and pharmacies (or other appropriate drug dispensers, such as doctors for physician-administered drugs) and is typically used as a benchmark for the reimbursement by end-payors for the dispensers' (*e.g.*, retail pharmacies or doctors) acquisition of the drug product. Historically, the AWP is set directly or indirectly by the drug manufacturer, with an effective date and remains in effect until a change in price is published.

35. WAC and AWP differ in that they represent list prices at different levels in the market. WAC represents a list price from manufacturer to wholesaler, while AWP represents a list price from wholesaler to dispenser (*e.g.*, pharmacy, physician, hospital, or other provider).

### E.     The WAC-to-AWP Spread

36. In the pharmaceutical industry, the amount by which the AWP exceeds the WAC is sometimes known as the WAC/AWP "markup" or "spread" for a particular drug product.

37. The relationship between AWP and WAC is sometimes expressed as the percentage by which the difference is above WAC (*e.g.*, 20% or 25% above WAC, usually called "the markup") rather than the percentage in which the difference is measured as an amount under AWP (*e.g.*, 16.7% or 20% off AWP, sometimes called the "spread"). In this complaint, we usually refer to the WAC-to-AWP markup in the first sense, *i.e.*, as expressed as a percentage above WAC.

38. For many years preceding the Scheme alleged in this complaint, the WAC-to-AWP spread for branded drugs had predictably set patterns, and the competitive pricing marketplace for pharmaceuticals had adjusted and accommodated for the patterns. For branded pharmaceuticals, the WAC/AWP spread tended to fall in two quantum places: 20%, and 25%.

- 13 -

In other words, in the many years preceding the Scheme alleged in this case, a particular branded drug NDC would carry both a published WAC (*e.g.*, $100 for a 100 count bottle) and a published AWP at either 1.16 or 1.20, or 1.25 of the WAC (*e.g.*, $120).

39. These steps in the WAC/AWP spreads 20%, and 25%, percentages known to McKesson, First Data and others in the pharmaceutical industry as the WAC/AWP markup factors – were commonly associated with particular divisions of pharmaceutical companies. For example, a pharmaceutical division might be designated as a "20% markup" company, while another company working in a different therapeutical area, would be designated as a "25% markup" company.

40. Another part of the predictable aspects of the WAC/AWP spreads over the years was the *unchanging* nature of the WAC/AWP markup for a particular NDC. In other words, if a particular NDC first launched at a 20% markup value, that NDC would remain as a 20% drug during the lifetime of that NDC, almost as if it were part of the generic code for that NDC. Thus, the WAC and AWP for that drug moved in parallel fashion (usually up), keeping the same markup factor associated with that NDC. Indeed, prior to the Scheme alleged in this case, it was extraordinarily rare for the WAC/AWP spread to be changed for any particular NDC, and in the few isolated situations where that did occur, a particular market-based reason existed which was known to all participants in the marketplace (*e.g.*, a merger of drug companies necessitating uniformity of particular prices).

## F. Drug Wholesalers

41. Branded manufacturers' primary customers are wholesalers, although to a much broader extent, manufacturers also sell direct to retail pharmacy chains, mail-order pharmacies,

- 14 -

hospital chains and some health plans. Wholesalers are manufacturers' largest group of purchasers, and wholesale prices depend partially on volume purchased.

42.     Like most other types of wholesalers, pharmaceutical wholesalers purchase goods from manufacturers and then resell them to other purchasers. Wholesalers, whose main customers are retail and mail-order pharmacies, buy pharmaceuticals in large quantities, sort them by customer needs and disperse them in usable quantities.

43.     The price wholesalers pay to manufacturers for any given product at any given time can fluctuate with the quantity purchased. The manufacturer may quote a wholesaler a price close to or at WAC, but typically there will also be a small volume discount or early cash payment discount off that price.

44.     National wholesalers are the primary intermediate level in the retail channel of distribution process accounting for 45.7% of prescription drugs ($98.5 billion) in 2002. Other intermediate channels of distribution include chain warehouses with 32.3% ($69.8 billion) of the market, regional and specialty wholesalers with 9.3% ($20.2 billion) of the market, and group purchasing organizations that usually contract with a wholesaler to perform the distribution function on their behalf. Only about 12% of prescription sales by drug manufacturers are made directly to providers (*e.g.*, physicians or hospitals) or pharmacies.

45.     Wholesale drug distribution is heavily concentrated. The three largest wholesalers are Defendant McKesson, Cardinal Health, Inc. ("Cardinal") and AmeriSource Bergen Corporation ("ABC"). Each of these "Big Three" wholesalers has slightly less than one-third of the national market of prescription drug wholesale distribution. Collectively they account for about 97% of drug sales that flow through national wholesalers, and collectively they account for more than 80% of all drug wholesalers (national, regional, and specialty).

- 15 -

## G. Wholesaler Sales Transactions

46. National drug wholesaling is generally perceived as price competitive, with McKesson, Cardinal and ABC (or their predecessors) competing for business with retailers (primarily major chain drug retailers, independent pharmacies, supermarket drug retailers, and mail orders). As a result, sell-side national drug wholesaler margins to retailers tend to be thin (even at times non-existent), with a significant portion of national drug wholesaler revenue instead being derived from buy-side prompt pay discounts received from manufacturers and from wholesaler inventorying measures that anticipate price increases.

47. National drug wholesalers sell branded drugs to the retail class of trade based on prices pegged to the WAC. Given the tendency for narrow margins in the national drug wholesaling business, the published WAC for a manufacturer's retail-channel branded drug is not only a strong market indicator for the wholesaler's buy-side cost for a branded drug, it is also expected that the WAC, subject to certain adjustments, is a reasonable benchmark of the sell-side costs charged by national wholesalers of branded drugs to major pharmacy retailers.

## H. Retail Pharmacy Channel

48. The retail pharmacy channel (including chain drug store companies, independent pharmacies, mail orders and supermarkets), comprise roughly two-thirds of the estimated market share of dollars for prescription drugs. Currently, the four largest drug store chains account for most of the retail pharmacy market share today, and the recent consolidation trend appears to be continuing. Some large national or regional retail chains (including pharmacy, supermarket, mass merchandiser chains) purchase drugs in large enough volumes so that they can bypass the wholesaler and buy directly from the manufacturer, but these direct purchases remain a small portion of the overall picture.

- 16 -

49. Regardless whether the retail pharmacy is large or small, its purchase of prescription drugs is typically based using WAC as a benchmark, although that benchmark is subject to adjustments such as a variety of discounts, rebates, and direct or indirect offsets to pricing.

50. When large chain pharmacies buy directly from manufacturers, manufacturers offer these pharmacies both up-front discounts for purchasing their products and back-end discounts and formulary rebates to selling specific volumes of drugs or achieving a certain share of a specified market. When purchasing drugs directly from manufacturers, pricing using the same WAC benchmark system, but the actual transaction cost varies considerably from the WAC given these other arrangements.

51. Smaller retail entities, such as independent retail pharmacies and regional retail chains, purchase directly from wholesalers or joint group purchasing organizations ("GPOs") in order to leverage their combined purchasing power, and some of these groups further reduce their costs through direct rebate deals offered by manufacturers. In making purchases from wholesalers, resellers and manufacturers, the starting benchmark for transactions is the WAC but, again, the actual transaction cost is highly variable due to the additional arrangements.

52. In short, entities in the retail distribution chain (including wholesalers, resalers (retailers), retail chain pharmacies, independent pharmacies, mail order houses, and GPOs) purchase brand-name drugs based upon WAC. While the actual transaction purchase price varies from the WAC, WAC acts as the actual baseline for the many millions of transactions by which entities in the retail distribution chain acquire branded drugs.

- 17 -

## I.    The Private End-Payors for Prescription Drugs

53.    At the most basic level, prescription drug expenditures are funded by either private or public sources. In the United States, more than \$200 billion dollars is spent annually on prescription drugs, and about three quarters of this amount is privately funded.

54.    Private payors for prescription drugs include drug benefit plan sponsors and consumers. The drug benefit plan sponsors (who pay for part or all of the cost of prescription drugs for their covered beneficiaries) include self-insured employers, health and welfare plans, health insurers and managed care organizations (MCOs). Most of these plan sponsors reimburse retailers (for retailers' drug purchase costs) through pharmacy benefit administrators (either health plans or pharmacy benefit management companies) who negotiate discounts with retail pharmacies and rebates from drug manufacturers. The vast majority of such purchases are for out-patient drugs that are self-administered, *i.e.*, drugs distributed through the retail distribution channel.

## J.    End Payors Drug Reimbursements Are AWP-Based

55.    Although retail pharmacies *purchase* pharmaceutical products based upon pricing formulae that employ the WAC, retail pharmacies *get paid* (*i.e.* receive reimbursement) from plan sponsors and consumers based upon an AWP reimbursement formula plus a dispensing fee. This is fundamental anomaly of the retail distribution channel for drug products – that retail pharmacies' *purchases* are based on prices pegged to the published WAC, but retail pharmacies' *reimbursements* or charges are based on the published AWP.

56.    Health plans typically contract with intermediaries called pharmacy benefit managers ("PBMs") to negotiate prices with manufacturers and retail pharmacies and thereafter adjudicate the numerous transactions that occur during administration of a plan. Although the

- 18 -

PBM negotiates prices and adjudicates claims, the plan sponsor (*i.e.*, insurer, self-insured employee, health and welfare plan) remains at risk for the charges paid to retail pharmacies and mail orders. In the contracts between PBMs and plan sponsors, the retail pharmacies drug ingredient costs for brand-name drugs are reimbursed at the AWP less a certain percentage, or "discount."

