1

2

3

4

5              IN THE UNITED STATES DISTRICT COURT

6            FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    SKILSTAF, INC.,                              No. C 09-02514 SI

9              Plaintiff,                         **ORDER GRANTING DEFENDANTS'
                                                  MOTIONS TO DISMISS**
10      v.

11   CVS CAREMARK CORP., et al.,

12             Defendants.
     _____/
13

14          Defendants have filed two motions to dismiss: a motion by defendant Rite Aid Corporation, and

15   a joint motion by all defendants, in which Rite Aid has joined.  The motions are presently set for hearing

16   on January 15, 2010.  Pursuant to Civil Local Rule 7-1(b), the Court finds these matters appropriate for

17   resolution without oral argument and VACATES the hearing.  Having considered the papers submitted,

18   and for good cause shown, the Court  GRANTS defendants' motions with prejudice.

19

20                              **BACKGROUND**

21          This litigation was filed on June 5, 2009, and arises from an alleged conspiracy to inflate the

22   prices of brand-name prescription drugs in order to increase the revenues of the pharmacies dispensing

23   the drugs.  Plaintiff Skilstaf, Inc., an Alabama-based provider of payroll and employee benefits, brings

24   this action on behalf of a class of "self-insured employers, health and welfare plans, health insurers, and

25   other private end payors of prescription drugs" against chain pharmacies Albertson's, CVS, Kroger,

26   Longs, Rite Aid, Safeway, Supervalu, Walgreens, and Wal-Mart.   According to the complaint,

27   defendants initially purchase a given drug from a wholesaler for a set price, known as the wholesale

28   acquisition cost ("WAC").  Complaint ¶ 4.  Once the drug is dispensed to an employee covered under

United States District Court
For the Northern District of California

1    one of plaintiffs' benefit plans, that plaintiff reimburses the pharmacy according to the average

2    wholesale price ("AWP") for the drug.  *Id.*  The AWPs of the various drugs are published in an index

3    used as a benchmark throughout the industry.  *Id.* ¶¶ 6, 14-15.  The difference between the WAC and

4    AWP, known as the "spread" or "mark-up," constitutes a pharmacy's profit for sales of a drug.  *Id.* ¶

5    5.

6           Plaintiff alleges that, historically, AWPs were set by drug manufacturers at either 20% or 25%.

7    *Id.* ¶¶ 10.  Once a particular drug was launched with a 20% or 25% mark-up factor, that factor would

8    remain in place for the life of the drug.  *Id.* ¶ 65.  In the late 1990s, however, many manufacturers ceased

9    providing AWPs, and publishers of AWP indexes, such as First DataBank ("First Data"), became

10   increasingly reliant on drug wholesalers for pricing information.  *Id.* ¶ 118.  After this shift, starting in

11   late 2001, First Data allegedly began conspiring with McKesson Corporation ("McKesson"),[1] a drug

12   wholesaler, to inflate AWPs for hundreds of drugs.  *Id.* ¶ 8.  In the alleged scheme, First Data agreed

13   to utilize only information provided by McKesson to derive AWPs, although it represented that it used

14   data from manufacturers and all wholesalers, that its AWP for a given drug equaled the "average of

15   prices charged by the national drug wholesalers," and that its index was "accurate".  *Id.* ¶¶ 17-19, 111.

16   According to plaintiff, the result of this scheme was that "McKesson and First Data, without any

17   legitimate economic justification, raised the WAC-to-AWP mark-up to 25% for over four hundred

18   brand-name drugs that previously had received only the 20% mark-up amount."  *Id.* ¶ 20.  Defendants

19   allegedly participated in the scheme by knowingly submitting fraudulent claims for reimbursement at

20   the inflated rates and accepting inflated payments, thus increasing their own profits.  *Id.* ¶ 29.

21          Plaintiff asserts three causes of action: (1) civil violations of the Racketeer Influenced and

22   Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), for "associating with an enterprise that

23   engaged in a pattern of racketeering activity," Complaint ¶ 259; (2) RICO conspiracy, 18 U.S.C. §

24

25          [1] Neither First Data nor McKesson is named as a defendant in this action.  A class action was
     instituted by end payors of prescription drug costs against First Data and McKesson in 2005 in the
26   District of Massachusetts. *See New England Carpenters Health Benefits Fund, et al. v. First DataBank,
     Inc., et al.*, No. 05-11148 (D. Mass.).  The matter was ultimately settled.  The plaintiffs settled with
27   McKesson for $350 million. *See* Order Approving Class Settlement (Docket No. 810).  The settlement
     with First Data included a payment of $2.1 million and a rollback of the AWPs increased through the
28   scheme back to their original 20% rate. *See* Final Order and Judgment (Docket No. 722).  Class counsel
     in the *New England Carpenters* case is also plaintiffs' counsel in this action.