57.    Brand drug reimbursement for retail pharmacy ingredient cost contained in the contracts between PBMs and plan sponsors, and PBMs to pharmacies, use an AWP-based reimbursement structure. For example, since 2002, Express Scripts' standard form contract has expressly stated that its reimbursement formula is based on AWP from the "current information provided to ESI by drug pricing services such as First Data Bank...." Similarly, Caremark's website states: "For both brand and generic drugs, the pricing formula at retail and mail is based on the discounted Average Wholesale Price (AWP) as reported by First Data. Caremark loads First Data's updated data into the system on a daily basis." Other PBMs expressly utilize First Data's published AWPs as the source of AWP pricing to be utilized in payment.

58.    The AWP-based reimbursement benchmark for private payments to the retail class of pharmaceutical trade has long been acknowledged. Most recently, at a hearing on December 7, 2004, before the United States House of Representatives Committee on Energy and Commerce, a former Senior Vice President of Aventis Pharmaceuticals, testified that "AWP has been codified as the benchmark price, by statute and regulations, in the public sector and by contract in the private sector."

59.    In addition to affecting the magnitude of plan sponsors' branded drug reimbursement to retail pharmacies for drug ingredient costs, the private sector AWP-based system also affects consumers. There are primarily two types of consumer: those who have

- 19 -

some type of pharmacy benefit coverage and pay a portion of the cost of a drug (co-payment, co-insurance, deductible), and those who have no coverage and pay the entire cost of the prescription drug at the retail pharmacy.

60.     Consumers that pay "co-insurance" are at risk for the delivery of their drug benefit ratably with their insurer; to the extent that the overall reimbursement amount unlawfully is inflated, the consumer group is co-insurance is proportionally injured.

61.     Consumers that do not have insurance are sometimes referred to as "cash-paying consumers," and they include many seniors who are eligible for Medicare. Recent estimates suggest that these consumers (*i.e.*, Medicare-eligible seniors who have no prescription drug coverage or who are covered by traditional indemnity plans and must therefore pay the full amount prior to reimbursement), amount to more than one-fifth of the private prescription drug expenditures at retail pharmacies. Most retail pharmacies based their price to cash payors on formulae tied to the AWP.

62.     Consumers who have insurance coverage and those who are eligible for government programs (such as Medicaid) typically pay less than consumers who do not have such coverage. Uninsured consumers, or cash payors, are disproportionately elderly and poor consumers.

63.     In summary, thousands of pharmaceutical reimbursement contracts are based on AWP minus a specified discount. As a result, a leading expert on pharmaceutical pricing has concluded that "AWP is the glue that binds the system of pharmaceutical reimbursement rates. All or predominantly all, reimbursement rates for pharmaceuticals purchased under public sector and private drug benefit insurance plans are negotiated based upon AWP and discounts from AWP."

- 20 -

## K. Medicaid Drug Reimbursements Are AWP-Based

64. Public purchases for prescription drugs provide a variety of programs for low-incomed and elderly patients, veterans, members of armed services, and federal, state and local government employees. While public purchaser programs are not directly at issue in this case, the significant reliance on those systems of AWP-based reimbursement underscores the ambiguity and magnitude of reliance on the AWP-based reimbursement system to pay for dispensers' ingredient costs for branded pharmaceutical products.

65. Medicaid has the most significant impact on prescription drug pricing for out patient drugs. The Medicaid Program, jointly financed through federal and state funds, is designed to aid certain low-income people and the disabled, and covers about 40 million individuals. Between 1997 and 2002, Medicaid expenditures for prescription drugs in the fee-for-service part of the program increased at an average annual rate of 18%, going from $10.2 billion to $23.4 billion. (While these are significant sums, they amount to less than 10% of the overall annual prescription drug expenditure.)

66. Medicaid's reimbursement system relies upon the published list prices of drugs (which are largely directly set by manufacturers) to determine pharmacies' reimbursement. States reimburse pharmacies using formulas that are typically based on the average wholesale price or AWP of a drug. For example, a state might reimburse a pharmacy 85% to 90% of the average wholesale price of a drug plus a fixed dollar amount of $3 to $5 (as dispensing fee) to cover the pharmacy's other costs.

## L. Medicare Drug Reimbursements Are AWP-Based

67. The other significant public purchaser for prescription drugs is the federal Medicare Program.

- 21 -

68. Until recently, the Medicare Program generally did not cover the cost of out-patient prescription drugs that a Medicare beneficiary self administers (*e.g.*, by swallowing the drug in liquid or pill form). However, Medicare Part B does cover some drugs, including injectables administered directly by a doctor, certain oral anti-cancer drugs, and drugs furnished under a durable medical equipment benefit. Approximately 450 drugs are covered by Medicare Part B.

69. Medicare Part B reimburses medical providers 80% of the allowable amount for a drug. The remaining 20% is paid by the Medicare Part B beneficiary, and is called the "co-payment" amount. All medical providers are required by law to bill the 20% co-payment and make attempts beyond merely billing to collect that amount. In addition, beneficiaries under Part B are required to pay an annual deductible amount before Part B benefits are payable.

70. Some Medicare beneficiaries are able to purchase private Medigap insurance, which covers, among other things, all or part of the 20% co-payment for Covered Drugs.

71. For many years up to and through 1997, Medicare's reimbursement system for the relatively narrow band of physician-administered drugs sought to estimate providers acquisition costs by pegging reimbursement to either the estimated acquisition costs or to the national average wholesale price sale price. In practice, carriers that administered the Medicare Program reimbursed physicians and clinics for physician-administered drugs covered by Medicare on the basis of the published wholesale price or AWP.

72. Beginning in 1998, Medicare's practice of reimbursing based upon the published AWP was codified by statue and implemented by regulation. Beginning in 1998 and until recently, Medicare reimbursed for drugs and biologicals under its program of the reimbursing physician administered drugs based upon 95% of the published average wholesale price.

- 22 -

73. At the end of 2003, Congress enacted the Medicare Modernization Act. Among other things, that changed the AWP-based reimbursement system for Medicare to a system based upon each manufacturers' actual calculation for the average sales price for each drug or biological covered by the program. Interim rules transitioned the AWP-based system with modifications to the percentage off of AWP. Beginning in 2004, Medicare has been transitioning to the ASP-based reimbursement system.

74. In summary, the two largest public purchaser programs for prescription pharmaceuticals – Medicaid and Medicare – historically relied upon published average wholesale prices as the fundamental basis upon which to reimburse for branded drug ingredient costs incurred by dispensers (retail pharmacies for Medicaid, and medical providers in the Medicare area).

## M. Private and Public End Payors Rely on Published Drug Pricing Compendia

75. The private (and public) pharmaceutical reimbursement systems have at their core critical dependence upon accurate and timely publication of the current AWP for every active formulation of drugs dispensed by retail pharmacies in the country. Given the breath of this dependence (private insurance systems covering more than 200 million lives as well as millions of cash payors) given the healthcare system's growing reliance on pharmaceutical products as a treatment of first resort, and given the scores of thousands of available drugs on the market, the private (and public) reimbursement systems for pharmaceuticals depend on the honesty and integrity of the AWP and WAC data provided by drug manufacturers. The reimbursement systems (including the plan sponsors and consumers who reimburse drug dispenser costs) also rely upon the accuracy and integrity of the pharmaceutical pricing publishers to accurately and fairly publish AWPs and WACs for NDCs.

- 23 -

76. Several pharmaceutical industry compendia periodically publish the AWPs for active NDCs in the United States. Generally these publications are available in either hard copy format or in electronic media.

77. Generally speaking, the two printed compendia include Drug Topics Red Book (the "Red Book") (published by Thompson Healthcare) and American Druggist First Data Bank Annual Director of Pharmaceuticals and Essential Director of Pharmaceuticals (the "Blue Book") (which for several years has been defunct). While the Red Book is used to determine published AWPs (primarily for physician-administered drugs), and while certain limited electronic information is available regarding Red Book published prices, the Red Book remains primarily an annual printed publication with periodic printed updates.

78. In periodically announcing the AWP for each drug, publishers generally report prices that are supplied to them by manufacturers for their respective drugs. For instance, the forward to the 1999 edition of the Red Book states that "all pricing information is supplied and verified by the products' manufacturers, and it should be noted that no independent review of those prices for accuracy is conducted." In addition, a June 1996 Dow Jones news article reported that Phil Southerd, an associate product manager of the Red Book, stated that Red Book only publishes prices that are faxed directly from the manufacturer.

## N.    The Emergence of First Data and MediSpan as Electronic Data Publishers

79. In addition to printed publications of pharmaceutical prices, the AWP for NDCs is also widely made available to manufactures, wholesalers, retailers (including major chain pharmacies, independents, mail orders), pharmacy benefit managers and third-party payors, (*i.e.*, plan sponsors of drug benefit plans such as insurers, Taft-Hartley Funds and self-insured employers), through large electronic drug databases.

- 24 -

80. Drug databases started back in the mid-1970s with the advent of significant drug benefit programs. These programs, along with the pharmacists who are dispensing the drugs and the third-party payors (primarily insurance companies) who are paying for them, needed comprehensive and accurate descriptive and pricing information in order to ensure the accuracy of the claims they were paying.

81. The processing of claims became a massive job as drug prescriptions increased. The need for a consistently accurate and comprehensive drug price database became a major need. As First Data documents acknowledge, the "specter of inaccurate drug prices drove the database companies to develop techniques to assure the accuracy and comprehensiveness of the data."

82. During the 1990s, there were only two major electronic drug database companies: (1) First Data, which describes itself as "started as the only purely electronic database company," and (2) MediSpan, which had its roots in the printed drug price catalog business.