1962(d), for "knowingly join[ing] McKesson and First Data in a conspiracy to manipulate AWPs," Complaint ¶ 334; and (3) unjust enrichment through receipt of the increased payments from plaintiffs, whether or not defendants were aware of the scheme between First Data and McKesson, *id.* ¶ 339. Plaintiff seeks treble damages, restitution, fees and costs, and declaratory and injunctive relief.

Presently before the Court are two motions to dismiss the complaint: a motion filed independently by Rite Aid, and a second motion filed by all defendants, which Rite Aid has joined.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must provide "more than labels and conclusions," and must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 544, 555.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court must assume the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *St. Clare v. Gilead Scis., Inc. (In re Gilead Scis. Sec. Litig.)*, 536 F.3d 1049, 1055 (9th Cir. 2008). The court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## DISCUSSION

Defendants first seek dismissal of this action with prejudice on the ground it is barred by a

covenant not to sue.  Defendants point to the *New England Carpenters* case referenced above, in which a certified class of plaintiffs sued McKesson and First Data for violations arising from the pricing scheme alleged in this action.[2]  Skilstaf, the named plaintiff in the present action, was a member of the *New England Carpenters* class, though not a class representative.  Defendants assert that the settlement reached with McKesson in *New England Carpenters* included a court-approved covenant not to sue any other person or entity for a claim based on the same facts.  Defendants argue that, because the claims in this case arise from the very same set of facts as the claims giving rise to the prior action, plaintiff's suit must be dismissed.  Plaintiff counters that the covenant not to sue "violates due process and is unenforceable."

## I.     Procedural History of *New England Carpenters* Action

The district court in *New England Carpenters* certified a class of plaintiffs asserting claims against McKesson in March 2008.  *See* Order Granting Mot. to Certify Class (Docket No. 466, No. 05-11148).  The opt-out notice sent to potential class members, including Skilstaf, stated that failure to opt out of the class would result in giving up the ability "to pursue any other lawsuit against McKesson concerning or related in any way to the claims in the McKesson Class Action," but did not state that remaining in the class would result in a release of claims against potential defendants other than McKesson.  *See* Opt-Out Notice, Ex. B to Pltf. RJN, at 2, 7.  Class members were given until November 15, 2008 to opt out of the class, *id.* at 8, and it is undisputed that Skilstaf did not do so.

McKesson and the class representatives ultimately reached a settlement, and the district court granted preliminary approval of the agreement in March 2009.  *See* Order Granting Prelim. Approval of McKesson Settl. (Docket No. 719, No. 05-11148).  The agreement contained a release provision providing, in relevant part, that the class members "covenant and agree that they shall not hereafter seek to establish liability against any Released Party *or any other person* based, in whole or in part, on any

---

[2] The Court grants the parties' requests for judicial notice of court filings from the *New England Carpenters* litigation.  *See Tellabs*, 551 U.S. at 322 (in ruling on 12(b)(6) motion, court may consider "documents incorporated into the complaint by reference"); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("[A court] may take judicial notice of court filings and other matters of public record.").

United States District Court
For the Northern District of California

1    of the Released Claims." Am. Settl. Agreement and Release, ex. B to Def. RJN, at 33 (emphasis added).

2    Thereafter, Skilstaf wrote to McKesson's counsel in order to clarify the scope of the release provision.

3    *See* April 17, 2009 Letter, ex. C to Pltf. RJN. McKesson's counsel responded, "The release was framed

4    broadly, as is customary in class action settlements, but McKesson does not intend the release to extend

5    to claims against retail pharmacies." April 30, 2009 Email, ex. D to Pltf. RJN.

6        Skilstaf subsequently filed a limited objection to the settlement agreement, seeking to have the

7    district court clarify that the agreement did not release claims against "entities other than McKesson,

8    such as retail chain pharmacies." Skilstaf's Lim. Obj. to McKesson Settl. Agreement, ex. D to Def.

9    RJN, at 1-2. McKesson opposed the objection, stating: "Skilstaf is now asking the Court to rewrite the

10   settlement to narrow the relief that McKesson bargained for. . . . If all McKesson had was a release, it

11   would remain exposed to claims for indemnification or contribution if plaintiffs filed new lawsuits

12   against third parties based on the claims that McKesson had just settled." McKesson's Resp. to Mot.

13   by Skilstaf, ex. E to Def. RJN, at 1-3. No other class member filed an objection to the settlement.

14       At the final approval hearing, the district court expressed surprise and concern over the

15   settlement agreement's inclusion of a provision barring future suits against all third parties. The court

16   stated, "I must say, when I read this [Skilstaf's objection], I was surprised because I didn't think I was

17   releasing claims against other entities other than McKesson." Final Approval Hearing Transcript, ex.