83. The principal products sold by First Data are based upon information contained in its National Drug Database Files, or "NDDF." The NDDF is a massive electronic database dating back many years and containing scores of fields of information for both active and non-active NDCs. Among many other pieces of quantitative and non-quantitative information contained in the NDDF, are the current and each historical WAC (known in the NDDF as the wholesale net price, or "WHN") and AWP (set forth in various fields, including an AWP field designated by First Data as Blue Book AWP or "BBAWP") for each NDC.

84. The principal electronic database products sold by MediSpan are based upon its Master Drug Database Files or "MDDF." The MDDF electronic database is smaller than the NDDF, but nevertheless contains numerous fields of data for each NDC, including current and

- 25 -

historical WAC and AWP. Both the NDDF and the MDDF are comprehensive, integrateable drug information databases.

85.     Comprehensive, integratable drug information databases ("integratable drug data files") are electronic databases containing purportedly comprehensive clinical, pricing, and other information on prescription and non-prescription medicines. Integratable drug data files are uniquely capable of being readily integrated with other computerized information systems to help pharmacists and third-party payors quickly obtain information important to decisions regarding the prescription, dispensing, price reimbursement and purchase of medicines, and also to automatically provide drug information that patients need for safe use of their drugs. Retail pharmacies and PBMs usually use integratable drug data files to determine third-party payor reimbursement (when using AWP fields), as well as their own acquisition costs (when using WAC fields).

86.     Drug information in other forms is usually not an adequate substitute for the provision of much information obtainable only in integratable drug data files. For example, a pharmacist filling a prescription can more quickly and reliably check for harmful drug interactions through an instant, automatic check of a drug data file when he or she enters the prescription into the pharmacy's computer system, than through consulting a separate, unintegrated, and less up-to-date information source such as a book or data on a compact disk. Relying on such a separate reference would be more time-consuming, and would increase the risk that a harmful drug interaction would not be detected until after the patient purchased and used the drug.

87.     During the 1990's and up to 1998, First Data and MediSpan were substantial, direct competitors within the relevant market of integratable drug data files in the United States,

- 26 -

and faced little or no competition from other firms. Until 1998, two electronic drug databases –
First Data's NDDF and MediSpan's MDDF – played the integral role in providing essentially all
electronically-based drug reimbursement transactions in the United States, accounting for
billions of transactions each year and many billions of dollars of payments.

88.     Of course, First Data's NDDF and MediSpan's MDDF both contained data fields
for critical price points for the approximate 65,000 NDCs then active in the marketplace.[2] The
retail class of trade has primary reliance on these systems for health and reimbursement among
the data fields for each active NDC (in the NDDF and the MDDF) information, using the AWP
for the associated NDC when seeking reimbursement for drug ingredient cost.

**O.    The Merger of First Data and MediSpan Systems**

89.     In 1998, the Hearst Corporation caused First Data to be merged with the smaller
MediSpan. After the merger, First Data began the process of combining its NDDF with
MediSpan's MDDF (resulting in a product sometimes known as NDDF Plus). Through this
process, the Hearst Corporation caused First Data to become the sole United States provider of
integratable drug data files, including the publication of electronic drug database pricing
information such as the WAC and associated AWP for branded pharmaceutical products. Thus,
beginning in or around 1998 and thereafter, virtually every participant in the pharmaceutical
distribution chain who used electronic database systems used and relied upon the accuracy of
data from First Data's NDDF and MDDF, including the published WAC and AWP price fields in
undertaking reimbursement transactions for billions of dollars of pharmaceutical products.

---

[2] First Data's NDDF also contains historical information and thus, it contains data for almost 200,000 NDCs
since many are no longer active in the marketplace.

- 27 -

90. In 2001, the Federal Trade Commission (after a lengthy investigation) brought suit against the Hearst Corporation and First Data claiming, among other things, that the First Data and MediSpan merger had been unlawful. Shortly thereafter, the Hearst Corporation agreed to the divestiture of the MediSpan assets, culminating in a consent decree late that year. However, by this time, First Data's merger of the NDDF and MDDF, along with changes of personnel and related systems effectuated over the prior three years, was nearly complete. As a result, as part of First Data's divestiture of the MediSpan assets, First Data was required to provide the purchaser of the MediSpan assets with transitional and editorial services for many years into the future.

91. As a practical matter, therefore, pricing data contained in both the NDDF and the MDDF post-divestiture remained the same. Since 1998 and despite the late 2001 divestiture, First Data has functioned as the sole editor of data populating the only available comprehensive integratable electronic drug data systems (the NDDF and the MDDF) for the pricing information ubiquitously used in the United States for reimbursement transactions in the retail pharmacy channel for branded drugs.

92. During the 1990s and up to the end of 2001, both First Data and MediSpan maintained the historical proportion between AWP and WAC when branded price increases were announced. This enabled the publishers (when receiving, for example, information only regarding WAC changes to a branded drug) to automatically calculate the corresponding AWP. "When a manufacturer releases a price change, the AWP is calculated using the historical proportion." As a result, the marketplace had predictability, and marketing pricing dynamics had adjusted according to that expected practice.

- 28 -

## P. First Data Gains the Trust of the Pharmaceutical Industry

93. Prior to and throughout the Class Period, pharmaceutical end payors operated on

the belief that the AWPs were the result of honest reporting both by the pharmaceutical

companies with respect to the publication of their WACs or submission of their suggested AWPs

to publishers, and an empirical and professional analysis undertaken by First Data.

94. The reliance upon the accuracy and legitimacy of First Data's data was not only

known to First Data, but used as the foundation of its business model and its marketing and

promotion plans. For example, First Data stated:

> -- "For over two decades, healthcare professionals have come to
> depend on First DataBank's comprehensive knowledge bases to
> deliver the timely, accurate drug information they need to support
> their business and clinical decision-making."
>
> -- "Thus developers can respond quickly to their customers'
> demands for reliable, east-to-access drug information, available on
> multiple platforms.
>
> -- "[First Data:] A partner you can trust."
>
> -- Trusted Drug Knowledge…Comprehensive drug knowledge
> bases that have been trusted for decades by healthcare
> professionals – in thousands of installations – to provide the
> timely, accurate information they need to support their clinical and
> business decision-making.

95. First Data promoted its pricing information as "accurate," of "high-quality," and

as "set[ting] the standard in the healthcare industry for comprehensive coverage of descriptive,

pricing and clinical information on drugs." It also recognizes that its pricing information is

"relied upon by professionals in th[e] industry," and that, "*[t]o be useful to its audience, First*

*Data's data must be accurate and up-to-date*."

- 29 -

96.     In pleadings filed in the *In re Pharmaceutical Indus. Average Wholesale Pricing
Litig.*, MDL No. 1456 (D. Mass.), First Data has admitted that buyers and sellers in the
pharmaceutical marketplace rely on its pricing data: "FDB knows the pharmaceutical industry
well and is relied upon by professionals in that industry to report reliable information."

97.     Throughout the 1990s, First Data gained the trust and reliance of participants in
the pharmaceutical marketplace – most notably pharmacies and the third-party payors that
reimbursed them – upon First Data's electronic publication of AWP for each active NDC.

98.     Throughout all this time, First Data knew, of course, that the primary purposes of
publication of the WAC and of the AWP, and of the associated WAC-to-AWP markup
(embedded in the difference between the AWP and WAC data fields), was to serve as an
electronic basis for the mass-reimbursement of retail pharmacies for thousands of daily
transactions and billions of yearly transactions. After all, First Data acknowledged: "AWP was
developed because there had to be some price which all parties could agree upon if machine
processing was to be possible." It is stated elsewhere: "AWP represents the average wholesale
price; the average price a wholesaler would charge a customer for a particular product. The
operative word is *average*. AWP was developed to provide a price at which all parties could
agree upon for electronic processing to be possible."

**Q.     First Data's Representations to Gain Marketplace Reliance on Its Pricing Data**

99.     First Data gained this reliance upon the empirical integrity of its electronic
publication of AWP due to the representations it made to its customers and others in the
pharmaceutical marketplace regarding how First Data populated the fields of information
relating to WAC and AWP.

- 30 -

100. Among other things, First Data held out that its electronic databases contained accurate field information for the AWP for each NDC. Emphasizing that as to the AWP the "operative word is *average*" (First Data's emphasis), First Data indicated that its empirically derived information was obtained directly from its specific contacts "within each major drug manufacturer/labelers organization." First Data represented that when it was apprised that the AWPs suggested by manufacturers were also those used by the wholesalers, First Data published as the AWP the exact AWP that had been suggested by the manufacturer. On other occasions, First Data represented that its AWPs were based upon empirically determined markup factors obtained by First Data after it undertook a comprehensive and sound survey. In these situations, while the manufacturer effectively established both price points (the WAC and the AWP, since the manufacturer established the WAC and knew of the existing mathematical markup factor resulting in the AWP), First Data held out that its markup factors have been corroborated through empirical research of wholesalers' actual markup of WAC to AWP.

101. During these years, First Data occasionally published information regarding how it derived the markup factors for the WAC-to-AWP spread. This information always emphasized the empirical nature of the data populating its electronic database. Thus, First Data represented:

> -- That industry changes "have made the wholesale survey fundamental in maintaining current pricing data";
>
> -- That when a manufacturer had not provided a suggested wholesale price for a new product, "wholesaler surveys" were undertaken in order to derive an empirically based markup actually used by wholesalers;
>
> -- That wholesaler surveys were also undertaken in order "to confirm that the markup that First DataBank utilizes for AWP is representative of the wholesaler industry";

- 31 -

-- In the early 1990s, First DataBank represented that it "surveys a minimum of five drug wholesalers that represent over two-thirds of the total dollar volume of drug wholesalers," and that the "number of surveys performed is increasing";

-- Throughout the 1990s, and again in order to paint a picture that the markups are empirically derived, First DataBank represented that because "individual wholesalers may markup each manufacturer differently, a weighted average, not a consensus average, is calculated," and that then "the market share held by the wholesalers surveyed affects the markup proportionally," and that thereby "a higher degree of certainty is achieved."