18   F to Def. RJN, at 10-11. The court questioned whether the class members had received adequate notice

19   of this provision in the opt-out notice, stating, "Right now I don't even think it would pass due process

20   muster. . . . I don't think it was fair notice to people that they were giving up claims against the

21   pharmacies" *Id.* at 13, 17. Ultimately, after noting that the settlement had been "widely publicized" but

22   had received no other objections,[3] the court permitted Skilstaf ten days to opt out of the class before the

23   settlement was entered. *Id.* at 25-27; *see also* Order Approving Class Settl., ex. G to Def. Req. for Jud.

24   Notice. Skilstaf did not opt out of the class at that point.

25       Skilstaf later filed a motion for reconsideration of the court's ruling, but withdrew the motion

26   ―――――――――――――――

27       [3] At one point during the hearing, counsel for several other class members stated, "We've
     received many calls from third-party payors. The fact that this would quiet any and all litigation that
     they could bring in connection with the violations alleged in the complaint that was brought before this
28   Court is well known, well understood[.]" Transcript at 23.

United States District Court
For the Northern District of California

upon entry by the court of a final order stating, "To the extent otherwise permitted by law, nothing in the foregoing Order precludes Skilstaf from raising the same contentions before another court to determine the enforceability or applicability of the 'any other person' language in Paragraph 15 of the Settlement Agreement." Order and Final Judgment, ex. H to Def. RJN, at 10. Accordingly, this Court must now decide whether the covenant not to sue embodied in the *New England Carpenters* settlement is enforceable in this action against Skilstaf.

## II.   Enforceability of Settlement Agreement

Skilstaf contends that the covenant not to sue contained in the *New England Carpenters* settlement agreement cannot be enforced to bar its claims in the present action because the covenant was entered without adequate due process protections. Skilstaf does not dispute that its claims in this action arise from the same scheme at issue in *New England Carpenters* or that its claims against defendants are otherwise within the scope of the provision, if it is found to be enforceable. Rather, Skilstaf's sole assertion is that enforcement of the provision would violate its right to due process.[4]

For a class action judgment to bind an absent class member, it "must provide minimal procedural due process protection." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811 (1985). The due process inquiry typically focuses on the adequacy of the notice provided to absent class members:

> The notice must be the best practicable, reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice should describe the action and the plaintiffs' rights in it. Additionally, we hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an "opt out" or "request for exclusion" form to the court.

*Id.* at 811-812 (internal quotation marks and citations omitted). Skilstaf asserts that the notice provided to class members in the *New England Carpenters* action was insufficient because it "made no mention of the potential impairment of class members' claims against any entity other than McKesson." Pltf. Oppo. to Mot. to Dismiss, at 9.

As recognized by the *New England Carpenters* court itself, the fact that the settlement agreement

---

[4] Defendants argue in their reply brief that Skilstaf is foreclosed from collaterally attacking the covenant not to sue on due process grounds. The Court's analysis assumes, for purposes of discussion, that Skilstaf may challenge the constitutionality of the provision in these proceedings.

contained a broad ban on any future suit based on the same allegations was not flagged by any of the parties until quite late in the game, when the settlement with McKesson was nearly finalized. The opt-out notice sent out after the court had certified the class contained numerous statements indicating only that remaining in the class would impair the ability to assert future claims *against McKesson*:

> This Notice involves claims against McKesson. Opt-Out Notice at 2.

> If you are in either Class and with to stay in the lawsuit, you do not need to do anything. You will not be able to sue McKesson for the claims in this lawsuit and will be bound by the Court's decisions. *Id.*

> You will be bound by the results of the trial of the McKesson Class Action. . . . [Y]ou will not be able to pursue any other lawsuit against McKesson concerning or related in any way to the claims in the McKesson Class Action. *Id.* at 6.

The opt-out notice did not state that remaining in the class would result in a release of claims against potential defendants other than McKesson.

Similarly, although the settlement notice sent to class members after preliminary approval of the settlement quoted the release provision of the agreement, including the "or any other person" portion, the plain language explanation of the provision stated as follows:

> If the Proposed Settlement is approved, the claims against McKesson will be completely "released." This means that you cannot sue McKesson for money damages or other relief based on the claims in the lawsuit or otherwise arising from its alleged involvement in setting AWP for brand drugs in the relevant period.

Settlement Notice, ex. C to Def. RJN, at 5. Moreover, the settlement notice did not provide an additional opportunity for class members to opt out.