-- While in most cases the "surveys" matched current data, where they did not, "it is the policy that First DataBank will change the markup on file to report marketplace reality."

102.    First DataBank's representations and marketing efforts regarding empirically

driven markup factors obtained by "wholesaler surveys" continued throughout the 1990s. A late-

1990, widely published editorial by First Data regarding AWP pricing stated:

Average Wholesale Price

I have many conversations regarding what is "AWP" and how does FDB determined [sic] it. There is much folklore and misunderstanding as to the determination of AWP and where we get the data. AWP is the average wholesale price. That is, AWP is the average of the prices charged by the national drug wholesalers for a given product (NDC). The operative word is average. AWP was developed to provide a price which all parties could agree upon for electronic processing to be possible.

*In order to determine the AWP, First DataBank surveys national wholesalers to ascertain what they use as a price basis in their AWP files.* We contact the wholesalers to determine what the markup should be for a new company or to confirm that the markup that we are applying is current. A survey may be performed on a single NDC number or for a manufacturer's entire line of products. In either case, each national wholesaler is surveyed on a number of products from each manufacturer.

*The number of surveys performed is increasing. First DataBank surveys drug wholesalers that represent over two-thirds of the*

- 32 -

*wholesaler total dollar volume.* The markup that First DataBank
utilizes is representative of wholesalers on a national level.
Because individual wholesalers may mark up each manufacturer
differently, a weighted average, not a consensus average, is
calculated. That is, the market share held by the wholesalers
surveyed affects the markup proportionally. Wholesalers with
higher drug dollar volumes have more weight in the determination
of the final markup. Thus, a higher degree of certainty is achieved.
We also consider the manufacturer's suggested wholesale price
(SWP) in our determination.

Many are under the impression that the manufacturer sets the
AWP. FDB considers the wholesale price suggested by the
manufacturer a "Suggested Wholesale Price (SWP)" and has a
different data element called "SWP" on the NDDF file for those
customers who chose to use the SWP instead of AWP. Frequently,
the SWP and AWP are the same; however, we are having more
instances where they are differing. We will populate the SWP with
the new markup, but will survey the national wholesalers to
determine AWP. The AWP will be populated with the wholesaler
survey price even if it disagrees with the SWP.

In most cases, the results from surveys match what First DataBank
is using. In the instances that they do not, it is policy that First
DataBank will change the markup to report marketplace reality.
(Emphasis added.)

103.    First Data's representations regarding the accuracy of its electronic publication of

AWP were highly successful. By 1998 (and along with its acquisition of its only competitor,

MediSpan), First Data was the sole provider of comprehensive, integrateable electronic data files

providing AWP information throughout the retail pharmacy distribution chain, including most

private third-party payors. Of course, when marketing its products, First Data made this known

stating that it "provides you the same AWP prices used by Aetna, PAID PCS, MEDI, MET, most

Blue Cross Blue Shield Plans, wholesalers and approximately 49 Medicaid programs."

- 33 -

**R.    In the Late 1990s, Retailers Looked to the WAC/AWP Spread to Increase Margin**

104.    Also during the 1990s, national wholesalers and drug retailers continued to report

significant declines in margin (despite the overall escalation in drug costs). In order to address

escalating healthcare costs, including the significant rise in prescription drug expenditures, third-

party payors and managed care organizations had, to some extent, placed significant pressure on

national wholesalers and the retail distribution industry, causing widely reported reductions in

margin for wholesalers and retailers.

105.    With this increased pressure on margin, retail pharmacies began to look for ways

to stave off the reduction. To insiders in the pharmaceutical industry, it has long been

recognized, as one manufacturer has stated, that "the AWP-WAC spread is the primary

determinant of the end retail pricing of prescription drugs. As a result, changes in the spread will

have a direct impact on retailer profitability as well as drug expenses for not only consumers but

even more uniformly for health insurers and other third party payors."

106.    Another industry insider stated:

> Payors currently use AWP or average wholesale price as a basis
> for reimbursing retail pharmacy for providing RX's to patients
> with insurance and by retail pharmacy as a basis for pricing cash
> prescriptions. Pharmacy reimbursement – a higher spread
> translates into higher reimbursement to retailers and mail order
> pharmacies. The usual reimbursement formula for private third
> party Medicaid RX's in anchored off of AWP – so a higher
> markup will increase the reimbursement level at least in the short
> term.

107.    In 1998, McKesson tested the waters to see whether increased WAC-to-AWP

spread might help its relations with its retail customers. In March 1998, McKesson announced

that it would begin utilization of First Data's AWP. McKesson knew that which was quietly

known by a few of the national chain drug retailers and First Data itself – that many of the

- 34 -

AWPs, and the timing of the reported AWPs, provided by First Data's electronic files were often, albeit marginally, higher than other publications. While the stated purpose was to provide customers "with consistency in AWP pricing", McKesson made clear to its retail pharmacy customers "that in almost every case retail prices will go up helping increase gross profit." McKesson even gave instructions to its retail customers as to how to electronically access the changed "markup percentages" in order to access the increased gross profit that would be earned at the expense of plan sponsors and consumers by shifting to First Data publication of AWP.

108.    Following McKesson's switch to exclusive use to First Data data, a handful of the largest national chain drug retailers continued to push for increased AWP/WAC markups on drugs, including increased WAC-to-AWP markups for branded drugs that were not already at the 25% level. In and around 1999, national chains and retailers requested increased AWP spread for branded products, and some of them engaged in practices in order to ensure that the increased markups would occur. For example, some large retailers would refuse to stock drugs that had therapeutic equivalents products if the product only had a 20% markup, and more powerful retailers could lock out the products unless the AWP/WAC spread were adjusted upward.

## S.    By 2001, First Data WAC-to-AWP Markups Were Susceptible to Abuse

109.    By late 2001, the First Data editorial process for imputing the WAC/AWP markup factor was susceptible of significant abuse. Although First Data held out to the public that its determination of the WAC/AWP markup factor was empirically driven through multiple sources, in truth there was no empiricism and the WAC/AWP markups for numerous NDCs of retail branded drugs became susceptible to manipulation by First Data and those with whom it worked, most notably McKesson.

- 35 -

110. The truth about First Data's determination of the WAC/AWP markup is that many

of their historical claims were simply false. For example:

-- Although First Data claimed that because "individual
wholesalers may markup each manufacturer differently, a weighted
average, not a consensus average, is calculated", in fact First Data
never undertook weighted averages of reported markups. Thus,
First Data's publications over a decade had falsely claimed
mathematical precision on empirical data for the markups.

-- Although First Data claimed that it undertook "surveys" , in fact
no "surveys" in the reasonable sense of that word were undertaken.
First Data's questions were not set forth in a survey design, nor
were they even in writing. Responses received were not
memorialized in writing. No other paper trail was kept.

-- The purported "surveys" undertaken by First DataBank rarely
occurred. When a inquiry was made, it was a monetary phone call
lasting only a few moments.

-- Although First Data claimed, during the 1990s was "increasing"
in fact the "surveys" were was decreasing given the ongoing
consolidation among national drug wholesalers. Moreover, First
Data was not taking a calculated average of the markups reported,
it only used a "consensus" approach which did not require a
response from all the major national wholesalers.

-- During most times during the 1990s, even the wholesalers that
were "surveyed" apparently did not know that they were being
surveyed. Since the wholesalers themselves purchased their
information about AWP from First Data itself, most found circular
at best the notion that First Data would "survey" them to find out
AWP information that the wholesalers themselves had already
purchased from First Data.

-- By around 2000, only a few national wholesalers existed and
were on the short list for First Data "surveys." Most of these
wholesalers professed never to have participated in First Data
"surveys" at any time. By the end of 2001, it appears that
virtually all communications by wholesalers back to First Data
regarding the WAC/AWP markup and/or AWP generally were
expressly prohibited by management with the singular exception of
McKesson.

- 36 -

111. First Data continued to mislead its customers and the public about the nature of its

AWP and WAC-to-AWP markup data. For example, in a 2002 letter to subscribers of its

publication Price Alert, First Data's Kay Morgan describes AWP as follows:

> I have had many conversations regarding what "AWP" is and how
> First Data determines it. There is much folklore and
> misunderstanding as to the determination of AWP and how we
> obtain the data.
>
> AWP is the average wholesale price. That is, AWP is the average
> of the prices charged by the national drug wholesalers for a given
> product (NDC), often referred to by First Data as the "Blue Book
> Price." The operative word is *average*. AWP was developed to
> provide a price, which all parties could agree upon.
>
> In order to determine the AWP, First DataBank surveys national
> wholesalers to ascertain what the price is. This is based on their
> AWP price files. We contact the wholesalers to determine what
> the markup should be for a new company. *First, DataBank then
> confirms that the markup is accurate and current.* A survey may
> be performed on a single NDC number or on a manufacturer's
> entire product line. In either case, a survey will be performed with
> all national wholesalers to determine the appropriate AWP.
>
> *With increased numbers of surveys done, the determination
> represents over two-thirds of the volume of the wholesalers, and
> is also representative of wholesalers on a national level.* Because
> individual wholesalers may mark up each manufacturer differently,
> a weighted average, not a consensus average, is calculated. That
> is, the market share held by the wholesalers surveyed affects the
> markup factor proportionally. Therefore, wholesalers with higher
> drug dollar volumes have more weight in the determination of the
> final markup. Thus, a higher degree of certainty is achieved. We
> also consider the manufacturer's suggested wholesaler price
> (SWP) in our determination. [Emphasis added.]