If Skilstaf's notice of the terms of the settlement agreement had come solely from these two documents, the Court would likely share Skilstaf's and the *New England Carpenters* court's due process concerns. Skilstaf's argument regarding the deficiencies in the class notice procedures described above, however, fails to mention its unique position in the settlement process. Skilstaf's counsel, apparently through its own diligence, discovered the broad scope of the release provision and specifically applied to the district court for clarification. At the final approval hearing, the court, defense counsel, class counsel, and Skilstaf's counsel had an extensive discussion regarding the provision, after which Skilstaf was given another opportunity to opt out of the settlement. Skilstaf acknowledges in its brief that it chose not to opt out or appeal the district court's decision because it "did not want to prevent the *New*

United States District Court
For the Northern District of California

*England Carpenters* class from immediately receiving the monetary benefits of the McKesson settlement." Pltf. Oppo. at 8.[5]  Skilstaf's own actions undermine its contention that it lacked sufficient notice of the scope of the release.  Having made an informed and strategic decision to remain in the *New England Carpenters* class in order to reap the benefits of the settlement with McKesson, Skilstaf cannot now attempt to circumvent the limitations that attended those benefits.  The Court finds that the covenant not to sue contained in the *New England Carpenters* settlement is enforceable against Skilstaf and bars its claims in the present proceeding.[6]

## III.    Substitution of Class Representative

Skilstaf asserts that, even if the Court finds the covenant not to sue provision enforceable against Skilstaf, the fact that the provision is a covenant – as opposed to a release – means that Skilstaf's rights against defendants are not extinguished.  Rather, Skilstaf contends, "the covenant would simply prevent Plaintiff and any other member of the *New England Carpenters* settlement class from serving as a class representative in this suit."  Pltf. Oppo. at 13.  Skilstaf asks the Court to provide it the opportunity to substitute another class representative that is not subject to the covenant.

Even assuming that Skilstaf is correct in defining the distinction between a release and a covenant not to sue, the Court is not persuaded that it would be appropriate to permit the substitution of another class representative at this stage.  Ordinarily, substitution of class representatives is permitted only after a class has already been certified.  This is because, when the named plaintiff's claim is dismissed at the pleading stage, there is no longer an Article III "case or controversy" between the parties, and the action must be dismissed.  *See, e.g.*, *Kremens v. Bartley*, 431 U.S. 119, 132-33 (1977); *Bd. of Sch. Comm'rs of City of Indianapolis v. Jacobs*, 420 U.S. 128, 129 (1975) (per curiam); *Lierboe*

---

[5] Steve Berman, lead counsel for the class in the *New England Carpenters* case and one of the counsel for Skilstaf in this action, argued to the court during the July 23, 2009 final approval hearing that the $350 million settlement had received "eye-popping" support from the class members.  Neither Mr. Berman nor Mr. Buck, who spoke for Skilstaf at the July 23 hearing, sought rejection of the settlement by the court.

[6] Plaintiffs did not present, and the Court does not decide, the question whether an absent member of the *New England Carpenters* class which had not been privy to the information shared with Judge Saris at the final settlement hearing would be entitled to rescind its agreement and avoid the settlement altogether.

8

*v. State Farm Mut. Auto Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003).  Skilstaf cites two cases in which substitution of the named class representative was permitted prior to certification.  Both of these cases are factually distinguishable and do not present grounds for departing from the usual rule in this action. *See* December 22, 2008 Order, *Strickrath v. Globalstar, Inc.*, No. 07-1941 (Docket No. 146), at 11 (where the named plaintiff's claim was found to be time-barred just prior to the class certification hearing, court allowed 28 days for substitution in the interest of judicial economy); *Wiener v. The Dannon Co.*, 255 F.R.D. 658 (C.D. Cal. 2009) (after class certification hearing and issuance of order finding that all certification requirements had been met other than typicality, court allowed approximately two weeks for substitution of class representative).

    Accordingly, because the covenant not to sue is enforceable against Skilstaf and it is not appropriate at this stage in the proceedings to permit substitution of the named plaintiff, plaintiff's complaint is DISMISSED without leave to amend.[7]  This determination is dispositive of defendants' motions to dismiss and the Court therefore need not address the remaining arguments in the joint motion and Rite Aid's separate motion.

///

---

    [7] Skilstaf asserts that the Court should permit discovery to enable it to determine the true intent of the parties to the *New England Carpenters* settlement agreement.  Skilstaf's argument is unpersuasive.  The course of the proceedings in *New England Carpenters* made quite clear that McKesson intended to bar all future suits based on the same alleged scheme, to avoid the inevitable indemnification proceedings which would follow. There is no indication that class counsel intended something different, either from its court filings or the transcript of the final approval hearing, and no other absent class member objected to the terms of the settlement.  *New England Carpenters'* class counsel Berman is counsel of record in this action, which was filed before the final settlement hearing in *New England Carpenters*.

United States District Court

For the Northern District of California

**CONCLUSION**

For the foregoing reasons, defendants' motions to dismiss are GRANTED with prejudice. (Docket Nos. 47, 77).

**IT IS SO ORDERED.**

Dated: January 13, 2010

_____
SUSAN ILLSTON
United States District Judge