112. This 2002 publication, mimicking the similar 1991 First Data publication of

eleven years earlier, continued most of the falsehoods about First Data. In its 2002 website,

again First Data claims that its published AWPs result from *surveys* of national wholesalers and

that the number of surveys is "increasing."

- 37 -

**T.    Implementation of the Five Percent Spread Scheme**

113.    In late 2001 or early 2002, McKesson and First Data agreed to implement a fundamental change in the WAC-to-AWP markups for branded drugs.

114.    On the eve of the McKesson and First Data Scheme, McKesson acknowledged: "[E]verything was straight forward for many years. Manufacturers' product lines were very consistent in their markups, and so were the FDB AWP's." This would soon change.

115.    Beginning sometime in late 2001 or early 2002, and continuing to this day, First Data, by agreement with McKesson, limited it's purported "surveys" to McKesson and did not "survey" other wholesalers. At the same time, McKesson in hundreds of e-mails, faxes and reports to First Data implemented a 5% increase in the WAC-to-AWP markup for hundreds of brand-name drugs that it distributed. This increase was from 20% above WAC to 25% above WAC for the affected drugs. First Data then published the new figures for hundreds of brand-name drugs without contacting any other wholesaler, in spite of publicly stating it contacted more than one wholesaler to obtain a "weighted average." First Data knew that this increase across the board from 20% to 25% was not due to any real economic change in the average wholesale price, and that by publishing this increase, it was not providing "reliable" and "accurate" information as it had promised. McKesson for its part knew that the 5% increase was not justified by any change in the price of drugs or other change in the marketplace. Rather, this 5% increase was implemented by McKesson solely to benefit its own pharmaceutical business and the business of its prominent retail pharmacy clients.

116.    McKesson's own internal documents describe the profitability of increasing spreads, the dynamics of the marketplace that can give rise to increased profits if McKesson

- 38 -

were to implement a scheme to increase spreads, and McKesson's implementation of the Scheme.

117. At this time, McKesson itself acknowledged that pressure by managed care had, for many branded products, dampened the WAC-to-AWP spread. (In other words, the competitive marketplace was, for many branded drugs, working exactly the way one would hope it would – price competition was for some branded drugs reducing end payor price.) To McKesson, however, this "phenomena often had a negative impact on customers' [*i.e.*, retailers] profitability."

118. McKesson and First Data knew the consequences of their acts – that "customers" (*i.e.*, retail chain pharmacies and other retailers) would "benefit in the short term because this process provides the opportunity for increased profitability if managed care contracts remain as they are today." Remarkably, McKesson even acknowledged that, once this "normalization" process was eventually known in the marketplace, it might lead to the downfall of the AWP pricing system altogether: "Most likely the industry will see a move to negotiate third party reimbursement based on WAC plus a fee and get away from AWP altogether."

119. An increase in the WAC-to-AWP spread directly results in higher prices to plaintiffs and members of the Class. For example, in the case of AstraZeneca's Prilosec (as reflected in the chart below), the AWP spread increase raised the AWP for that drug by $295.72. The following chart reflects, for a single drug manufactured by certain companies, the AWP spread increase and related AWP increase:

- 39 -

1821.10 0006 BSC.DOC

| Defendant | Drug | AWP Before 2000 | WAC Before 2000 | AWP Spread Before 2000 | AWP After 2000 | WAC After 2000 | AWP Spread After 2000 |
|-----------|------|-----------------|-----------------|------------------------|----------------|----------------|-----------------------|
| **Abbott** | Biaxin 500 mg #60 | $396.72 | $334.08 | 18.8% | $437.98 | $350.38 | 25% |
| **AstraZeneca** | Prilosec 40 mg #1000 | $6,171.66 | $5,143.05 | 20% | $6,621.67 | $5,297.34 | 25% |
| **Aventis** | Allegra 60 mg #100 | $118.36 | $98.63 | 20% | $123.29 | $98.63 | 25% |
| **BMS** | Tequin 400 mg #100 | $818.86 | $682.27 | 20% | $895.48 | $716.38 | 25% |
| **GSK** | Combivir #100 | $1,241.26 | $1,034.38 | 20% | $1,370.55 | $1,096.44 | 25% |
| **J&J (Janssen)** | Risperdal 2 mg #500 | $2,320.10 | $1,933.42 | 20% | $2,535.20 | $2,028.16 | 25% |
| **Novartis** | Exelon 2 mg/ml | $246.96 | $205.80 | 20% | $267.29 | $213.83 | 25% |

120.    Another way to understand the widespread nature of the change in the WAC-to-

AWP markup as a result of the McKesson-First Data agreement, is to examine the change in the

WAC-to-AWP markup of all drugs manufactured by the following illustrative pharmaceutical

manufacturers over time:

- 40 -

# Number of NDCs Experiencing an WAC/AWP Spread Change from 20% to 25%





- 41 -











**ELI LILLY**
**Number of NDCs with Spread Change from 20-25%, 1999 - 2004**

121. Examining the Scheme on an annual basis also illustrates the timing and extent of

the Scheme's implementation:



**Number of NDCs with Spread Change from 20% to 25%, 1994-2004**

- 44 -

122. The dramatic across the board increase in the spread on hundreds of brand-name drugs was implemented pursuant to the joint Scheme between McKesson and First Data. As noted, McKesson reported the across the board 5% WAC-to-AWP increase to First Data, and First Data in turn agreed to report the new AWPs.

123. Each defendant had a reason to implement this Scheme. For sales to non-cash paying customers, pharmacies are reimbursed by health plans and other pharmacy benefit providers based on AWP. Consequently, pharmacies make a profit on the spread between AWP and the actual acquisition cost for the drug. Under this system, a higher WAC/AWP spread results in increased profits to pharmacies. Thus, McKesson and First Data by operation of the Scheme benefits retail pharmacies.

124. Indeed, for several years many of the major retail pharmacies had jointly approached various pharmaceutical manufacturers and urged that they raise the WAC/AWP spread by 5%. The manufacturers did not do so. On information and belief, these same retailers then urged McKesson to do so and McKesson had a strong financial incentive to cooperate with retail pharmacy clients:

(a) In recent years, the wholesale drug industry (including McKesson) and retail pharmacies have been economically threatened by the managed care industry. McKesson, as have other wholesalers, has seen their relationships with retail pharmacies as a key to their future. In this regard, over the past five years, the wholesale drug industry and McKesson have sought to compete by downplaying the traditional product distribution functions and by developing new programs to strengthen their retail pharmacy customer base. These include dozens of specialized services ranging from departmental "planogramming" to special contract administration programs for buying groups. The provision of these value-added services is a key

- 45 -

element in the campaign by drug wholesalers like McKesson to build the kind of customer
loyalty in retailers that will help them to shore up their own sagging profit margins. McKesson
offers dozens of value added programs to retail pharmacies, including technology and care
management solutions that it offers to "25,000 retail and 5,000 health systems pharmacies
nationwide."[3] McKesson's customers for these programs include "large national chains and
community drugstores, as well as hospital pharmacies, outpatient clinics, and other institutional
providers."[4] If McKesson could cause First Data to report a higher AWP, McKesson could use
this to curry favor with retailers who use McKesson as their wholesaler or other services and to
further establish or maintain business ties between retailers and McKesson. As noted in
McKesson's 2004 Annual Report, in recent years a significant portion of its revenue growth
came from large customers, including such large retail pharmacy chains like Rite-Aid. Rite-Aid
represented 8% of McKesson's 2003 revenues. In 2003, Rite-Aid named McKesson its
wholesaler of the year. In a 2003 article in Chain Drug Review, McKesson executive Pat Blake
described McKesson and retailers as "we're really positioned to be a business partner" due to the
company's automation and information technology offered to retailers as well as its Access
Health Programs linking retailers with third-party payors. Indeed, Rite-Aid was one of the
companies that had asked, without success, certain of the defendant manufacturers to increase
the WAC/AWP spread by 5%. McKesson agreed to the 5% Scheme when the manufacturers
apparently would not (notwithstanding the manufacturers' own inflation of AWPs and WACs for
drugs specified in the ongoing AWP litigation and their, at a minimum, acquiescence to the
results of the Scheme), McKesson offered large retail pharmacy chains a chance to make a profit

---

[3] McKesson website: http://www.pharmaceutical.mckesson.com/wt/home.php.

[4] *Id.*

- 46 -

off the increased spread. Thus, the 5% Spread Scheme was a benefit to McKesson's largest clients, many of whom had previously approached the drug manufacturers seeking imposition of the 5% increase.

      (b)    The Scheme also directly benefited McKesson's own pharmacy business. McKesson has an operation called McKesson Valu-Rite, which consists of a nationwide network of independent pharmacies that are connected to McKesson. McKesson manages 275 pharmacies in 35 states and employs 900 pharmacists. Again, an increase in the spread was a direct benefit to these pharmacies by increasing profits off the spread. This in turn also increased McKesson's profits from its Valu-Rite program.

      (c)    Further, by simply raising the spread on hundreds of drugs, McKesson saved money from reductions in administrative expenses in reporting AWPs to First Data. It was far easier to simply flip a switch converting hundreds of drugs from 20% to 25% over WAC than to deal with the drugs one at a time. Thus McKesson had its own interests that were served by the 5% Scheme.

125.    First Data also saw advantages to participating in the 5% Scheme:

      (a)    First Data too could reduce its administrative costs by virtue of eliminating the costs associated with limited surveys and variation in spreads, which would otherwise have to be tracked in order to be "accurate."

      (b)    Second, by virtue of reporting a higher AWP, First Data incentivized other powerful forces in the distribution chain to use First Data's AWP as the pricing standard and thereby created greater demand for First Data's reporting services. For example, PBMs in their contracts with end payors often designate which publisher's AWP will be used to set the AWP. PBMs frequently take a percentage of the spread between AWP and acquisition cost so the larger

- 47 -

the spread the more profit they make. As of 2002, many if not most of the major PBMs specified the use of First Data. In addition, by virtue of its partnership with McKesson, McKesson designated First Data's AWP to be the pricing standard for the Together Rx program, a prescription drug savings program for Medicare enrollees, thereby again increasing the use of First Data's services. Thus First Data, like McKesson, had its own interests that were served by the 5% Scheme.

(c)     At some point in 2002-2003, certain manufacturers and wholesalers refused to provide First Data with pricing information. If First Data publically revealed that certain manufacturers and wholesalers were disavowing AWP, the use of the AWP system could be threatened. By participating in the Scheme and continuing the illusion of surveys, First Data maintained the demand for its services.

126.    McKesson and First Data also agreed to hide the Scheme by implementing the WAC-to-AWP increases only when the manufacturer increased WAC. McKesson and First Data were fearful to implement the Scheme without such an increase because such action "would trigger a lot of questions on why there was a change to the item when the MFG (manufacturer) hasn't sent any price changes." To avoid having end payors ask questions, McKesson and First Data camouflaged the Scheme by imposing the 5% increase when other price changes were reported, thus in effect compounding price increases. This part of the Scheme is depicted by the following chart showing a dramatic increase in the number of 25% spreads associated with price changes in 2002 and 2003:

- 48 -



**First Data Bank Number of Reported Price Changes at
25% and 20% AWP/WAC Spread Levels, 1989 - 2004**

DRAFT 5/19/06                    Privileged and Confidential                    Page 2 of 5

127.    After the scheme was implemented (and despite the flack from some drug

manufacturers), First Data and McKesson continued their collaboration to ensure that First

Data's WAC/AWP markups mimicked those of McKesson, and vise-versa. On numerous

occasions in recent years, First Data and McKesson have exchanged comparative AWP, WAC,

and WAC/AWP markup information in order to ensure that the forced markups continue to

prevail in the marketplace.

128.    These post-2001 communications were in no sense a "survey" being conducted by

First Data. Indeed, the communications were bilateral, with First Data equally enforcing the new

WAC/AWP markup protocol. And even when disparities were shown in the databases, First

Data would counsel against making changes because "it would trigger a lot of questions on why

- 49 -

there was a change to the item when the MFG [*i.e.*, manufacturer] hasn't sent any price changed."

129. At times, when McKesson was "catching some flack from our large retail friends," McKesson would ensure that both it's and First Data's databases contained the higher WAC/AWP markup. At other times, a large national chain pharmacy would call "complaining about" the particular AWP for a product, and McKesson, in turn, would contact First Data in order to get it "fixed."

130. When in 2003 one manufacturer indicated that it would "no longer report average wholesale prices (AWP) for its products", First Data reported to McKesson that this manufacturer appeared "to be playing hard ball and [First Data] just won't play." First Data indicated that it would, then, "just assume the markup is 1.25." In this situation, when the manufacturer wanted to be assured that any disclosure of an AWP associated with its product was a price that "has not been authorized" by it, First Data wrote back stating: "Wonderful. If we don't report an AWP, the NDC will not be listed. It is the rules of the database. That database does not allow for statements such as your attorneys wrote below."

131. Many insiders in the pharmaceutical industry recognized that the extraordinary, across-the-board increase in the number of drugs that were increased in the WAC/AWP spread from 20 to 25% was a "change... being driven at wholesaler lever" in order to accommodate the large drug retail chains.

132. First Data's participation in the Scheme is also evidenced, in part, by its conduct with respect to AWPs reported to First Data from certain manufacturers. For example, in *In re Pharmaceutical Indus. Average Wholesale Pricing Litig.*, MDL No. 1456 (D. Mass.), Novartis filed declarations stating that Novartis regularly communicated its AWP to the Publishers,

- 50 -

including First Data and that for the period March 27, 2000 through August 21, 2002, the AWP published for its drugs was 20% higher than the WAC Novartis reported. Novartis then stated in its declaration that since January 18, 2002, First Data has consistently published an AWP that was 5% higher than the AWP reported by Novartis, or 25% over WAC. However, the Novartis declaration did not describe anything Novartis had done to remedy First Data's fraudulent reporting of Novartis' AWP.

## U.    Some Branded Manufacturers' Response to the McKesson/First Data Scheme

133.    Some branded manufacturers noticed implementation of the Scheme and immediately appreciated its purpose – to provide additional profit to the wholesalers and retailers in the pharmacy class of trade. One branded company commented that "First Data, at the direction of the wholesale industry, has begun to change all branded pharmaceutical products to a 25 % markup… and that "the spread will be changed as product price changed…." The same company observed that the "largest negative factory is publicity" since the increase in AWP would increase end payors prices (even though it may not increase that revenues to manufacturers).

134.    A different branded manufacturer also observed that the changed WAC/AWP markup for many branded drugs was "being driven at wholesaler level" and that they are "reporting 1.25 when companies take a price increase…."

135.    Because branded and generic manufacturers have historically established AWPs for their NDCs either directly (by suggesting and AWP that was incorporated by First Data and wholesalers) or indirectly (by setting a WAC and setting or knowing of the markup factor to be applied to that WAC), manufacturers whose NDCs had been affected by the McKesson/First Data Scheme, asked First Data for answers as to why the markups had changed for selected

- 51 -

branded products in 2002. In response, First Data generally pushed them off, giving different answers to different manufacturers. To make matters worse, First Data had counsel for its parent, the Hearst Corporation, write letters to various branded manufacturers' representatives. In these letters, Hearst's lawyers made claims which were false.

136. Ultimately, brand-name manufacturers did nothing in response to the Scheme. First Data and McKesson kept their scheme secret, and almost universally branded manufacturers acquiesced to the results of McKesson/First Data Scheme. Moreover, branded manufacturers took no action to disclose the existence of the inflated AWPs which had been effectuated by the Scheme to change the WAC/AWP markup. As a result, while First Data and McKesson as insiders to the Scheme were well aware of the changed markup factor (and corresponding increase in reimbursement payments being made throughout the country), and while some branded manufacturers were similarly aware that many of their branded products had experienced the WAC/AWP markup change without their explicit request, none of them disclosed this to the marketplace at large. Indeed, some manufacturers republished or utilized the new First Data AWPs in communications to customers or other publishers. In a market where billions of prescriptions are filled each year, where over 65,000 NDCs are actively in the marketplace, and where the WAC/AWP Scheme was sequentially implemented during the course of 2002 and later as price increases imposed by the manufacturers were effectuated, the Scheme went unnoticed to the marketplace at large. Indeed, even when players in the pharmaceutical marketplace noticed the increases in the WAC/AWP spread, they assumed by virtue of the manufacturers' silence that those increases were the result of the actions of those manufacturers.

- 52 -

## V.    First Data's 2005 Capitulation

137.    Then, in a March 15, 2005 letter, First Data announced that the unreliable surveys

would be discontinued. Reviewing its past practices with respect to establishing AWP, First

Data restated that it had conducted surveys to establish AWPs:

March 15, 2005

### Re: First DataBank's Blue Book AWP Data

Dear Customer:

It is our pleasure to serve you as a customer of First DataBank.
We are writing to make you aware of upcoming changes to First
DataBank's National Drug Data File Plus™ database, or NDDF
Plus™, that may impact your use of our products.

In order to publish various drug pricing data fields available
through its NDDF Plus database and related products, *First
DataBank has historically relied on drug manufacturers and
wholesalers to report or otherwise make available information
concerning their list price for drugs.* Unfortunately, First
DataBank is no longer able to obtain information relating to list
prices directly from wholesalers in a manner that is consistent with
First DataBank's editorial standards and policies. In fact, it is our
understanding that some wholesalers often do not use catalog or
list prices as a basis for determining actual transaction prices. As a
result, First DataBank must implement certain changes to its
publication of the "Blue Book AWP" pricing data field. Effective
immediately, First DataBank will no longer survey drug
wholesalers for information relating to their catalog or list prices.

First DataBank historically relied upon wholesalers to provide
information relating to their catalog or list prices for purposes of
publishing the Blue Book AWP data field. *First DataBank
periodically surveyed full-line national wholesalers to determine
the average markup applied to a manufacturer's line of products.
The average markup of the wholesalers responding to the survey
was applied against the Wholesale Acquisition Cost (the
manufacturer's list price to wholesalers, also commonly referred
to as WAC)* or, if a Wholesale Acquisition Cost was not available,
the Direct Price (the manufacturer's list price to non-wholesalers),
with the resulting value populating the Blue Book AWP field. In

- 53 -

certain instances, wholesalers would accept a manufacturer's
suggested wholesale price, in which case the Blue Book AWP and
Suggested Wholesale Price data fields would reflect the same
value. [Emphasis added.]

## V. CLASS ACTION ALLEGATIONS FOR THE AWP PAYOR SCHEME

138.   Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure, on behalf of themselves and the Class comprised of:

*AWP McKesson/First Data Class:*

All persons or entities who, for purposes other than resale and
during the Class Period, paid any portion of the purchase for a
prescription drug at a price calculated by reference to the AWP
published by First Data during the Class Period. The drugs
purchased subject to this class are all drugs identified in
Exhibit A.[5]

Excluded from the Class are: (a) each defendant and any entity in which any defendant has a

controlling interest, and their legal representatives, officers, directors, assignees and successors;

(b) any co-conspirators; and (c) any governmental entities who purchased such drugs during the

Class Period. Included in the Class are end payors and consumers who made a pro rata co-

payment or who paid cash.

139.   The Class Period is January 1, 2002 to March 15, 2005, when First Data disclosed

that it had stopped surveying wholesalers.[6]

140.   The exact identity of the drugs covered by this lawsuit is capable of being

discovered from the records of First Data. Based on an investigation of First Data's databases,

the list of such drugs is attached as Exhibit A.

---

[5] Plaintiffs reserve the right to modify the Class Definition based on class related discovery and/or merits
discovery.

[6] The exact dates for the Class Period may be refined based upon discovery.

- 54 -

141. The Class consists of numerous individuals and entities throughout the United States, making individual joinder impractical, in satisfaction of Rule 23(a)(1). The disposition of the claims of the Class Members in a single class action will provide substantial benefits to all parties and to the Court.

142. The claims of the representative plaintiffs are typical of the claims of the Class, as required by Rule 23(a)(3), in that the representative plaintiffs include people and entities who, like all Class Members, purchased drugs whose prices were inflated by the 5% price increase. Such representative plaintiffs, like all Class Members, have been damaged by defendants' misconduct because, among other things, they paid prices for these drugs that were higher than they would have been but for defendants' improper actions.

143. The Class representatives for the Class are all of the plaintiffs.

144. The factual and legal bases of each defendant's misconduct are common to the Class Members and represent a common thread of fraud and other misconduct resulting in injury to plaintiffs and members of the Class.

145. There are many questions of law and fact common to plaintiffs and the Class, and those questions predominate over any questions that may affect individual Class Members, within the meaning of and fulfilling Rules 23(a)(2) and 23(b)(3). Common questions of law and fact include, but are not limited to, the following:

a. Whether AWPs published by First Data are used as a benchmark for negotiating payments by third-party payors for drugs;

b. Whether defendants engaged in a course of conduct that improperly inflated the WAC-to-AWP markup and the ultimate AWPs used by plaintiffs and Class Members as the basis for reimbursement;

- 55 -

c. Whether defendants artificially inflated the published AWPs for the drugs that are the subject of this complaint;

d. Whether defendants engaged in a pattern and practice that caused plaintiffs and Class Members to make inflated payments for the AWPs;

e. Whether defendants engaged in a pattern of deceptive and/or fraudulent activity intended to defraud plaintiffs and the Class Members;

f. Whether defendants formed enterprises for the purpose of carrying out the 5% Scheme;

g. Whether defendants used the U.S. mails and interstate wire facilities to carry out the 5% Scheme;

h. Whether defendants' conduct violated RICO and various California statutes and common law;

i. Whether defendants are liable to plaintiffs and the Class Members for damages for conduct actionable under the various state consumer protection statutes.

146. Plaintiffs will fairly and adequately represent and protect the interests of the Class, as required by Rule 23(a)(4). Plaintiffs have retained counsel with substantial experience in prosecuting nationwide consumer class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so. Neither plaintiffs nor their counsel have any interest adverse to those of the Class.

147. Plaintiffs and members of the Class have all suffered, and will continue to suffer, harm and damages as a result of defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3). Absent a class action, most members of the Class likely would find the cost

- 56 -

of litigating their claims to be prohibitive, and will have no effective remedy at law. The class

treatment of common questions of law and fact is also superior to multiple individual actions or

piecemeal litigation in that it conserves the resources of the Courts and the litigants, and

promotes consistency and efficiency of adjudication. Additionally, defendants have acted and

failed to act on grounds generally applicable to plaintiffs and the Class and require Court

imposition of uniform relief to ensure compatible standards of conduct toward the Class, thereby

making appropriate equitable relief to the Class as a whole within the meaning of Rules 23(b)(1)

and (b)(2).

## COUNT I

### Violations of 18 U.S.C. § 1962(C)

148. Plaintiffs, on behalf of themselves and all others similarly situated, reallege and

incorporate herein by reference each of the allegations contained in the preceding paragraphs of

this Complaint.

149. This Count, which alleges violations of Section 1962(c) of RICO, 18 U.S.C.

§ 1962(c), is asserted against the defendants on behalf of the Class.

150. Plaintiffs, the members of Class, and the defendants are each "persons," as that

term is defined in 18 U.S.C. § 1961(3).

151. At all relevant times, in violation of 18 U.S.C. § 1962(c), the defendants

conducted the affairs of certain association-in-fact enterprises identified herein, the affairs of

which affected interstate commerce through a pattern of racketeering activity.

### The McKesson-First Data Enterprise

152. For purposes of this claim, certain RICO "enterprises" are associations-in-fact

consisting of (a) First Data and (b) McKesson, including its directors, employees and agents.

- 57 -

These associations-in-fact are sometimes collectively referred to herein as the "McKesson – First Data Enterprise." The Enterprise is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating pharmaceutical price information, which all too often includes disseminating false and misleading AWPs; (b) implementing the 5% Spread Scheme; (c) deriving increased profits from the activities of the Enterprise; and (d) perpetuating use of AWPs as a benchmark for reimbursement in the pharmaceutical industry. First Data and McKesson each has a common purpose of perpetuating the use of AWPs as a benchmark for reimbursement in the pharmaceutical industry and a common purpose in inflating the AWPs by 5%. *See infra* ¶ 125 (describing common purposes).

153. The Enterprise has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between McKesson and First Data. There is a common communication network by which McKesson and First Data shared and continue to share information on a regular basis. Typically this communication occurred and continues to occur, by use of the wires and mails in which McKesson and First Data will discuss and agree on an AWP. McKesson and First Data functioned as a continuing unit for the purposes of implementing the 5% Scheme.

154. At all relevant times, First Data was aware of McKesson's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct. First Data was aware that the published AWPs were inflated by the 5% Scheme. This awareness comes from the following sources: First, at some point prior to 1992, First Data in some instances obtained markups from wholesalers, which made First Data aware that the reported AWPs were not accurate even absent the 5% Scheme. Second, as various congressional bodies and

- 58 -

government agencies reported on AWP inflation, First Data did not change or challenge manufacturers regarding the self-reported WAC and AWPs, or the markups that First Data used. Third, First Data stopped even the limited surveys other wholesalers and simply accepted the 5% Scheme, when it knew there was no basis for this bump and actually received letters from certain manufacturers stating that the 5% increase in AWP was not justified. McKesson and First Data initiated the 5% Scheme in 2001-2002 and continued in force in 2003-2004 where additional 5% increases were instituted. Fourth, McKesson and First Data regularly discussed the Scheme.

155. The impacts of the Scheme are still in place, *i.e.*, the 5% increased spreads are still being maintained. As described earlier, for sales to non-cash paying customers, pharmacies are reimbursed by health plans and other pharmacy benefit providers based on AWP. Consequently, pharmacies make a profit on their spread between AWP and the actual acquisition cost for the drug. Under this system, a higher WAC-to-AWP spread results in increased profits to pharmacies. Thus, McKesson and First Data could help deliver greater profits to pharmacies by conspiring to increase AWPs.

156. The foregoing evidences that First Data and McKesson each was a willing participant in the enterprise; had a common purpose in the Scheme; and their agreement to a structure wherein First Data and McKesson agreed on the operation of the Enterprise. This structure was the basis in which the enterprise operated.

### The Defendants' Use of the U.S. Mails and Interstate Wire Facilities

157. The Enterprise engaged in and affected interstate commerce because it engaged in the following activities across state boundaries: The transmission and publication of false and misleading information concerning AWPs.

- 59 -

158. During the Class Period, the defendants' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information, products and funds by the U.S. mails and interstate wire facilities.

159. The nature and pervasiveness of the Scheme, which was orchestrated out of the corporate headquarters of each defendant, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities.

160. Many of the precise dates of defendants' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these defendants' books and records. Indeed, an essential part of the successful operation of the Scheme alleged herein depended upon secrecy. However, plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the Scheme; plaintiffs describe this below.

161. The defendants' use of the U.S. mails and interstate wire facilities to perpetrate the 5% Scheme involved thousands of communications throughout the Class Period including, *inter alia*:

(a) Marketing materials about First Data's services, which First Data, sent to health care providers located across the country;

(b) Written representations and telephone calls between McKesson and First Data regarding markups and AWPs, which occurred on a regular basis each year;

(c) Hundreds of e-mails between McKesson and First Data agreeing to or effectuating the implementation of the Scheme;

- 60 -

(d)     Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented what the AWPs were, or that were intended to deter investigations into the true nature of the AWPs or to forestall changes to reimbursement based on something other than AWPs;

(e)     Receipts of increased profits sent through the U.S. mails and interstate wire facilities – the wrongful proceeds of the Scheme; and

(f)     In addition to the above-referenced RICO predicate acts, it was foreseeable to each defendant that First Data would distribute publications containing false AWPs through the U.S. mails and by interstate wire facilities. Further, each defendant has, in furtherance of the Scheme, communicated through use of the U.S. mails and by interstate wire facilities with their various local headquarters or divisions. These uses of the U.S. mails include some of the documents referenced in this Complaint.

**Conduct of the RICO Enterprises' Affairs**

162.    During the Class Period, the defendants have exerted control over the Enterprise and, in violation of Section 1962(c) of RICO, the defendants have conducted or participated in the conduct of the affairs of those RICO enterprises, directly or indirectly, in the following ways:

(a)     Each of the defendants had a degree of control concerning the WAC-to-AWP spread and each had AWPs that First Data reported;

(b)     First Data has directly controlled the creation and distribution of marketing, sales, and other materials used to inform members of the Class as to the value of its services;

- 61 -

(c)     McKesson intended that First Data would (and did) distribute their publications containing false AWPs through the U.S. mails and by interstate wire facilities; and

(d)     First Data has allowed McKesson to exert control over its organization knowing that the AWPs were inflated as a result of the 5% Scheme and were not real numbers. First Data did so because the reporting of AWPs was, and is, a major part of its business, and McKesson was integral to First Data's AWP reporting and to increasing FDB's profits for the reasons set forth herein.

163.    The Enterprise had a hierarchical decision-making structure headed by McKesson. McKesson issued instructions on how the WAC-to-AWP spread was to be reported and each Publisher accepted those instructions despite knowing of their falsity.

164.    In violation of Section 1962(c) of RICO, each defendant conducted the affairs of the Enterprise with which it associated by establishing a phony extra 5% WAC-to-AWP spread that First Data then published and disseminated nationwide.

**The Defendants' Pattern of Racketeering Activity**

165.    Each of the defendants conducted and participated in the affairs of the above-referenced Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. The defendants' pattern of racketeering likely involved thousands of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their Scheme. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of

- 62 -

racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the defendants intended to defraud plaintiffs, members of the Class and other intended victims.

166. McKesson and First Data calculated and intentionally crafted the Scheme to ensure that plaintiffs and members of the Class would be over-billed for the drugs. In designing and implementing the 5% Scheme, at all times the defendants were cognizant of the fact that those in the distribution chain who are not part of the industry rely on the integrity of the pharmaceutical companies, wholesalers and Publishers in setting the AWPs, as reported by the Publishers.

167. By intentionally and artificially inflating the AWPs by virtue of the increase in the WAC-to-AWP spread, and by subsequently failing to disclose such practices to the individual patients, health plans and their insurers, the defendants engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

168. The defendants' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive plaintiffs and members of the Class. Each separate use of the U.S. mails and/or interstate wire facilities employed by the defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including plaintiffs and members of the Class. Each of the defendants has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its particular Manufacturer-Publisher Enterprise.

**Damages Caused by the Defendants' Five Percent Spread Scheme**

169. The defendants' violations of federal law and their pattern of racketeering activity have directly and proximately caused plaintiffs and members of the Class to be injured in their business or property because plaintiffs and members of the Class have paid many hundreds of

millions of dollars in inflated reimbursements or other payments for drugs whose AWP was artificially raised as described herein.

170. The defendants sent AWP information through the U.S. mails or by interstate wire facilities and reported AWPs and other information by the same methods in furtherance of their 5% Scheme. Plaintiffs and members of the Class have made inflated payments for drugs based on and/or in reliance on reported and false AWPs.

171. Under the provisions of Section 1964(c) of RICO, the defendants are jointly and severally liable to plaintiffs and members of the Class for three times the damages that plaintiffs and the Class Members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT II

### Untrue and Misleading Advertising
### (Business and Professions Code § 17500, *et seq*.)

172. The preceding paragraphs of this Complaint are realleged and incorporated by reference. Plaintiffs assert this claim on behalf of themselves and the members of the Class.

173. Bus. & Prof. Code § 17500 provides that "[i]t is unlawful for any … corporation … with intent … to dispose of … personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, … any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading …."

174. First Data made a series of representations as to the meaning of AWP and how it was derived, all of which were false. McKesson was aware of those representations. Both First

- 64 -

Data and McKesson proceeded to implement a false advertising scheme designed to induce

payors to pay based on the inflated amount.

175.    Pursuant to Bus. & Prof. Code § 17535, plaintiffs and members of the Class are

entitled to the remedies set forth below.

## COUNT III

### Violations of Unfair Competition Law
### (Business and Professions Code § 17200, *et seq.*)

176.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and

incorporate herein by reference each of the allegations contained in the preceding paragraphs of

this Complaint.

177.    Defendants are incorporated, or maintain their principal places of business, in

California. California courts have ruled that California statutes apply on a nationwide basis to

the conduct of California corporations.

178.    Defendants' actions, as complained of herein, constitute unfair and deceptive

unlawful practices committed in violation of the Unfair Competition Law, Bus. & Prof. Code

§§ 17200 *et seq*.

179.    Defendants violated the "fraudulent" prong of § 17200, the "unfair" prong of

§ 17200, and the "unlawful" prong of § 17200 by engaging in the following conduct:

a.    Defendants' conduct was unfair, unlawful and deceptive in that knowing

of the use of AWP by payors, and despite knowledge as to representations that AWPs were

established in part by use of surveys, and were "reliable" and "accurate," defendants artificially

raised AWPs by increasing the WAC-to-AWP spread by 5% thereby allowing publication of

AWPs that were even more inaccurate and unreliable;

- 65 -

b.      Defendants' conduct was unfair, unlawful and deceptive in that defendants knew that the 5% WAC-to-AWP increase was not based on any actual change in the average wholesale price, and knew that the increase did not have any other legitimate cost or pricing basis and was implemented solely for defendants' own purposes;

c.      Defendants' conduct was unfair, unlawful and deceptive in that they suppressed, manipulated and conceded information that would reveal the lack of any economic basis in the 5% increase in the WAC-to-AWP spread; and

d.      Defendants omitted material information known to them in order to induce payors to use an inflated AWP and pay an inflated price for drugs.

180.    All of the conduct alleged herein occurs and continues to occur in defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

181.    Plaintiffs request that this Court enter such orders or judgments as may be necessary to restore to any person in interest any money which may have been acquired by means of such unfair practices, as provided in Bus. & Prof. Code § 17203 and Civil Code § 3345, and for such other relief as set forth below.

## COUNT IV

### Violations of the Consumers Legal Remedies Act
### (Cal. Civ. Code § 1750, *et seq*.)

182.    The preceding paragraphs of this Complaint are realleged and incorporated by reference. Plaintiffs assert this claim on behalf of themselves and the members of the Class against First Data.

- 66 -

183. Plaintiffs and the members of the Class are payors who are paying for consumers' purchase of goods for personal, family, or household purposes.

184. Representing that published AWPs have characteristics, uses, benefits, or qualities that they do not have, and advertising goods with intent not to sell them as advertised constitutes unfair or deceptive trade practices under the provisions of the CLRA, Civil Code § 1770 (a)(5), (7), (8), and (9).

185. Plaintiffs and the members of the Class have all been directly and proximately injured by First Data's conduct, and such injury includes payment for drugs inflated by the Scheme, which drugs plaintiffs and the members of the Class, would not have purchased at the inflated prices were they truthfully and fully informed of material facts concerning the product.

186. In accordance with Civil Code § 1780 (a), plaintiffs and members of the Class seek injunctive and equitable relief as to defendants' violations of the CLRA; however, in accordance with Civil Code § 1782(a) & (d), plaintiffs will subsequently amend this Class Action Complaint without leave of Court to include a request for damages. Plaintiffs request that this Court enter such orders or judgments as may be necessary to restore to any person in interest any money which may have been acquired by means of such unfair business practices, and for such other relief as provided in Civil Code § 1780 and the Prayer for Relief.

## COUNT V

### Negligent Misrepresentation

187. The preceding paragraphs of this Complaint are realleged and incorporated by reference and asserted by plaintiffs on behalf of themselves and members of the Class.

188. During the Class Period, First Data made representations concerning its services, which were false and omitted disclosure of material facts as set forth above.

- 67 -

189. Each Class Member's use of the AWPs published by First Data established the Class' reliance on First Data.

190. First Data, having issued representations as to its services had a duty to be accurate and breached that duty thereby causing plaintiffs and Class Members to suffer damage.

## COUNT VI

### Civil Conspiracy

191. The preceding paragraphs of this Complaint are realleged and incorporated by reference and asserted by plaintiffs on behalf of themselves and members of the Class.

192. The defendants joined in a conspiracy to raise the spread between reported AWPs and WAC. Each defendant also agreed to publish or caused to be published AWPs that were inflated as a result. Each defendant also knew that by agreeing to raise and fix AWPs in this fashion, they were perpetuating the use of inflated AWPs on a nationwide basis.

193. The defendants consciously conspired and deliberately pursued a common plan or design to commit tortious acts, subjecting each to joint liability.

194. Defendants each committed unlawful act or acts in furtherance of this conspiracy, including acts violating RICO, state consumer protection laws, the common law and committed acts of mail and wire fraud. All of these acts were in furtherance of the conspiracy.

195. Plaintiffs are entitled to a presumption of reliance on the false representations, concealments and nondisclosures by the defendants. Class Members were ignorant of defendants' conduct and were ignorant of the full and true facts suppressed by them, and such reliance was justified.

- 68 -

196.    As a direct, proximate result of this conspiracy, plaintiffs and Class Members

have been injured, as they have suffered and continue to suffer economic losses and general and

specific damages, all in an amount to be determined according to proof.

## VI.    DEMAND FOR JUDGMENT

WHEREFORE, plaintiffs demand judgment as follows:

A.    The Court determines that this action may be maintained as a class action

pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to plaintiffs'

claims for declaratory, equitable and injunctive relief, and Rule 23(b)(3) of the Federal Rules of

Civil Procedure with respect to the claims for damages, and declaring plaintiffs as

representatives of the Class and their counsel as counsel for the Class;

B.    The conduct alleged herein be declared, adjudged and decreed to be unlawful;

C.    Plaintiffs and the Class be granted an award of damages in such amount to be

determined at trial, with trebling under Count I;

D.    Plaintiffs and the Class be granted an award of punitive damages in such amount

to be determined at trial;

E.    Defendants be enjoined from continuing the illegal activities alleged herein;

F.    Plaintiffs and the Class recover their costs of suit, including reasonable attorneys'

fees and expenses as provided by law; and

G.    Plaintiffs and the Class be granted such other, further, and different relief as the

nature of the case may require or as may be determined to be just, equitable, and proper by this

Court.

DATED: June 2, 2005

By_____

Thomas M. Sobol (BBO#471770)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL 60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Allan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA 18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

- 70 -

Kenneth A. Wexler
Jennifer Fountain Connolly
The Wexler Firm LLP
One North LaSalle Street, Suite 2000
Chicago, IL 60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

George E. Barrett
Edmund L. Carey, Jr.
Barret, Johnston & Parsley
217 Second Avenue, North
Nashville, TN 37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

- 71 -